AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of California

**FILED**

**Jun 23, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America

v.

38 Defendants listed in the attached affidavit
incorporated herein

**SEALED**

Case No.   1:25-mj-00072-SAB

)
)
)
)
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or between the date(s) of _____Various_____ in the county of _____Fresno_____ in the

_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| | See Attached Penalty Slip incorporated herein |

This criminal complaint is based on these facts:

See affidavit of FBI Special Agent Ryan Steger incorporated herein

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Ryan Steger, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with
the requirements of Fed.R.Crim.P. 41.1, by internet/
telephone

Date:   **Jun 23, 2025**

_____
*Judge's signature*

City and state:         Fresno, CA

Hon. Stanley A. Boone, U.S. Magistrate Judge
*Printed name and title*

1  MICHELE BECKWITH
   Acting United States Attorney
2  ANTONIO J. PATACA
   ROBERT L. VENEMAN-HUGHES
3  Assistant United States Attorney
   2500 Tulare Street, Suite 4401
4  Fresno, CA 93721
   Telephone: (559) 497-4000
5  Facsimile:  (559) 497-4099

6  Attorneys for Plaintiff
   United States of America

7
                    IN THE UNITED STATES DISTRICT COURT
8
                      EASTERN DISTRICT OF CALIFORNIA
9

10
   UNITED STATES OF AMERICA,                CASE NO.
11
                         Plaintiff,         AFFIDAVIT IN SUPPORT OF COMPLAINT
12
                                            **<u>FILED UNDER SEAL</u>**
13                   v.

14 IGNACIO SANCHEZ,
        AKA "GIDDY";
15 RAY PINON,
        AKA "LIL RAY";
16 BENNY GONZALES,
        AKA "HUERO";
17 RAMONA FELISCIANO;
   JENNIFER ESCOBEDO;
18 ARMANDO ALFARO,
        AKA "WHISPER";
19 LUIS AMARO AGUILAR;
20 SERVANDO AYALA;
   CARLY BALBOA;
21 TIMOTHY CHENOT,
        AKA "LIL WHISPER";
22 BARBARA DIAZ;
   BRIAN FORNES;
23 SUSANNA GARCIA;
24 AXEL GUEVARA,
        AKA "ACTION";
25 CARLOS GUILLEN,
        AKA "C-DOG";
26 GILBERTO HERNANDEZ;
   ANTHONY JEFF;
27      AKA "ENVY";
28 JOSE LICEA;

AFFIDAVIT IN SUPPORT OF COMPLAINT          1

1     AKA "T-BIRD";
VICTORIA LIMA;
2  ANGEL SOLORIO LOPEZ,
   AKA "RONZO";
3  RICARDO LOPEZ,
   AKA "R-DOG";
4  DAMIEN MURPHY;
5  BRIDGETT MURPHY;
RICARDO NUNEZ;
6  LAURA PLASENCIA,
   AKA "LP";
7  GRACIE PULIDO;
8  JESUS QUESADA,
   AKA "ROJO";
9  DANIEL LOUBET ROMERO,
   AKA "TOPO";
10 DEBBIE SANCHEZ;
11 NAUL SANDOVAL;
ANGEL SOTO RIOS;
12 RODRIGO RUVALCABA,
   AKA "REGAL";
13 VICTOR TAMAYO;
ALEXANDER VASQUEZ,
14    AKA "A-DOG";
15 HEMIR ALONSO FEVELA VELAZQUEZ;
HERMAN VIERA JR.;
16 LOUIS BONILLA; and
CRYSTAL MARTINEZ.
17
18 Defendants.
19

## TABLE OF CONTENTS

I.     INTRODUCTION AND AGENT BACKGROUND ........................................................5

    A.    Purpose of Affidavit ...............................................................................5

    B.    Agent Experience ...............................................................................10

    C.    Summary of Investigation ...............................................................................14

II.    PROBABLE CAUSE........................................................................................................16

    A.    Count 1 – Members and Associates of the ENTERPRISE Conspire to Distribute and Possess with Intent to Distribute Controlled Substances ...........................16

        1.    April 17, 2025 – SANCHEZ Arranged Methamphetamine Transaction with AGUILAR, Resulting in the Arrest of ROMERO on April 17, 2025 with 1 pound of methamphetamine...............16

2.   April 22, 2025 – SANCHEZ and ROMERO facilitated the distribution of methamphetamine from AGUILAR to FELISCIANO ....................................28

3.   May 2, 2025 – SANCHEZ and RIOS facilitated the distribution of heroin from TAMAYO to FELISCIANO and GONZALES...............................41

4.   May 4, 2025 – SANCHEZ facilitated the distribution of methamphetamine from R. LOPEZ to GUILLEN...................................52

5.   May 7, 2025 – SANCHEZ facilitated and orchestrated a plot to smuggle narcotics into the Fresno County Jail, in which FELISCIANO, ESCOBEDO, GONZALES, Debbie SANCHEZ, BALBOA, ALFARO, CHENOT, LIMA, DIAZ, and JEFF participated and/or conspired to complete ..................................................................61

6.   May 8, 2025 – SANCHEZ, A. LOPEZ, PLASENCIA, B. MURPHY, D. MURPHY, and SANDOVAL Conspired to Distribute and Possess with Intent to Distribute Methamphetamine into a Custodial Facility .................94

7.   May 12, 2025 – SANCHEZ, FELISCIANO, ESCOBEDO, PULIDO, GARCIA, L. PLASENCIA, B. MURPHY, D. MURPHY, RUVALCABA, and SANDOVAL Procured a Pound of Methamphetamine, and Conspired to Distribute and Possess with Intent to Distribute Controlled Substances into a Custodial Facility..................104

8.   May 15, 2025 – SANCHEZ conspired with HERNANDEZ to distribute methamphetamine to ESCOBEDO, and conspired with RIOS to distribute heroin to ESCOBEDO............................................................121

9.   May 22, 2025 – SANCHEZ facilitated the distribution of methamphetamine from HERNANDEZ to ESCOBEDO and FELISCIANO ................................................................................................133

10.  May 22, 2025 – SANCHEZ and GONZALES facilitated the distribution of methamphetamine from HERNANDEZ to BONILLA and MARTINEZ ..................................................................................................140

11.  June 4, to June 9, 2025 – Ignacio SANCHEZ Arranged Two Methamphetamine Transactions with Luis Amaro AGUILAR Resulting in the Seizure of a Half Pound of Methamphetamine ......................151

12.  June 10, 2025 – SANCHEZ facilitated the distribution of methamphetamine from an uncharged male to PULIDO ....................................160

B.   Count 2 - PINON Possesses and Distributes Methamphetamine ....................................166

C.   Count 3 - VELAZQUEZ and PINON Distribute and Possess with Intent to Distribute Methamphetamine........................................................................168

D.   Count 4 – GUILLEN Conspires to Traffic in Firearms and Count 5 – VIERA Possesses a Firearm as a Felon ........................................................................172

E.   Count 6 – LICEA, AYALA, VASQUEZ, and FORNES Conspire to Deal in Firearms without a License and Count 7 - VASQUEZ and FORNES Conspire to Traffic in Firearms ........................................................................179

F.    Count 8 – QUESADA Illegally Possessed and Distributed a Firearm. ...........................183

III.    CONCLUSION........................................................................................................................188

1    I, Ryan Steger, being first duly sworn under oath, depose and say:

2    **I.    INTRODUCTION AND AGENT BACKGROUND**

3    A.    **Purpose of Affidavit**

4    1.    I make this Affidavit in support of a complaint charging the individuals below of the

5    following violations:

6    a)    **Count 1 - Conspiracy to Distribute and Possess with Intent to Distribute a**

7    **Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 841(a)**:

8    i.    **Ignacio SANCHEZ (SANCHEZ)**, aka "Giddy" is

9    currently incarcerated at Salinas Valley State Prison, is the user of

10    (279) 386-7769 (Target Telephone 6) and is a user of (213) 334-1252

11    (Target Telephone 18). **SANCHEZ** is the *de facto* head of the

12    **ENTERPRISE**[1].

13    ii.    **Benny GONZALEZ (GONZALES)**, aka "Huero" is one

14    of Ignacio **SANCHEZ**'s lieutenants, is a heroin distributor and

15    transporter who lives and works with his paramour Ramona

16    **FELISCIANO** at the direction of **SANCHEZ**, and is the user of (559)

17    961-6401 (Target Telephone 5).

18    iii.    **Ramona FELISCIANO (FELISCIANO)** is involved in

19    the day-to-day movement of money and transportation of various types

20    of narcotics at **SANCHEZ**'s direction, and lives with her paramour

21    Benny **GONZALES**.

22    iv.    **Jennifer ESCOBEDO (ESCOBEDO)** is involved in the

23    day-to-day movement of money and transportation of various types of

24    narcotics at **SANCHEZ**'s direction. **ESCOBEDO** is also the user of

25    (831) 596-0869 (Target Telephone 3).

26

27    ─────────────

28    [1] For the purpose of this affidavit, I will refer to the Bulldog criminal street gang alliance of the Huron Dog Life Bulldogs (HDL), Coalinga Dog Life Bulldogs (CDL), and San Joaquin Ruthless Perro Bulldogs (SRP) as "the **ENTERPRISE**".

v.    **Armando ALFARO (ALFARO)**, aka "Whisper" procured various types of narcotics at **SANCHEZ**'s direction and is currently incarcerated at the Fresno County Jail.

vi.    **Luis Amaro AGUILAR (AGUILAR)** is a regular supplier of methamphetamine to members of the **ENTERPRISE** and is a member of the ENTERPRISE as well**.**

vii.    **Carly BALBOA (BALBOA)** is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction.

viii.    **Timothy CHENOT (CHENOT)**, aka "Lil Whisper" conspired with **SANCHEZ** to traffic narcotics into the Fresno County Jail.

ix.    **Barbara DIAZ (DIAZ)** conspired to traffic narcotics.

x.    **Susanna GARCIA (GARCIA)** is an associate of **SANCHEZ** and is involved in the movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction.

xi.    **AXEL GUEVARA (A. GUEVARA)**, aka "Action" attempted to distribute controlled substance into the Fresno County Jail at the direction of **SANCHEZ** and **D. MURPHY. A. GUEVARA** is also the user of (559) 404-9901 (Target Telephone 25).

xii.    **Carlos GUILLEN (GUILLEN)**, aka "C-Dog" is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction. **GUILLEN** is also involved in the sale and distribution of firearms. **GUILLEN** is also the user of (559) 508-6409 (Target Telephone 9).

xiii.    **Gilberto HERNANDEZ (HERNANDEZ)** is a regular supplier of controlled substances to members of the **ENTERPRISE.**

xiv.    **Anthony JEFF (JEFF)**, aka "Envy" conspired to traffic

narcotics.

xv.    **Victoria LIMA (LIMA)** conspired to traffic narcotics.

xvi.    **Angel Solorio LOPEZ (A. LOPEZ)**, aka "Rondo" attempted to distribute controlled substance into the Fresno County Jail at the direction of **SANCHEZ** and **D. MURPHY**. **A. LOPEZ** is also the user of (559) 818-8601 (Target Telephone 8).

xvii.    **Ricardo LOPEZ (R. LOPEZ)**, aka "R-Dog" is a regular supplier of methamphetamine to **SANCHEZ** and his associates. **R. LOPEZ** is the user of (559) 519-8338 (Target Telephone 20).

xviii.    **Damien MURPHY (D. MURPHY)** conspired to traffic controlled substances into the Fresno County Jail.

xix.    **Bridgett MURPHY (B. MURPHY)** conspired to traffic controlled substances into the Fresno County Jail.

xx.    **Ricardo NUNEZ (NUNEZ)** conspired to traffic controlled substances into the Fresno County Jail. **NUNEZ** is currently incarcerated at the Fresno County Jail.

xxi.    **Laura PLASENCIA (L. PLASENCIA)** aka "LP" is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction. **L. PLASENCIA** is also the user of (559) 800-4470 (Target Telephone 12) and frequently uses it to facilitate **SANCHEZ**'s communication with sources of supply and other members of the **ENTERPRISE**.

xxii.    **Gracie PULIDO (PULIDO). PULIDO** is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction.

xxiii.    **Daniel Loubet ROMERO (ROMERO)**, aka "Topo" is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ**'s direction.

xxiv.    **Debbie SANCHEZ (D. SANCHEZ)** is involved in the day-to-day movement of money and transportation of various types of narcotics at **Ignacio SANCHEZ's** direction.

xxv.    **Naul SANDOVAL (SANDOVAL)** conspired to traffic controlled substances into the Fresno County Jail.

xxvi.    **Angel Soto RIOS (RIOS)** distributed heroin to members of the **ENTERPRISE**, as well as coordinated the procurement of methamphetamine between **SANCHEZ** and a supplier.

xxvii.    **Rodrigo RUVALCABA (RUVALCABA)**, aka "Regal" is involved in the day-to-day movement of money and transportation of various types of narcotics at **SANCHEZ's** direction. **RUVALCABA** is also the user of (559) 210-2375 (Target Telephone 21).

xxviii.    **Victor TAMAYO (TAMAYO)** is a regular supplier of controlled substances to members of the **ENTERPRISE. TAMAYO** is also the user of (559) 776-7731 (Target Telephone 17).

xxix.    **Louis BONILLA (BONILLA)** is an associate of **SANCHEZ** who buys and sells narcotics on **SANCHEZ's** behalf.

xxx.    **Crystal MARTINEZ (MARTINEZ)** is an associate of **SANCHEZ** who buys and sells narcotics on **SANCHEZ's** behalf.

b)    **Count 2 - Distribution and Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a):**

i.    **Ray PINON (PINON)**, aka "Lil Ray" is one of **SANCHEZ's** lieutenants, a methamphetamine distributor, and is the user of (559) 931-4104 (Target Telephone 1) and (559) 806-4347 (Target Telephone 15).

c)    **Count 3 - Distribution and Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a):**

i.    **Hemir Alonso Fevela VELAZQUEZ (VELAZQUEZ)**  is a regular

1    supplier of controlled substances to **PINON.  VELASQUEZ** is also

2    the user of (213) 795-3500 (Target Telephone 14).

3        ii.    **Ray PINON (PINON)** is one of **SANCHEZ's** lieutenants, a

4    methamphetamine distributor, and is the user of (559) 931-4104

5    (Target Telephone 1) and (559) 806-4347 (Target Telephone 15).

6    d)    <u>**Count 4 – Conspiracy to Traffic in Firearms, in violation of Title 18, United States**</u>

7    <u>**Code, Section 933(a)(1), (2), and (3):**</u>

8        i.    **Carlos GUILLEN (GUILLEN)** is involved in the sale and

9    distribution of firearms to members of the **ENTERPRISE.**

10    **GUILLEN** is also the user of (559) 508-6409 (Target Telephone 9).

11    e)    <u>**Count 5 – Possession of a Firearm by a Felon, in violation of Title 18, United States**</u>

12    <u>**Code, 922(g)(1):**</u>

13        i.    **Herman VIERA JR (VIERA)** possessed a firearm while involved in

14    the sale and distribution of firearms to members of the

15    **ENTERPRISE.**

16    f)    <u>**Count 6 – Conspiracy to Deal in Firearms without a License, in violation of Title 18,**</u>

17    <u>**United States Code, Sections 371 and 922(a)(1)(a):**</u>

18        i.    **Servando AYALA (AYALA)** is involved in the sale and distribution of

19    firearms to members of the **ENTERPRISE.**

20        ii.    **Jose LICEA (J. LICEA)**, aka "T-Bird" is involved in the sale and

21    distribution of firearms to members of the **ENTERPRISE. J. LICEA** is also

22    the user of 559-410-2221 (Target Telephone 2221), (559) 880-5089 (Target

23    Telephone 26) and (559) 880-3519 (Target Telephone 29)

24        iii.    **Alexander VASQUEZ (VASQUEZ)** is involved in the sale and distribution

25    of firearms to members of the **ENTERPRISE. VASQUEZ** is also the user of

26    (559) 895-2027 (Target Telephone 10).

27        iv.    **Brian FORNES (FORNES)** is involved in the sale and distribution of

28    firearms to members of the **ENTERPRISE. FORNES** is also the user of

(559) 742-9396 (Target Telephone 23).

g)      **Count 7 – Conspiracy to Traffic in Firearms, in violation of Title 18, United States**

**Code, Section 933(a)(1), (2), and (3):**

i.      **Alexander VASQUEZ (VASQUEZ)** is involved in the sale and distribution

of firearms to members of the **ENTERPRISE. VASQUEZ** is also the user of

(559) 895-2027 (Target Telephone 10).

v.      **Brian FORNES (FORNES)** is involved in the sale and distribution of

firearms to members of the **ENTERPRISE. FORNES** is also the user of

(559) 742-9396 (Target Telephone 23).

h)      **Count 8 -- Possession of a Firearm by a Felon, in violation of Title 18, United States**

**Code, 922(g)(1):**

vi.     **Jose QUESADA (QUESADA)**, aka "Rojo" possessed a firearm while

involved in the sale and distribution of firearms to members of the

**ENTERPRISE. QUESADA** is also the user of (559) 796-3656 (Target

Telephone 27).

B.      **Agent Experience**

2.      I am an "investigative or law enforcement officer" within the meaning of Title 18, United

States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to

conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code,

Section 2516, and Title 21, United States Code.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and I am a "federal

law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have

been a Special Agent with the FBI since September 2018.  I received basic law enforcement instruction

at the FBI Academy from approximately September 2018 through February 2019.  I have been assigned

to FBI's Safe Streets Task Force (SSTF) in Fresno, CA since February 2019.  In 2019, I completed the

California Department of Justice's Electronic Surveillance Certification course, which authorizes my

participation in California state wire investigations for a period of five years. I then renewed that

authorization in February 2024.

4. Prior to joining the FBI, I was a prosecutor at the Kane County State's Attorney's Office in Kane County, Illinois from approximately November 2014 until September 2018. In that position, I prosecuted offenses ranging from traffic infractions to felony-level violent offenses, drug offenses, burglaries, and gang-related offenses, and have participated in numerous investigations of the same. As a prosecutor and a Special Agent, I have attended numerous trainings related to investigating and prosecuting gang-related crimes, which most recently includes the MAGEC Regional Gang Summit in Fresno, CA in March 2025.

5. I am currently assigned to the FBI Sacramento Division – Fresno Resident Agency Violent Crime Squad, and I investigate violations of Titles 18 and 21 of the United States Code and Title 28 of the Federal Code of Regulations.

6. As a Special Agent, I have investigated and wiretapped numerous members and associates of criminal street gangs in California's Central Valley, spoken with numerous criminal street gang members, cooperators, witnesses, confidential human sources ("CHSs"), and defendants, and reviewed legal documents and reports describing various Fresno-based street gangs and prison gangs and their activities. Specifically, I have obtained intelligence regarding criminal prison gangs, criminal street gangs, drug trafficking, illegal firearms trafficking, and human trafficking. Additionally, I have reviewed the supporting affidavits of all the warrants and/or orders set out below and have spoken at length with members of the investigative team who have extensive experience specifically with Bulldog criminal street gang cliques. Additionally, I have previously participated in several wiretaps involving Sureno criminal street gangs, Norteno criminal street gangs, the Mexican Mafia criminal prison gang, the Nuestra Familia criminal prison gang, the Aryan Brotherhood criminal prison gang, and other various criminal street gangs in California's Central Valley area. As part of those investigations, I reviewed tens of thousands of gang-related calls and messages and have authored numerous affidavits supporting complaints, residential search warrants, pen register/trap and trace orders, precision location warrants, vehicle trackers, Title III wiretap orders, and Title III audio listening device orders based on that intelligence. Based on these experiences, I am aware of common themes, slang, and *modus operandi* of gangs in California's Central Valley, which includes the Bulldog criminal street gang alliance of the Huron Dog Life Bulldogs (HDL), Coalinga Dog Life Bulldogs (CDL), and San Joaquin

Ruthless Perro Bulldogs (SRP) ("the **ENTERPRISE**") and the general manner in which these gangs operate.

7.      I have participated in the prosecution of Racketeer Influenced and Corrupt Organization Act ("RICO") violations targeting criminal street gangs and criminal prison gangs in this judicial district since November 2019.  I am familiar with street- and leadership-level "tax" collection activities of these gangs, specifically those which involve drug trafficking, illegal firearms trafficking, and violent activity in furtherance of their goals.  I am familiar with the types and amount of profits made by firearms traffickers and gun traffickers and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal dealings.  These methods include the use of telephones, cellular telephones, wireless communication technology, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and the use of coded or vague communications in an attempt to thwart law enforcement interference with illegal transactions.  I have also surveilled and observed gang members and contraband traffickers at length and have discussed with other experienced investigators the lifestyle, appearances, and habits and methods of gang members and contraband traffickers. I have also previously participated in investigations that utilized multiple Title III wiretaps and/or audio listening devices and am familiar with various investigative methods used in conjunction with Title III methods.

8.      Additionally, I have become knowledgeable about the investigative techniques that are useful and viable in investigations involving criminal **ENTERPRISE**s and contraband traffickers and those that are not.  I have also consulted with other investigators who have extensive training and experience in criminal **ENTERPRISE**s and financial investigations.  I have executed numerous search warrants for gang and narcotics investigations, seeking evidence of the trafficking of controlled substances, weapons violations, gang indicia, and violent crimes.  I have participated in multiple gang, narcotic, firearms, and human trafficking investigations which utilized court-ordered interceptions of wire, electronic, and/or oral communications to assist in dismantling violent criminal street gangs and drug and/or firearms trafficking organizations.

9.      During my review of monitoring and review of legally intercepted phone calls, text messages, social media postings, social media messages, and oral conversations in previous cases, I have

noted several slang terms used in reference to illegally-obtained items or illegally-possessed items. I have learned that the purpose of the use of slang during phone calls, social media messages, and text messages is to obstruct law enforcement in their investigations. During this investigation, the investigative team has reviewed hundreds and/or thousands of social media communications received from search warrants and has observed that the **ENTERPRISE** members and associates referenced below generally align with other Central Valley gang-related investigations in how they attempt to encode their communications.

10.    Some members of the **ENTERPRISE** speak Spanish, and occasionally utilize the Spanish language to communicate with each other. I speak and understand Spanish in a very limited capacity. Throughout this investigation, law enforcement linguists and certified Spanish-speaking members of the investigative team have been employed to translate communications between **ENTERPRISE** members, witnesses, Confidential Human Sources (CHS), and/or in reviewing social media communications.

11.    Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. When I use the term "investigative team", I am referring to the Fresno County Sheriff's Office; the Federal Bureau of Investigation; the Bureau of Alcohol, Tobacco, Firearms, and Explosives; Homeland Security Investigations; the Drug Enforcement Administration; and the following state and local participating agencies: the California Highway Patrol, the California Department of Justice, the California Department of Corrections and Rehabilitation, the Fresno Sheriff's Office, the Fresno Police Department, the Fresno County District Attorney's Office, and other participating law enforcement agencies.

12.    Since this affidavit is being submitted for the limited purpose of securing a complaint and arrest warrants, I have not included details of every aspect of this investigation to date in describing the

probable cause for issuance of these warrants.  Facts not set forth herein are not being relied on in reaching my conclusion that a warrants should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this complaint.

      **C.**    **Summary of Investigation**

      13.    On February 8, 2024, Members of the Multi-Agency Gang Enforcement Consortium (MAGEC) began a focused investigation into the Bulldog criminal street gang operating in Fresno County with a specific focus on the ongoing criminal activities of the Bulldog cliques Huron Dog Life (HDL), Coalinga Dog Life (CDL) and San Juaquin Ruthless Perros (SRP) (hereinafter "the **ENTERPRISE**").  Since that date, the investigation has expanded to include the Fresno Police Department, the Federal Bureau of Investigation, Homeland Security Investigations, the California Department of Justice, and the California Department of Corrections and Rehabilitation.

      14.    During the course of this investigation, a series of wiretap applications were authorized and are further described as follows.

      a)    On April 11, 2025, the Honorable Jennifer L. Thurston authorized the interception of communications to and from (559) 931-4104 (Target Telephone 1 or TT1), used by Ray **PINON**; (559) 442-9272 (Target Telephone 2 or TT2), used by an uncharged individual; (831) 596-0869 (Target Telephone 3 or TT3), used by Jennifer **ESCOBEDO**; (559) 341-3196 (Target Telephone 4 or TT4), used by an uncharged individual; and (279) 386-7769 (Target Telephone 6 or TT6), used by Ignacio **SANCHEZ**. The wire intercepts were initiated on April 14, 2025.

      b)    On April 22, 2025, the Honorable Jennifer L. Thurston authorized the interception of communications to and from (559) 961-6401 (Target Telephone 5 or TT5), used by Benny **GONZALES**), (559) 895-2773 (Target Telephone 7 or TT7), used by an uncharged individual; and (559) 818-8601 (Target Telephone 8 or TT8), used by Angel Solorio **LOPEZ**. The wire intercepts were initiated on April 22, 2025.

      c)    On May 7, 2025, the Honorable Jennifer L. Thurston authorized the interception of communications to and from (559) 508-6409 (Target Telephone 9 or TT9), used by Carlos **GUILLEN**; (559) 895-2027 (Target Telephone 10 or TT10), used by Alexander **VASQUEZ**; (559) 404-9386 (Target Telephone 11 or TT11), used by an uncharged individual ; (559) 800-

4470 (Target Telephone 12 or TT12), used by Laura **PLASENCIA**; (559) 821-3314 (Target Telephone 13 or TT31), used by an uncharged individual; and (213) 795-3500 (Target Telephone 14 or TT14), used by Hemir **VELAZQUEZ**. The intercepts were initiated on May 7, 2025.

d)      On May 9, 2025, the Honorable Jennifer L. Thurston authorized the interception of (559) 806-4347 (Target Telephone 15 or TT15), used by Ray **PINON**. The intercepts were initiated on May 10, 2025.

e)      On May 13, 2025, the Honorable Jennifer L. Thurston authorized the continued interception of (831) 596-0869 (Target Telephone 3 or TT3), used by Jennifer **ESCOBEDO**; (559) 341-3196 (Target Telephone 4 or TT4), used by an uncharged individual; and (279) 386-7769 (Target Telephone 6 or TT6), used by Ignacio **SANCHEZ**.

f)      On May 26, 2026, the Honorable Jennifer L. Thurston authorized interception of communications to and from (559) 796-3656 (Target Telephone 27 or TT27), used by Jesus **QUESADA**. The intercepts were initiated on May 26, 2025.

g)      On May 30, 2025, the Honorable Jennifer L. Thurston authorized the continued interception of communications to and from (559) 961-6401 (Target Telephone 5 or TT5), used by Benny **GONZALES**); and (559) 818-8601 (Target Telephone 8 or TT8), used by Angel Solorio LOPEZ; as well as the initial interception of communications to and from (559) 803-7096 (Target Telephone 16 or TT16), used by an unidentified male (**HERNANDEZ**); (559) 776-7731 (Target Telephone 17 or TT17), used by Victor **TAMAYO**; (213) 334-1252 (Target Telephone 18 or TT18), used by Ignacio **SANCHEZ**; (559) 882-8428 (Target Telephone 19 or TT19), used by an uncharged individual ; (559) 519-8338 (Target Telephone 20 or TT20), used by Ricardo **LOPEZ**; (559) 210-2375 (Target Telephone 21 or TT21), used by Rodrigo **RUVALCABA**; (559) 573-5821 (Target Telephone 22), used by an uncharged individual; (440) 742-9396 (Target Telephone 23 or TT23), used by Brian **FORNES**; (559) 776-2856 (Target Telephone 24 or TT24), used by an uncharged individual (UM369); (559) 404-9901 (Target Telephone 25 or TT25), used by Axel GUEVARA; and (559) 880-5089 (Target Telephone 26 or TT26), used by Jose **LICEA**. Intercepts on the initial authorizations commenced on May 30, 2025.

h)      On June 5, 2025, the Honorable Jennifer L. Thurston authorized the continued interception of communications to and from (831) 596-0869 (Target Telephone 3 or TT3), used by Jennifer **ESCOBEDO**; (279) 386-7769 (Target Telephone 6 or TT6), used by Ignacio **SANCHEZ**; (559) 508-6409 (Target Telephone 9 or TT9), used by Carlos **GUILLEN**; (559) 895-2027 (Target Telephone 10 or TT10), used by Alexander **VASQUEZ**; (559) 404-9386 (Target Telephone 11 or TT11), used by an uncharged individual ; (559) 800-4470 (Target Telephone 12 or TT12), used by Laura **PLASENCIA**; (559) 821-3314 (Target Telephone 13 or TT31), used by an uncharged individual; (213) 795-3500 (Target Telephone 14 or TT14), used by Hemir **VELAZQUEZ**; and (559) 806-4347 (Target Telephone 15 or TT15), used by Ray **PINON**; as well as the initial interception of communications to and from (559) 894-9222 (Target Telephone 28 or TT28), used by Ricardo **LOPEZ**; and (559) 880-3519 (Target Telephone 29 or TT29), used by Jose **LICEA**. Intercepts on the initial authorizations commenced on June 5, 2025.

## II.      **PROBABLE CAUSE**

A.      **Count 1 – Members and Associates of the ENTERPRISE Conspire to Distribute and Possess with Intent to Distribute Controlled Substances**

        1.      **April 17, 2025 – SANCHEZ Arranged Methamphetamine Transaction with AGUILAR, Resulting in the Arrest of ROMERO on April 17, 2025 with 1 pound of methamphetamine.**

15.      On April 17, 2025, at 9:45 AM, the investigative team intercepted a call between Ignacio **SANCHEZ**, using (279) 386-7769[2] (TT6) and Jennifer **ESCOBEDO**, using (831) 596-0869[3] (TT3). During this call, **SANCHEZ** spoke to **ESCOBEDO** about **SANCHEZ's** inventory and how it was depleted.  **ESCOBEDO** then used (831) 596-0869 (TT3) to call Ramona **FELISCIANO** using (559)

---

[2] The investigative team learned via intelligence gathered from a Confidential Human Source (CHS-1) that **SANCHEZ** possessed and utilized a contraband cell phone while incarcerated at the Salinas Valley State Prison.  Through analysis of historical call detail records and precision location data, the contraband cell phone utilized by **SANCHEZ** was found to be (279) 386-7769.  This has been corroborated by intercepted calls in which **SANCHEZ** is named as "Giddy" which I know to be the street moniker of **SANCHEZ**.

[3] The investigative team learned via intelligence gathered from a Confidential Human Source (CHS-2) that **ESCOBEDO's** cell phone number was (831) 596-0869.  This was corroborated on May 12, 2025, when members of the investigative team intercepted calls on (831) 596-0869 while simultaneously physically surveilling **ESCOBEDO**.

401-8633[4] (TT8633), at **SANCHEZ's** request.  **ESCOBEDO** then merged the call with **FELISCIANO** to the call with **SANCHEZ**, so that all three subjects could speak on a three-way call.  The following is a transcript of the pertinent portions of that call:

| | [Beginning at the 7:20 minute mark] |
|---|---|
| **SANCHEZ** | I'm going to have to go to Hanford and get the rest that I have, right there in the cuts, and then I have to – within that time – which today til – til then, I have to go search for a good uh – uh – uh deal.  I have to go shopping.  And I have to go shopping with – for at least 2 or 3 because I can't be like this.  Without – without it.  Without it like that, without food. |
| **FELISCIANO** | Si Si. |
| | [Ending at the 7:51 minute mark] |

16.     During the course of this investigation, I have learned that **SANCHEZ** and his associates use food terminology to describe illicit narcotics.  I believe **SANCHEZ** and his associates use these vague terms to attempt to thwart law enforcement's ability to arrest and prosecute them for trafficking illicit narcotics.  Therefore, I believe the term, "shopping," when used in this context, to mean **SANCHEZ** intended to purchase illicit narcotics.  I also believe that when **SANCHEZ** used the term, "food," **SANCHEZ** is referring to illicit narcotics.  I know the term "cuts" to mean a location that is geographically removed from a city.  I also know that when **SANCHEZ** stated, "for at least two or three," **SANCHEZ** is referring to two or three pounds of an illicit narcotic.

17.     Therefore, I believe **SANCHEZ** communicated to **FELISCIANO** that **SANCHEZ** needed to procure additional narcotics and hoped to get the narcotics for a good price.  **SANCHEZ** further related that **SANCHEZ** wanted to purchase two or three pounds of narcotics because **SANCHEZ's** inventory of narcotics was currently low.

18.     After the conclusion of this call, **SANCHEZ** used (279) 386-7769 to contact multiple individuals to procure methamphetamine.  For example, on April 17, 2025, at 10:53 AM, **SANCHEZ** used (279) 386-7769 (TT6) to call **Carly BALBOA**[5] on (559) 413-8584 (TT 8584).  During this call,

---

[4] On March 11, 2025, members of the investigative team established physical surveillance on **FELISCIANO**. Members of the investigative team called (559) 401-8633 and spoke with **FELISCIANO** while surveilling her.  Therefore, I believe **FELISCIANO** is the user of (559) 401-8633.

[5] Based on my knowledge of the investigation, I know that **Carly BALBOA** is **Ignacio SANCHEZ's** sister.  In later calls, **SANCHEZ** identifies the user of (559) 413-8584 (TT 8584) as his sister.

1  SANCHEZ asked BALBOA if she was able to get a CashApp; BALBOA related she had obtained a

2  CashApp account and currently had $765 in it. I entered (559) 413-8584 (TT 8584) into CashApp, a

3  commonly used money sending mobile phone application, which indicated that (559) 413-8584 (TT

4  8584) was associated with the account name "Carli Balboa" and the account handle "$xocarlii". Based

5  on my training and experience, I know that gang members and contraband traffickers will maintain their

6  true identity in a money sending / receiving application like "CashApp" so that members of their family

7  and friend group can confidently transfer money between themselves. BALBOA then explained to

8  SANCHEZ what narcotics were currently on hand in BALBOA's possession. The following is a

9  transcribed portion of that call:

| | [Beginning at the 3:41 minute mark] |
|---|---|
| SANCHEZ | What was it? |
| BALBOA | Ok there uh – so – you had uh – 14 moms – uh – we got – we got, 300 cause we sold – she sold – uh – 1, 2… |
| SANCHEZ | Yeah. |
| BALBOA | Whatever. And then there's – uh – six left, but she's going to ask you if she could have one for one hundred or something like that. And then there's going to be two left. And she reason, she said the reason why she don't get it from here is 'cause – uh – you said – uh – well she – 'cause she – she – she got it more… |
| SANCHEZ | Ok, so how much is it right now? |
| BALBOA | Six. |
| SANCHEZ | Six full ones? |
| BALBOA | Yeah. Whatever I don't – do you say there 50s. |
| SANCHEZ | Oh – oh – ok. Oh, there's only – there's only 6 left? |
| BALBOA | Yeah. Well, cuz she's been selling – that's what all the – all the money is coming from. |
| SANCHEZ | OK… |
| BALBOA | Cuz she has been selling them. All the little ones – and then – those other ones – and yeah. |
| … | [This conversation continued as BALBOA and SANCHEZ rehashed the inventory and finances available within BALBOA's custody. During this time, BALBOA told SANCHEZ they have sold all of the "twenty-five dollar ones," and only have, "six of the fifty dollar ones left." SANCHEZ communicated to BALBOA that SANCHEZ will call BALBOA regarding procuring more narcotics]. |
| | [Ending at the 4:53 minute mark] |

26      19.     I know from my training and experience that drug traffickers often use vague or

27  innocuous language to communicate with their co-conspirators, as is evident during this call. I believe

28  that when BALBOA stated there were "6 left," BALBOA was referring to six individually packaged

1 narcotics.  Later in the call, **BALBOA** clarified to **SANCHEZ** that these packages sell for $50 apiece.

2 **SANCHEZ** then related they will get $300 from those remaining.  Using this arithmetic and the

3 interpretation that **BALBOA** is providing a report to **SANCHEZ** on individually packaged narcotics

4 sold for $50 apiece, I deduced that the "14 moms" produced a profit of $700, which is reflected in

5 **BALBOA's** CashApp.

6     20.    Therefore, I believe this conversation between **SANCHEZ** and **BALBOA** centered

7 around **BALBOA** providing a summary of available funds and narcotics to **SANCHEZ**.  More

8 importantly, I also believe that **BALBOA** and "Mom[6]" are likely storing and selling narcotics on

9 **SANCHEZ's** behalf at **BALBOA's** residence in Hanford, CA.  Based on this call and the prior call with

10 **ESCOBEDO** and **FELISCIANO**, I believe when **SANCHEZ** stated he needs to go to Hanford "and get

11 the rest that I have," **SANCHEZ** is referring to the narcotics at Carli **BALBOA's** residence located  in

12 Hanford, CA.

13     21.    On April 7, 2025, at 12:43 PM, **SANCHEZ** used (279) 386-7769 (TT6) to call

14 **ROMERO** on (559) 821-3633[7] (TT 3633).  During this call, **SANCHEZ** simply stated, "I'm going to

15 need a ride to Fresno, right?"  **ROMERO** responded, "Oh, ok."  The call ended as **SANCHEZ** told

16 **ROMERO** he planned to call **ROMERO** back in 20 to 30 minutes.[8]

17     22.    On April 17, 2025, at 1:55 PM, members of the investigative team intercepted a call

18 placed by **SANCHEZ** using (279) 386-7769 (TT6) to (559) 880-7337 (TT 7337), used by an Uncharged

19 Co-Conspirator, hereinafter "UCC1".  During the course of this investigation, I learned that UCC1 is the

20 daughter of **ROMERO**.  Prior to this call, UCC1 sent **SANCHEZ** a text message on (279) 386-7769

21 (TT6) indicating **ROMERO's** vehicle was undrivable.  The following is a transcript of the pertinent

22 portions of the call:

23

| [Beginning of Call] | |
|---|---|
| **SANCHEZ** | What's upper? |

24

25     [6] The investigative team later identified **Carly BALBOA** as **Ignacio SANCHEZ's** sister and **Debbie SANCHEZ** as

26 **Ignacio SANCHEZ's** mother.  Due to the fact that **SANCHEZ** and **BALBOA** likely share the same mother, as well as the calls set out in sections below, I believe **Debbie SANCHEZ** to be "Mom" during this call.

    [7] **ROMERO** was later detained and provided the phone number (559) 821-3633 (TT 3633) as his cell phone

27 number.

    [8] This call occurred in a mix of the Spanish and English language.  Spanish speaking members of the investigative

28 team translated the Spanish language portions of this call into the English language.

| | |
|---|---|
| UCC1 | Hello. |
| **SANCHEZ** | Yeah, wh-what happened right now? |
| UCC1 | Oh that my Dad, he told me – he texted me right now, he told me to tell you that he wont be able to go for it. Where was he going to go? |
| **SANCHEZ** | To Fresno. |
| UCC1 | Oh… to go pick up – uh – shit? |
| UCC1 | Yeah. |
| UCC1 | Oh shit.  He said he is going to try fix it.  But he's going to get someone to fix it. |
| … | [The conversation continues, as **SANCHEZ** and UCC1 discuss alternate methods in which **ROMERO** can procure a truck on **SANCHEZ's** behalf.  **ROMERO** is then added to the call by UCC1.  UCC1 then acts as a translator between **SANCHEZ** and UCC1, as the two discuss using **ROMERO's** truck for the trip to Fresno.  The call ends as **SANCHEZ** agreed to send **ROMERO** extra money to offset the cost of gas in **ROMERO's** truck. |
| | [End of Call] |

23.     I know from my training and experience that the term, "shit," refers to methamphetamine. Based on that knowledge, I believe that when UCC1 asked **SANCHEZ** "to go pick up shit?" UCC1 was actually asking **SANCHEZ** if **ROMERO** was going to Fresno to pick up narcotics, to which **SANCHEZ** confirmed.  Therefore, I believe **SANCHEZ** placed the call to UCC1 to help **SANCHEZ** effectively communicate to **ROMERO** what **SANCHEZ** needed from **ROMERO**.  I believe **SANCHEZ** intended to send **ROMERO** to Fresno to purchase narcotics on **SANCHEZ's** behalf, and that UCC1 was aware of the purpose of the trip, and relayed this information to **ROMERO**.

24.     On April 17, 2025, at approximately 2:07 PM, members of the investigative team intercepted a call placed by **SANCHEZ** using (279) 386-7769 (TT6) to **FELISCIANO** using (559) 401-8633 (TT 8633).  **SANCHEZ** told **FELISCIANO**, "Prima I'm paying – I've never paid this much for – for – for just 'Cochina.' That's why I'm – but I gotta get it right – right now because a lot of…" **FELISCIANO** asked, "How much?"  **SANCHEZ** then stated, "I'm going to pay a lot, I don't even want to say how much I'm going to pay, but I'm going to pay a lot."

25.     I know from my training and experience that "Cochina" is used by **SANCHEZ** as well as other drug traffickers and is code for methamphetamine. Therefore, I believe **SANCHEZ** further corroborated my belief that **SANCHEZ** intended to purchase methamphetamine during this portion of the call.

26.     Further into the conversation, **FELISCIANO** asked **SANCHEZ**, "What happened to

fucking Topochito[9]?" **SANCHEZ** then stated, "He – he – he's going to go for me with – with – with – with my celly's people right now.  I – I – I have to go that route right now.  You know what I mean?

27.    I know from my training and experience that "celly" is short for "cellmate."  In the jail and prison systems, incarcerated persons are often required to share their housing unit, or cell, with another individual.  Incarcerated person's often call these individuals their "cellmate" or "celly."  Therefore, I believe **SANCHEZ** communicated to **FELISCIANO** that not only is **ROMERO** purchasing methamphetamine on **SANCHEZ's** behalf, but **SANCHEZ** plans to purchase the methamphetamine through a source of supply connected to **SANCHEZ's** cellmate.

28.    Over the next several hours, **SANCHEZ** coordinated the transfer of funds between **SANCHEZ's** associates and Benny **GONZALES'** CashApp account.  At approximately 2:48 PM, **SANCHEZ** used (279) 386-7769 (TT6) to call **GONZALES** on (559) 961-6401[10] (TT5).  During this call, **SANCHEZ** told **GONZALES**, "My sister is going to send the money."  I know that **SANCHEZ's** sister is **Carly BALBOA.**[11]  At approximately 2:49 PM, **SANCHEZ** used (279) 386-7769 (TT6) to call **Carly BALBOA** on (559) 413-8584 (TT 8584).  This call was placed by **SANCHEZ** as **GONZALES** remained on hold on the other line.  **SANCHEZ** stated, "send 300 to my Primo's CashApp real quick."  I know from my experience gained during this investigation that "Primo" is a name by which **SANCHEZ** identifies **GONZALES**.  **BALBOA** then stated, "I did."  I queried the pen-register trap and trace installed on (559) 961-6401 (TT5) and discovered an incoming text from "CashApp" at the same time **BALBOA** stated, "I did."

29.    I know from my training and experience that CashApp sends text messages as a means of notifying its account holders of activity on their accounts.  I believe this text message corroborates my belief that **BALBOA** did indeed send the $300 from her CashApp account to **GONZALES'** CashApp

---

[9] I know from my experience gained during this investigation that "Topo" is the street moniker of **Daniel Loubet ROMERO**.  I also know that "chito" is a suffix added to the end of a name in Spanish culture and usually means "little" or "young.'  In this instance, I believe **FELISCIANO** is stating "little or young Topo."

[10] I entered (559) 961-6401 into CashApp, a commonly used money sending mobile phone application, which indicated that (559) 961-6401 was associated with the account name "Benny Gonzales" and the account handle "$Huero824."  Furthermore, **GONZALES** is listed as the subscriber of (559) 961-6401.  Finally, during intercepted calls, **GONZALES** is named by callers as "Huero" or "Primo" or "Cousin," all monikers I know to be used by **GONZALES**.

[11] This was further corroborated during this call as **SANCHEZ** called **BALBOA** "sis," short for "sister" on multiple occasions.

account at **SANCHEZ's** request.  **SANCHEZ** then returned to the call with **GONZALES**, and the two conspired to withdraw the funds from **GONZALES'** CashApp account so that they could send **ROMERO** with cash to Fresno to purchase the methamphetamine with these funds.  **GONZALES** and **SANCHEZ** accomplished this by sending **ROMERO** and **FELISCIANO** to the bank to withdraw money from **GONZALES'** CashApp account.

30.    These actions were corroborated by the investigative team by deploying physical surveillance to the location of **ROMERO**, **SANCHEZ** and **FELISCIANO**.  At 2:58 PM, members of the investigative team observed **ROMERO** and **FELISCIANO**[12] occupy a white Cadillac Escalade at residence in Huron, CA.  The Cadillac Escalade then drove to the West America Bank also located in Huron, CA.  At 3:03 PM, members of the investigative team observed **FELISCIANO** exit the Cadillac Escalade and enter the West America Bank.  At 3:07 PM, members of the investigative team observed **FELISCIANO** exit the West America Bank.

31.    At 3:04 PM, **GONZALES**, using (559) 961-6401 (TT5), told **SANCHEZ**, using (279) 386-7769 (TT6), "Alright she took the money off already, off my card."  **SANCHEZ** responded, "She did Primo?"  **GONZALES** then stated, "Yeah, I just got the mem – I just got the memo right now." The conversation continued as **ROMERO** and **FELISCIANO** can be heard in the background of **GONZALES'** line.  The conversation then continued as follows:

| | |
|---|---|
| | [Beginning at the 14:47 minute mark] |
| **SANCHEZ** | Ok uh Dog's right there? |
| **GONZALES** | Yes. |
| **SANCHEZ** | Alright – so check it out – what did they end up taking out? |
| **FELISCIANO** | [Joined the call from the background of **GONZALES** line] 3 [UI] go to bank [UI] America. |
| **SANCHEZ** | So, how much is it – what is – what did they charge you? |
| **GONZALES** | 280. |
| **FELISCIANO** | I got 280 out, from the bank. |
| **SANCHEZ** | Oh, they only let you take out 280?  Ok, hold up real quick. Alright, lets check out 280. |
| ... | [**SANCHEZ** disconnected a call with **PINON** and an uncharged individual, and continued to speak on the specifics of the methamphetamine procurement at the 16:58 minute mark]. |
| **GONZALES** | [**GONZALES** is counting in the background] 1190. |

---

[12] Members of the investigative team identified these individuals by comparing their observations to known photographs of both **FELISCIANO** and **ROMERO** obtained from law enforcement databases.

| | | |
|---|---|---|
| **SANCHEZ** | 1190, alright.  Tell him – tell him he's going to put 40 in his gas, 40 in his – uh – uh – truck – I have to pay, this is the most I've ever paid but I have to do it. |
| **FELISCIANO** | [Speaking Spanish to **ROMERO** in the background] |
| **GONZALES** | [UI] 1190? Give him 40? |
| **…** | [The details of the exact amount is disputed, specifically what **ROMERO** is due.] |
| **SANCHEZ** | Put 1150 in an envelope, and that's going to get handed off to somebody.  So just tell my prima to put 1150 in an envelope, and then uh – all Topo is going to do is hand that envelope to him. |
| **…** | [The conversation continues as **SANCHEZ** rehashes details already discussed **GONZALES** is heard relaying the orders given by **SANCHEZ**.] |
| | [Ending at the 17:50 minute mark] |

32.     I know from my training and experience that drug traffickers often do not give the denomination of bills when talking about finances.  They will often state, "3" and mean $300 or "280" and mean $280.  I believe this is apparent during this call, as the individuals are speaking about numbers in hundred-dollar denominations.  I know from my experience gained during this investigation that "Prima" is a name by which **SANCHEZ** identifies Ramona **FELISCIANO**.

33.     I believe that **SANCHEZ** and **GONZALES** sent **FELISCIANO** and **ROMERO** out to withdraw the funds from **GONZALES'** CashApp account to fund the purchase of methamphetamine, and that **FELISCIANO** and **ROMERO** were successful in that endeavor.

34.     I also believe **SANCHEZ** asked **GONZALES** how much money **FELISICIANO** and **ROMERO** were able to liquidate from **GONZALES'** CashApp account.  **FELISCIANO** related she obtained $280 from the West America Bank.  **GONZALES** communicated to **SANCHEZ** they had $1,190 towards the purchase of methamphetamine.  I believe **SANCHEZ** then broke down the plan for the finances, which included giving **ROMERO** $40 for fuel, and asked **GONZALES** to put the remaining $1,150 in an envelope to be given to the methamphetamine supplier in Fresno, CA.

35.     Therefore, I believe this call demonstrated that **SANCHEZ** communicated with **GONZALES**, who relayed this communication to **FELISCIANO** and **ROMERO**.  These communications lay out the coordinated effort to send **ROMERO** with $1,150 to be given to a source, for the procurement of methamphetamine in Fresno, CA.

36.     The investigative team continued to surveil **FELISCIANO** and **ROMERO** within the

Cadillac Escalade and watched as they returned to the residence of **GONZALES** and **FELISCIANO**.

37.    On April 17, 2025, at 3:28 PM, the investigative team intercepted a text message received by **SANCHEZ** on (279) 386-7769 (TT6) from (213) 334-1252[13] (TT18), which was later identified as belonging to Ignacio **SANCHEZ's** cell mate.  This text message read, "2417 s. Argyle" and was sent while **SANCHEZ** and **GONZALES** were still communicating on the call which began at 2:55 PM.  Seconds after receiving the text message, **SANCHEZ** stated to an individual that appeared to be personally in the company of **SANCHEZ**, "Ok, boom – alright.  Yeah, I got it celly, thank you."  After a short pause, **SANCHEZ** appeared to be talking to no one in particular and stated, "k, give it – send it to "Mona…"  **SANCHEZ** then told **GONZALES** and **FELISCIANO**, "I sent it to you."

38.    I know from my experience gained during this investigation that "Mona" is a name by which **SANCHEZ** identifies Ramona **FELISCIANO**. Based on the above call, along with the prior knowledge that **SANCHEZ** used his "celly's people" for this procurement, I believe **SANCHEZ's** cellmate used (213) 334-1252 (TT18) to send the address of his source of supply to **SANCHEZ** on (279) 386-7769 (TT6).

39.    At 3:29 PM, **SANCHEZ,** using (279) 386-7769 (TT6), sent **FELISCIANO**, using (559) 401-8633 (TT8633) a text.  This message read, "2417 s. Argyle."  **FELISCIANO** can be heard in the background of **GONZALES'** line speaking to **ROMERO** in the Spanish language and appeared to place the directions to this address in **ROMERO's** cell phone.  Based on this call, I believe **SANCHEZ** received the address of the source of supply from his cellmate and forwarded this address to **FELISCIANO** on (559) 401-8633 (TT 8633).  I believe **FELISCIANO** then directed **ROMERO** to this address.

40.    At 3:34 PM, members of the investigative team observed the Cadillac Escalade leave **GONZALES** and **FELISCIANO's** residence and followed it as it left the city of Huron.

41.    At 4:51 PM, **ROMERO** used (559) 821-3633 (TT 3633) to call **SANCHEZ,** using (279) 386-7769 (TT6).  The following transcript contains the pertinent portions of that call:

---

[13] The investigative team searched the historical precision location data from (213) 334-1252 pursuant to a court order and discovered the cell phone was within the Salinas Valley State Prison.  The investigative team believed (213) 334-1252 to be a contraband cell phone used by incarcerated persons.  This belief was corroborated as **SANCHEZ** indicated on an intercepted call that this text message came from **SANCHEZ's** cell mate.

| | | [BEGINNING OF CALL] |
|---|---|---|
| | SANCHEZ | 10 more minutes? |
| | ROMERO | [UI] |
| | SANCHEZ | [speaking to an individual in the background] Uh – ce -celly – he said 10 minutes he's away.  Spenca.  Yeah, yeah OK 10 minutes ok.  OK – OK – uh – uh I'm gonna – I'm gonna let my – my – my – my amigo know real quick – the homie. |
| | ROMERO | OK. |
| | SANCHEZ | I'm gonna let him know your 10 minutes away.  OK? |
| | ROMERO | Yeah. |
| | SANCHEZ | OK.  Trucha. OK, bye. |
| | ROMERO | [UI] |
| | | [END OF CALL] |

42.     During this conversation, **SANCHEZ** used Spanish slang terms like, "Spenca," and "Trucha."  In speaking with Spanish translators, I learned "Spenca" is a slang term for "sorry," while "Trucha" is a slang term for "be careful."  I believe **ROMERO** called **SANCHEZ** to notify **SANCHEZ** that **ROMERO** was 10 minutes away from **SANCHEZ's** cellmates' methamphetamine source. **SANCHEZ** then relayed this information to his cellmate and ended the call.

43.     The investigative team applied for an administrative subpoena for historical call detail records and subscriber information associated with (213) 334-1252 (TT18) used by **SANCHEZ's** cellmate.  Upon reviewing these historical records, I discovered that immediately after this call, **SANCHEZ's** cellmate used (213) 334-1252 (TT18) to send two outgoing text messages to the user of (559) 652-6826[14] (TT 6826) at 4:53 PM and 4:56 PM respectively. At 4:56 PM, the user of (559) 652-6826 (TT 6826), believed to be **AGUILAR**, responded and sent a text message back to **SANCHEZ's** cell mate on (213) 334-1252[15] (TT18).

44.     The investigative team was not privy to the content of these messages, due to the fact that

---

[14] I conducted an open-source search of this phone number utilizing a database that searches through public and proprietary databases and found (559) 652-6826 (TT6826) is associated with "Luis Amaro" at an address of "2417 S. Argyle Avenue in Fresno, CA."  I entered (559) 652-6826 (TT6826) into CashApp, which indicated that (559) 652-6826 (TT6826) was associated with the account name "Luis Aguilar" and the account handle "$luisaguilar624.  I know that "624" represents "FBD" alphabetically, which represents the Fresno Bulldogs criminal street gang.  The investigative team applied for an administrative subpoena for historical call detail records and subscriber information associated with (559) 652-6826 (TT6826).  The records were received and reviewed, and I found that (559) 652-6826 (TT6826) is subscribed to "Jamie Fleming" at an address of, "2417 S. Argyle Avenue in Fresno, CA."  I therefore believe the user of (559) 652-6826 (TT6826) is likely Luis Mario Amaro **AGUILAR**, who is a member of the Fresno Bulldog criminal street gang.

[15] From 4:51 PM to 4:57 PM, these text messages are the only transactional records between (279) 386-7769, (213) 334-1252 and (559) 652-6826.

there was not a court order at the time authorizing the interception of electronic content on (213) 334-1252 (TT18). Based on the context of the prior calls and the later observations of the investigative team, I believe **SANCHEZ's** cell mate sent a text message to the source of supply which indicated **ROMERO** was 10 minutes away.

45.    At 4:54 PM, members of the investigative team observed the Cadillac Escalade arrive at 2417 S. Argyle Avenue in Fresno, CA. **ROMERO** exited the Cadillac Escalade and walked towards the front door of the residence.

46.    At 4:57 PM, simultaneous with the above observations, members of the investigative team intercepted an incoming call to **SANCHEZ** on (279) 386-7769 (TT6) from **ROMERO** on (559) 821-3633 (TT 3633). **ROMERO** told **SANCHEZ** that **ROMERO** was "outside." A few seconds later, a male in the background of **ROMERO's** line asked for "Giddy." **SANCHEZ** introduced **ROMERO** to the male. **SANCHEZ** then asked the male, "If time permits right, and we – we need something else, and if we get more than one, will – will the price change?" The male responded, "um – well let me see and shit, because I said – uh – uh – you know I'm just busting middle shit you know?"

47.    I believe **SANCHEZ** inquired that if **SANCHEZ** was able to purchase more than one pound of methamphetamine from the seller, would the price be reduced. The unidentified male responded that he was unsure, because he was "just busting middle shit." I believe this to mean the unidentified male was acting as a broker between buyer and seller, and did not have the authority to negotiate prices with **SANCHEZ**.

48.    The conversation continued, and at the 1:40 minute mark, **SANCHEZ** asked the male, "and it's, it's all rock right? It's not powder?" The male responded, "Nah hell nah, it's all rock baby." **SANCHEZ** responded, "OK, there it is there." The male stated, "Your homeboy is looking at it right now too." Immediately after this statement, the male told **ROMERO**, "dile pura piedra," which translates, "tell him (**SANCHEZ**) pure rock.[16]" **ROMERO** responded, "pura piezita," which translates, "nothing but little parts or rocks." The conversation ended as **SANCHEZ** and **ROMERO** agreed that **ROMERO** will return to Huron with the methamphetamine. Based on my training and experience, I

---

[16] Spanish speaking members of the investigative team translated **ROMERO's** statements from the Spanish language to the English language.

know the terms, "rock" and "powder" to describe different types of methamphetamine.

49.    Therefore, I believe when **SANCHEZ** asked, "and it's, it's all rock right?  It's not powder?", he was inquiring about the physical consistency of the methamphetamine. I further believe **ROMERO** paid the male the $1,150 as ordered, and in turn was given a pound of methamphetamine. The male described the quality of the methamphetamine to **SANCHEZ** while in the company of **ROMERO**, and **ROMERO** is heard commenting on the methamphetamine's quality.

50.    At 5:01 PM, members of the investigative team observed **ROMERO** re-enter the Cadillac Escalade, and drive away from the residence located at 2417 Argyle Avenue.  At 5:34 PM a Fresno Sheriff's Deputy conducted a traffic stop of the Cadillac Escalade in the City of Fresno. The deputy contacted the driver and sole occupant of the car, and identified him as Daniel Loubet **ROMERO** via his personal admission as well as **ROMERO's** California driver license. The deputy observed an open grocery bag containing a white crystalline substance in plain view on the floorboard in the passenger compartment.  The white crystalline substance was seized and tested by the Fresno County Sheriff's Office Forensic Laboratory and confirmed to be positive for methamphetamine with a weight of 446.73 grams.

51.    A cell phone was located during the search of **ROMERO's** vehicle.  Investigators placed a call to (559) 821-3633 (TT 3633) and the phone did not show an incoming call. Based on my training and experience, I know cell phone users can apply settings to their phone in which a cell phone can be placed in a state where it does not notify the user of an incoming notification.  I believe it is likely that this device was in this form or state.

52.    Based on the intercepted calls and electronic messages, coupled with the physical observations and transactional data observed by members of the investigative team, I believe **Ignacio SANCHEZ**, **Jennifer ESCOBEDO**, **Carly BALBOA**, **Daniel Loubet ROMERO**, **Benny GONZALES**, **Ramona FELISCIANO**, and **Luis Amaro AGUILAR** conspired to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code Sections 846, 841(a)(1).

2.    **April 22, 2025 – SANCHEZ and ROMERO facilitated the distribution of methamphetamine from AGUILAR to FELISCIANO**

53.    As is set out above, on April 17, 2025, Daniel Loubet **ROMERO** was pulled over by the investigative team while transporting approximately one pound of methamphetamine.  On April 22, 2025, **SANCHEZ,** using (279) 386-7769 (TT6) called **FELISCIANO,** using (559) 401-8633 (TT 8633**), and told her that he no longer wanted to use **ROMERO** to transport illicit narcotics.

54.    Later that day, at approximately 2:07 PM, **SANCHEZ**, using (279) 386-7769 (TT6), conducted a three-way call with **FELISCIANO**, using (559) 401-8633 (TT 8633), and **ROMERO**, using (559) 821-3633 (TT 3633). During the portion of the call in which **ROMERO** participated, **FELISCIANO** translated for **SANCHEZ**; based on the fact that **SANCHEZ** usually uses a translator to convey complex ideas to **ROMERO**, I do not believe that **SANCHEZ** is very proficient in Spanish, and Spanish speaking members of the investigative team have confirmed this belief. During the call, **SANCHEZ** told **FELISCIANO** to tell **ROMERO** that **SANCHEZ** was "going to need it real fast," that it would "take forty-five minutes to go over there" and "forty-five minutes to go back," and that the parties would pick "it" up "at four." I then heard **ROMERO** say "*esta bien*," which – though I am not fluent in Spanish – I know to essentially mean "okay" or "that's fine" in Spanish. Additionally, based on the events set out above, the subsequent events set out below in this section, as well as the fact that I heard **FELISCIANO** use the phrase "*tu carro*," which I know to mean "your car" in Spanish, I believe that **SANCEHZ** was asking **ROMERO** to use his car and that **ROMERO** understood this fact.

55.    Additionally, I believe that **ROMERO** understood that his vehicle was going to be used to transport illicit narcotics. First, I believe **ROMERO** understood the nature of his relationship with **SANCHEZ** based on the events from April 17, 2025, set out above. Also, several minutes after the previous call, at approximately 2:19 PM, **SANCHEZ**, using (279) 386-7769 (TT6), received a call from **FELISCIANO**, using (559) 401-8633 (TT 8633). During the call, **FELISCIANO** told **SANCHEZ** that **ROMERO** had a question, at which point **SANCHEZ** and **ROMERO** discussed – in English – how **SANCHEZ** was willing to sell "two fifty for two of them" or "four for five hundred." **SANCHEZ** asked **ROMERO** if he wanted "that" immediately, at which point **ROMERO** asked **SANCHEZ** to hold on. While **SANCHEZ** and **FELISCIANO** were waiting, **SANCHEZ** told **FELISCIANO** that ". . . if he

[**ROMERO**] wants that, I'm just gonna- I'll- I'll have to order me a full one real quick. That's why he needs to let me know. If not… [if] he doesn't let me know ahead of time, I- I'm willing to do, uh, two… and that's it. So he's just gonna have to accept that." The parties then made small talk until **ROMERO** came back on the line and attempted to say in English that another party wanted "one thousand for one pound;" **FELISCIANO** then clarified with **ROMERO** for **SANCHEZ** that **ROMERO** was attempting to say that another party wished to purchase "a pound" for "a thousand bucks" from **SANCHEZ**. **SANCHEZ** responded by asking **FELISCIANO** to convey to **ROMERO** that this was not possible because the "yellow" was "pricey."

56.    Based on my training and experience, I know that it is very common for drug traffickers to use vague and innocuous language when discussing their illicit narcotics. I also know that they very commonly refer to their narcotics by the number of the weight only, in an attempt to confuse law enforcement. I also know that $250 for two ounces and $500 for four ounces is consistent with the current price of methamphetamine in California's Central Valley. Finally, I know that the phrase "full one" is very commonly used in drug trafficking circles to refer to the idea of a full ounce, pound, or kilogram, as the context requires.

57.    Therefore, I believe that **ROMERO** was initially discussing with **SANCHEZ** how **SANCHEZ** was essentially willing to sell ounces of methamphetamine for $125. **SANCHEZ** then asked if **ROMERO** wanted the methamphetamine immediately, at which point **ROMERO** left the conversation, presumably to ask a third party with whom he would be coordinating the distribution of these narcotics. Based on subsequent information set out below, I know that **SANCHEZ's** goal was to purchase one-half pound of methamphetamine, or eight ounces. I therefore believe that **SANCHEZ** indicated to **FELISCIANO** that if **ROMERO** wanted to purchase four ounces, **SANCHEZ** would have to purchase a full pound of methamphetamine; otherwise, **SANCHEZ** was only willing to distribute two ounces of methamphetamine to **ROMERO**. I believe **ROMERO** then re-entered the call and effectively asked **SANCHEZ** if **SANCHEZ** were willing to sell one pound of methamphetamine for $1,000. **SANCHEZ** responded in the negative, indicating that methamphetamine was more expensive than that.

58.    Based on all of the above information, including the facts that **ROMERO** asked **SANCHEZ** to distribute narcotics to him approximately twelve minutes after he had just agreed to let

SANCHEZ use his vehicle and that ROMERO had just been pulled over with a pound of methamphetamine in the vehicle, I believe that ROMERO was aware that SANCHEZ was (again) going to attempt to obtain methamphetamine, and that he was going to use ROMERO's vehicle to do so.

59.    SANCHEZ then used (279) 386-7769 (TT6) to participate in calls at 2:36 PM with FELISCIANO, using (559) 401-8633 (TT 8633), and at 3:08 PM with ESCOBEDO, using (831) 596-0869 (TT3), to indicate to both women that he was going to "No Town" and that he was doing so because "it" was cheaper there. Specifically, in the call with FELISCIANO, SANCHEZ told her to "take out that six hundred." Based on my training and experience, I know that the name "No Town" is commonly used in California's Central Valley to refer to Fresno, CA. I also know that drug dealers also frequently speak about the prices for their narcotics without using the denominations of the money being uses. For example, they commonly say "one hundred" or even just "one" instead of "one hundred dollars." Finally, I know that $600 for one-half pound is consistent with the price of methamphetamine in California's Central Valley.

60.    Because of all of the other indications in the calls set out herein that SANCHEZ was purchasing methamphetamine, as well as the fact that he had just unsuccessfully attempted to obtain methamphetamine using ROMERO several days earlier, I believe that he was coordinating the sale of one-half pound of methamphetamine in exchange for $600. Based on the context of the calls set out above, I believe that SANCHEZ was indicating that he was going to obtain said methamphetamine in Fresno, CA because he could obtain it there for a lower cost. Additionally, based on the calls above and subsequent events, I believe SANCHEZ was indicating that he was going to have FELISCIANO go to Fresno to obtain that methamphetamine in ROMERO's vehicle.

61.    At approximately 3:00 PM, the team established surveillance on 16901 W. Tornado Avenue, Apt. 1510, Huron, CA, an apartment believed to be ROMERO's residence. Several minutes later, at approximately 3:21 PM, the surveillance team observed a black 2010 Mazda 323 registered to Daniel Loubet ROMERO pull into the parking lot of the apartment complex. A female exited the vehicle and the Mazda then travelled to a nearby parking lot. The driver exited the vehicle and walked into a nearby taco shop; when the driver came back out, he was positively identified by members of the

1    investigative team as **ROMERO**, based on a comparison with the picture of Daniel Loubet **ROMERO**

2    maintained on file by the California Department of Motor Vehicles, as well as prior contacts with

3    **ROMBERO** in this case. At approximately 3:24 PM, **ROMERO** drove the Mazda to 36946 Los

4    Angeles Street, Huron, CA, a property owned by **SANCHEZ**, and on which a trailer has been placed

5    and named "Thug Mansion" by members of the ENTERPRISE. Based on my knowledge of the

6    investigation, I know that Benny **GONZALES** and Ramona **FELISCIANO** reside at this property

7    based on numerous intercepts between (559) 961-6401 (TT5), used by **GONZALES**, and (559) 401-

8    8633 (TT 8633), used by **FELISCIANO**, which indicate that the two live together and sleep at that

9    location, coupled with numerous surveillance observations of those two individuals at that property, as

10   well as precision location data transmitted by both phones which cover that property during nighttime

11   hours when I know most people are asleep.

12       62.    When **ROMERO** arrived at "Thug Mansion," a female positively identified as

13   **FELISCIANO**[17] exited the residence and got into the front passenger seat of the Mazda with

14   **ROMERO**. **ROMERO** then drove the Mazda back to the parking lot of his apartment complex on

15   Tornado Avenue and exited the vehicle, at which point **FELISCIANO** exited the front passenger seat,

16   entered the driver's seat of the vehicle, and departed the area.

17       63.    Based on the prior call in which **SANCHEZ** and **FELISCIANO** spoke with **ROMERO**

18   about using his vehicle to obtain methamphetamine, the investigative team maintained visual of

19   **ROMERO'S** Mazda.

20       64.    At approximately 4:00 PM, **SANCHEZ**, using (279) 386-7769 (TT6), called (559) 800-

21   4470 (TT12), used by Laura **PLASENCIA**.[18] It should be noted that **SANCHEZ,** using (279) 386-7769

22

23   ───────────
         [17] **FELISCIANO** was identified based on a comparison with the known picture of **FELISCIANO** maintained on
     file by the California Department of Motor Vehicles, as well as prior contacts in this case.

24       [18] I believe that **PLASENCIA** is the user of (559) 800-4470 (TT12) for several reasons. First, this number is
     registered to **PLASENCIA** in open-source databases commonly used by law enforcement to identify subjects. Additionally,
25   the account name listed in the cellular phone application CashApp for this number is "laura plasencia" and the account handle
     is "$Lplocs79". Based on my knowledge of the investigation, as well as my training and experience, I know that
26   **PLASENCIA**'s date of birth is in 1979, and that ENTERPRISE members use the word "loc" or "locs" to refer to the Spanish
     word "*loco*," which means crazy; I know that these ENTERRPISE members and associates use these words to refer to other
27   ENTERPRISE members and associates. Therefore, I believe the CashApp handle is meant to stand for the initials "L.P.," the
     word "locs," and then the year of **PLASENCIA**'s birth. Additionally, in a text message from Jennifer **ESCOBEDO**, using
     (831) 596-0869 (TT3), to (559) 800-4470 (TT12), **ESCOBEDO** addressed the user of **TT12** as "LP." I therefore believe that
28   **PLASENCIA** is the user of (559) 800-4470 (TT12).

(TT6), had previously sent a text message to (559) 800-4470 (TT12) at approximately 2:56 PM which read, "Hi coma, give me a call asap please!!" The following is a transcript of the pertinent portions of the conversation which took place at approximately 4:00 PM:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| . . . | . . . [During the beginning portion of the conversation, **SANCHEZ** called **PLASENCIA** his "Comadre" and indicated that he had acquired a car and been trying to get ahold of her so that she could drive that car to Fresno, CA.] |
| **SANCHEZ** | I needed it today, right? [OV] |
| **PLASENCIA** | [OV] Oh, okay. |
| **SANCHEZ** | [OV] I needed it "asap," right? So, I- I said, "Man." I- I tried to wait for you. And I was like, "Oh, she has to be busy. Something has to be going on." [OV][UI] |
| **PLASENCIA** | [OV] Oh. Yeah. |
| **SANCHEZ** | You know what I mean? So I just crossed my fingers. Everything was okay. Because with you, it's legit, because you have a license. |
| **PLASENCIA** | [OV] Right. |
| **SANCHEZ** | [OV] They cannot pull you over for nothing. Or they just- can't just… you know what I mean? |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | So I just had to take the- the chance. You know me, man. I gotta have food. I cannot- [OV] |
| **PLASENCIA** | [OV] Yeah. Yeah. |
| **SANCHEZ** | [OV] -go without food like that. You know? |
| **PLASENCIA** | Yeah. [OV][UI] |
| **SANCHEZ** | That's not just for my sake, it's for the community's sake, that likes to still mess around. You know what I mean? |
| **PLASENCIA** | Mm-hm. [indicating the positive] |
| **SANCHEZ** | And then, uh… shit like that. So- |
| **PLASENCIA** | Okay. |
| **SANCHEZ** | That's what happened. Um, um… Coma, it's alright. It- it- it happens. Uh, just- |
| **PLASENCIA** | No, but, um, well, now that I know that, like, you're gonna need me like that, like that- [OV] |
| **SANCHEZ** | [OV] Yes. |
| **PLASENCIA** | [OV] –I'll be- you know what I mean? I'm gonna be- [OV] |
| **SANCHEZ** | [OV] Yes. Yes, I wa- I was even trying to- mm-hm [indicating the positive]. I was even trying to, uh, uh, uh- I am still gonna do it, but I'm gonna get me a car. |
| . . . | . . . [**SANCHEZ** then explains why he did not already have a car] |
| **SANCHEZ** | Um, I told them that you were gonna be the one to be driving the car, mostly [sic] the time, because you have a license, right? |
| **PLASENCIA** | Yeah. |
| . . . | . . . [The parties then talk about how **SANCHEZ** sent "Mona" instead of "Comadre," and how the people "Mona" met function "like going to McDonald's" or "like a drive-in" in that they operate very quickly.] |
| **PLASENCIA** | Like the way we did the other day? We were gonna- in Fresno? Me and Jen? |

| | |
|---|---|
| | Or- [OV] |
| **SANCHEZ** | [OV] Yes. Yes. |
| **PLASENCIA** | [OV] Boom boom. |
| **SANCHEZ** | [OV] Like- like that. When you guys went with the black? |
| **PLASENCIA** | Yeah. Yeah. |
| **SANCHEZ** | Just- just like that. Just like that. In and out. Boop boop. We're outta here. You know? [OV] |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | [OV] So I had to do that for- you know? Even doing your brother a favor, too. You know what I mean? |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | Yeah, yeah. So he could have something. 'Cause I know that a lot of stuff that's in the hood right now, it's- it- it tastes, uh, like, uh, like, uh, gasoline. |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | Yeah. |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | And- and- and it- it's- it's not that it's bunk. It just tastes like gasoline- it smells like gasoline 'cause [of] the way they brought it back from T.J. [OV] |
| **PLASENCIA** | [OV] Yeah. Yeah. |
| **SANCHEZ** | [OV] You know what I mean? From the bord- from the- from Mexico and all that stuff. [UI] [OV] |
| **PLASENCIA** | [OV] Yeah. |
| **SANCHEZ** | So that's what it is, but I wasn't gonna try to get none of that. I try not to get nothing that's in the hood and try to have some different stuff. |
| **PLASENCIA** | Yeah. |
| **SANCHEZ** | You know what I mean? |
| . . . | . . . [**SANCHEZ** and **PLASENCIA** then spoke about how **PLASENCIA**'s family is doing and what they plan to do to celebrate **SANCHEZ**'s birthday.] |
| | [END OF CONVERSATION] |

65.     Based on my training and experience, I know that drug traffickers very commonly use vague or innocuous language – such as the words "that" or "it" – when speaking about their drug dealing to attempt to confuse law enforcement and avoid criminal liability for their actions. Furthermore, I know that they use the word "black" to refer to black tar heroin, specifically. I also know that drug couriers are often individuals who do not have a valid driver's license or are otherwise not legally able to operate a motor vehicle in California; as such, when these individuals are stopped by law enforcement and subsequently detained or instructed not to drive, law enforcement is then able to search the vehicle at issue when it is towed or when law enforcement becomes aware of other probable cause to search it. Therefore, I know that a drug courier with a valid driver's license is less susceptible to losing the narcotics they are transporting and are also more highly valued by the individual sending them. Finally, I

also know that the vast majority of methamphetamine in California's Central Valley comes from Mexico, that methamphetamine is sometimes described as tasting like gasoline, and that many times drug couriers attempt to smuggle methamphetamine across the U.S./Mexico border by putting it in a vehicle's gasoline tank. I therefore believe that the "stuff" **SANCHEZ** and **PLASENCIA** discuss in the latter part of the call is methamphetamine, which corroborates my belief that **SANCHEZ** was sending **FELISCIANO** to purchase one-half pound of methamphetamine.

66.    Based on my knowledge of the investigation, I know that ENTERPRISE members – and **SANCHEZ**, specifically – uses food-related terms, such as "burrito," to refer to illicit narcotics. I also know of only one individual in **SANCHEZ** and **PLASENCIA's** social circles who is named "Jen," and that is Jennifer **ESCOBEDO**, who I already know to be involved in drug trafficking with **SANCHEZ**, as is set out in elsewhere in this affidavit.

67.    Therefore, I believe that **SANCHEZ's** preference would have been for **PLASENCIA** to go pick up the methamphetamine and sent her a text message, using (559) 800-4470 (TT12), asking her to call him.  When she called him back approximately one hour later, I believe **SANCHEZ** indicated that he tried to wait for her because she has a valid driver's license and would therefore have a higher likelihood of returning his drugs to his stash house without law enforcement interference. I believe **SANCHEZ** then indicated that he could not wait any longer because he had to get narcotics "for the community's sake," but also indicated that he was "still gonna do it" and was going to get another vehicle. When **SANCHEZ** began to discuss the speed of the individuals distributing the narcotics in Fresno, I believe **PLASENCIA** and **SANCHEZ** transitioned to speaking about a different time in which **PLASENCIA** and Jennifer **ESCOBEDO** transported heroin. I believe the parties ended this portion of the conversation by discussing how the methamphetamine that is available in "the hood" tastes like gasoline due to the way it is smuggled into the United States from Mexico, and that this is why **SANCHEZ** wanted to get methamphetamine from somewhere else (i.e. from Fresno). I believe this also corroborates my belief that the narcotic being obtained was methamphetamine.

68.    Over the next hour, **SANCHEZ**, using (279) 386-7769 (TT6), called **FELISCIANO** several times, using (559) 401-8633 (TT 8633), to ask for her location and to coordinate where she would meet "him" (referring to the source of supply). Eventually, **SANCHEZ** told **FELISCIANO** to

1   travel to a Me-n-Ed's Pizza Parlor located in the vicinity of W. Clinton Avenue and Interstate Highway

2   99 in Fresno, CA.

3       69.    The investigative team was previously aware that an incarcerated person at Salinas

4   Valley State Prison illegally used – and allowed **SANCHEZ** to also illegally use – (213) 334-1252

5   (TT18) to communicate with other individuals while in custody. When I observed records obtained from

6   Verizon[19] for (213) 334-1252 (TT18), I saw that several text messages had been sent between (213)

7   334-1252 (TT18) and (559) 652-6826 (TT 6826) during the time the investigative team was following

8   **FELISCIANO** in **ROMERO's** Mazda. For example, at approximately 4:01 PM, (213) 334-1252

9   (TT18) sent a text message to (559) 652-6826 (TT 6826) which read, "\0T\0h\0e\0r\0e\0 \0o\0n\0

10  \0t\0h\0e\0i\0r\0 \0w\0a\0y\0 <q\0 \04\05\0 \0m\0i\0n\0u\0t\0e\0s\0 \0a\0w\0a\0y\0", which translates to

11  "There [sic] on their way [new line] 45 minutes away". As stated above, **SANCHEZ** and

12  **FELISCIANO** spoke several times during this period, including at approximately 4:15 PM. During this

13  call, the audio for **FELISCIANO's** side of the conversation is of poor quality; however, **FELISCIANO**

14  may be heard saying that she is approximately "twenty-one miles" and "fifteen, twenty minutes" away

15  from "Fresno" and "that place." Approximately four minutes after this call took place, (213) 334-1252

16  (TT18) sent a text message to (559) 652-6826 (TT 6826) (in plain text) which read, "There [sic] in

17  Caruthers about 20 minutes away". It should be noted that at the time of these calls and text messages,

18  the surveillance team was following **FELISCIANO** as she drove north on State Route 41 toward

19  Fresno, CA.

20      70.    Additionally, although **SANCHEZ** eventually told **FELISCIANO** to go to the Me-n-

21  Ed's Pizza Parlor located near W. Clinton Avenue and State Highway 99, he had initially told her in

22

23      [19] On April 23, 2025 – the day after this narcotics deal – the investigative team served a search warrant on
    VERIZON for records associated with (213) 334-1252 (TT18). Because VERIZON retains content from text message

24  conversations for several days, the investigative team received the content of text messages sent on April 22, 2025, between
    (213) 334-1252 (TT18) and (559) 652-6826 (TT 6826). It should be noted that due to the format in which the team received

25  some of the text messages, several irrelevant characters were inserted in between the letters of the text. For example, instead
    of the word "There", the raw return from VERIZON for several of the text messages would read, "\0T\0h\0e\0r\0e". 

26  Furthermore, it appears that the characters "<q\0" denote a new line in the text message. Finally, sometimes the text messages
    were returned out of the order in which they were likely sent; however, in most cases, the text was cut off in the middle of the

27  word, making the task of piecing the text message thread together much easier. In this affidavit, I will first set out the raw text
    received between (213) 334-1252 (TT18) and (559) 652-6826 (TT 6826) and will then translate it to ease the Court's

28  evaluation of the evidence.

1  calls at 4:31 PM and 4:42 PM to go to a McDonald's restaurant located near the corner of Jensen

2  Avenue and Interstate Highway 99. Accordingly, at approximately 4:44 PM, (213) 334-1252 (TT18)

3  sent a text message (in plain text) to (559) 652-6826 (TT 6826) which read, "Where at McDonald's at

4  41 and Jensen".

5      71.    Based on my knowledge of Fresno, CA, I know that there is only one McDonald's

6  restaurant on or near Jensen Avenue in Fresno, CA, and it is located directly (and immediately) to the

7  east of the off ramp for State Highway 99 on E. Jensen Avenue. However, I also know that State Route

8  41 is a short distance to the west of this intersection.

9      72.    Therefore, based on the fact that the text messages from (213) 334-1252 (TT18) were

10  mirroring **FELISCIANO's** location, as well as her calls with **SANCHEZ**, using (279) 386-7769 (TT6),

11  I believe that (213) 334-1252 (TT18) was essentially coordinating for the user of (559) 652-6826 (TT

12  6826) to meet with **FELISCIANO** when she arrived in Fresno, CA.

13      73.    Subsequent events would corroborate this belief, as well as reveal the user of (559) 652-

14  6826 (TT 6826). At approximately 4:56 PM, **SANCHEZ**, using (279) 386-7769 (TT6), spoke with

15  **FELISCIANO**, using (559) 401-8633 (TT 8633), to confirm that the meeting location was "the Me-n-

16  Ed's" located at "Clinton and ninety-nine." **FELISCIANO** indicated that she was three miles away.

17  **SANCHEZ** indicated he would call her back and eventually did so at approximately 5:07 PM. It should

18  be noted that this call was approximately 21 minutes long, and did not terminate until approximately

19  5:28 PM. During this call, **SANCHEZ** asked how far away she was and **FELISCIANO** responded that

20  she was "like, a minute" away. Approximately 24 seconds into that call, another unidentified male may

21  be heard speaking in the background; based on the exchanges between him and **SANCHEZ**, I believe

22  that he was physically present with **SANCHEZ**. Because the unidentified male could be clearly heard,

23  but no "other side" of the conversation could be heard at all, it appeared that the unidentified male was

24  speaking on the phone to another individual. The unidentified male could be heard saying that "we're

25  pulling up, like, right now." **FELISCIANO** then conveyed to **SANCHEZ**, **SANCHEZ** conveyed to the

26  unidentified male, and the unidentified male conveyed to the individual on the phone with him that

27  **FELISCIANO** was in a black "little buggy." When **SANCHEZ** attempted to ask the unidentified male

28  what kind of car the source of supply was driving, the unidentified male started to ask the individual he

1    had been speaking with but then indicated that "he [i.e. the source] hung up."

2        74.    From the time that I first heard the unidentified male greet the source on the phone until

3    the time he indicated to **SANCHEZ** that the source had hung up was approximately 26 seconds (00:23

4    to 00:50). I therefore believe that the call time for the unidentified male's call with the source of supply

5    likely started several seconds before 00:23 – the phone had to ring – and likely ended several seconds

6    before 00:50, as the unidentified male did not realize immediately that the source of supply had

7    terminated the call. When I viewed the records provided for Verizon for (213) 334-1252 (TT18), I

8    observed that (213) 334-1252 (TT18) placed a call to (559) 652-6826 (TT 6826) at approximately 5:08

9    PM – the next minute after **SANCHEZ** called **FELISCIANO** at 5:07 PM – and that the call lasted 27

10    seconds. I therefore believe that the unidentified individual in the background of **SANCHEZ's** call with

11    **FELISCIANO** was using (213) 334-1252 (TT18) to call (559) 652-6826 (TT 6826), and that the user of

12    (559) 652-6826 (TT 6826) was the source of supply of methamphetamine.

13        75.    At approximately 5:12 PM, while **SANCHEZ** and **FELISCIANO** were still on the

14    phone, the surveillance team observed the Mazda driven by **FELISCIANO** pull into the Me-n-Ed's

15    Pizza Parlor parking lot located on W. Clinton Avenue, just east of State Highway 99.

16        76.    At approximately 5:24 PM (approximately 17 minutes and 20 seconds into the ongoing

17    call between **SANCHEZ** and **FELISCIANO**), **FELISCIANO** began speaking to **SANCHEZ** about

18    getting "the rest of the money out." **SANHCEZ** then became upset and said, "You didn't fucking take it

19    out?" **FELISCIANO** then told **SANCHEZ** to hold on and **SANCHEZ** effectively sat on hold for the

20    next six minutes until the call terminated.

21        77.    Based on my knowledge of the investigation, I know that because **SANCHEZ** is in

22    custody with the California Department of Corrections and Rehabilitation, he does not have direct

23    access to cash U.S. currency in order to purchase illicit narcotics, and must therefore rely on his

24    associates to conduct the transactions for him. I also know that one of the ways that he exerts control

25    over these situations is to have his associates use money transfer cellular phone applications such as

26    CashApp and Chime to gather and transfer funds for illegal transactions involving illicit narcotics.

27    Therefore, based on the context of this call, as well as numerous prior calls in which **SANCHEZ** and

28    **FELISCIANO** discussed transferring funds from and to various accounts, I believe that **SANCHEZ**

had instructed **FELISCIANO** to withdraw cash for this transaction, and that she had failed to do so.

78.    Several minutes prior, at approximately 5:23 PM, (559) 652-6826 (TT 6826) sent a text message (in plain text) to (213) 334-1252 (TT18) which read, "Pulling up".  Based on my training and experience, I know this to be a phrase used in popular culture to refer to the idea of imminently arriving at a location. Accordingly, at 5:26 PM, the team observed a silver Toyota sedan pull into the same parking lot and park next to **ROMERO's** Mazda. **FELISCIANO** was then observed exiting the driver's seat of the Mazda and speaking with the occupants of the silver Toyota through the passenger side window and showing them something on her cellular phone.

79.    Three minutes later, at 5:29 PM, the silver Toyota pulled out of the parking lot and departed the area. At approximately the same time, **FELISCIANO**, using (559) 401-8633 (TT 8633), called **SANCHEZ**, using (279) 386-7769 (TT6). During the call, **SANCHEZ** asked what happened and **FELISCIANO** responded "Touchdown! It's a touchdown!" **FELISCIANO** also elaborated that "he" [the source] had Chime and **SANCHEZ** instructed her to "head on back" and to "go smooth." The next minute, **SANCHEZ**, using (279) 386-7769 (TT6), called **ROMERO**, using (559) 821-3633 (TT 3633), to tell him that "they already left Fresno" and thanked **ROMERO**. Based on the previous calls and events, I believe **SANCHEZ** was thanking **ROMERO** for letting **SANCHEZ** use his vehicle to traffic illicit narcotics.

80.    Based on my training and experience, I know that the word "touchdown" is very frequently used in contraband trafficking communities to refer to the idea that a transaction has been successfully completed, and I therefore believe that **FELISCIANO** was indicating to **SANCHEZ** that she had completed the transaction and obtained the methamphetamine. I also know that when a courier is travelling with contraband in their vehicle, they very often attempt to drive in such a way that they will not invite a traffic stop by law enforcement during their trip; I believe this is what **SANCHEZ** was referring to when he told **FELISCIANO** to "go smooth."

81.    Several minutes later, a series of text messages was sent from (213) 334-1252 (TT18) to (559) 652-6826 (TT 6826). The following chart sets out how the text messages were initially received:

///

///

| CALL NUMBER | RAW TEXT |
|---|---|
| 837 | \0\0I\0 \0a\0I\0r\0e\0a\0d\0y\0 \0k\0n\0o\0w\0 q<\0 \0I\0 \0d\0o\0n\0'\0t\0 \0k\0n\0o\0w\0 \0w\0h\0y\0 \0t\0h\0e\0y\0 \0d\0i\0d\0n\0'\0t\0 \0h\0a\0v\0e\0 \0c\0a\0s\0h\0.\0.\0t\0h\0a\0t\0 \0g\0i\0r\0 |
| 838 | \0\0h\0a\0t\0 \0o\0n\0e\0 \0b\0i\0t\0.\0.\0m\0y\0 \0b\0a\0d\0 \0b\0l\0o\0c\0k\0 |
| 839 | \0\0I\0 \0w\0a\0s\0 \0s\0u\0p\0p\0o\0s\0e\0d\0 \0t\0o\0 \0d\0o\0 \0t\0h\0a\0t\0.\0.\0d\0o\0n\0'\0t\0 \0k\0n\0o\0w\0 \0w\0h\0y\0 \0s\0h\0e\0 \0d\0i\0d\0n\0'\0t\0.\0.\0d\0i\0d\0n\0'\0t\0 \0I\0i\0k\0e\0 \0t |
| 840 | \0\0I\0 \0a\0I\0r\0e\0a\0d\0y\0 \0k\0n\0o\0w\0 q<\0 \0I\0 \0d\0o\0n\0'\0t\0 \0k\0n\0o\0w\0 \0w\0h\0y\0 \0t\0h\0e\0y\0 \0d\0i\0d\0n\0'\0t\0 \0h\0a\0v\0e\0 \0c\0a\0s\0h\0.\0.\0t\0h\0a\0t\0 \0g\0i\0r\0 |
| 841 | \0\0h\0a\0t\0 \0o\0n\0e\0 \0b\0i\0t\0.\0.\0m\0y\0 \0b\0a\0d\0 \0b\0l\0o\0c\0k\0 |

82.    When I reviewed the above data, I observed that the text message sent under call 840 was the same as that sent under call 837, and that the text message sent under call 841 was the same as that sent under call 838. Additionally, when translated, I observed that the letters "gir" were at the end of call 837 and that that call 839 began with the letter "L". Furthermore, I observed that call 839 ended with the letter "T" and that call 838 began with the letters "hat". I therefore believe that the correct ordering of the messages is 837, 839, and then 838, which I believe is borne out by the context of the translated text:

| CALL NUMBER | TRANSLATED TEXT |
|---|---|
| 837 | I already know<br>I don't know why they didn't have cash..that gir |
| 839 | l was supposed to do that..don't know why she didn't..didn't like t |
| 838 | hat one bit..my bad block |

83.    Based on the context of the calls set out above, in which **FELISCIANO** appears to indicate to **SANCHEZ** that she had not drawn the cash out like he had instructed, and in which **FELISCIANO** later indicated that the transaction was completed because "he" had Chime, I believe that the user of (213) 334-1252 (TT18) was apologizing to the source of supply because **FELISCIANO** had not used cash to complete the transaction though she was supposed to have done so, requiring the source and **FELISCIANO** to use the Chime application to transfer to the funds instead. This belief was corroborated by a subsequent text message sent later that evening from (559) 652-6826 (TT 6826) to (213) 334-1252 (TT18), which read, "Ay block next time all cash b". Based on the context of the messages sent between (559) 652-6826 (TT 6826) and (213) 334-1252 (TT18), I believe the parties call each other "block" as a term of endearment. Based on the context of all of the events and calls set out

above, I believe the user of (559) 652-6826 (TT 6826) was essentially telling the user of (213) 334-1252 (TT18) that transactions for illicit narcotics in the future would have to be conducted in cash, not using money transfer applications such as Chime.

84.     Based on events on Aprill 22, 2025, as well as subsequent events in May 2025, I believe that the user of (559) 652-6826 (TT 6826) is Luis AMARO **AGUILAR**. First, members of the investigative team checked open-source databases frequently used by law enforcement to identify individuals and learned that (559) 652-6826 (TT 6826) is associated with Luis AMARO **AGUILAR**. Additionally, on April 22, 2025, after the deal with **FELISCIANO**, the surveillance team continued to follow the silver Toyota – whose occupants had spoken with **FELISCIANO** – until the driver exited the vehicle. Members of the investigative team then positively identified the driver as Luis AMARO **AGUILAR** after reviewing the picture of Luis AMARO **AGUILAR** maintained on file with the California Department of Motor Vehicles. Finally, on April 24, 2025 (two days after this deal), Debbie **SANCHEZ** and Carly **BALBOA** travelled to Fresno to receive methamphetamine from **AGUILAR** [20] at **SANCHEZ's** direction. During that deal, as is set out below, **AGUILAR** got on the phone with **SANCHEZ** and spoke about how the way the last deal (i.e. the deal set out in this section) had transpired was not optimal and that he wished to proceed only with cash. Therefore, I believe that **AMARO AGUILAR** is the user of (559) 652-6826 (TT 6826), that he was the driver of the vehicle from which **FELISCIANO** obtained the methamphetamine, and that he coordinated the distribution of the methamphetamine with the user of (213) 334-1252 (TT18).

85.     Therefore, I believe that **ROMERO** knowingly provided a vehicle for **FELISCIANO** to use to facilitate the distribution of illicit narcotics; that **FELISCIANO** knowingly travelled to Fresno, CA, to receive one-half pound of methamphetamine in exchange for $600; that **AMARO AGUILAR** distributed one-half pound of methamphetamine in exchange for $600; and that **SANCHEZ** coordinated all of the above, along with the unidentified male in the background of his calls with **FELISCIANO**.

---

[20] **AGUILAR** was positively identified on that date based on a comparison with the picture maintained on file by the California Department of Motor Vehicles.

3.    **May 2, 2025 – SANCHEZ and RIOS facilitated the distribution of heroin from TAMAYO to FELISCIANO and GONZALES**

86.    On May 1, 2025, at approximately 11:28 AM, Angel Soto **RIOS**,[21] using (559) 514-1768 (TT 1768), called **SANCHEZ**, using (279) 386-7769 (TT6). It should be noted that during this call, **SANCHEZ** referred to **RIOS** as "Happy," and **RIOS** identified himself as "Angel Soto RIOS." Based on my knowledge of the investigation, I know that "Happy" is **RIOS's** moniker. The following is a transcript of the pertinent portions of that call:

| | [BEGINNING OF CALL] |
|---|---|
| . . . | [During the initial portions of this call, the parties spoke about how **RIOS's** associate was attempting to sell high-quality marijuana and how **RIOS** wanted to get a job. At one point, **SANCHEZ** conducted a three-way call with his "Compa" who indicated that he would consider **RIOS** for a job. **SANCHEZ** then terminated the call with his "Compa" and he and **RIOS** continued to speak about **SANCHEZ**'s relationship with his "Compa."] |
| **SANCHEZ** | But, uh, are we still rocking and rolling with the *negrita*? |
| **RIOS** | Hell, yeah. Mando. Always. [OV] [UI] It could happen right now if you want. |
| **SANCHEZ** | Ye- ye- no, no, no, no. I- I am. I- um. I'm gonna be ready- remember? I told you before Friday? |
| | [the parties speak over each other] |
| **SANCHEZ** | It will be tom- yeah, it will be tomorrow, you hear me? I'll end up snat- snatching up, uh, one. You know what I mean? |
| . . . | [**SANCHEZ** then speaks about how he gave narcotics to another individual to smuggle it into the Fresno County Jail, but this individual has not turned himself in yet. RIOS indicated that he understood.] |
| | [END OF CONVERSATION] |

87.    Based on my training and experience, I know that drug traffickers commonly use the word "black" to refer to heroin, that the word "*negrita*" means "the little black girl" in Spanish, and that Hispanic drug traffickers very commonly use various derivations of the word "black" in various languages, including this word, to refer to black tar heroin. I therefore believe that in this call, **SANCHEZ** was asking **RIOS** if **RIOS** still sold heroin. After **RIOS** indicated that he did, and that **SANCHEZ** could get it right now, **SANCHEZ** reminded[22] him that he would be ready "before Friday"

---

[21] Based on the fact that the user of (559) 514-1768 (TT 1768) identified himself as "Angel Soto Rios," as well as the fact that **SANCHEZ** identified the user of (559) 514-1768 (TT 1768) as "Happy," which I know to be **RIOS**' moniker, I believe that the user of (559) 514-1768 (TT 1768) is **RIOS**.

[22] Several days before, on April 27, 2025, between approximately 9:53 PM and 11:19 PM, **SANCHEZ** and **RIOS** had exchanged text messages on (279) 386-7769 (TT6) and (559) 514-1768 (TT 1768) in which **RIOS** asked **SANCHEZ**, "When are you gonna be ready again" and **SANCHEZ** responded, "By Friday, my ninja gracias".

1  and indicated that he would take "one." Based on subsequent events, I believe that **SANCHEZ** was

2  indicating he would take one ounce.

3      88.    Later that night, at approximately 6:09 PM, **SANCHEZ**, using (279) 386-7769 (TT6),

4  called Ramona **FELISCIANO**, using (559) 401-8633 (TT 8633).  During the call, another male began

5  speaking with **SANCHEZ**. Based on the fact that the investigative team has intercepted hours of

6  conversation involving Benny **GONZALES** while he was using (559) 961-6401 (TT5), I and other

7  members of the investigative team recognized this male voice as belonging to **GONZALES**. During this

8  conversation, **GONZALES** indicated that he was going to go to Fresno in the morning because he had

9  "court in the morning." **GONZALES** then stated, "If you need it tomorrow by a certain time, like when

10  I get out of court, like if it's in the morning-" and then the parties spoke over each other. **GONZALES**

11  then suggested that one of them speak with "Happy," and **SANCHEZ** agreed. The parties then spoke

12  about transferring money with CashApp. Approximately 23 minutes and 26 seconds into the call,

13  **SANCHEZ** indicated that "tomorrow" they would "buy an ounce of it," and that he was going to "call

14  the homie" to see if he could "make this happen early in the morning," at which point the call stayed

15  active, but no noise could be heard.

16      89.    Accordingly, at approximately 6:33 PM, while **GONZALES** and **FELISCIANO** stayed

17  on the other line, **SANCHEZ** used (279) 386-7769 (TT6) to call **RIOS**, using (559) 514-1768 (TT

18  1768). During the call, **SANCHEZ** stated that when his *primo* goes to court," he wanted to "get one for

19  sure." **SANCHEZ** also stated that it was "too much" to have his associates go to "the No" at the time of

20  the call, but then asked, "Can you have it ready in the morning for us?" **RIOS** responded that he could

21  call "[his] people right now."

22      90.    Based on my training and experience, I know that ENTERPRISE members refer to

23  Fresno, CA as "the 'No." Therefore, based on the context of the previous calls, I believe **SANCHEZ**

24  was indicating that he wished to have one ounce of heroin distributed to one of his associates when that

25  associate went to court, as it would be "too much" to have his associate go to Fresno, CA before that

26  time. Based on the context of the previous call with **GONZALES** and **FELISCIANO**, I believe that

27  **SANCHEZ**'s associate was **GONZALES**, and that therefore the plan was for **GONZALES** and

28  **FELISCIANO** to receive that heroin. I therefore believe that the heroin source – and possibly **RIOS** –

were located in Fresno, CA.

91.    I observed call detail records from (559) 514-1768 (TT 1768) and observed that (559) 514-1768 (TT 1768), used by **RIOS**, called (559) 776-7731 (TT17), used by **TAMAYO**[23] as described below, approximately two minutes after the previous call, at 6:35 PM. The call with **TAMAYO** lasted just over one minute. Based on the context of the previous call between **SANCHEZ** and **RIOS**, I believe **RIOS** called **TAMAYO** to ask if **TAMAYO** would agree to distribute the heroin to **SANCHEZ**'s associate (**GONZALES**) the following morning.

92.    Approximately two minutes after that, at 6:37 PM, **RIOS** again used (559) 514-1768 (TT 1768) to call **SANCHEZ**, using (279) 386-7769 (TT6). The following is a transcript of the pertinent portions of that call:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| **SANCHEZ** | Yee. |
| **RIOS** | Yeah, boy. Don't even trip, B. We'll make it happen first thing in the morning. My boy don't work tomorrow, so it's all good. |
| **SANCHEZ** | Oh, there it is there. Yes. [OV] |
| **RIOS** | [OV] Just give me a- just give me a call when your people on the way over here. He said if they can to meet at the same Seven Eleven. |
| **SANCHEZ** | Okay. Yeah, yeah, yeah. Mandatory, we'll do that. |
| . . . | [The parties then spoke about other individuals who were transporting and distributing narcotics, as well as **SANCHEZ**'s "Compa," who was going to get RIOS a job.] |
| | [END OF CONVERSATION] |

93.    Based on the context of the calls set out above, as well as subsequent events, I believe **RIOS** indicated to **SANCHEZ** that **TAMAYO** would have the heroin ready "first thing in the morning," and that the deal was going to happen at a "Seven Eleven" convenience store.

94.    The following morning, on May 2, 2025, at approximately 8:22 AM, **SANCHEZ**, using (279) 386-7769 (TT6), called **RIOS**, using (559) 514-1768 (TT 1768). During the call, **RIOS** indicated that "[his] boy was waiting on [**SANCHEZ**'s] people." **SANCHEZ** responded that "he" was "going to court" and that **SANCHEZ** would have his "*prima*" go and "meet the homie," as she was going to drop off the individual who had court. The parties then (again) spoke about **RIOS** working with

---

[23] On May 2, 2025, members of the investigative team established physical surveillance on **TAMAYO** who was with an uncharged female. The investigative team called (559) 776-7731 and watched as the uncharged female removed a phone from her purse and handed it to **TAMAYO**. **TAMAYO** placed the cell phone on his ear and answered the investigative team's call. Therefore, I believe **TAMAYO** is the user of (559) 776-7731.

1 **SANCHEZ**'s "Compa."

2     95.    Based on the context of previous calls, I believe **SANCHEZ** was indicating that

3 **GONZALES** had to go to court, but that **FELISCIANO** would come to pick up the heroin. A

4 subsequent call at approximately 8:27 AM between **SANCHEZ**, using (279) 386-7769 (TT6), and

5 **FELISCIANO**, using (559) 401-8633 confirmed this belief; during this call **SANCHEZ**'s "suggestion"

6 was that his "primo" would go "into the courts" and that **FELISCIANO** would "go over there and pick

7 it up." **FELISCIANO** ended the call by telling **SANCHEZ** that **GONZALES** had already been

8 dropped off at the courthouse.

9     96.    At approximately 8:43 AM, **SANCHEZ** used (279) 386-7769 (TT6) to call (559) 514-

10 1768 (TT 1768), used by **RIOS**. During the call, **RIOS** said that his "homeboy" had sent a text

11 message[24] indicating he was on his way. **RIOS** indicated that his "homeboy" would be in "a truck or a

12 Charger;" **SANCHEZ** indicated that he (i.e. **FELISCIANO**) was in a white Nissan Altima.

13     97.    When I reviewed call detail records for (559) 514-1768 (TT 1768), I observed that

14 approximately six minutes before the previous call with **SANCHEZ**, **RIOS** used (559) 514-1768 (TT

15 1768) to attempt to call **TAMAYO**, using (559) 776-7731 (TT17). The call lasted approximately two

16 seconds, which indicates to me that the call was likely not completed. Immediately after hanging up with

17 his next call with **SANCHEZ** at 8:44 AM, **RIOS**, using (559) 514-1768 (TT 1768), again called

18 **TAMAYO**, using (559) 776-7731 (TT17). That call lasted approximately 16 seconds, which based on

19 my experience I know to be consistent with a short conversation indicating someone was on their way to

20 a meeting. I therefore believe that **TAMAYO** was the "homeboy" who would be distributing the heroin,

21 based on the context of the prior call and transactional data discussed.

22     98.    It should be noted that while these calls were taking place that morning, the surveillance

23 team had observed that the vehicle tracker installed on **GONZALES**'s white Nissan Altima had

24 travelled to Fresno, CA earlier that morning. Due to the large increment set on the tracking device, the

25 logged geolocation points in the vehicle's tracker jumped from the area of Fowler, CA, to a 7-11

26

27        [24] A search of the historical records of (559) 514-1768 (TT 1768) via a court order did not reveal any text messages

28 sent from (559) 514-1768 (TT 1768) immediately prior to this call.  This does not preclude the possibility that **RIOS** was using a second phone or an encrypted application on his primary phone.

convenience store located at Fresno St and E. McKinley Avenue in the city of Fresno, CA. Though the tracker recorded that it was in the area of the 7-11 convenience store at 8:55 AM, the team was able to view in real time that the tracker had arrived several minutes before that, at approximately 8:40 AM. Based on the calls set out above, as well as subsequent calls and events, I believe **FELISCIANO** dropped **GONZALES** off at the Fresno County Courthouse and then proceeded to the agreed upon location to receive the heroin.

99.     It should also be noted that at approximately 8:29 AM, **SANCHEZ**, using (279) 386-7769 (TT6), began a call with another phone line. For an unknown reason, the pen register did not capture the number he called. However, based on the fact that he was speaking with a female, that the female knew **GONZALES**, that the female and **SANCHEZ** were speaking about breaking "it" down into "Gs," and the fact that several members of the investigative team recognized the voice as **FELISCIANO's**, I believe that **SANCHEZ** had used (279) 386-7769 (TT6) to contact **FELISCIANO**, using (559) 401-8633 (TT 8633). Additionally, during the call, which lasted approximately one hour and two minutes, **FELISCIANO** told **SANCHEZ** that she had put the "black shirts" in a brown paper bag.

100.     I believe that when **FELISCIANO** related she was breaking "it" down into "Gs", **FELISCIANO** was communicating to **SANCHEZ** that **FELISCIANO** packaged the narcotics into grams, to be eventually sold to drug users.  I know the term "black shirts" is used by the ENTERPRISE to describe heroin.  Therefore, when **FELISCIANO** told **SANCHEZ** she put the "black shirts" in a brown paper bag, **FELISCIANO** was describing that she placed heroin in a brown paper bag.

101.     The team then established surveillance on the vehicle while it travelled to the Fresno County Courthouse, and subsequently observed **GONZALES** in the front passenger seat of the vehicle[25]. The investigative team subsequently initiated a traffic stop on the vehicle at approximately 9:46 AM. At approximately 9:50 AM, **FELISCIANO**, using (559) 401-8633 (TT 8633), sent a text message to **SANCHEZ**, using (279) 386-7769 (TT6), which read, "Primo they stopped us". **SANCHEZ** then attempted to call **FELISCIANO** without success, and **FELISCIANO** sent another text message which read, "Can't talk". She then sent another text message several seconds later which read, "They're

---

[25] Based on the totality of the data, intercepted phone calls and personal observations, the investigative team believes **FELISCIANO** returned to pick up **GONZALES** at the courthouse after **FELISCIANO** purchased the heroin.

going to take us primo I don't have that stuff put away". After several more text messages between the two, in which **FELISCIANO** states the location of the stop and **SANCHEZ** tells her to "[p]ut it a way! Real quick", **FELISICIANO** sent a text message which read, "Primo we are going to jail" and another message which read, "I'm going to take the blame".

102.    During the vehicle stop, a member of the investigative team removed **GONZALES** and **FELISCIANO** from the vehicle, and subsequently located approximately one ounce of a black, tar-like substance wrapped in clear plastic wrap and placed in brown paper bag, which had in turn been placed inside of a black canvas bag and placed on the rear passenger seat. Based on my training and experience, I know that this substance is consistent in appearance with black tar heroin. **GONZALES** and **FELISCIANO** were cited for possession of narcotics and released.

103.    Later that morning, at approximately 11:04 AM, **GONZALES**, using (559) 961-6401 (TT5), called **SANCHEZ**, using (279) 386-7769 (TT6). The following is a transcript of the pertinent portions of that conversation:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| SANCHEZ | *Bueno*? |
| GONZALES | Bro. |
| SANCHEZ | Yes. |
| GONZALES | Fuck, dog. |
| SANCHEZ | She didn't fuckin' listen, man. |
| GONZALES | What happened? |
| SANCHEZ | Uh, my *prima*. |
| GONZALES | What did you tell her? |
| . . . | [**SANCHEZ** then recounted how he had been speaking with **FELISCIANO** and the sequence of events that transpired when they were on the phone and after they had terminated the call, including **FELISICANO's** text messages to **SANCHEZ** during the traffic stop. **SANCHEZ** then began to express disbelief that a police officer would find a *clavo* and would not arrest **GONZALES** and **FELISCIANO**.] |
| SANCHEZ | Were you guys playing? |
| GONZALES | No, on the hood, dog. We got pulled over, dog. |
| SANCHEZ | Oh, on the hood? And they took the *clavo*? |
| GONZALES | They took the *clavo*, dog. And they let us go. |
| SANCHEZ | Fuck. Those are some fuckin' crooked-ass cops. |
| GONZALES | [**GONZALES** they recounted the sequence of events that transpired during the stop. **SANCHEZ** then began to speak about getting "another one," and **GONZALES** indicated that **FELISCIANO** needed to buy diapers, but **SANCHEZ** had told her to wait.] |

| | | |
|---|---|---|
| SANCHEZ | Yeah, yeah, no, no. I- I have to focus on- look, we can- we can get that- get those, uh, uh- it's just, I ha- I- I- I mean, I need to get me another- another, uh… uh, full black shirt. You know what I mean? But if you guys don't… yeah, if you don't want to do it, *pri*s, I'll have to have someone go get it or something, but I- I gotta get another one. You know what I mean? I don't know- I cannot let this, um… [UI] [**SANCHEZ** spoke in the background to another individual] You hear me? | |
| GONZALES | Yeah, yeah, no, I hear you, bro. I was just tryin' to find out what's gonna happen, 'cause I- I- I'm already right here at, uh… | |
| SANCHEZ | Huh? You're- you're where? | |
| GONZALES | I'm on Jensen Avenue. I'm tryin' to see what's going on. Do I have to go back or what? What's goin' on? What's the deal? | |
| . . . | [The parties then spoke about how much money was in a CashApp account. | |
| SANCHEZ | Okay, what I'm gonna do, real quick… is- yeah, *primo*, 'cause I just told the- the homie [that] I don't wanna l- l- leave the 'No Town without getting one real quick. I just gonna send the money to you real fast, so, uh, I can call dog and just send the money to his CashApp real fast. So I could- I could get that. You hear me? | |
| GONZALES | Okay. But where do I need to go, *primo*? 'Cause I'm right here on the outskirts of town. I need to fuckin'- fuckin' turn around and go back. | |
| SANCHEZ | O- o- okay. We will go on McKinley- uh, 'cause the homie lives right there. We'll go on McKinley and, um… that Seven Eleven, uh… uh… McKinley and Fresno, *primo*. Do you hear me? | |
| GONZALES | I don't know where that's at, but I'm gonna find it right now. | |
| . . . | [**SANCHEZ** then speaks about how he is going to transfer money to a CashApp account, and begins a call with another male in the background. During the call, the male indicated that **SANCHEZ** could transfer funds to "his" (another male's) CashApp account. **SANCHEZ** and **GONZALES** then spoke again briefly, and **SANCHEZ** then started another call with the same male in the background, after which the call terminated.] | |
| | [END OF CONVERSATION] | |

104.    Based on my training and experience, I know that gang members frequently used the phrase "on the hood" to indicate that they are taking a situation seriously. I also know that Hispanic drug traffickers who smuggle narcotics into detention facilities frequently use the Spanish slang term "*clavo*" to refer to a small object that is inserted inside of one's body in an attempt to thwart the facilities' scanning equipment, and that they also frequently use innocuous terms such as "one" to refer to their narcotics in an attempt to thwart law enforcement and avoid criminal prosecution. Based on my knowledge of the investigation, I know that **SANCHEZ** frequently uses the term "black shirt" and/or "black T-shirt" to refer to a set amount of black tar heroin.

105.    Therefore, based on the information set out above, as well as the context of this call, I believe that **SANCHEZ** essentially begins this call by expressing to **GONZALES** that **SANCHEZ** is

frustrated with **FELISCIANO** because of the circumstances surrounding the traffic stop. **SANCHEZ** then asks for reassurance from **GONZALES** that **GONZALES** is not simply playing a prank on **SANCEHZ**, and **GONZALES** confirmed that he and **FELISCIANO** were actually stopped by the police and that the police actually seized the "*clavo*," which based on the context of the situation I believe to have been a reference to the ounce of heroin which was recovered from the vehicle. **SANCHEZ** then indicated that he had to get more heroin; in fact, based on the context of the conversation, when **SANCHEZ** began to say, "I cannot let this," I believe he was going to finish that sentence by essentially indicating that he could not let the situation stand as it was (i.e. without having received more heroin). **GONZALES** then expressed that he wished to know what was going to happen because he was on "Jensen Ave" and "the outskirts of town." Based on my knowledge of Fresno, I know that Jensen Avenue runs east and west through the southern portion of the more heavily populated areas of the city of Fresno, and that south of Jensen Avenue (which is the direction **GONZALES** would have been headed if he were travelling out of town) the area would have become more and more rural at the time of this call. I believe **SANCHEZ** confirmed this when he indicated that he had expressed to his "homie" that he did not want to leave "'No Town [i.e. Fresno] without getting [heroin] real quick." I believe **SANCHEZ** then indicated that they would go back to the 7-11 convenience store that **FELISCIANO** previously used to receive the first ounce of heroin (at "McKinley and Fresno") to conduct the second deal because "the homie lives right there."

106.    Based on my knowledge of the investigation, I know that **TAMAYO**'s last known address is 2415 E. Peralta Way, Fresno, CA, which is approximately 500 feet northwest of the 7-11 convenience store located on the northeast corner of E. McKinley Avenue and N. Fresno Street in Fresno, CA. I therefore believe that **SANCHEZ** was indicating that he wanted to complete the second deal at the same location as the first because **TAMAYO** lives in the area, and therefore believe that it was also **TAMAYO** who completed the first deal with **FELISCIANO**, as well.

107.    It should be noted that approximately two minutes after **SANCHEZ** began the above call with **GONZALES**, **FELISCIANO**, using (559) 401-8633 (TT 8633), also called **SANCHEZ**, using (279) 386-7769 (TT6). **SANCHEZ** put his call with **GONZALES** on hold and spoke with **FELISCIANO**, during which **FELISCIANO** also recounted the events of the traffic stop.

108.    At approximately 11:21 AM, **SANCHEZ** used (279) 386-7769 (TT6) to call **RIOS**, using (559) 514-1768 (TT 1768). During the call, **SANCHEZ** asked to pay using $130 in CashApp funds initially, promising to pay the remaining $270 later. **RIOS** indicated that he could not make this decision on his own and started a three-way call with an individual named "Big." **SANCHEZ** then related to "Big" that he wished to purchase "another one" with $130 in CashApp funds, promising to pay the remaining funds when **SANCHEZ** (i.e. **GONZALES** and **FELISCIANO**) arrived back in "the *varrio*." "Big" indicated that this arrangement "would work," and **SANCHEZ** told "Big" and **RIOS** to stay on the line.

109.    **SANCHEZ** then used (279) 386-7769 (TT6) to call **GONZALES**, using (559) 961-6401 (TT5), briefed **GONZALES** on the situation, and then merged the calls with **GONZALES**, using (559) 961-6401 (TT5), **RIOS**, using (559) 514-1768 (TT 1768), and an individual who was on the line with **RIOS** and who was identified as "Vic," at approximately 11:24 AM. It should be noted that when I reviewed call detail records for (559) 514-1768 (TT 1768), used by **RIOS**, I observed that **RIOS**, using (559) 514-1768 (TT 1768), had called (559) 776-7731 (TT17) at 11:22 AM, approximately two minutes before **RIOS** and "Vic" were merged with **SANCHEZ's** call; additionally, that call between (559) 514-1768 (TT 1768) and (559) 776-7731 (TT17) lasted for approximately 4 minutes and 22 seconds, indicating they stayed on the phone with **SANCHEZ** for another several minutes after the call was merged. This matches the audio from the call with **SANCHEZ**, further corroborating my believe that the user of (559) 776-7731 (TT17) ("Vic") is Victor **TAMAYO**. During that portion of the call, **SANCHEZ** introduced **GONZALES** as "Guero," and requested the CashApp account to which the funds would be paid. "Vic" gave the CashApp account handle as "$BigVic500", which is an account registered to "Victor **TAMAYO**." **SANCHEZ** then gave **GONZALES**'s CashApp handle as "$Huero824." **SANCHEZ** indicated it would "come up as Benny **GONZALES**."

110.    At approximately 11:26 AM, **GONZALES**, using (559) 961-6401 (TT5), received a text message from a number associated with CashApp which read, "Cash App: Victor Tamayo requested $130. Open the app to approve or decline." Based on the context of the events set out in this affidavit, I believe this money was partial payment for the second ounce of heroin received from **RIOS** and **TAMAYO**.

111.    The parties then agreed to meet at the "same spot," at "Fresno and McKinley," **GONZALES** indicated that he was already parked there, and the parties then terminated the call.

112.    Based on the calls set out above, the surveillance team had initiated surveillance on the 7-11 convenience store where I believe **FELISCIANO** previously received the initial ounce of heroin. The vehicle tracker installed on **GONZALES**'s Nissan Altima indicated that it arrived back at the 7-11 at approximately 11:22 AM, and the surveillance team observed the vehicle arrive at the same approximate time. At approximately 11:35 AM, the team observed **GONZALES** speaking with a Hispanic male adult – later identified as **TAMAYO** – in the parking lot of the 7-11. The two shook hands, embraced, and then **GONZALES** returned to his vehicle and departed the area.

113.    The surveillance team then followed the Hispanic male adult as he drove to 2415 E. Peralta Way, Fresno, CA, in a Dodge Charger. The male then walked in and out of the residence and was positively identified as the individual who had met with **GONZALES** in the parking lot and as Victor **TAMAYO** based on a comparison with the picture of Victor **TAMAYO** maintained on file with the California Department of Motor Vehicles.

114.    The surveillance team then followed **TAMAYO** as he and an unidentified female drove in the same Charger to the area of the Fashion Fair Mall in Fresno, CA. While one investigative team member called (559) 776-7731 (TT17), another team member observed the female take a phone out of her purse and give it to **TAMAYO**, who looked at the phone and then put it up to his right ear with his right hand. I therefore believe that **TAMAYO** is the user of (559) 776-7731 (TT17), and is the individual who distributed heroin to **GONZALES** and **FELISCIANO** earlier that day.

115.    During the first weeks of the wiretap portion of this investigation, the investigative team observed that (213) 334-1252 (TT18) was being used by an individual housed in **SANCHEZ**'s same pod in Salinas Valley State Prison (UM97). Several hours after the above-referenced deal for the second ounce of heroin, at approximately 2:10 PM, (213) 334-1252 (TT18) called (559) 961-6401 (TT5), used by **GONZALES**. The investigative team immediately recognized **SANCHEZ**'s voice, and after reviewing further calls[26] and toll records, believes that **SANCHEZ** uses this line to communicate with

---

[26] The investigative team was previously aware that **SANCHEZ** and his associates at least occasionally used (213) 334-1252 (TT18) to communicate. On April 23, 2025, the investigative team served a warrant on VERIZON for records

1    **ENTERPRISE** members and associates.

2       116.    The following is a transcript of the pertinent portions of the call between **GONZALES**

3    and **SANCHEZ**:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| **GONZALES** | Yeah |
| **SANCHEZ** | [UI] *primo*, my phone died. You hear me? |
| **GONZALES** | Yeah. |
| **SANCHEZ** | Yeah, yeah. So it died real quick. |
| . . . | [The parties then spoke about another female who was communicating with **SANCHEZ** during or around the time of the traffic stop set out above.] |
| **SANCHEZ** | But, uh, real quick, *primo*, so that's how they pulled you over? Just- just basically that- that [UI] she did that, and then [**SANCHEZ** then made noises like a siren].] |
| **GONZALES** | I didn't even know we were getting pulled over, *primo*. I fuckin'… I seen her pulling over, I was like, "What the fuck?" I was like, "You know we're getting pulled over?" and she was like, "Yeah, the cops are behind us." I was like, "What the fuck?" |
| **SANCHEZ** | Yeah, and the- and then- and then she had the thing right there. She couldn't put it in her "P?" |
| **GONZALES** | Oh, it was right there, dog. But no, there was not- they- they fuckin'- it happened so quick. I even told her, I said, "You got that fuckin' shit put away?" She was like, "No." I was like, "Fuck." |
| **SANCHEZ** | Yeah. I do- I was like, "What?" And then she's texting me and- and tell- I was like, "What the f-…" And then- |
| **GONZALES** | They- they kept telling her, "Get off the phone. Get off the phone." [At this point, a female – likely **FELISCIANO**, based on all of the information set out herein – began speaking in the background] Because they said that she was calling people to fuckin' go meet them over there. They were thinking- thinking that we were trying to… put a hit on 'em or somethin'. |
| **SANCHEZ** | Yes, yes, yes. |
| | [The parties then continued to speak about the circumstances leading up to the stop, during the stop, and after the stop. In total, the call lasted approximately 50 minutes.] |
| | [END OF CONVERSATION] |

associated with (213) 334-1252 (TT18). Because VERIZON retains content from text message conversations for several days, the investigative team received the content of a text message sent by **FELISCIANO**, using (559) 401-8633 (TT 8633), to (213) 334-1252 (TT18), on April 18, 2025, at approximately 6:04 PM, which read, "CICI … Can you tell my primo to call me please when he has a chance. Please and thank you so much. Have a blessed day".

       However, on May 7, 2025, at approximately 9:15 AM, **SANCHEZ**, using (279) 386-7769 (TT6), called an unidentified female (UF20), using (559) 413-8584. During the call, UF20 addressed **SANCHEZ** as "Giddy" and asked, "Was that you that just called me?" **SANCHEZ** responded, "Yeah, that was my other phone." The team previously obtained authorization to install a PRTT device on (213) 334-1252 (TT18). When I viewed call detail records for May 7, 2025, I observed that (213) 334-1252 (TT18) had attempted to call (559) 413-8584, used by UF20, approximately 30 seconds before the above-referenced call. Based on this call, I believe that **SANCHEZ** is a user of (213) 334-1252 (TT18).

117.    Based on my training and experience, I know that it is very common in drug trafficking communities for females to attempt to hide narcotics in their vaginal cavity. I also know that the word "pussy" is a common slang term for a female's vagina, and therefore believe this is what **SANCHEZ** and **GONZALES** were referencing when they spoke about **FELISCIANO** having the heroin "put away" and "put in her 'P.'"

118.    Therefore, I believe that on May 1 and May 2, 2025, **SANCHEZ** coordinated with **RIOS** and **TAMAYO** to have heroin distributed to **FELISCIANO** and **GONZALES**, and I believe that **TAMAYO** distributed that heroin to **FELISCIANO** and then to **GONZALES** on May 2, 2025.

4.    **May 4, 2025 – SANCHEZ facilitated the distribution of methamphetamine from R. LOPEZ to GUILLEN**

119.    On May 4, 2025, the investigative team became aware that **SANCHEZ**, while housed in the Salinas Valley State Prison, conspired to procure a half pound of methamphetamine from **R. LOPEZ**.  This procurement was brokered by Carlos **GUILLEN** and was transported by both **GUILLEN** and an uncharged co-conspirator**.**

120.    On May 4, 2025, at approximately 5:37 PM, the investigative team intercepted a call from **GUILLEN**,[27] using (559) 508-6409 (TT9), to **SANCHEZ**, using (279) 386-7769 (TT6). During the initial portion of this call, **SANCHEZ** merged the call with **GUILLEN** with another call between **SANCHEZ** and an uncharged co-conspirator.  **SANCHEZ**, the uncharged co-conspirator, and **GUILLEN** then spoke generally about the ENTERPRISE, its maintenance, and its structure until approximately 12:27 into the call, at which point I believe the conversation turned to the distribution of methamphetamine.  The following is a transcript of the pertinent portions of that conversation:

| NAME | TRANSCRIPT |
| --- | --- |
| | [BEGINNING AT THE 12:27 MINUTE MARK] |
| **SANCHEZ** | Do you still got that – those – those homeboys from Mendota?  Or from Kerman or |

[27] I believe that Carlos **GUILLEN** is the user of (559) 508-6409 (TT9) for several reasons. First, on April 19, 2025, at approximately 1:00 PM, Ignacio **SANCHEZ**, using (279) 386-7769 (TT6), called Ray **PINON**, using (559) 931-4104 (TT1).  At a certain point during the call, **SANCHEZ** indicated to **PINON** that **SANCHEZ** was receiving a call from an individual named "C-Dog," which I know to be **GUILLEN**'s moniker based on my knowledge of the investigation and human source reporting. The investigative team was able to see that (279) 386-7769 (TT6) was receiving a call from (559) 508-6409 (TT9) at the same time; additionally, the team was able to see the same data on a PRTT previously installed on (559) 508-6409 (TT9). Second, when **SANCHEZ** answered the call from (559) 508-6409 (TT9), members of the investigative team recognized **GUILLEN**'s voice based on prior contact with him. I therefore believe that **GUILLEN** is the user of (559) 508-6409 (TT9).

| | | |
|---|---|---|
| | | whatever? |
| | **GUILLEN** | Uh – from the – the – the crazy bitch?  That white chicka? |
| | **SANCHEZ** | Yeah, the crazy *hyna*. |
| | **GUILLEN** | Yeah [background noise] yeah they're uh - I think they're on stand-by right now, I think.  I think – they should have some I think dog. |
| | **SANCHEZ** | [speaking with someone in the background, then again with **GUILLEN**] Can you call them right now and see? Is it fire though? |
| | **GUILLEN** | Yeah, they told me it's good dog. I don't know, I never – I – I – I never – you know?  I never had got somebody. |
| | **SANCHEZ** | We're just kind of… |
| | **GUILLEN** | Yeah, I never had got somebody but he's – [UI] but they sell like six of 'em you know?  Like six big ones. |
| | **SANCHEZ** | So do this.  I – I – I'll leave you the half of one right? |
| | **GUILLEN** | Oh, a half piece? |
| | **SANCHEZ** | Yes, just to see how it is dog. 'Cause, I – I'm not going to give up all – give up money like that – and then it's – you know what I mean? Like, I want it to be… |
| | **GUILLEN** | Yeah, I get you. |
| | **SANCHEZ** | And then if it's good then I'll come back and get one or – two or – whatever it might be. You know what I mean? |
| | **GUILLEN** | Yeah. |
| | **SANCHEZ** | How can we do this shit? Are we able to… |
| | **GUILLEN** | Um – do you want me to make a call right now for – for the half real quick? For just get to test it real quick? |
| | **SANCHEZ** | Yes, please. |
| | **GUILLEN** | Ok. Um – let me call – let me get back to you right now real quick. Okay, my dog? |
| | **SANCHEZ** | Alright, thank you. |
| | **GUILLEN** | Alright, no problem, dog. |
| | **SANCHEZ** | We will be right here. Just holler at me, alright? |
| | **GUILLEN** | Okay. |
| | **SANCHEZ** | Alright, bulldog, gotcha. |
| | … | [13:43 into the call, **SANCHEZ** and the uncharged co-conspirator remained on the line and the conversation returned to the history and maintenance of the **ENTERPRISE**.] |
| | | [END OF CALL] |

121.    Based on my training and experience, I know that drug traffickers use innocuous and vague-sounding terms such as "one," "big one," and "piece" to describe a pound of illicit narcotics, and that they also use terms that refer to a "white girl" such as "crazy bitch" and "white *hyna*" to describe methamphetamine, specifically. Finally, I know that they use the term "fire" to describe high-quality narcotics. Therefore, I believe that in this call, **SANCHEZ** asked **GUILLEN** if **GUILLEN** still had a connection with the methamphetamine distributor in Kerman, CA.  **GUILLEN** responded that he did, and that he knew that the distributor had approximately six pounds of methamphetamine for sale. **SANCHEZ** then asked **GUILLEN** to coordinate the purchase of a half-pound of methamphetamine

1  from this distributor, so that **GUILLEN's** customers can test it out prior to **SANCHEZ** purchasing a

2  large amount from this distributor.  **GUILLEN** agreed and exited the call, presumably to call

3  **GUILLEN's** distributor.

4      122.    When the investigative team reviewed tolls records for (559) 508-6409 (TT9) used by

5  **GUILLEN**, the team observed that immediately after getting off the phone with **SANCHEZ**,

6  **GUILLEN**, using (559) 508-6409 (TT9), made three calls. The first and third calls were to unknown

7  numbers and were so short that I believe they were unanswered. The second call, made immediately

8  after the first, at approximately 5:54 PM, was to (559) 519-8338[28] (TT 8338), utilized by **R. LOPEZ**

9  and lasted for approximately one minute and nineteen seconds.  I believe the content of this call is set

10  out in the transcription below, in **GUILLEN's** own words.  I believe when **GUILLEN** stated, "he told

11  me he had a couple of 'em," **GUILLEN** was indicating that this individual (i.e. **R. LOPEZ**, see below)

12  was indicating that he had several pounds of methamphetamine for sale.

13      123.    At 5:55 PM, after making the three above-referenced calls, **GUILLEN** used (559) 508-

14  6409 (TT9) to call **SANCHEZ** on (279) 286-7769 (TT6).  The following is a transcript of a pertinent

15  portion of that call:

| NAME | TRANSCRIPTION |
|---|---|
|  | [BEGINNING OF CONVERSATION] |
| **SANCHEZ** | Hello? |
| **GUILLEN** | Hey my dog.  You hear me? |
| **SANCHEZ** | Yeah. |
| **GUILLEN** | Um – I just called the homie, he said that he – he um – he – he is um – he is hanging up his TV right now on his wall and all that.  Like in 20 minutes or so he's going to call me back. But, I had hollered at him also to about like – since like – he had told me that he had a couple of 'em. |
| **SANCHEZ** | Yeah. |
| **GUILLEN** | I had told him like – like um – I wanted like maybe a half "P" real quick.  Just to get a test real quick. But – like if my – if my folks like it and shit, we might come – like – for one or two maybe and shit. And then – and then they're still like on stand-by – like if – if it's constantly [UI] with it… |
| **SANCHEZ** | [**SANCHEZ** talking in the background] Go ahead my ninja, go ahead.  I added my |

[28] Throughout this investigation, members of the investigative team have intercepted (559) 519-8338 on multiple occasions.  During these intercepts, the user of (559) 519-8338 was identified as "R" or "R-Dog" or the "homie from San Joaquin."  I know these monikers to describe **Ricardo LOPEZ**. Furthermore, members of the investigative team recognized the voice in these calls to be that of **R. LOPEZ** from prior contacts and investigations. Though **R. LOPEZ** ceased use of this phone toward the end of May 2025, I believe that **R. LOPEZ** was the user of (559) 519-8338 (TT20) at the time of the calls set out in this affidavit.

| | |
|---|---|
| | brother so we don't have him on hold. Go ahead. |
| **GUILLEN** | Oh, okay – nah – nah – but it's good cuz I had just told him – hollered at him like, "Hey dog, well-" 'cause, like, I just want to make sure, like, if we could lock it in and shit. It's going to be constantly, like, if we, like- hey, bitch, the plug is right there on stand-by, you know? |
| **SANCHEZ** | Yeah. |
| **GUILLEN** | Like, if my people like it, but we want to get that half too, so he said he would shoot me 5 bills, he would shoot it for 5 bills. |
| **SANCHEZ** | Ye – yeah. So what did he say? |
| **GUILLEN** | He said that he's gonna call me back like – in twenty, thirty minutes as soon as he's done, um, not being busy from, um, hanging up his TV on the wall in his house. |
| **SANCHEZ** | Okay, where does he live at? |
| **GUILLEN** | He – he – he stay in Fresno – but – I don't know if his shit – if he has his stash in Kerman or I don't know what – but – um either way I could meet him up though, dog. |
| **SANCHEZ** | Oh, you – okay – the – the reason why... |
| **GUILLEN** | I could probably get a ride or something if you need it you know? |
| **SANCHEZ** | If you could – no – if you could get a ride right... |
| **GUILLEN** | Yeah. |
| **SANCHEZ** | I – I'll – um – um – what's it called – what we – what I'll do dog right – uh... |
| **GUILLEN** | Yeah |
| **SANCHEZ** | You get a ride, but you have bud, huh? |
| **GUILLEN** | Um – um – yeah I have – well – to be honest – I just have like – I'm helping out the little homie – um – well, uh, "Rue" he be having some tree and shit. |
| **SANCHEZ** | Yeah. Yeah well – well what I can do right – is – is – uh – if you could get a ride, dog – uh – uh you know I like to show appreciation dog so... |
| **GUILLEN** | Yeah. |
| **SANCHEZ** | So if you could do it for me – I – I come – I do whatever I can dog, you know what I mean? |
| **GUILLEN** | Yeah I get it, I understand you right now. |
| **SANCHEZ** | Remember the last time, I shot you bud whenever you were in the *vario*, da da da da da – so – um I could do that again – but um – I'm trying to do this asap though, dog, 'cause I need to – I need to rock and roll, big dog. |
| **GUILLEN** | Okay, okay, yeah. Like, right now you need it- an emergency right? It's, like, dry right now, that's why? |
| **SANCHEZ** | It's dry and then the people that – that – that have, right? Look it – I don't mess with these other people in the hood right? I could be greedy. |
| **GUILLEN** | Yeah. |
| **SANCHEZ** | I could have the homies – I could – "Hey, dog, fuck that. We're going to go over here and wa wa." I try to let everybody live – everybody have their own – uh – everybody has to live dog, you know what I mean? |
| ... | [At the 2:54 minute mark, **SANCHEZ** continued to speak about the way he maintains the **ENTERPRISE's** drug trade, and why **SANCHEZ** doesn't – even though he could – eliminate drug competitors within Huron. **SANCHEZ** and **GUILLEN** continued to speak about the issues facing the **ENTERPRISE**, including rival gang members and the history of their conflict(s). At the 18:22 minute mark the conversation returned to the drug conspiracy.] |

| GUILLEN | Hey, my dog – um – the homie from SRP is calling me real quick – um – can I call you back in a couple minutes? |
| SANCHEZ | Yeah.  Go ahead, go ahead. |
| GUILLEN | Alright. |
| SANCHEZ | Alright, 'bye. |
| | [END OF CALL] |

124.    Based on my knowledge of the investigation, I know that "SRP" is an acronym used by **ENTERPRISE** members to refer to the San Joaquin Ruthless Perros Bulldog criminal street gang. Based on my training and experience, I know that drug traffickers use the phrase "to lock it in" to indicate that a transaction will very likely occur or is being confirmed with that phrase and the letter "P" to stand for one pound of an illicit narcotic. I also know that they will frequently shorten financial denominations. For example, instead of saying "five hundred dollars," a drug trafficker will often use the phrase "five bills." Finally, I know that they use the word "dry" to indicate that they do not possess any more narcotics that they can sell.

125.    Therefore, I believe that **GUILLEN** began the conversation by indicating that he had contacted his distributor, who had indicated that he would call **GUILLEN** back in approximately 20 minutes. I believe **GUILLEN** then indicated that he had asked his distributor for one-half pound of narcotics. **GUILLEN** then further elaborated that his distributor had indicated that he would sell the half-pound for $500, which based on my training and experience I know to be consistent with the price of methamphetamine in California's Central Valley. **GUILLEN** then indicated that his distributor currently stayed in Fresno, but that his distributor may have his "stash" in Kerman, CA; **GUILLEN** also said that he could get a ride to meet with the distributor. **SANCHEZ** then asked that **GUILLEN** complete the transaction "asap," and confirmed – when **GUILLEN** asked – that there was no methamphetamine left for **SANCHEZ** to sell at that time, as **SANCHEZ** did not want to be "greedy" and take other sellers' methamphetamine.

126.    Toll records from (559) 508-6409 (TT9), utilized by **GUILLEN**, showed that at 6:13 PM, **GUILLEN,** received a call on (559) 508-6409 (TT9) from (559) 519-8338 (TT 8338), utilized by **R. LOPEZ** that lasted approximately 28 seconds.

127.    I believe that **GUILLEN** and **R. LOPEZ** spoke, as indicated in the previous call between **GUILLEN** and **SANCHEZ**, about **GUILLEN** purchasing one-half pound of methamphetamine on

behalf of **SANCHEZ**. I also believe these calls likely included conversations regarding the availability

of the methamphetamine and the price to be advertised to **SANCHEZ** when **GUILLEN** returned

**SANCHEZ's** call.

128. Approximately six minutes after the last call, and with no intervening calls, at 6:53 PM,

**GUILLEN**, using (559) 508-6409 (TT9), called **SANCHEZ**, using (279) 386-7769 (TT6). The

following is a transcript of the pertinent portions of that call:

| | [BEGINNING OF CALL] |
|---|---|
| **GUILLEN** | [Background noise] Hello? |
| **SANCHEZ** | My ninja? |
| **GUILLEN** | Yeah. |
| **SANCHEZ** | Everything Gucci? |
| **GUILLEN** | Yeah I'm uh – I just went over to drop my daughter off and all that shit – um – I got a little, you know, distracted and all that but uh… |
| **SANCHEZ** | No, no, it's beautiful. No it's – it's nice. You gotta take your baby. But – but – what's up with the – the homies? |
| **GUILLEN** | Yeah I'm – I'm texting them right now on my other phone while we are talking right now. |
| **SANCHEZ** | Yeah, so you can let me know so we can rock and roll. Dog, I need to handle business. |
| **GUILLEN** | [Text message audio heard] Um yeah – let me – here – he's telling me that he gots it. |
| **SANCHEZ** | Okay, well, then – uh – uh – how can we rock and roll? |
| **GUILLEN** | Do you got the cash or…? |
| **SANCHEZ** | Yeah! Hell yeah I got the cash. |
| **GUILLEN** | [UI] Do you gotta – send it in CashApp. |
| **SANCHEZ** | No, no I got it in hand. |
| **GUILLEN** | Okay, um, what's it called? Um, let me – let me call this phone and number dog. Let me put him on the phone right quick. |
| **SANCHEZ** | Yeah, let's do this, ninja style. |
| … | [At 6:54 PM, the PRTT device installed on (559) 508-6409 (TT9) indicated that (559) 508-6409 (TT9) called (559) 519-8338 (TT8338); that call was then merged with the original call between **GUILLEN** and **SANCHEZ**. **SANCHEZ** and **R. LOPEZ** spoke generally about **ENTERPRISE** members and past drug deals. The conversation then turned to the purchase of methamphetamine.] |
| **R. LOPEZ** | Yeah but, what's it called – I told "C-Dog" and shit, if fuckin it's for you – um – yeah it's good, for five, I'll give you the half – the half "P." |
| **SANCHEZ** | Thank you, thank you, my dog – uh, uh – the – the thing is – is, uh – my boy is – where are you at? 'Cause "C-dog" is going to do me the "*paro*." |
| **R. LOPEZ** | I'm, uh – I'm right here in Fresno, I'm going to send him the address right now. He said he's going to come here right now. |
| **SANCHEZ** | Ok, that's my little nigga. Ya – ya – no – no – ok so – check this out right – ok – so, are you the one that – that has it? Like basically you – you be um – the one that be having it? Or… |

| | R. LOPEZ | Yeah. |
|---|---|---|
| | SANCHEZ | Okay, so, whenever from here on out, 'cause I'm just going to go get it, 'cause I need a- I wanna see if it's good. If it's good, I'll come back tomorrow – or – or – or the following day for sure, you know what I mean? Like- |
| | R. LOPEZ | Yeah it's good, it's good.  [UI] You could just come get this one and I'll send it out, if you like it or whatever, I have it, so you could just tap in whenever. |
| | SANCHEZ | Okay then, there it is, there it is, dog.  Okay – so – alright – check this one out alright? Um – 'kay, let's see, uh – um – you know what – alright – but you could – it's guaranteed fire right? |
| | R. LOPEZ | Yeah. |
| | SANCHEZ | Ok, 'cause it – what I – what I'm thinking right now my dog. |
| | R. LOPEZ | 'Cause its fire and shit, it's good. And what's it called – I know the homies from the hood – the fool fucking um – homie [UI] fucking tried it, that fool said it was fire too, it's better – um it's better then all the ones that's right now in Kerman. |
| | ... | [The conversation turns to **SANCHEZ**'s cell mate, who is currently rehoused in another facility.  The conversation returned to the drug conspiracy at the 6:55 minute mark.] |
| | SANCHEZ | Um – if anything, it will be "C-Dog" rolling through with you and stuff because, I'll bring "*feria*" your way dog, like – if, if, if, if it's good – like that dog, I'll be coming through. For sure with pounds – or – half a pound, a pound.  Or sometimes if you could get me a good deal, lil- lil- lil' better than a thousand I'll come through with two- two pounds, dog. I'll be doing my little thing dog even though I'm right here, do you hear me, my ninja? |
| | R. LOPEZ | Yeah. |
| | SANCHEZ | Mm-hm.  So… |
| | R. LOPEZ | Alright, alright that sounds good. |
| | SANCHEZ | Is it consistently though?  You always have it like this? |
| | R. LOPEZ | Yeah, yeah I have it and shit because [UI] have it, or whenever I run out I'll get it back you know? |
| | SANCHEZ | Ok, fuck yeah, dog! Alright, alright then dog, there it is there, bulldog. |
| | R. LOPEZ | So whenever I run out it will probably be like – proly like – just like – probably like a day wait – or like, less than that, fucking, until I get you know? |
| | SANCHEZ | But you have – you – you have enough for me to go back to back a couple times right? |
| | R. LOPEZ | Yeah – yeah – yeah – yeah. That's like fucking – fucking like – I've got like seven whole ones. |
| | SANCHEZ | Oh, ok then, ok then. Alright. Ther – there it is there, but look – check this out – what about like if – if I ever needed to – you – you don't – you couldn't meet me halfways?  Or to – to – to – uh – to uh – you know – you know how right there – uh by – your hood?  Uh – um – that one little store right there? That helm or whatever or what is it, that's still by the railroad tracks? |
| | ... | [**SANCHEZ** then began describing how the **ENTERPRISE's** drug trade struggles at times due to a shortage of vehicles.  **SANCHEZ** asked if **R. LOPEZ** was able to meet buyers closer to Huron and reiterated that if the methamphetamine were good, he would be a regular customer.  **SANCHEZ** then briefly left the conversation to take another call, and returned to the conversation at approximately 10:14.] |
| | SANCHEZ | C-Dog? |
| | GUILLEN | Is it 3880 N. Fruit? |

| R. LOPEZ | Yeah – yeah – yeah – yeah. |
|---|---|
| GUILLEN | Alright I got it over here. |
| ... | [The parties then continued to rehash the details of the narcotics deal, and subsequently terminated the conversation] |
| | [END OF CALL] |

129.    As stated above, I know that "SRP" stands for "San Joaquin Ruthless Perros," and I know that **R. LOPEZ** is a member of that clique. Based on my knowledge of the investigation, I also know that **R. LOPEZ**'s moniker is "R-Dog."

130.    Therefore, I believe that **GUILLEN** began this portion of the conversation by indicating that his distributor – **R. LOPEZ** – had the requested narcotics and asked if **SANCHEZ** had cash. When **SANCHEZ** indicated that he did, **GUILLEN** then said that he would call **R. LOPEZ** and then subsequently merged his call with **R. LOPEZ** with his original call with **SANCHEZ**. When **R. LOPEZ** joined the call, I believe **R. LOPEZ** confirmed that he would sell **SANCHEZ** one-half pound of methamphetamine for $500. I know that the Spanish word "*paro*" means "favor" in English, and therefore know that **SANCHEZ** then asked for **R. LOPEZ**'s location because **GUILLEN** was doing **SANCHEZ** a favor by picking up the narcotics. **R. LOPEZ** then indicated that he was in Fresno, CA, that he would send **GUILLEN** the location, and that he was the one who actually possessed the narcotics. **SANCHEZ** then also confirmed that the methamphetamine was "fire" or of a high quality and **R. LOPEZ** confirmed that it was. **SANCHEZ** then indicated that if **R. LOPEZ** was willing to give him a better deal than "a thousand," **SANCHEZ** would buy multiple pounds. It is also worth noting that **SANCHEZ** asked if **R. LOPEZ** would have that amount of methamphetamine "consistently," to which **R. LOPEZ** responded that he would. Finally, I believe that **R. LOPEZ** indicated that he currently had seven pounds of methamphetamine and that **GUILLEN** then confirmed the address of the deal with **R. LOPEZ** as "3880 N. Fruit."

131.    Members of the investigative team began monitoring the precision location information being transmitted by the ankle monitors worn by **GUILLEN** and **R. LOPEZ** as a term of their State of California parole terms. Several hours after the last call set out above, at approximately 8:40 PM, the investigative team observed that **GUILLEN'S** ankle monitor left the City of Huron and arrived at 3880 N Fruit Avenue in Fresno, CA at approximately 9:35 PM.  During the time of **GUILLEN'S** arrival, **R. LOPEZ** GPS ankle monitor remained in Kerman, CA.  Members of the investigative team established

physical surveillance at 3880 N. Fruit Avenue and at 9:38 PM, **GUILLEN** was observed walking out of apartment #114, the address of record for **R. LOPEZ**'s paramour.  **GUILLEN** was identified by comparing him to prior known booking photographs of **GUILLEN** as well as his California Department of Motor Vehicles photograph.  **GUILLEN** was carrying a white bag as he walked toward a silver Infinity sedan.  **GUILLEN** then placed the white bag in the trunk of the silver Infinity sedan and **GUILLEN** entered the passenger side of the vehicle.  Members of the investigative team observed the Infinity sedan leave the apartment complex, and simultaneously intercepted a call between **GUILLEN** on (559) 508-6409 (TT9) and **SANCHEZ** on (279) 386-7769 (TT6).  The following is transcript of the pertinent portions of the conversation:

| | |
|---|---|
| | [BEGINNING OF CALL] |
| **SANCHEZ** | My ninja. |
| **GUILLEN** | My dog. |
| **SANCHEZ** | CiCi, what's upper boy? |
| **GUILLEN** | CiCi, um – it's a green light. |
| **SANCHEZ** | Ok, where are you at? |
| **GUILLEN** | I'm barely leaving the homies spot right now. |
| **SANCHEZ** | Ok, alright cool.  I've got a little bit of bud for you too.  It's like two different kinds but it's – it's still cool. |
| **GUILLEN** | Alright then um – yeah that's cool – um – where do you want me to – uh – to drop it off? |
| **SANCHEZ** | Uh – hold up – uh – hold up – wait up – my thug. |
| **GUILLEN** | [UI] In the house? |
| **SANCHEZ** | Uh – It would probably be best if you could do it at the thuggy. |
| … | [**SANCHEZ** placed **GUILLEN** on hold and went to another call.  **SANCHEZ** eventually returned to the call at the 1:07 minute mark.] |
| **SANCHEZ** | Ninja? My ninja? |
| **GUILLEN** | Yeah. |
| **SANCHEZ** | Hey do me a big paro, take it to the thuggy so I could have some bud for you. Ok? |
| **GUILLEN** | Um – alright then um – I'll see it when I get there um – um – let's see how town is in the entrance – if not, I'll probably pull my scooter and drop it off. |
| **SANCHEZ** | Yeah – yeah – yeah, just do it ninja style, please. |
| **GUILLEN** | Alright then. Yeah I will. |
| **SANCHEZ** | Alight I'll – I'll holler at you, thank you.  Does it – is it look fire though? |
| **GUILLEN** | Um – to be honest – it's like – hella like – like – little cool rocks and shit.  It's not fat you know? |
| **SANCHEZ** | Yeah, but they're cool ones? |
| **GUILLEN** | Yeah, it's all – cool – shiny and white you know? |
| **SANCHEZ** | Ok, well we're going to try it out you know.  Ok? |
| … | [The two end the conversation by rehashing the fact that **SANCHEZ** has bud for **GUILLEN**, and that **GUILLEN** will call when he is back in Huron.] |
| | [END OF CALL] |

132.    At 9:42 PM, a Fresno Police Department patrol unit conducted a vehicle stop on the Infinity sedan.  This vehicle stop was not coordinated by the investigative team, and the patrol unit was not aware of this investigation.  No searches were conducted during this detention, and **GUILLEN** and the uncharged co-conspirator who was driving were released with a verbal warning for a traffic infraction.  After the vehicle stop, **GUILLEN** using (559) 508-6409 (TT9) placed a call to **SANCHEZ** on (279) 386-7769 (TT6) and advised **SANCHEZ** that **GUILLEN** had been pulled over, and "it was in the trunk."  **GUILLEN** and **SANCHEZ** then confirmed plans for **GUILLEN** to deliver the narcotics. The investigative team later observed that at approximately 11:13 PM, **GUILLEN** arrived at 36946 Los Angeles Street, a property owned by **SANCHEZ** and commonly referred to by **ENTERPRISE** members as "Thug Mansion" or "Thuggy."  **GUILLEN** then left "Thug Mansion" at about 11:16 PM and returned to his residence.

133.    Based on all of the information set out above, I believe **R. LOPEZ** distributed one-half pound of methamphetamine to **GUILLEN** at **SANCHEZ**'s request. Based on all of the above, I believe **SANCHEZ**, **R. LOPEZ** and **GUILLEN**, conspired to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

5.    **May 7, 2025 – SANCHEZ facilitated and orchestrated a plot to smuggle narcotics into the Fresno County Jail, in which FELISCIANO, ESCOBEDO, GONZALES, Debbie SANCHEZ, BALBOA, ALFARO, CHENOT, LIMA, DIAZ, and JEFF participated and/or conspired to complete**

134.    Beginning on April 15, 2025, Ignacio **SANCHEZ** and his associates began to conspire to smuggle narcotics into the Fresno County Jail. After the smuggler – Armando **ALFARO** – was apprehended, several other individuals attempted to acquire the narcotics to save their investment, as well as to attempt to warn those involved that law enforcement had acquired the narcotics.

135.    On April 15, 2025, at approximately 1:10 PM, **SANCHEZ**, using (279) 386-7769, spoke with an uncharged individual (UM44), using (559) 341-9376. During that conversation, UM44 referenced something that **SANCHEZ** "had said," that UM44 had been thinking about that topic, and then said that he had "a couple homies that'll just fuckin' go straight in there, too, you know?" **SANCHEZ** indicated that he understood and then said that there was "this one specific homeboy" who was **SANCHEZ's** age, who had "been in the game for a long time," and who had done "this" on three

other occasions.[29] **SANCHEZ** further told UM44, "I told him, 'I got this much money and I got all this for you. [UM44 indicated he understood] What's up?' And he says, 'Yeah, I got you.'" **SANCHEZ** then indicated that he hoped that he [**SANCHEZ**] "stayed in the County" because the smuggler "gets out on the twenty-first, and he's on- it's only gonna take him two days and he's gonna come back, right?" UM44 then indicated that he knew an individual who **SANCHEZ** could use, and the parties began to hypothesize about what UM44's associate was willing to do, including whether he would be willing to drunkenly argue with law enforcement, how many "ounces of black" and "ounces of white" **SANCHEZ** would be able to give him, and whether or not he "could do a Q.P in his butt." UM44 expressed doubt that "he" could handle "a whole Q," but that maybe he could handle "something close to it." The parties also discussed paying these potential smugglers, indicating that the payment would be "a band" and that they could each contribute "five hundred."

136.     Based on my training and experience, I know that ENTERPRISE members use the phrases "homie" and "home boy" to refer to other members of the ENTERPRISE. I also know that the phrase "to be in the game" is used in popular culture frequently to refer to the idea that one has experience or expertise in a particular field or profession and that the phrase "I got you" is frequently used to indicate that the speaker understands and will fulfill the request of the other party to the conversation. Furthermore, I know that drug traffickers very often use vague and innocuous language to attempt to avoid prosecution for their crimes. Specifically, I know that they often use words such as "this" to refer to their contraband, the words "black" and "white" to refer to black tar heroin and methamphetamine, respectively, the acronym "Q.P." (or simply "Q") to refer to a quarter pound of illicit narcotics, and the word "band" to refer to $1,000 U.S. currency. Finally, I also know that it is very common practice for drug traffickers to attempt to smuggle illicit narcotics into detention facilities by paying couriers to insert narcotics into their anal cavity and then intentionally have themselves arrested, either by being taken in on an outstanding warrant or by committing a new crime in front of a peace officer.

137.     Therefore, based on the above information, I believe **SANCHEZ** and UM44 continued a

---

[29] For clarity, the individual **SANCHEZ** is speaking about will be referred to as "the smuggler" until he is later identified.

previous conversation about narcotics smuggling. I believe **SANCHEZ** indicated that he knew a smuggler who was about **SANCHEZ's** age and who had smuggled narcotics several other times. I believe **SANCHEZ** further specified that he had spoken with this smuggler, that he had detailed the narcotics that he wished smuggled and how much he was willing to pay the smuggler, and that the smuggler had indicated that he would smuggle those narcotics for **SANCHEZ**. I believe that **SANCHEZ** further specified that the smuggler was going to be let out of custody and would then take two days to get taken back into custody. When UM44 indicated that he knew a potential smuggler, as well, I believe he and **SANCHEZ** began speaking about how much black tar heroin and methamphetamine this smuggler would be willing to smuggle. I believe **SANCHEZ** then specified that he would probably have to fit close to one-quarter pound of narcotics in his anal cavity, at which point UM44 expressed doubt that his associate would be able or willing to do that. Finally, I believe that the parties indicated that they would be willing to pay whichever smuggler was used $1,000 for his troubles.

138.    The next day, though **SANCHEZ** had indicated that he had a smuggler who was willing to attempt to smuggle narcotics, **SANCHEZ** continued to attempt to find someone who was willing to smuggle narcotics into the jail. For example, at approximately 8:03 PM, **SANCHEZ** was intercepted using (279) 386-7769 to converse with an uncharged female (UF86) on (559) 816-0296 about that topic. Of note is that during this call, **SANCHEZ** referred to "drawings" and white and black "portraits," as well as "t-shirts," and indicated again in coded language that he would pay $1,000 for someone to take these items with them into custody.

139.    Based on my knowledge of the investigation, I know that **SANCHEZ** and his associates commonly use the word "t-shirt" to refer to ounces of heroin. Based on my training and experience, I know that drug traffickers commonly use the word "white" to refer to methamphetamine and "black" to refer to black tar heroin; based on the fact that – as is set out below – **SANCHEZ** began referring to the smuggler as "the Artist," I believe that "white portraits" and "black portraits" were meant to refer to methamphetamine and heroin, and that **SANCHEZ** was again speaking about smuggling these narcotics into a detention facility.

140.    It should be noted that while **SANCHEZ** was attempting to orchestrate the actual smuggling of the narcotics, he was also coordinating the acquisition of the narcotics in the first place.

For example, on April 17, 2025, **SANCHEZ** sent Daniel Loubet **ROMERO** to Fresno, CA to pick up approximately one pound of methamphetamine from Luis AMARO **AGUILAR**. The investigative team conducted a traffic stop on the vehicle driven by **ROMERO** and seized the pound of methamphetamine.

141.    Later in the day on April 17, 2025, **SANCHEZ** appeared to have finalized his selection of a smuggler. At approximately 5:00 PM, **SANCHEZ**, using (279) 386-7769, spoke with Carlos **GUILLEN**, using (559) 508-6409. During the call, **SANCHEZ** told **GUILLEN** that **SANCHEZ** "[gave] the homies *clavo*," but that "they have not hollered at" him. After discussing other minor topics, **SANCHEZ** said, "I'm going back, though, in twenty something days, you hear me? . . . And then I got this other big play going- jumping off that the hom- you remember Whisper? Or you-" to which **GUILLEN** responded, "Oh, Whisper from Pleasant?" **SANCHEZ** confirmed that Whisper was "the big one" and **GUILLEN** indicated that he knew who **SANCHEZ** was speaking about. **SANCHEZ** then said that Whisper was "coming back, you know what I mean? For sure. 'Cause [UI]. . . , you know what I mean? He's- he already gave the word so money's already put down, and stuff, so, yeah." **SANCHEZ** then discussed when he would have his court date, how "Whisper" was going to be "going in" "damn near fuckin' ten to twelve days" prior to **SANCHEZ** arriving, and that **SANCHEZ** would have to trust the other "homies" to "hold onto this shit" before he could retrieve "it" from them.

142.    Based on my knowledge of the investigation, I know that "Whisper"[30] is the street moniker for Armando **ALFARO**. Based on my training and experience, I know that the word "*clavo*" is used by Hispanic drug traffickers to refer to a tightly-bound package of narcotics which is meant to be inserted into body cavities in order to be smuggled into detention facilities. I also know that drug

---

[30] The calls that follow make it abundantly clear that the individual named "Whisper" is who will attempt to smuggle the narcotics into the Fresno County Jail, though the parties move back and forth between referring to him as "Whisper" and referring to him as "the Artist" in an attempt to use coded language to avoid detection by law enforcement. Based on my knowledge of the investigation, as well as subsequent events, I know that "Whisper" is the moniker for Armando **ALFARO**, and that it was actually **ALFARO** who the parties were speaking about. For example, on April 25, 2025, at approximately 5:22 PM, **ESCOBEDO**, using (831) 596-0869, called (559) 214-7050. The next minute, at 5:23 PM, she then used (831) 596-0869 to call **SANCHEZ**, using (279) 386-7769, to tell him that she had called "Whisper" and then identified the number she called as (559) 214-7050. In a call on April 25, 2025, at approximately 5:55 PM, **SANCHEZ**, using (279) 386-7769, indicated on a multi-line call with several individuals, including **ALFARO**, that if he called **ALFARO** while he was in custody, he would be using the words "Artist" and "portraits." **SANCHEZ** also identified **ALFARO** as "Whisper." Finally, during a call on April 30, 2025, at approximately 2:05 PM, while attempting unsuccessfully to call **ALFARO**, **SANCHEZ** told **FELISCIANO** that "the Artist's" name was "Armando Alfaro," that he is "Mexican," and that he was 48 years old. Therefore, all references to "Whisper" and "the Artist" will instead be referenced as **ALFARO** for the rest of this section unless the language is quoted directly from an intercepted phone call.

1  traffickers generally also use the term "shit" to refer to their narcotics and the word "play" to refer to a

2  narcotics transaction. I also know that the phrase "to holler at" is used in popular culture to refer to the

3  idea of contacting or communicating with someone. Therefore, based on this information, as well as the

4  context of the previous calls set out above, I believe that **SANCHEZ** and **GUILLEN** were discussing

5  **SANCHEZ's** plan to use **ALFARO** to smuggle narcotics into a detention facility. I believe **SANCHEZ**

6  indicated that he had given narcotics to other ENTERPRISE members which was meant to have been

7  smuggled into a detention facility, but that these other members had subsequently not contacted

8  **SANCHEZ**. I believe that **SANCHEZ** then referenced how he was going to return to the Fresno County

9  Jail, and then indicated that he was going to have a large narcotics transaction and began to reference

10  **ALFARO**. After indicating that **ALFARO** was from Pleasant – a reference to **ALFARO's** status at the

11  time as a Pleasant Street Bulldog criminal street gang member – I believe **SANCHEZ** then indicated

12  that **ALFARO** was going to "come back" into custody and then essentially expressed concern because

13  **SANCHEZ** was going to have to trust for several days that his fellow **ENTERPRISE** members would

14  take care of his narcotics for him.

15      143.    Several days later, on April 22, 2025, **SANCHEZ** made another attempt to obtain

16  methamphetamine, this time sending Ramona **FELISCIANO** to Fresno, CA to obtain it from Luis

17  **AMARO AGUILAR**, as his previous attempt with **ROMERO** had failed. Though **ROMERO** did not

18  participate directly, **SANCHEZ** asked **ROMERO** to use his vehicle, and I believe the surrounding

19  circumstances make it clear that **ROMERO** knew why his vehicle was being used by **FELISCIANO**.

20  On the afternoon of April 22, 2025, the investigative team observed and documented **FELISCIANO**

21  obtaining the half pound of methamphetamine from **AMARO AGUILAR** and transporting it back to

22  Huron, CA.

23      144.    The next day, on April 23, 2025, at approximately 12:05 PM, **SANCHEZ**, using (279)

24  386-7769, utilized the three-way calling feature of (279) 386-7769 to speak with **FELISICANO**, using

25  (559) 401-8633, and another uncharged individual (UM116), using (559) 852-6111. During the call, at

26  time marker 1:51, **SANCHEZ** indicated that "tomorrow, all myself, putting it together, and I'm gonna

27  meet dog anyways over there in, uh, uh, Fresno. You know what I mean? My Artist." Later in the call,

28  the line fell silent for an extended period of time, after which – at time marker 27:10 – another male

voice came on the line and **SANCHEZ** began speaking with him, calling him "Artist." When I reviewed the calls from April 23, 2027, I observed that **ESCOBEDO** had utilized (831) 596-0869 to engage in a three-way call with (279) 386-7769 (TT6) and (559) 214-7050 at approximately 12:31 PM and 12:32 PM, respectively. I believe that **SANCHEZ** added **ESCOBEDO**'s call to his original call with **FELISCIANO**. Based on my review of the audio between the three-way call involving (279) 386-7769 and (559) 401-8633, and (279) 386-7769, (831) 596-0869, and (559) 214-7050, I believe that it is all the same call, beginning at time marker 27:10 in the call involving (559) 401-8633. I therefore believe that "the Artist" – **ALFARO** – is the user of (559) 214-7050. For clarity, the following is a graph of how I believe the various phone lines connected:



145.     During this portion of the call, in which **SANCHEZ**, **FELISCIANO**, **ESCOBEDO**, and **ALFARO** participated, **SANCHEZ** first identified the parties involved by indicating that both his "*prima*" – his pet name for **FELISCIANO** – and his "ninjetta" – his pet name for **ESCOBEDO** – were on the call. He then began speaking about how **FELISCIANO** "knows how to make plugs," that the "plugs" would be made "with black tape," and that **ALFARO** would have an additional "ounce of white" and an "ounce of chiva" in addition to the narcotics that he would be smuggling for **SANCHEZ**. **SANCHEZ** also indicated that "if it ain't my ninjetta, it'll be my *prima*" who would be meeting with **ALFARO** the following day.

146.     Based on my knowledge of the investigation, I know that **SANCHEZ** almost constantly

refers to **FELISCIANO** as his "*prima*," and likewise has referred to **ESCOBEDO** numerous times as his "ninjetta," and that he does so in a mutually exclusive fashion. I therefore believe that these are **SANCHEZ's** pet names specifically for **FELISCIANO** and **ESCOBEDO** and will – for clarity – refer to the women's actual names when **SANCHEZ** uses the pet names. Based on my training and experience, I know that the word "plug" is another word used by drug traffickers to refer to either a source of illicit narcotics or a tightly-bound package meant to be inserted into a body cavity to be smuggled into a detention facility. Based on the context of this conversation, I believe **SANCHEZ** is using the latter meaning. I believe that **SANCHEZ** also revealed in this conversation that **ALFARO** would be bringing in other narcotics in addition to those being smuggled in at **SANCHEZ's** request, and that either **ESCOBEDO** or **FELISCIANO** would be meeting with **SANCHEZ** the following day. Based on subsequent events and calls, I believe the purpose of this meeting would be to deliver the narcotics to **ALFARO**.

147.    As is set out in the preceding paragraphs, the investigation has revealed that **FELISCIANO** and **ESCOBEDO** are intricately involved with **SANCHEZ's** drug trafficking enterprise. Numerous intercepted calls over the course of this wiretap investigation (and recorded jail calls prior to this wiretap investigation) have demonstrated that **FELISCIANO** and **ESCOBEDO** contact other individuals, transport narcotics, package narcotics, communicate information on behalf of **SANCHEZ**, and otherwise facilitate **SANCHEZ's** will, all for the benefit of the ENTERPRISE as a whole.[31]

---

[31] For example, on April 23, 2025, at approximately 9:52 PM, in a call between (831) 596-0869, used by **ESCOBEDO**, and (279) 386-7769, used by **SANCHEZ**, **SANCHEZ** indicated to **ESCOBEDO** that he was going to have the drugs transported to her location because the drugs had to be prepared for **ALFARO**. On April 24, 2025, at approximately 9:34 AM, in a call between **FESLICIANO**, using (559) 401-8633, and **SANCHEZ**, using (279) 386-7769, **SANCHEZ** instructed **FELISCIANO** to prepare the narcotics by weighing them, smashing them to make them smaller, wrapping them in black tape, and labeling them. On April 24, 20225, at approximately 11:34 AM, in a call between **SANCHEZ**, using (279) 386-7769, and **FELISCIANO**, using (559) 401-8633, **SANCHEZ** spent over an hour instructing **FELISCIANO** on which black t-shirts would be going to which individuals, how to make the narcotics bundles, how the "G" stands for "Giddy" (which I know to be **SANCHEZ's** moniker), how the "P" stands for "Pleasant" (and how this ounce of heroin would be **ALFARO's** payment for completing the smuggling operation), how the "five" stands for "5th Street" and was meant to be smuggled for a fellow ENTERPRISE member from the 5th Street Bulldog gang, how another plug would be labeled with the letter "B" because it would be given to an ENTERPRISE member from the Bond Street Bulldog gang, and how three ounces of methamphetamine would also be smuggled in for **SANCHEZ**. On April 24, 2025, at approximately 12:43 PM, **SANCHEZ**, using (279) 386-7769, spoke with ALFARO, while **ESCOBEDO** used the three-way calling capabilities of (831) 596-0869 to connect (559) 214-7050, used by **ALFARO**, with (279) 386-7769, used by **SANCHEZ**. During that conversation, **SANCHEZ** detailed which *clavos* would go to which individuals, as well as how **ALFARO** would

148.    On April 24, 2025, at approximately 11:34 AM (referenced above with respect to **SANCHEZ's** instructions for **FELISCIANO**), **SANCHEZ**, using (279) 386-7769, spoke with **GONZALES**, using (559) 401-8633 (during the second half of this call, **GONZALES** took the phone from **FELISCIANO** and conversed with **SANCHEZ**). During this portion of the call, **SANCHEZ** set out for **GONZALES** exactly what would be transported to **ALFARO** and then subsequently smuggled into the jail. The following is a transcript of this portion of the call, which in total lasted over an hour:

| | | |
|---|---|---|
| | | [BEGINNING OF CONVERSATION at approximately time marker 44:35] |
| | **SANCHEZ** | So we're gonna go- see, what I'm gonna do with mine is you're gonna put "G" on it, *primo*. You're gonna grind- grind up, um, the twenty grams of bud. |
| | **GONZALES** | Yes. |
| | **SANCHEZ** | As [UI] as you can. Bam. Then you're gonna, uh, go ahead and do, uh, uh, a ounce of the black. Boom. Bam. And then we're gonna do, um, uh, a ounce of, uh, white- to the twenty-eight grams. Do- do it good. That's gonna be mine. And then, um, we're gonna do, uh… another- okay, that will be- okay, that will be mine to do. Boom. We'll do that one right. That one's gonna be mine. [UI] |
| | **GONZALES** | Twenty grams of bud, Mona. |
| | **SANCHEZ** | Twenty grams [UI] the- the… the ounce of black. And, uh, uh, uh, an ounce of white. Okay, that's gonna be mine, for sure. I'ma have to put another plug in there, I just- I gotta make sure I have enough for eve- everybody to divide it by. So that's gonna be mine, see, for right now. Then the one that- where it says, "Whisper," that's gonna be Whisper. Which is a "P," you're gonna [UI] [OV] |
| | **GONZALES** | [OV] The "P?" Right. |
| | **SANCHEZ** | The "P" for "Pleasant." His- his is gonna be, um, a ounce of black. Boom, that's his. And then he's gonna- you're gonna give him, um, about, uh- we're gonna make sure it's, uh… twenty-one grams- twenty-one grams. Which would be, uh, uh… you're gonna bring- you're gonna put one of those, uh, quarters, right? And then- and then a half. That'll be his. You put it together, that'll be his *cochina*. That'll come out to twenty-one grams. Twenty-one grams of white, that'll be his. |
| | **GONZALES** | But they're gonna be- they're gonna be in different plugs, though, right? |
| | **SANCHEZ** | Yeah, they're all gonna be in different plugs. All different plugs with their names- he- he could take, like, sixteen of those. You know what I mean? |
| | **GONZALES** | Oof. [OV] |
| | **SANCHEZ** | [OV] That's the most we took. Yeah, I know. |
| | **GONZALES** | That's a lot to- that's a lot to have in your fuckin' gut, dog, and fuckin' stay in fuckin' booking for a long time. |
| | **SANCHEZ** | He d- he did it, that's the max. [UI] I'll put all these- |
| | **GONZALES** | Yeah, I- nah, I know. We used to… fuckin' take a fat-ass shit before you do that. |
| | **SANCHEZ** | [UI] |

proceed when he successfully entered the jail.  On May 1, 2025, at approximately 5/1 at 3:43 PM, **SANCHEZ**, using (279) 386-7769, called **ESCOBEDO**, using (831) 596-0869. During that conversation, **SANCHEZ** told **ESCOBEDO** that he wanted her to text and call "that number" (referring to (559) 214-7050, the number they had for **ALFARO**). The parties then attempted to remember "Whisper's" actual name. **ESCOBEDO** indicated that she would "do some thinking in [her] brain" to attempt to figure out **ALFARO's** identity.

| | |
|---|---|
| **GONZALES** | [UI] |
| **SANCHEZ** | Yeah. Okay. Okay, let me see real quick. Alright, so- al- alright, so there's- there's that. That's his. [UI] the two his. Right? |
| **GONZALES** | Okay, so for- for- for Whisper, it's gonna be the- the- the zip- the zip of the black and then, uh, twenty-one grams of the Go Fast. |
| **SANCHEZ** | Yes. Yes, right? |
| **GONZALES** | And those are- those are gonna have the "P" on it. |
| **SANCHEZ** | Yes. And then this one- this is gonna be a- a- a- a- a- "B." A "B" for Bulldog. That one is because of, uh, uh, uh… that's gonna be Envy, right? 'Kay. This is gonna be his, right? Due to the fact that he's [UI] paying with cash. Right? Um.. his is gonna be, uh, uh, a ou- a half- would be those twelve grams that I told my *prima*- 'cause I have three ounces of black and I have, like, twenty-one grams, or twenty-two grams, left ov- like, uh, that I have- [OV] |
| **GONZALES** | [OV] I tried talking to Envy the other day but I think he was in a fuckin' cell, he didn't want to come out. |
| **SANCHEZ** | [OV] He- he- he- |
| **GONZALES** | [OV] He was Mimi's. |
| **SANCHEZ** | He was Mimi's. Yeah, he don't know. He's alright, watch. That- that fucker is gonna get twelve grams of black, right? Which- which [OV] |
| **GONZALES** | [OV] Twelve grams of black. |
| **SANCHEZ** | And- and- and he's gonna get… uh, um, uh, uh, ten grams… wait a… yeah, ten grams of… |
| **GONZALES** | The Go Fast. |
| **SANCHEZ** | Of Go Fast. |
| **GONZALES** | And those are gonna be separate, as well, or they're gonna be together. |
| **SANCHEZ** | Um, you could put those together… with his. 'Cause that- that- that'll make one good little solid- solid one. So he'll have that, and then you'll have the… the- the ten grams of, uh, uh, white. |
| **GONZALES** | So it's gonna be- it's gonna be how much? Twelve grams of the- of the black? |
| **SANCHEZ** | Yes, and ten grams of the white. |
| **GONZALES** | And ten grams of the Go Fast. Alright. |
| **SANCHEZ** | Yes. |
| **GONZALES** | And that's gonna have a "B" on it. |
| **SANCHEZ** | A "B" on it. That'll be his. And then this other one itself, right? It's gonna be, uh, uh, a ounce of black. Just an ounce of black. And that's gonna have a five, a number five on it. |
| **GONZALES** | One zip of the black with a five on it. |
| **SANCHEZ** | Yes, yes.  (50:17) |
| | [END OF CONVERSATION at approximately time marker 50:17] |

149.     It should be noted that earlier in this conversation, **SANCHEZ** had indicated that the "G" on his plugs stood for "Giddy," the "P" on two of the plugs stood for "Pleasant" because **ALFARO** was a Pleasant Street Bulldog gang member, and the plug with the number "5" on it would be for "the Fifth Street associate."

150.     Based on my training and experience, I know that drug traffickers in the ENTERPRISE

Affidavit In Support Of Complaint                    69

commonly use the word "black" to stand for black tar heroin, the word "white" to refer to methamphetamine, the word "bud" to refer to marijuana, the word "plug" to refer to a tightly-bound bundle of contraband which is inserted into a body cavity in order to smuggle it into a detention facility, and the word "zip" to refer to an ounce of an illicit narcotic. Based on my knowledge of the investigation, I know that "Whisper" is the street moniker used by **ALFARO** and that "Envy" is the moniker of **Anthony JEFF**. I have also confirmed with members of the Fresno County Sheriff's Office that **JEFF** was in the custody of the Fresno County Jail at the time of this call.

151.    Therefore, I believe that in this call, **SANCHEZ** indicated to **GONZALES** that **SANCHEZ** would need **GONZALES** to manufacture the following plugs:

a)    Three "G" plugs for **SANCHEZ**, which would contain 20 grams of marijuana, one ounce of heroin, and one ounce of methamphetamine;

b)    Two "P" plugs for **ALFARO**, which would contain one ounce of heroin and 21 grams of methamphetamine;

c)    One "B" plug for **JEFF**, which would contain (in one plug) 12 grams of heroin and 10 grams of methamphetamine; and

d)    One "5" plug for a Fifth Street Bulldog associate, which would contain one ounce of heroin.

152.    **SANCHEZ** also spoke later in the call about adding another eighth of an ounce of methamphetamine to a "G" plug, and then also stated that he was "gonna looking for a ride" so that someone could "go to Fresno so I could, uh, bring, you know- and then to do a little bit more, uh, um, as a plug." Based on the context of all of the information set out in this affidavit, I believe that **SANCHEZ** was detailing exactly what would be given to **ALFARO** to smuggle into the detention facility and then also indicating that he was about to ask someone to pick up more narcotics to make yet another plug to be given to **ALFARO**. I therefore believe that **GONZALES** had knowledge of the conspiracy that **SANCHEZ** was orchestrating, which would become relevant later that afternoon.

153.    Accordingly, as soon as **SANCHEZ** hung up with **FELISCIANO**, at approximately 12:45 PM, **SANCHEZ**, using (279) 386-7769, attempted to call (559) 404-8363 (TT 8363), used by

1    Debbie **SANCHEZ**,[32] who based on my knowledge of the investigation, I know to be **SANCHEZ's**

2    mother. The call went unanswered.

3         154.    A little over a minute later, at 12:47 PM, **SANCHEZ** again used (279) 386-7769, this

4    time to call (559) 413-8584 (TT 8584), used by Carly **BALBOA**.[33] During this conversation,

5    **SANCHEZ** asked **BALBOA** what **SANCHEZ's** "mom" was doing. **BALBOA** replied that

6    **SANCHEZ's** mother had obligations later that day. **SANCHEZ** then asked if she was available "right

7    now" because **SANCHEZ** "would need her just to go, uh, uh, to Fresno for [him]." **SANCHEZ** also

8    indicated that "that's the only ride [he's] gonna have right now." Based on the context of the previous

9    calls, I believe **SANCHEZ** was attempting to reach his mother to ask her to travel to Fresno to pick up

10   narcotics.

11        155.    At approximately 1:00 PM, (559) 413-8584, used by **BALBOA**, called **SANCHEZ**,

12   using (279) 386-7769. During the call, **BALBOA** said, "Mom said, 'Where in Fresno?'" **SANCHEZ**

13   said he would "ask him right now," and then spoke with another individual in the background. When

14   **SANCHEZ** came back on the phone, he said "Mom?" several times; when his mother did not answer,

15   he began to say "Carly?" and then said, "Get my mom on the phone, please." **BALBOA** then said,

16   "Here" and **SANCHEZ** began speaking with another female voice. Based on the totality of the

17   circumstances, I believe this individual was **Debbie SANCHEZ**, who based on my knowledge of the

18   investigation I know to be his mother. **SANCHEZ** then told **Debbie SANCHEZ** that "it's not deep in

19   Fresno" and that "he lives on the west side." During that conversation, **Debbie SANCHEZ** indicated

20   that she would arrive in "an hour," the parties spoke about how "Carly" was going to give **Debbie**

21

---

22       [32] Based on my knowledge of the investigation, I know that **SANCHEZ** is Carly **BALBOA's** brother and **Debbie**
**SANCHEZ's** son. Additionally, as is set out in this section, **BALBOA** was identified as the user of (559) 413-8584 (TT
23   8584), and travelled with another individual on April 24, 2025 to obtain methamphetamine from Luis Amaro **AGUILAR**.
During that trip, both **BALBOA** and **SANCHEZ** referred to the other individual in the vehicle with **BALBOA** as "Mom;"
24   after the trip, as is set out below, **Debbie SANCHEZ** was positively identified as the driver of the vehicle. Finally, when
**SANCHEZ** attempted to call (559) 404-8363 (TT 8363) and **BALBOA** picked up the phone, **SANCHEZ** initially said,
25   "Mom?" which indicates to me that he believed his mother – **Debbie SANCHEZ** – would be answering the phone.
Therefore, based on the totality of the circumstances set out in this section, I believe that **Debbie SANCHEZ** is the user of
26   TT 8363.

27       [33] I believe **BALBOA** is the user of (559) 413-8584 for several reasons. First, based on my knowledge of the
investigation, I know that **BALBOA** is **SANCHEZ's** sister. Second, there are several calls in which **SANCHEZ** calls the
28   user of TT 8584 "Carly." Finally, there are several calls in which **BALBOA** refers to **SANCHEZ's** mother as "Mom,"
indicating that she is also a child of Debbie **SANCHEZ's**. I therefore believe that the user of TT 8584 is **BALBOA**.

SANCHEZ "the six" and **SANCHEZ** said that "he knows that you're my mom." When **BALBOA** reminded **SANCHEZ** that the parties would need gas, **SANCHEZ** indicated that **BALBOA** would instead give **Debbie SANCHEZ** "six twenty."

156.    The surveillance team then began to attempt to locate **Debbie SANCHEZ** without success.

157.    Approximately one hour later, at 1:59 PM, **BALBOA**, using (559) 413-8584, called (279) 386-7769, used by **SANCHEZ**. During the call, **BALBOA** asked for the address and said, "We're in Selma," at which point **SANCHEZ** responded, "Okay. Okay, yeah, you guys are, like, like, ten minutes away." **BALBOA** then said, "But we want to know the address." At approximately time marker 2:15 in the call, **SANCHEZ** said, "I'm gonna text it to you right now… sis, the address." At approximately 2:01 PM, (279) 386-7769 sent a text message to (559) 413-8584 which read, "1446 s. Chance". The parties then clarified that the location was 1446 S. Chance Avenue and **BALBOA** indicated that she was 20 minutes away. Based on my knowledge of the geography of California' Central Valley, I know that 1446 S. Chance Avenue, Fresno, CA is approximately 20 minutes away by car from the city of Selma, CA. Over the next several minutes, **SANCHEZ**, stayed on the phone with **BALBOA** and **Debbie SANCHEZ** until they arrived in the area of 1446 S. Chance Avenue, Fresno, CA where they were observed by the surveillance team.

158.    At approximately 2:29 PM, members of the investigative team observed a white Chevy Cruze arrive in the area of 1446 S. Chance Ave, Fresno, CA. A male identified as Luis **AMARO AGUILAR** based on a comparison with the picture of **AMARO AGUILAR** maintained on file with the California Department of Motor Vehicles was observed walking up to the vehicle and making contact with the occupants.

159.    After arriving at the Chance Avenue location, and while still on the phone with **SANCHEZ**, **Debbie SANCHEZ** indicated that "he" (the seller) was on the phone and then indicated that the seller wished to speak with **SANCHEZ**. Another male voice then came on the line and spoke with **SANCHEZ**. Based on the totality of the circumstances, including the following portion of this call and the surveillance observations set out below, I believe this individual was Luis AMARO **AGUILAR** and that he had simply been given the phone by **Debbie SANCHEZ**. When **AGUILAR** and

1  SANCHEZ began talking, **AGUILAR** said that he gave **SANCHEZ** "half and half," "some white and

2  some pink."  At approximately time marker 30:10, after **SANCHEZ** had indicated that **BALBOA** and

3  **Debbie SANCHEZ** were his "people," **AGUILAR** indicated that it was "good" but then mentioned

4  "last time" and said to "make sure it's always cash." **SANCHEZ** responded, "Yeah, no, no, my *prima*-

5  no, I fuckin' chewed her ass out. You know what I mean? She knows better than that." Based on the

6  events of April 22, 2025, set out herein, I believe that **SANCHEZ** and **AGUILAR** were speaking about

7  the transaction involving **FELISCIANO** and **AGUILAR** from that date, which further confirms my

8  belief that the individual on the phone with **SANCHEZ** was **AGUILAR**. The parties then exchanged

9  pleasantries and **Debbie SANCHEZ** may be heard in the background saying, "It was nice meeting you."

10  **SANCHEZ** then said that he was curious about "the pink one," and **Debbie SANCHEZ** responded that

11  they would "check it out when [they] get home." **SANCHEZ** also indicated that someone would pick up

12  the narcotics, thanked his mother and "Carly," and terminated the call.

13    160.    The white Chevy Cruze then departed the area and began to travel south back toward

14  Hanford, CA. The surveillance maintained visual of the Cruze while it traveled.

15    161.    At approximately 2:43 PM, while the Chevy Cruze was still in transit, **SANCHEZ**, using

16  (279) 386-7769, called (559) 404-8363, used by **Debbie SANCHEZ**, **SANCHEZ**'s mother. When the

17  call was answered, **SANCHEZ** said, "Mom?" but another female said, "It's me." **SANCHEZ** then said

18  that he had been attempting to call this female but that it "wasn't letting [him] pick up for some reason."

19  When I reviewed toll records for (279) 386-7769, I observed that the call made immediately prior was to

20  (559) 413-8584, used by **BALBOA**. I therefore believe that **BALBOA** was using **Debbie SANCHEZ's**

21  phone for this call. During the call, **SANCHEZ** told **BALBOA** to "tell [his] mom" to "wrap it up good

22  for [him]". **SANCHEZ** then indicated that he was going to "take out two half of burritos- a half of

23  burrito for [his] mom," as well as take out other half burritos for another individual. **SANCHEZ** also

24  indicated that **BALBOA** should "take out" "a half of- of- of- of that pink stuff" and "a half of the white

25  stuff." In this way, **SANCHEZ's** mother would "get half pink and half, uh, uh, uh, white for her and

26  half pink and half white for" another uncharged female. **SANCHEZ** then instructed **BALBOA** to "wrap

27  [] up real good" his other "seven burritos," which would then be taken to **SANCHEZ's** "pad."

28  **BALBOA** then clarified that the other uncharged female would be the one "taking it" – she ultimately

would not – and **SANCHEZ** affirmed, indicating again that two half-burritos would be "taken out of that," and that "we" (i.e. **BALBOA**) should "wrap that up real good" so that **SANCHEZ** could know "if someone got in it." **BALBOA** then began speaking with an individual in the background and began speaking with **SANCHEZ** about "Mom," when "Mom" would be "taking it," and about how **SANCHEZ** was going to be given "Mom" a half "burrito." I therefore believe that **Debbie SANCHEZ** was present in the background of **BALBOA's** side of the conversation and that **Debbie SANCHEZ** was going to be paid for her services with a "half burrito." **BALBOA** then indicated that "Mom" was going to drop **BALBOA** off in Hanford and said the parties would call **SANCHEZ** at that point.

162.    Based on my knowledge of the investigation, I know that **SANCHEZ** uses the word "burrito" to refer to ounces of methamphetamine. I also know that **SANCHEZ** has previously received pink-colored methamphetamine from various sources of supply. Therefore, I believe that in this call **SANCHEZ** was instructing **BALBOA** to tell **Debbie SANCHEZ** to wrap up the ounces of methamphetamine tightly, and that **SANCHEZ** would be giving **Debbie SANCHEZ** one-half ounce of methamphetamine in exchange for her travelling to Fresno to pick up the narcotics. I believe that **SANCHEZ** then indicated that seven ounces of methamphetamine would be left, that these should be wrapped tightly so that no one could get into them without **SANCHEZ's** knowledge, and initially that these would be taken to a location controlled by **SANCHEZ**, which based on subsequent events I believe to be the location ENTERPRISE members have named "Thug Mansion," and is the residence of **GONZALES** and **FELISCIANO**.

163.    At approximately 3:25 PM, **SANCHEZ**, again using (279) 386-7769, had a conversation with Carlos **GUILLEN**, using (559) 508-6409. Though the topic of conversation between the two of them is only tangentially related to the conspiracy at issue, during this call, **GUILLEN** asked for money, at which point **SANCHEZ** put that call on hold and used (279) 386-7769 to call (559) 401-8633, used by **FELISCIANO**. **SANCHEZ** then merged the two calls. **SANCHEZ** then spoke at length with **FELISCIANO** and a male voice in the background – which I recognize as belonging to Benny **GONZALES** – regarding sending $30 to **GUILLEN** using the money transfer application CashApp.[34]

---

[34] It should be noted that I also believe that **GONZALES** participated in this call because the parties set out that **GUILLEN** would request the $30 from CashApp account handle "Huero824," which I know based on my knowledge of the

After **GUILLEN** left the three-way call, **GONZALES** and **SANCHEZ** then began speaking about the conspiracy to smuggle narcotics into the detention facility. At approximately time marker 7:05,[35] **GONZALES** told **SANCHEZ** that "these dubs are ready," "I did all them *negra*, I did the three zippers of the *negra*." **GONZALES** also spoke about preparing plugs for another individual and about how he prepared "twenty-one grams for the homie Whisper."

164.    As stated above, I know that **GONZALES** had specific knowledge of the conspiracy that **SANCHEZ** was orchestrating involving the smuggling of narcotics into a detention facility. Based on my training and experience, I also know that Hispanic drug traffickers use the word "*negra*" to refer to black tar heroin and the words "zip" and "zipper" to refer to an ounce of a narcotic. As is set out above, I also know that "Whisper" is **ALFARO's** street moniker. Therefore, I believe that in this call **GONZALES** detailed for **SANCHEZ** how **GONZALES** had prepared several of the plugs, one of which was for **ALFARO**. I therefore believe that **GONZALES** knowingly assisted **SANCHEZ** with his conspiracy by packaging the narcotics for transport to **ALFARO** so that **ALFARO** could attempt to smuggle them into a detention facility.

165.    It should be noted that **GONZALES** had also been involved in the planning for the transportation of the narcotics to **ALFARO**, though he would ultimately not fulfill this role. On April 24, 2025, at approximately 11:34, **SANCHEZ**, using (279) 386-7769, spoke with **GONZALES**, using (559) 401-8633 (typically **FELISCIANO's** phone); during that conversation, the parties spoke about how **GONZALES** would transport the narcotics to **ALFARO** the following day (April 25, 2025). Later that night, at approximately 10:07 PM, **SANCHEZ** sent at text message from (279) 386-7769 to TT5, used by **GONZALES**, which read, "Thank you primo tomorrow we will go and drop them off , I send love,".

166.    During and after **GONZALES'** call with **SANCHEZ** at 3:25 PM, the surveillance team continued to follow the Chevy Cruze until it arrived at 11911 Chris Lane, Hanford, CA, at approximately 3:42 PM. Two females were then seen exiting the Chevy and entering the residence.

---

investigation belongs to Benny **GONZALES**. Specifically, **SANCHEZ** and **GONZALES** used this CashApp account to facilitate the distribution of heroin from **TAMAYO** to **GONZALES** on May 2, 2025.

[35] The sequence of calls these calls is confusing due to the way the monitoring system registers three-way calling; it should be noted that the conversation at issue here occurs in call number 11490 on (279) 386-7769.

1    Several minutes later, the female who was observed driving the Chevy came back outside and was

2    positively identified as **Debbie SANCHEZ** based on a comparison with the picture maintained on file

3    by the California Department of Motor Vehicles.

4         167.    At approximately 3:54 PM, **SANCHEZ**, using (279) 386-7769, called **BALBOA**, using

5    (559) 413-8584. During the call, **SANCHEZ** called **BALBOA** "Sis" and asked where his mother was.

6    **BALBOA** indicated that **Debbie SANCHEZ** was there, that **Debbie SANCHEZ** was "gonna go right

7    now," and that **Debbie SANCHEZ** and **BALBOA** "just got here." Based on the context of this call, as

8    well as subsequent observations by the surveillance team, I believe that even though **SANCHEZ** had

9    previously indicated that another uncharged female would be transporting the methamphetamine to

10    **FELISCIANO** and **GONZALES'** location for preparation for transport to **ALFARO**, the plan changed

11    such that **Debbie SANCHEZ** would now transport the narcotics there.

12         168.    At approximately 4:20 PM, **SANCHEZ**, using (279) 386-7769, called **BALBOA**, using

13    (559) 413-8584. During the call, **SANCHEZ** asked where his mother was, and **BALBOA** responded,

14    "Right here." **SANCHEZ** then said, "Mom" and **Debbie SANCHEZ** responded "Yeah" in the

15    background of the call. **SANCHEZ** then asked if **Debbie SANCHEZ** knew how they were "gonna do

16    this" and specified that "six full burritos" would be going to his "pad." As state above, I know that

17    **SANCHEZ** frequently uses the phrase "full burrito" to refer to an ounce of methamphetamine. I

18    therefore believe that **SANCHEZ** was specifying that **Debbie SANCHEZ** would be transporting six

19    ounces of methamphetamine to **FELISCIANO** and **GONZALES'** residence.

20         169.    At approximately 4:44 PM, the surveillance team at 11911 Chris Lane, Hanford, CA

21    observed **Debbie SANCHEZ** get back into the white Chevy Cruze.  After a call at approximately 4:46

22    PM, in which **SANCHEZ** instructed **Debbie SANCHEZ** – during a three-way call with **BALBOA** – to

23    bring the other uncharged female's methamphetamine payment with her, **Debbie SANCHEZ** was

24    observed briefly returning to 11911 Chris Lane at approximately 4:51 PM and then departing again after

25    one minute. The surveillance team followed **Debbie SANCHEZ's** vehicle until approximately 5:29 PM,

26    when the vehicle was observed pulling into the alley that leads to 36946 Los Angeles Avenue, Huron,

27    CA, a location ENTERPRISE members refer to as "Thug Mansion," the home of **GONZALES** and

28    **FELISCIANO**. Several minutes later, at approximately 5:38 PM, **Debbie SANCHEZ's** vehicle was

observed departing the area and the team terminated surveillance at that time.

170.   Later that evening, at approximately 8:50 PM, **FELISCIANO**, using (559) 401-8633, **ESCOBEDO**, using (831) 596-0869, and **SANCHEZ**, using (279) 386-7769, spoke about various aspects of the conspiracy. At approximately time marker 19:20, **SANCHEZ** asked when his *primo* (**GONZALES**) was coming; when **FELISICANO** indicated she did not know, **SANCHEZ** suggested that she and another male go instead. Based on the calls set out above, I believe **SANCHEZ** was suggesting that **FELISCIANO** transport the narcotics to **ALFARO**. At approximately time marker 24:32, **SANCHEZ** indicated to **ESCOBEDO** that he wished to call **ALFARO** while **SANCHEZ** and his *prima* were on the phone together. I then observed that **ESCOBEDO** created a separate call on (831) 596-0869 and called (559) 214-7050, used by **ALFARO**, at approximately 21:13 hours. I then began hearing **ALFARO's** voice on the original three-way call with **SANCHEZ**, and **SANCHEZ** began to reiterate his instructions to **ALFARO** regarding not touching the drugs until **SANCHEZ** arrived at the jail and how the drugs would be distributed. At approximately time marker 41:30, **SANCHEZ** asked **ALFARO** for an "address," at which point **ALFARO** eventually indicated that the address was, "Nineteen twenty-eight east Hunter." Based on subsequent surveillance observations, I believe **ALFARO** was giving his home address of 1928 E. Hunter Avenue, Fresno, CA. It should be noted that earlier in the call, at approximately time marker 24:41, **SANCHEZ** also indicated to **FELISCIANO** that he wanted her to "send [him] pictures right now so [he could] show 'em… the homies." At approximately 21:18 hours, I observed that (559) 401-8633, used by **FELISICANO**, sent a multimedia text message to (279) 386-7769 of the following picture:

///

///

///

///

///

///

///

///



171.    Based on all of the information set out herein, I believe this is a picture of some of the *clavos* containing controlled substances before they were delivered to **ALFARO**.

172.    That evening, **SANCHEZ** and **FELISCIANO** spoke several more times about the conspiracy, including discussing the type and weight of the narcotics being smuggled.

173.    The next day, April 25, 2025, the involved parties began to coordinate the transfer of the narcotics to **ALFARO**. At approximately 2:04 PM, **ESCOBEDO**, using (831) 596-0869, called (559) 214-7050[36], used by **ALFARO**, and merged the call with her original call with **SANCHEZ**. During the portion of that call, **SANCHEZ** indicated that his "*primo*" (**GONZALES**) was not able to take the narcotics to **ALFARO** and indicated that he was attempting to find another "ride." It should be noted that **SANCHEZ** would speak with **ALFARO** several more times regarding the logistics of the smuggling operation, including how to use coded language while in the jail,[37] as well as the timing of

---

[36] On May 6, 2025, members of the investigative team detained **ALFARO** and located his cell phone. Members of the investigative team placed a call to (559) 214-7050 and watched as **ALFARO's** call rang.

[37] This was intercepted in a call on April 25, 2025, at approximately 5:55 PM.

1  the operation and **ALFARO's** apprehension about it.[38]

2    174. At approximately 5:03 PM, **SANCHEZ**, using (279) 386-7769, spoke with

3  **FELISCIANO**, using (559) 401-8633. During that call, **FELISCIANO** indicated that she would "just

4  take it [her]self" and that she "already had the ride and everything." After **SANCHEZ** had cancelled his

5  other "ride," **SANCHEZ** indicated that he wanted to tell "the homeboy" – **ALFARO** – that "they would

6  be there before seven." Several minutes later, at approximately 5:20 PM, **SANCHEZ**, using (279) 386-

7  7769, called **ESCOBEDO**, using (831) 596-0869, and asked her to call "the boy," "my homeboy,"

8  "Whisper" – again, **ALFARO** – to tell him that they would "be there no later than eight." **ESCOBEDO**

9  indicated that she would call. Accordingly, at 5:22 PM, **ESCOBEDO** used (831) 596-0869 to call (559)

10  214-7050, used by **ALFARO**, to let him know that "we got the ride" and that "the ninja said that the

11  would be there no later than eight." The next minute, **ESCOBEDO**, using (831) 596-0869, called

12  **SANCHEZ**, using (279) 386-7769, and reported the events of the previous call.

13    175. Several more calls transpired between **SANCHEZ**, using (279) 386-7769,

14  **FELISCIANO**, using (559) 401-8633, **ESCOBEDO**, using (831) 596-0869, and **ALFARO,** using

15  (559) 214-7050, in which **ALFARO** was informed that there were eleven *clavos*, **FELISCIANO**

16  indicated that she was going to transport them and was going to leave imminently, and **ESCOBEDO**

17  facilitated **SANCHEZ** speaking with other individuals.

18    176. At approximately 6:06 PM, the surveillance team observed **FELISCIANO** leaving

19  "Thug Mansion," getting into the right front passenger seat of Chevy Malibu, and departing the area.

20  Another uncharged individual was driving. The team maintained surveillance on the Chevy as it traveled

21  to various locations, including **FELISCIANO'S** apartment and a gas station, before travelling to the

22  Fresno, CA area and pulling into the shared driveway between 1928 E. Hunter Ave and 1916 E. Hunter

23  Avenue.

24    177. The investigative team then observed an individual dressed all in back exit 1928 E.

25

26    [38] This was intercepted in calls on April 26, 2025, at approximately 4:19 PM, during a three-way call between (279)

27  386-7769, used by **SANCHEZ**, (559) 401-8633, used by **FELISCIANO**, and (559) 214-7050, used by **ALFARO**, as well as on May 1, 2025, at approximately 4:11 PM, in a call between **ECOBEDO**, using (831) 596-0869, and **ALFARO**, using

28  (559) 894-1568. It should be noted that during this call, **ALFARO** was not using (559) 214-7050, but identified himself to **ESCOBEDO** at the beginning of the call as "Whisper."

1    Hunter Avenue, Apartment 3 and approach the Chevy. After appearing to make contact with the

2    occupants, the individual re-entered 1928 E. Hunter Ave, Apartment 3 and the Chevy departed the area.

3    178.    Several minutes later, at approximately 7:26 PM, the team observed a red Chevy

4    Avalanche leave the parking lot in front of 1928 E. Hunter Avenue. The team maintained surveillance

5    on the vehicle until it parked in the parking lot of a shopping center and subsequently identified the front

6    seat passenger as Armando **ALFARO** based on a comparison with the picture of Armando **ALFARO**

7    maintained on file with the California Department of Motor Vehicles. Additionally, when **ALFARO**

8    entered a store, a member of the surveillance team established physical surveillance on **ALFARO** while

9    another member of the team called (559) 214-7050 ((559) 214-7050); the first team member observed

10    **ALFARO** take out his cellular phone, look at it, and put it to his head as if he were answering it. As

11    stated above, I believe that **ALFARO** is the user of (559) 214-7050.

12    179.    While **FELISCIANO** was on her way back to Huron, CA, at approximately 7:49 PM,

13    **SANCHEZ**, using (279) 386-7769, spoke with **ESCOBEDO**, using (831) 596-0869. During that call,

14    **SANCHEZ** spoke about how "she" was "a ninja associate [] from one of the finest," and indicated that

15    "she's already on her way back" and that she "did it before eight." **SANCHEZ** then asked **ESCOBEDO**

16    what "we should give her." **FELISCIANO** then came on the line and began speaking with **SANCHEZ**

17    and **ESCOBEDO** about how she (i.e. **FELISCIANO**) had completed the transaction for **SANCHEZ**.

18    Based on the context of the calls set out herein, I believe that **SANCHEZ** was praising **FELISCIANO**

19    for transporting the narcotics to **ALFARO** at 1928 E. Hunter Ave, Fresno, CA. [39]

20    180.    **SANCHEZ's** associates then began to make plans to acquire the narcotics when

21    **ALFARO** came into the jail. On May 2, 2025, at approximately 7:33 PM, an inmate at the Fresno

22    County Jail named **Timothy CHENOT** used his jail identification number to use the recorded telephone

23    system at the Fresno County Jail to call (559) 720-4260, used by his mother, an uncharged female

24    (UFM).[40] During the call, **CHENOT** gave his mother the number (559) 214-7050 and asked her to call

25

26    [39] This was also made clear in a call between **SANCHEZ**, using (279) 386-7769, and **FELISCIANO**, using (559)
401-8633, on May 1, 2025, at approximately 1:44 PM. During the call, **SANCHEZ** asked **FELISCIANO** where she went
exactly when she "took that *clavito*" at "the apartment complex." **FELISCIANO** gave the address "1928 E. Hunter Avenue,"
27    which based on my knowledge of the investigation is the apartment complex where ALFARO resides.

28    [40] I have listened to numerous calls between **CHENOT**, using both his jail identification number and other jail

1   that number for him. UFM indicated that she would, after which there was a period of silence. When I

2   reviewed call detail records for (559) 720-4260, I observed that at approximately 7:37 PM, it called

3   (559) 214-7050, used by **ALFARO**. A male voice which I recognized as **ALFARO's** subsequently

4   came on the line and another male voice began speaking with him and identified himself as "Envy ,"

5   which based on my knowledge of the investigation, I know to be the street moniker of Anthony **JEFF**.

6   **JEFF** also indicated that he had "Tim on the line right here;" when **ALFARO** asked, "Who?" **JEFF**

7   said, "My cellie," and **ALFARO** responded, "Whis?" and **JEFF** said, "Yeah." **CHENOT** then said,

8   "What's crackin', homie?" in the background. **JEFF** then asked how **ALFARO** was doing and indicated

9   that he was "just checking in on" him. **ALFARO** replied that he was okay, but related that he almost

10  "ended up the hospital" because he was "tucking away the luggage" and it all "fell out on" of him; there

11  was "too much luggage." **ALFARO** then indicated that "everything's good" and that he was going "to

12  bring [UI] there for everybody." When UFM began to ask **ALFARO** "When-" **ALFARO** cut him off

13  and indicated it would be "today." **JEFF** then thanked **ALFARO** and both **JEFF** and **ALFARO** left the

14  call. **CHENOT** and UFM then began to speak about non-pertinent matters and subsequently concluded

15  their call.

16      181.    Based on my knowledge of the investigation, I know that **CHENOT's** street moniker is

17  "Lil' Whisper." As stated above, I also know that "Envy" is **JEFF's** moniker; I also know that at the

18  time this call was made **CHENOT** was housed with only two other individuals: Anthony **JEFF** and

19  another uncharged individual whose moniker is not "Envy" or even phonetically close to it. Based on

20  my training and experience, I know that drug traffickers commonly use vague and innocuous language

21  when speaking about their narcotics. Based on all of the facts set out herein, I believe that **ALFARO**

22  was using coded language involving luggage to speak about attempting to insert the *clavos* into his

23  body.

24      182.    I therefore believe that **ALFARO** was indicating to **CHENOT** and **JEFF**, who were

25  "checking in on" him, that he had attempted to insert all of the *clavos* into himself, but had almost ended

26

27  identification numbers, and the user of (559) 720-4260. Based on the fact that I have heard CHENOT call the female "Mom"

28  numerous times, as well as the fact that I have heard her call **CHENOT** "Tim," "Timmy," and "Timothy," I believe that it is
    actually **CHENOT** calling from the Fresno County Jail and that the user of (559) 720-4260 is actually his mother, UFM.

1  up in the hospital because there were too many of them. I believe that **ALFARO** indicated that he was

2  going to be bringing in narcotics "for everybody," which was why **JEFF** thanked him.

3       183.    However, by May 6, 2025, **ALFARO** still had not been arrested or otherwise taken into

4  custody at the Fresno County Jail. Throughout the day on May 6, 2025, **SANCHEZ** spoke with multiple

5  associates who offered to find and potentially assault **ALFARO** for not getting himself taken into

6  custody for the purpose of smuggling the narcotics into the jail. That evening, at approximately 6:25

7  PM, the investigative team conducted a traffic stop on the red Chevy Avalanche previously seen at 1928

8  E. Hunter Avenue, Fresno, CA, which was being driven by Barbara **DIAZ** and in which **ALFARO** was

9  a passenger. **ALFARO** was taken into custody for violation of an order of protection, as he was

10  violating the protective order by being in the vehicle with **DIAZ**. At the time of the stop, **ALFARO** had

11  approximately one ounce of heroin on his person. Based on the totality of the circumstances, I believe

12  that this was the ounce of heroin promised to **ALFARO** by **SANCHEZ** in exchange for **ALFARO's**

13  promise to smuggle narcotics.

14       184.    At approximately 4:38 PM on May 6, 2025, **CHENOT** used his jail identification

15  number to make a call to (559) 720-4260, used by UFM, using the Fresno County Jail's recorded

16  telephone system. During the call, UFM called **CHENOT** "Timothy" and **CHENOT** called UFM

17  "Mom." During the conversation, **CHENOT** told his mother to "[g]ive this phone number a call real

18  quick, please. I need a three-way" and then identified the number as (559) 628-5743. It should be noted

19  that UFM indicated that she had missed several calls from a "six one two" number and that she did not

20  know if those calls were for **CHENOT**. After indicating that she would call the number set out above,

21  **CHENOT's** mother then came back on the line and said, "Go ahead" at which point a female voice I

22  recognized as Victoria **LIMA's** came on the line.[41] **CHENOT** then asked for "Whisper," identified

23  himself as "Lil' Whisper," and said that they were calling off of his "mom's phone." **LIMA** indicated

24

---

25      [41] I recognized the user of (559) 628-5743's voice after having listened to several dozen calls to (559) 628-5743
from the Fresno County Jail. Additionally, I believe that **LIMA** is the user of (559) 628-5743 for several reasons. First, when

26  I listened to the calls, I could tell that the user of the phone is female and that she is referred to as "V" in several calls,
including in a call to (559) 628-5743 at 11:54 AM on May 6, 2025. Based on my knowledge of the investigation, I know that

27  **LIMA's** first name is Victoria, and that this is likely a reference to her first name. Second, **LIMA** gave this number to the
officer who conducted the traffic stop on her and Barbara **DIAZ** on May 7, 2025. Additionally, during that same stop, a

28  member of the investigative team called (559) 628-5743 and the officer at the scene observed **LIMA's** phone ringing. I
therefore believe that **LIMA** is the user of (559) 628-5743.

1    that she would try to get ahold of "Whisper," at which point, **CHENOT** indicated that **ALFARO** could

2    simply leave a message with UFM. **LIMA** then suggested that **CHENOT** simply contact her directly;

3    **CHENOT** indicated that he would call her shortly and concluded the call.

4          185.    Less than an hour later, at approximately 5:06 PM, **CHENOT** again used his jail

5    identification number to make a call using the Fresno County Jail's recorded telephone system to (559)

6    628-5743, used by Victoria **LIMA**. During the call, **CHENOT** identified himself as "Whisper," and

7    later on in the call also specified his jail identification number (7039403).  **LIMA** indicated that she had

8    messaged "him," and that "his" phone had broken because "he" had dropped it. **LIMA** also indicated

9    that she had instructed "him" to call her. **LIMA** also indicated that **CHENOT** could call her the next

10   day. **CHENOT** then indicated that the number he spoke with **LIMA** on last ((559) 720-4260, used by

11   UFM) was his mother's number, and that if **LIMA** wanted to get ahold of **CHENOT**, she could contact

12   that number and that his mother would reach out to him using "G.T.L.," the jail's communication

13   system. Finally, **CHENOT** also specified his pod number at the Fresno County Jail and said that "he

14   just left here not too long ago."

15         186.    Based on my knowledge of the investigation, as well as subsequent events, I believe that

16   the male being spoken about during this call is Armando **ALFARO**. I believe that **LIMA** indicated that

17   she attempted to send a message to **ALFARO** and that she believed that **ALFARO** was not responding

18   because his phone had broken. I also believe that **CHENOT** indicated that if **LIMA** wished to get ahold

19   of him, she could call UFM, who would connect her with **CHENOT**.

20         187.    Several hours after that, on May 6, 2025, at approximately 8:37 PM, **CHENOT** again

21   used the Fresno County Jail's recorded telephone system to call (559) 628-5743, used by **LIMA**.

22   During the call, **LIMA** indicated that she had contacted **CHENOT** – apparently by using a messaging

23   service available through the jail – to indicate that she had seen that "he" had been arrested. **CHENOT**

24   then indicated that the situation could have turned into "something bigger;" based on the context of the

25   conversation, I believe it was clear that both parties believed that **ALFARO** had successfully smuggled

26   the narcotics into the jail.

27

28

188.    The next day, May 7, 2025, at approximately 11:54 AM, **ALFARO**[42] used a phone in the booking division of the Fresno County Jail to place a recorded phone call to (559) 628-5743, used by **LIMA**. During the call, **LIMA** indicated that "Lil' Whisper" kept calling to attempt to get ahold of **ALFARO** and that "people were trippin'." **ALFARO** indicated that "it's bad right now for [him]" and asked **LIMA** to "message them" to tell them that he "made every effort to come in." At a certain point, **ALFARO** said, "I got everything still" and "I'm not holding nothing, you know what I'm saying?" **ALFARO** then elaborated that when he was pulled over, he had "some black" on him, but that he has "the rest," "the baseball cards," "the t-shirts," all "at home." **LIMA** then asked if there was any way that she could "go pick up the t-shirts and, uh, give 'em to somebody else." **ALFARO** responded that **LIMA** should ask if "they" wanted her to do that, reiterated that "everything's there," and indicated that "the only thing that wasn't theirs" was "some black that was mine," and that this was what he "got popped with."

189.    Based on my training and experience, I know that drug dealers commonly use vague and innocuous language, such as the phrases "baseball cards," "t-shirts," "the rest," and "everything" when speaking about their narcotics. I also know that they use the word "black" to refer to black tar heroin. I also know that the phrase "to trip" is commonly used in popular culture to refer to someone being particularly upset about a situation. Finally, I know that the phrase "to get popped" is used in gang communities to refer to the idea of being arrested for committing a crime. Finally, based on my knowledge of the investigation, I know that "Lil' Whisper" is the street moniker of Timothy **CHENOT**.

190.    Therefore, I believe that in this call **LIMA** told **ALFARO** that **CHENOT** was asking about **ALFARO** and attempting to get ahold of him. I believe she also conveyed that "people" – i.e. **SANCHEZ** and his associates, based on the context of the conversation and the situation as a whole – were becoming upset. **ALFARO** then asked **LIMA** to message these people to let them know that he made every effort to get arrested with the narcotics. However, **ALFARO** then specified that he did not have the narcotics on him when he was arrested, indicating that the narcotics were still at his residence

---

[42] Though **ALFARO** did not use his jail identification number, based on the context of the call, including his recitation of how he was pulled over, the narcotics that were found on his person, and his concern and understanding of the situation as a whole, I believe that he was the male calling **LIMA's** phone, (559) 628-5743.

1   and that the only narcotics he had on his person when he was arrested was heroin. Based on the totality

2   of the circumstances, I believe this was the heroin **SANCHEZ** paid **ALFARO** in exchange for

3   **ALFARO** agreeing to smuggle narcotics into the jail. Finally, I believe that the reason **ALFARO** was

4   specifying this is because he understood that if he smuggled the narcotics into the jail and did *not* turn

5   them over to **SANCHEZ** as directed, **ALFARO** was risking his life.

6        191.    Several minutes later, at approximately 12:35 PM, **CHENOT**, using his account on the

7   recorded telephone system at the Fresno County Jail, made a call to **LIMA**, using (559) 628-5743.

8   During that call, **LIMA** spoke with **CHENOT** about the conversation she had several minutes earlier

9   with **ALFARO**, indicating that the "white t-shirts and everything were at the pad." **CHENOT**

10   responded, "I need you to pick all that up," to which **LIMA** replied that she would "figure out how to go

11   get it." **CHENOT** then further specified, "I'll give you the address to where my mom is at. You will go

12   and pick that up and drop it off to her." At a certain point in the conversation, **CHENOT** also gave the

13   address "2677 College" and the phone number (559) 720-4260 as being associated with his mother and

14   told **LIMA** to contact his mother to tell his mother that **LIMA** would be dropping something off "for

15   Whisper," and that his mother's name was "Tracy." **CHENOT** also specified that they "need that done

16   today."

17        192.    I then accessed open-source databases that law enforcement frequently use to identify

18   individuals and observed that (559) 720-4260 is associated with UFM. Based on the previous call, as

19   well as the context and content of the calls set out below, in which **CHENOT** calls (559) 720-4260 from

20   the Fresno County Jail using the jail's recorded phone system and is called "Tim" by a woman that he

21   calls "Mom," I believe that UFM is the user of (559) 720-4260.

22        193.    As is stated above, I also know that ENTERPRISE members commonly use the word "t-

23   shirts" to refer to narcotics. I therefore believe that **CHENOT** was instructing **LIMA** to go to

24   **ALFARO's** residence, retrieve the narcotics, and transport them to UFM' residence at 4766 N. College

25   Ave, Fresno, CA.

26        194.    Several minutes after the call with **CHENOT**, at approximately 1:37 PM, **LIMA**, using

27   (559) 628-5743, received a call from **ALFARO**, using his jail ID number from a recorded line at the

28   Fresno County Jail. During the call, **LIMA** generally relayed the content of her conversation with

**CHENOT**, including that **LIMA** was to take the "t-shirts." When **LIMA** indicated that she was willing and able to pick up the "t-shirts," **ALFARO** said, "We need a three-way. Because that's probably what's gonna happen." When **LIMA** indicated that she was not sure if she would have a ride, **ALFARO** indicated that "ol' girl gots [sic] a car, you know what I mean?" The parties then ran out of time and the call terminated.

195.    Based on my training and experience, I know that the phrase "ol' girl" is used in criminal street gang culture to refer to one's significant other, such as one's wife, girlfriend, or sometimes other immediate family member. Based on my knowledge of the investigation, I know that Barbara **DIAZ** is **ALFARO's** girlfriend. Based on this fact, as well as subsequent events, I believe that **ALFARO** was indicating that **LIMA** could use **DIAZ's** vehicle to transport the narcotics.

196.    Several minutes later, at approximately 1:44 PM, **LIMA**, using (559) 628-5743, received another call from **ALFARO** at the Fresno County Jail, who was again using his account to make a call using the jail's recorded telephone system. During that call, **LIMA** said, "Okay, what's the number?" **ALFARO** responded, "eight nine four, fifteen sixty-eight." I then heard silence for several seconds, after which I heard **LIMA** said that there was no answer. When I reviewed call detail records for (559) 628-5743, I observed that at approximately 1:46 PM, **LIMA** used (559) 628-5743 to call (559) 894-1568. At a certain point during the call, after **ALFARO** indicated that he did not want to be separated from the rest of the gang – which had been done for his own safety due to statements made by **SANCHEZ** – **ALFARO** said, "You were… look, man, you were there. You were there helping me make them motherfuckers again, you know what I mean?" **LIMA** responded, "That's what I told him, too. I told him, that." She then reiterated that she knew that **ALFARO** had not gone out in public because he did not want to be arrested before he was ready (i.e. before he had the drugs inserted in himself) and then stated, "I even told him. I go, 'We've got…' I go, 'He even got sick.' I go, 'That's why…' I go, 'That's why I- I- we- we met up.' I go, 'So… that we can clean the t-shirts even better so that . . .  he can have 'em.' You know what I mean?" Later in the call, **LIMA** indicated that "he" was calling, at which point there was silence for several seconds, and then a male voice came on the line. **ALFARO** asked if it was "Whis" – i.e. ""Lil' Whisper," or **CHENOT** – and the male indicated that it

1    was.[43] **CHENOT** then asked how they were going to obtain the narcotics and indicated that he was

2    going to have "her" – **LIMA**, based on previous calls – take the narcotics to **CHENOT's** mother's

3    house. **ALFARO** was clearly concerned that **CHENOT** was going to think that **ALFARO** was stealing

4    from the gang and repeatedly protested that he did not want to be in solitary confinement, and that

5    "everything's still the same way they left it, dog. Everything's marked." **ALFARO** then indicated that

6    he would "work on getting' it for" **CHENOT** and that **ALFARO** would "have her take it to

7    [**CHENOT's**] mom's."

8       197.    Based on my training and experience, I know that if *clavos* are dirty, they can actually

9    transmit bacteria or other foreign bodies to the smuggler, causing the smuggler to become ill. As set out

10   above, I know that **ENTERPRISE** members and associates use the phrase "t-shirts" to reference

11   narcotics. Based on the calls set out above in which **SANCHEZ** extensively discussed which narcotics

12   would be labeled and for whom they would be labeled, I believe that **ALFARO** was indicating that

13   everything was still as **SANCHEZ** wanted it and was ready for **LIMA** to pick up and transport. I also

14   believe that **LIMA** admitted that she helped **ALFARO** clean the *clavos* after – as **ALFARO** mentioned

15   above to UFM and **CHENOT** – **ALFARO** attempted to insert them into himself and subsequently

16   became ill.

17       198.    Several minutes later, at approximately 1:59 PM, **ALFARO**, using his jail identification

18   number on the recorded line at the Fresno County Jail, spoke again with **LIMA**, using (559) 628-5743,

19   asking **LIMA** to tell "her" that **ALFARO** wanted to talk to "her," and that "he wants you to hear it from

20   him." Based on the context of the calls set out below, I believe **ALFARO** was asking **LIMA** to call

21   Barbara **DIAZ** for him.

22       199.    At approximately 2:38 PM, **CHENOT** again used the recorded phone system at the

23   Fresno County Jail to call UFM, again using (559) 720-4260 (TT 4260). It should be noted that during

24   the call, UFM called **CHENOT** "Tim" and **CHENOT** called UFM "Mom." **CHENOT** also told his

25

---

26       [43] It should be noted that call detail records from the Fresno County Jail indicated that "Michael Castillo"'s jail
identification number was used to make this call. However, given the fact that this individual told **ALFARO** that he was

27   "Whis," as well as the fact that this individual told LIMA that he was "Whisper" before she connected this call with her
original call with **ALFARO**, I believe the caller was actually **CHENOT**. Additionally, this male's voice sounds very similar

28   to **CHENOT's** to the point where after having listened to several hours of **CHENOT's** calls, I am confident they are the
same person.

1  mother to save "(559) 628-5743" in her phone and said the user's name was "Nia." UFM responded that

2  she would save that number so she would know it was actually **CHENOT** calling. **CHENOT** further

3  stated that "Nia" was going to "take [UI] today," that it was "important to put it away," and that

4  **CHENOT** would tell UFM "what to do with it later." UFM replied, "Okay. Okay. Got it." Later,

5  **CHENOT** told UFM to "text her and [stuttering] write, 'I'm awake if you ever- if you want to drop that

6  off.'" UFM replied, "Hold on, 'K." UFM asked for the number again, at which point **CHENOT** stated,

7  "Just hit her text and put, 'My son doesn't know what's going on. I'm here, uh, when it's ready." UFM

8  said, "Okay," and then clarified the number – (559) 628-5743 – with **CHENOT** again.

9       200.    Based on the context of the calls set out above, I believe **CHENOT** was giving his

10  mother **LIMA's** number because he knew that UFM and **LIMA** would need to coordinate with each

11  other when **LIMA** delivered the narcotics. I believe **CHENOT** was also attempting to obtain

12  information about the status of **LIMA's** delivery by instructing UFM to message (559) 628-5743.

13       201.    Several minutes after the previous call began, at approximately 2:40 PM, **ALFARO** used

14  his jail identification number to use the jail's recorded phone system to call **LIMA**, using (559) 628-

15  5743. During that call, **LIMA** asked if **ALFARO** wanted **LIMA** to call "her," which was followed by

16  several seconds of silence. Barbara **DIAZ**[44] then came on the line, at which point **ALFARO** stated that

17  he wanted **DIAZ** to give "the bundles" to "V." **ALFARO** also instructed **DIAZ** to pull specific

18  "bundles" out, as those belonged to "that person;" **DIAZ** indicated that she was looking at the bundles as

19  they were speaking, which I believe indicates that she was likely with "the bundles" at the time of the

20  call. **ALFARO** then told **DIAZ** to "hold on to that" and to "give 'V' the rest." Finally, **LIMA** concluded

21  this portion of the call by indicating that she would travel to **DIAZ's** location.

22       202.    Based on the context of the calls set out above, as well as subsequent events, I believe

23  that the "bundles" being spoke about during this call are the *clavos* which **ALFARO** was supposed to

24

25       [44] At a certain point, when **ALFARO** was attempting to get the second female's attention, he said the name,

26  "Barbara," and the new female said "Yeah?" **ALFARO** also began describing the *clavos* and the new female indicated that
   she was looking at them while he was speaking. Based on these facts, as well as the fact that Barbara **DIAZ** was with

27  **ALFARO** when he was arrested and was at the residence where the *clavos* had been dropped off, I believe it was **DIAZ** on
   the line with **LIMA**. When I reviewed call detail records for (559) 628-5743, I observed that while the jail call with

28  **ALFARO** was still active, (559) 628-5743, used by **LIMA**, called (559) 894-1568. Later in the call, **DIAZ** and **ALFARO**
   confirmed that **DIAZ's** number was "894-1568," as well. I therefore believe that **DIAZ** is the user of (559) 894-1568.

have smuggled into the Fresno County Jail. Based on the fact that **LIMA** was supposed to transport the narcotics at **CHENOT's** direction, I believe that **ALFARO** was speaking about **LIMA** when he said the letter "V."

203.    Therefore, I believe that in this conversation, **ALFARO** told **DIAZ** to separate one of the *clavos* for another individual, and that **DIAZ** indicated that she would. I also believe based on the totality of the circumstances that **DIAZ** was at 1928 Hunter Avenue, Apartment 3 when she did so. Finally, I believe that **ALFARO** instructed **DIAZ** to give the rest of the *clavos* to **LIMA**, and that **LIMA** then indicated that she would travel to **DIAZ's** location, which based on subsequent events I believe to be 1928 Hunter Avenue, Apartment 3, Fresno, CA.

204.    At approximately 3:34 PM, based on the calls set out above, the investigative team established surveillance on 1928 Hunter Avenue, Apartment 3, Fresno, CA. At approximately 4:08 PM, the team observed the red Chevy Avalanche pickup truck leaving the apartment complex that **DIAZ** had driven the day before. **DIAZ** was positively identified as the driver of the vehicle based on a comparison with the picture of **DIAZ** maintained on file by the California Department of Motor Vehicles, as well as the contact the day before with **ALFARO**; the surveillance team also noted that there was a female in the front passenger seat. Several minutes later, the truck returned and **DIAZ** was observed manipulating an object in the backseat of the vehicle. At approximately 4:13 PM, the truck was again observed leaving the parking lot and was followed by the surveillance team.

205.    At this time, based on the calls set out above, the team believed that **LIMA** and **DIAZ** were likely transporting the narcotics which were supposed to have been smuggled into the Fresno County Jail from **ALFARO** and **DIAZ's** shared residence to UFM's residence at **CHENOT's** direction. It should be noted that at approximately 4:16 PM, call detail records for (559) 628-5743, used by **LIMA**, indicated that it had a 40 second conversation with (559) 720-4260 TT 4260, used by UFM, which would become relevant several hours later. A traffic stop was subsequently made on the vehicle at approximately 4:24 PM. **LIMA** and **DIAZ** were both contacted in the vehicle and detained.

206.    The investigative team then froze the red Chevy Avalanche and the apartment located at 1928 Hunter Avenue, Apartment 3 and wrote a search warrant for both locations, as well as for the persons of **DIAZ** and **LIMA**. When the team searched **LIMA's** purse, which was located in a backpack on the floorboard between the center console and the dashboard of the Chevy Avalanche, the team located nine small, tightly-bound objects which based on my training and experience I know to be consistent in appearance with *clavos*, plugs, and/or other objects inserted into the human body while attempting to smuggle them into detention facilities. The following is a picture of the objects recovered from **LIMA's** purse:



207.    The investigative team subsequently sent the *clavos* to a laboratory used by the Fresno County Sheriff's Office to test evidence. The laboratory results indicated that the substances inside the *clavos* tested positive for methamphetamine, heroin, and fentanyl.

208.    Inside 1928 Hunter Ave, Apartment 3, Fresno, CA, the team recovered drug paraphernalia, as well as user amounts of narcotics. During the stop, **LIMA** indicated to the reporting

1    officers that (559) 628-5743 was her phone number. Additionally, it should be noted that **LIMA** later

2    called Fresno County Dispatch and gave (559) 628-5743 as her callback number. Finally, during the

3    traffic stop, a team member called (559) 628-5743 and watched the phone that **LIMA** had identified as

4    hers begin to ring.

5    209.    At approximately 10:38 PM, UFM, using (559) 720-4260 TT 4260, received a call from a

6    recorded line in the Female Pre-Booking division at the Fresno County Jail. During the call, the female

7    caller indicated that her name was "Victoria"[45] and asked if UFM's name was "UFM." UFM responded,

8    "Yes." **LIMA** indicated that she was followed right after she had last been on the phone with UFM and

9    then said, "They got it." UFM responded, "They got it?" and then asked, "So you're locked up?" **LIMA**

10   confirmed that she was, and then described the situation further, including specifying that "it was, like,

11   almost a whole pound." **LIMA** also detailed how the police obtained search warrants for **LIMA's**

12   vehicle and an apartment. UFM said that she did not "know what 'it'" was, indicating that she was "just

13   doing Mom Duty." **LIMA** indicated again that "it was just under a pound." After **LIMA** indicated that

14   "he" – **CHENOT**, based on the context of the call – needs to be careful, UFM acknowledged and

15   indicated that she would pass the word of warning along. **LIMA** concluded the call by indicating that

16   she would continue to reach out to UFM to let UFM know what was happening with **LIMA** and to get

17   updates if **LIMA** were to stay in custody. UFM indicated that she understood.

18   210.    Based on my training and experience, I know that it is unconstitutional for individuals to

19   be arrested based on transporting articles of clothing or – absent other circumstances – anything other

20   than illegal contraband. Therefore, I believe that when **LIMA** indicated that she had been followed right

21   after she last spoke with UFM, and stated that "they got it," and UFM responded by saying, "So you're

22   locked up?" I believe UFM knew that **LIMA** was transporting illegal contraband to her residence at

23   **CHENOT's** direction. It should also be noted that when **LIMA** confirmed that "it" weighed "almost a

24   whole pound" and "was just under a pound," UFM did not ask what "it" was, instead going out of her

25   way to say that she did not know what "it" was and that she was just doing "Mom Duty." I do not

---

[45] Based on the fact that this call occurred several hours after **LIMA** had been arrested after being caught with the *clavos*, as well as the fact that she previously used her phone to speak with UFM at **CHENOT's** direction, I believe that "Victoria" was **LIMA**.

believe that either of these statements is consistent with an individual who thought that something completely innocuous – such as "t-shirts" (as set out in the call below on May 8, 2025 at 12:53 PM) – was being delivered to her residence. Additionally, based on the context of the calls and events set out above, I believe that **LIMA** was asking UFM to warn **CHENOT** to be careful, as **LIMA** had been doing all of this at **CHENOT's** direction, and knew that he was open to criminal liability now that **LIMA** had been arrested and the narcotics recovered. I further believe that UFM's agreement to pass the word of warning along also indicates her complicity in this conspiracy.

211. The following morning, on May 8, 2025, at approximately 11:25 AM, **CHENOT**, using his jail identification number to use the Fresno County Jail's recorded telephone system, called UFM, using (559) 720-4260. During the call UFM said that "Nia got pulled over last night" "for DUI, and []" they took everything." **CHENOT** responded, "Oh, hell no," and then said "that can't happen" repeatedly. UFM then passed on the message that "she said to be careful," and further stated that "they took her phones, everything." **CHENOT** then said that "that's just out" and the indicated that he would call UFM back.

212. Based on the context of this conversation, as well as the conversation that UFM had with **LIMA** the night before and the fact that **LIMA** had been introduced to UFM as "Nia" in a call on May 7, 2025 at 2:38 PM, I believe it is clear that UFM was speaking about **LIMA's** arrest and the seizure of the *clavos* on May 7, 2025, as no other numbers called UFM's number from the Fresno County Jail between **LIMA's** call the night before and this call. I also believe that UFM was knowingly assisting **CHENOT** and **LIMA** with the concealing of evidence by informing **CHENOT** of the events of the previous night and then warning him – as instructed by **LIMA** – to "be careful."

213. Over an hour later, at approximately 12:53 PM, the jail identification number for "Michael Castillo" called (559) 720-4260, used by UFM. In addition to the fact that I recognized **CHENOT's** voice, it should be noted that UFM called the male on the other end "Timmy," and therefore believe that the caller was actually **CHENOT**. During the call, UFM asked **CHENOT** if he was "okay," and he responded that "weird shit is going on" that he is going to try to avoid. UFM respond, "Me, too" and that she did not "need to be involved in any of that shit, too." **CHENOT** responded, "Yeah, well, you know, if you ever… you know, never comes through . . . we were just

waiting on t-shirts, you know what I mean?" UFM responded, "Yeah." **CHENOT** reiterated that "that's all we know. Nothing else," and UFM again responded, "Yeah." **CHENOT** then again confirmed that UFM understood by asking, "Did you hear me, though?" and UFM responded, "Uh-huh," indicating she understood.

214.    If – as UFM claimed – UFM were simply waiting on **LIMA** to deliver t-shirts, I do not believe that UFM would have taken the fact that "they got it" with such acceptance or would have gone out of her way to clarify immediately that she did not know what "it" was, as she claimed above. I also believe she would have been confused by **LIMA's** instruction to "warn" **CHENOT**, and would have likely requested more information about the situation as a whole. I therefore believe that in this call, **CHENOT** and UFM, knowing they were being recorded, were attempting to insulate themselves from criminal liability by essentially claiming that they believed that **LIMA** was attempting to deliver t-shirts. As stated above, I believe this is logically inconsistent with UFM's actions, and patently not what **CHENOT** believed was happening.

215.    Therefore, I believe that **SANCHEZ** directed and facilitated the distribution of narcotics and the attempted smuggling of those narcotics into a detention facility; that **ESCOBEDO** knowingly facilitated those plots by assisting **SANCHEZ** with communicating with his associates and transmitting information to him about the plot, as well as by "breaking down" the narcotics so they could be packaged for transfer to **ALFARO**; that **FELISCIANO** facilitated those plots by assisting **SANCHEZ** with communicating with his associates and transmitting information to him about the plot, as well as by transported narcotics to **ALFARO** at **SANCHEZ's** direction, that **Debbie SANCHEZ** obtained narcotics at **SANCHEZ's** direction and transported them to **GONZALES** and **FELISCIANO's** residence, that **GONZALES** facilitated this plot by assisting with the packaging of the narcotics, that **JEFF** requested that **ALFARO** smuggle narcotics into the Fresno County Jail and check on **ALFARO's** progress by using **CHENOT's** jail identification number and TH's phone, that **ALFARO** facilitated this plot by accepting responsibility for the narcotics, storing them, receiving payment for his services, and indicating that he would bring them inside the Fresno County Jail; that **CHENOT** assisted with this plot by instructing **LIMA** on where to attempt to take the narcotics so that the plot could proceed after **ALFARO's** arrest, that **LIMA** facilitated this plot by assisting **ALFARO** with communicating with

**DIAZ**, recovering the narcotics from **ALFARO's** residence, and attempting to transport them to **CHENOT's** mother's residence, and that **DIAZ** facilitated this plot by showing **LIMA** where the narcotics were located and using her vehicle to transport **LIMA** and the narcotics to UFM's residence.

      6.    **May 8, 2025 – SANCHEZ, A. LOPEZ, PLASENCIA, B. MURPHY, D. MURPHY, and SANDOVAL Conspired to Distribute and Possess with Intent to Distribute Methamphetamine into a Custodial Facility**

216.    In the days leading up to May 8, 2025, the investigative team became aware that **SANCHEZ** and **D. MURPHY**, while housed in the Fresno County Jail, were conspiring to smuggle contraband, to include methamphetamine and heroin, into the Fresno County Jail. Specifically, the team became aware that **SANCHEZ** and **D. MURPHY** coordinated the operation from custody over the recorded and monitored phone system and video call system, while **A. LOPEZ, PLASENCIA, B. MURPHY, D. MURPHY, M. MURPHY** and **SANDOVAL** procured, packaged and attempted to distribute the contraband to **SANCHEZ** and **D. MURPHY.**

216.    On May 7, 2025, at 9:40 PM, members of the investigative team intercepted and monitored an outgoing call from **A. LOPEZ** on (559) 818-8601[46] (TT8), to **SANCHEZ** on (279) 386-7769 (TT6). During this call, **SANCHEZ** told **A. LOPEZ**, "There's a play right now in the County right. We gotta – we gotta – hole in the – in the what's a called right. And, um – I'm making – um – straws and everything right, and – and – basically I need someone to tie on right. So once the homie – any of the homies end up tying on right, because I got the homie from San Joaquin that came with us. He knows the spot, he knows where right." The conversation continued as **SANCHEZ** told **A. LOPEZ**, "You tell any of the homies right – little homies – want to make some money – everything is good – they tie it on, I'll give them 250 bucks."

217.    I know based on my training and experience, including conversations with investigators familiar with the Fresno County Jail, that incarcerated persons within the Fresno County Jail have been bringing contraband into the facility through holes that ran from the housing units to the outer grounds of the facility. Investigators found that incarcerated persons would throw a "line[47]" through these holes,

---

[46] I entered (559) 818-8601 into CashApp which produced an account with the account name "Angel Solorio" and the handle "$Activecdl". Based on my training and experience, I know that **A. LOPEZ's** street moniker is "Active." Based on my knowledge of the investigation, I know that the acronym "CDL" is commonly used by ENTERPRISE members to refer to the Coalinga Dog Life Bulldog criminal street gang, of which I know that **A. LOPEZ** is a member. I have also heard individuals call the user of (559) 818-8601 "Active" during intercepted calls. Therefore, I believe A. LOPEZ is the user of (559) 818-8601

[47] Consisting of anything from string to cloth taken from common items within the facility.

and that individuals outside of the facility would tie contraband onto the line as the incarcerated persons pulled the contraband through the holes and into facility. This manner of bringing contraband into the facility became commonly referred to as "fishing."



Figure 1: Photograph taken by FSO Sgt. J. Guzman on May 13, 2025 depicting holes in the Fresno County Jail.

218.    I know from my training and experience that the phrase, "there's a play" means that an individual is currently working on a conspiracy to commit a crime. I know "the County" to be synonymous with the "County Jail." I also know that the Fresno County Jail is currently investigating physical holes in the housing units that incarcerated persons are utilizing to bring contraband into the facility. I know the term "homie" to refer to members of the same gang. I know the term, "straws" to refer to the shape the contraband is made into to smuggle the contraband into the Fresno County Jail. I also know "the homie from San Joaquin" to be **RUVALCABA** based on other intercepted calls in which **RUVALCABA** is identified as the "homie from San Joaquin[48]." I know the phrase "to tie on" refers to individuals tying contraband to the lines extended from the incarcerated person's housing unit.

219.    Therefore, I believe **SANHCEZ** informed **A. LOPEZ** of a conspiracy **SANCHEZ** organized that would bring contraband into the Fresno County Jail through holes in the facility. **SANCHEZ** related that he would pay any of the junior members of the **ENTERPIRSE** $250 if they successfully tied the contraband to the line **SANCHEZ** planned to extend to the outer grounds of the

---

[48] Sometimes shortened to **SRP** for the **S**an Joaquin **R**uthless **P**erros Bulldog criminal street gang.

1  Fresno County Jail.

2      220.    On May 8, 2025, at approximately 3:39 PM, **A. LOPEZ**, using (559) 818-8601 (TT8),

3  called (559) 404-9901[49] (TT25), used by **A. GUEVARA**. The following is a transcript of the pertinent

4  portions of the call:

| [BEGINNING OF CONVERSATION] | |
|---|---|
| LOPEZ | Hey. |
| A. GUEVARA | Heya. |
| LOPEZ | You wanna make two fifty? |
| A. GUEVARA | To do what? |
| LOPEZ | Sucking my dick. |
| A. GUEVARA | Huh? |
| LOPEZ | Sucking my dick. |
| A. GUEVARA | Your fucking stupid nigga. |
| LOPEZ | Nah I'm just playing.  You do or not? |
| A. GUEVARA | What is it doing though? |
| LOPEZ | You have to tie uh – uh – a necklace. |
| A. GUEVARA | A necklace? |
| LOPEZ | In Fresno.  [background voice] tell him a string comes down and… |
| A. GUEVARA | I got to tie 'em… |
| LOPEZ | Look, a string comes down, you tie it, and leave that's it. Walk away. There's no camera, there's no nothing right there.  Everyone… |
| A. GUEVARA | But I just came back from Fresno, Dog… |
| LOPEZ | I'm pretty sure the homies are gonna shoot you a ride, I don't know though, but – it's just "G" needs someone to do it, and he's gonna give you two fifty right there and then – well – whenever your coming back into town. |
| A. GUEVARA | Are you going to do it too or what? |
| LOPEZ | Uh no nigga – the fuck – "G" didn't ask me. |
| … | [The call continues as the two continue to rehash the plan, the fact that the homie from San Joaquin will give **A. GUEVARA** directions on how to complete the operation, and that **LOPEZ** would call **FELISCIANO** to gather all the pertinent details]. |
| [END OF CONVERSATION] | |

22      221.    During the call, **LOPEZ** asked **A. GUEVARA** if **A. GUEVARA** wanted to make $250,

23  and then indicated that **A. GUEVARA** only had to "tie a necklace" "at Fresno." When **A. GUEVARA**

24  expressed confusion, **A. LOPEZ** indicated that "a string comes down, you tie it, and leave. That's it,

[49] Members of the investigative team have reviewed numerous intercepted calls with (559) 404-9901 in which **ENTERPRISE** members have referred to the user of (559) 404-9901 as "Action."  Based on my knowledge of the investigation, I know  that "Action" is the street moniker of **A. GUEVARA**.  Additionally, members of the investigative team have reviewed multiple Fresno County Jail video calls in which **A. GUEVARA** is communicating on a recorded video and audio call.  Members of the investigative team compared **A. GUEVARA's** voice on these audio/video jail calls with the voice belonging to the user of (559) 404-9901and found them to be the same.  Based on these facts, I believe the user of (559) 404-9901is **A. GUEVARA**.

walk away." **A. LOPEZ** also said that he believed that "the homies" were going to "shoot [**A. GUEVARA**] a ride." **A. LOPEZ** also indicated during the call that "G" was "in county today." When **A. GUEVARA** asked who was going to "shoot the ride," **A. LOPEZ** indicated that he believed it was "going to be a homie from SRP." **A. GUEVARA** then indicated that he would call "Mona" (the moniker of **FELISCIANO**) to ask for more details.

222.    Based on my training and experience, I know that **ENTERPRISE** members and gang members use the word "homie" to refer to members of the same gang and the phrase "to shoot a ride" to refer to the idea of someone giving someone else a ride. Based on my knowledge of the investigation, I know that **SANCHEZ**'s associates occasionally refer to him as "G," as his moniker is "Giddy." Based on my knowledge of subsequent events, I believe that the phrase "tie a necklace" was meant to refer to the smuggling scheme set out above in which a line would be lowered from the housing unit, tied to a strand of narcotics, and then pulled back up into the jail.

223.    Therefore, based on the information set out above, as well as my knowledge of the activities of the inmates at the Fresno County Jail, I believe that **ENTERPRISE** members were being mobilized by **SANCHEZ** in an attempt to smuggle contraband into the Fresno County Jail.  Several minutes later, at approximately 3:44 PM, **A. LOPEZ**, using (559) 818-8601 (TT8), called **A. GUEVARA**, on (559) 404-9901(TT25). The call lasted approximately 20 seconds and consisted mainly of **A. LOPEZ** telling **A. GUEVARA** that "[t]hey just said that all you gotta do is the same shit. All you gotta do is walk up, tie it, walk to the car, and just dip."

224.    Based on all of the information set out above, I believe that **A. LOPEZ** was effectively confirming **A. GUEVARA's** role in the smuggling operation.

225.    At approximately 5:00 PM, **A. GUEVARA** used (559) 404-9901 (TT25) to send a text message to **PLASENCIA** on 559-800-4470 (TT12) which read, "218 el Camino ln".  I immediately recognized this address as being the residence of **A. GUEVARA** and believe that **A. GUEVARA** sent this address so that **PLASENCIA** could come and pick him up.

226.    At approximately 5:02 PM, the surveillance team observed a Honda sedan parked at **FELISCIANO's** residence located at 36946 Los Angeles St, Huron, CA.  The Honda sedan travelled to several locations, including 218 El Camino Lane, Coalinga, CA, at which location **A. GUEVARA** was

1  observed entering a rear passenger seat of the Honda sedan.  It should be noted that at approximately

2  5:20 PM, several minutes prior to the Honda sedan's arrival at **A. GUEVARA**'s location,

3  **PLASENCIA**, using 559-800-4470 (TT12), sent a text message to (559) 404-9901 (TT25) used by **A.**

4  **GUEVARA** which read, "B outside I'm rolling up."

5      227.    Shortly thereafter, at approximately 5:54 PM, **D. MURPHY,** while in custody at the

6  Fresno County Jail and in the same housing unit as **SANCHEZ**[50], used the Fresno County Jail phone

7  system[51] to call **B. MURPHY** at (559) 908-8713 (TT 8713).  During this call, **D. MURPHY** named the

8  user of (559) 908-8713 (TT 8713) "Bridgette[52]."  **D. MURPHY** asked **B. MURPHY**, "did you get a

9  message."  **B. MURPHY** replied, "No, I didn't get a call or a message."  **D. MURPHY** then stated,

10  "they're going to text you right now for your address, go ahead and send it to them."  Later in the call,

11  **SANCHEZ** can be heard in the background of **D. MURPHY's** call and appeared to be on another call.

12  **D. MURPHY** is heard relaying the fact that **B. MURPHY** will be sending the address to **SANCHEZ's**

13  associates, as **SANCHEZ** is heard on his call telling his associates that **B. MURPHY** will be sending

14  the address shortly.

15      228.    I believe this jail call demonstrated that **D. MURPHY** and **SANCHEZ** met personally

16  within their housing unit and decided to coordinate their efforts to bring narcotics into the Fresno

17  County Jail.  **SANCHEZ** then sent **PLASENCIA**, **RUVALCABA** and **A. GUEVARA** to **B.**

18  **MURPHY's** residence to package the narcotics to be smuggled into the Fresno County Jail.

19      229.    At the 9:44 minute mark, **D. MURPHY** asked **B. MURPHY**, "Did you guys do the

20  chocolate packs?" **B. MURPHY** responded, "No, we didn't do that one yet."  **D. MURPHY** then told

21  **B. MURPHY** to, "put Naul[53] back on the phone."  **SANDOVAL** joined the conversation and **D.**

22  **MURPHY** told **SANDOVAL**, "On the chocolate packs, do the same thing, but let me know how many

23  it actually comes out to."  **SANDOVAL** responded, "ok."

---

[50] Members of the investigative team searched jail records and found that both **SANCHEZ** and **D. MURPHY** were housed in MJ5B in the Fresno County Jail at this time.

[51] This phone system advised the recipient that the call was monitored and recorded.

[52] Later identified as **Bridgette MURPHY.** The investigative team had also listened to multiple jail video calls between **D. MURPHY** and **B. MURPHY** and became familiar with **B. MURPHY's** voice.  As a result, the investigative team recognized the voice of the user of (559) 908-8713 as **B. MURPHY.**

[53] Later identified as **Naul SANDOVAL.**

230.    I know from my training and experience that incarcerated persons are prudent with their communications on recorded lines and often attempt to confuse law enforcement and insulate themselves from criminal liability.  I believe that when **D. MURPHY** asked about the "chocolate packs," he was actually referring to black tar heroin.  Based on the context of the prior calls, I believe **B. MURPHY** and **SANDOVAL** are packaging narcotics to be smuggled into the Fresno County Jail.

231.    Meanwhile, the surveillance team observed the Honda driven by **PLASENCIA** arrive at 630 N. Thorne Avenue, Fresno, CA at approximately 6:34 PM.  This residence is located approximately two miles northwest of the Fresno County Jail and is associated to **B. MURPHY**.  At 6:43 PM, **D. MURPHY** used the Fresno County Jail video call system[54] to call **B. MURPHY**.  This video call showed a live video of **D. MURPHY** speaking with **B. MURPHY**.  During this call, **D. MURPHY** asked, "Are you guys almost done?"  **B. MURPHY** responded, "We're on the last one, because Naul [**SANDOVAL**] had to take it out and rescale it."  **SANDOVAL** can be heard in the background stating, "and the black, I'm going to try and put it into one fool."  **D. MURPHY** was visibly upset with **SANDOVAL's** statement.  **D. MURPHY** responded by stating, "Careful what you say bro."

232.    I know drug traffickers often use vague or innocuous language when discussing narcotics to attempt to attempt to confuse law enforcement and insulate themselves from criminal liability.  I know the term, "black" to refer to black tar heroin.  I believe that **D. MURPHY** was using the term, "chocolate packs" in prior calls to also describe heroin.  I believe that **D. MURPHY** was upset with **SANDOVAL** because **D. MURPHY** believed accurately that law enforcement knows that "black" means heroin, and that **SANDOVAL** just communicated that on a recorded and monitored video call.

233.    Therefore, I believe **D. MURPHY** called **B. MURPHY** to inquire as to the status of the narcotics being packaged.  **B. MURPHY** responded that they were not done yet, due to the fact that **SANDOVAL** had to remove the narcotics from their packaging to determine their weight.

234.    **D. MURPHY** then asked, "where's Mariah?"  **B. MURPHY** then handed the phone to an uncharged co-conspirator, herein referenced as UCC2, and **D. MURPHY** noticed (UCC2) was wearing

---

[54] This video call system is an application based system which requires users, both in and out of custody, to create a profile within the application to accept video calls and messages.  This application advises users that these video calls are monitored and recorded.

a red rag on her face. UCC2 stated, "It stinks." **D. MURPHY** agreed and commented that it –
assumably the narcotics – smells like "chemical, or vinegar or mustard." UCC2 then related she's "just
chilling, helping" indicating she was helping package the narcotics to be sent to the Fresno County Jail.

235.    I have spoken to experienced narcotics detectives who related that heroin has a strong
smell that resembles vinegar or a chemical smell.

236.    Later in the call, **D. MURPHY** asked, "where's the homie's people at?" **B. MURPHY**
responded that they were, "in the living room", and described them as a "lady and a young boy, and an
older one." **B. MURPHY** then took the phone to the living room, and handed the phone to
**RUVALCABA**, who was seated on the couch. **RUVALCABA** took the phone to the bedroom where
the narcotics were being processed and began to help (off camera) with the packaging.

237.    Based on the physical observations of **PLASENCIA's** vehicle arriving at **B.
MURPHY's** residence, I believe the aforementioned video corroborates my belief that **SANCHEZ**,
who **D. MURPHY** named, "the homie", sent his associates to the residence of **B. MURPHY**, to
combine their efforts in smuggling narcotics into the Fresno County Jail.

238.    At approximately 7:00 PM, **D. MURPHY** again used the Fresno County Jail video call
system to call **B. MURPHY.** At the beginning of the call, **D. MURPHY** is observed telling another
inmate, "I'll just tie it on." **D. MURPHY** then turned his attention to the video call and asked **B.
MURPHY**, "are you guys done?" **B. MURPHY** responded, "Yeah, I think we are about to start
wrapping it." **D. MURPHY** handed the phone to another inmate as **RUVALCABA** joined the call.
**RUVALCABA** stated that he believed "it (the contraband) was too thick." This uncharged inmate
provided **RUVALCABA** with direction on how to make the contraband thinner by utilizing tape to wrap
it tightly. **D. MURPHY** then rejoined the call and is observed speaking with **RUVALCABA** as
**RUVALCABA** is observed manipulating a rope shaped item. **RUVALCABA** then asked an individual
off camera for, "another one" and is handed a plastic tube-shaped container with a white powder
substance contained within. **D. MURPHY** observed the white powder and demanded that
**RUVALCABA** "put it down" so the white powder was out of the cameras view. **RUVALCABA**
obliged the demand and was observed manipulating the rope shaped object and applying strips of tape
out of the cameras view.

239.    I believe this call demonstrated that **RUVALCABA**, at the direction of **SANCHEZ** and **D. MURPHY**, assisted **B. MURPHY** and **M. MURPHY** with the packaging of narcotics, to include a white powdery substance to be smuggled into the Fresno County Jail.

240.    At approximately 7:15 PM, **D. MURPHY** again used the Fresno County Jail video call system to call **B. MURPHY**, who handed the phone to **RUVALCABA**.  **D. MURPHY** explained to **RUVALCABA** that, "it needs to be as thin as possible."  **RUVALCABA** agreed and panned the camera to show **SANDOVAL** and **A. GUEVARA** within the room where the narcotics are being packaged. Later in the call, **D. MURPHY** called to an incarcerated person within **D. MURPHY's** housing unit to assist with directing **RUVALCABA** on properly packaging the narcotics.  **D. MURPHY** handed this incarcerated person the phone and is identified as Ricardo **NUNEZ**.  I identified **NUNEZ** by his prior booking photos.  **NUNEZ** stated, "put em in saran wrap and just tape em" and that the hole is "like a Gatorade cap."  I believe **NUNEZ** was providing **RUVALCABA** with direction and insight as to how to package the narcotics.  **SANDOVAL** and **RUVALCABA** are observed taping the rope shaped object in full view of the camera.  Later in the call, **D. MURPHY** asked, "who's the little homie you're with?" **RUVALCABA** then handed **A. GUEVARA** the phone who introduced himself by stating, "I'm Action, from Coalinga to Huron" to which **D. MURPHY** stated, "I'm Fujo from 5th."

241.    I believe this video call further corroborated the fact that **RUVALCABA**, **SANDOVAL**, **B. MURPHY**, and **A. GUEVARA** clearly conspired together to package narcotics to be smuggled into the Fresno County Jail.  This video call ended at 7:25 PM.

242.    At approximately 7:45 PM, two individuals were observed exiting the Murphy residence and walked toward the Honda sedan, one of which was a male holding a backpack. The Honda then departed the residence and was followed until it arrived at the Fresno County Jail.

243.    At 7:57 PM, members of the investigative team continued to physically surveil the Honda and watched as **RUVALCABA**, **SANDOVAL**, and **A. GUEVARA** exited the Honda and loitered near the intake sally port for the Fresno County Jail.  During this time, **A. GUEVARA** was manipulating a backpack that had been taken out of the Honda, which he eventually gave to **SANDOVAL**.  It should be noted that this process took over an hour, and **SANCHEZ** was intercepted on jail calls during this period speaking with **A. GUEVARA** (and other individuals); based on the language being used in the call, it

was clear that **SANCHEZ** and his associates within the Fresno County Jail were attempting to lower

something down to a level where it would be accessible to **A. GUEVARA** and **SANCHEZ**'s other

associates. Based on the observations being made by the investigative team, as well as all the previous

calls, I believe that **SANCHEZ** and his associates inside of the jail were attempting to lower a string to

**A. GUEVARA** and other individuals with him; **A. GUEVARA** was supposed to tie the string to one

end of the "necklace" referenced above by **LOPEZ**, at which point **SANCHEZ** and his associates

would pull the string and the "necklace" up through the hole in the jail's wall.

244.    Fresno County Sheriff's Deputies contacted **SANDOVAL**, who immediately took flight

and disobeyed the Deputy's commands. **SANDOVAL** threw the backpack while being pursued and was

eventually apprehended. **SANDOVAL** was identified by his California identification card and was

advised of his rights pursuant to the Miranda decision. **SANDOVAL** expressed remorse for fleeing

from Deputies but would not speak on the contents of the backpack that he threw during the foot pursuit.

**PLASENCIA**, **RUVALCABA**, and **A. GUEVARA**, reentered the Honda sedan and attempted to leave

the scene but were detained during a vehicle stop. **RUVALCABA** and **PLASENCIA** were identified

by their California identification cards, while **A. GUEVARA** was identified by his verbal statements

which were corroborated by **A. GUEVARA's** California DMV photograph. The backpack **A.**

**GUEVARA** was observed with at 7:57 PM and that **SANDOVAL** later possessed and threw, was seized

and searched. Members of the investigative team located what appeared to be numerous straws which

were filled with narcotics and duct taped together into a strand approximately 20 feet long, similar to the

rope shaped object in the video calls detailed above.

///

///

///

///

///

///

///

///



*FIGURE 1: Photograph taken by Fresno County Sheriff's Deputies of the rope shaped apparatus located in the backpack.*

245.    Both **A. GUEVARA** and **RUVALCABA** were wearing the same outfits as observed in the video call just hours prior.  **SANDOVAL** was arrested and booked at the Fresno County Jail for the contents of the backpack, due to the fact that **SANDOVAL** possessed the backpack at the time of detention and fled from Deputies.  The contents of the rope shaped object were submitted to the Fresno County Sheriff's Office Forensic Laboratory and determined to be methamphetamine (6.864 grams), marijuana (3.661 grams), and heroin (23.498 grams).

246.    Based on all of the above, I believe **SANCHEZ** and **D. MURPHY** coordinated the collection of narcotics and contraband to be smuggled into the Fresno County Jail.  I believe **PLASENCIA** transported **RUVALCABA** and **A. GUEVARA** to the residence of **B. MURPHY** and **SANDOVAL**, where they packaged the narcotics to be trafficked. Finally, I believe **RUVALCABA**, **SANDOVAL, A. GUEVARA** and **PLASENCIA** transported the narcotics, to the Fresno County Jail and attempted to distribute the narcotics to **SANCHEZ** and **D. MURPHY,** conspired to distribute and

1    possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

2           7.    **May 12, 2025 – SANCHEZ, FELISCIANO, ESCOBEDO, PULIDO, GARCIA, L. PLASENCIA, B. MURPHY, D. MURPHY, RUVALCABA, and SANDOVAL Procured a Pound of Methamphetamine, and Conspired to Distribute and Possess with Intent to Distribute Controlled Substances into a Custodial Facility**

5    247.    On May 12, 2025, the investigative team became aware that **SANCHEZ** and **D.**

6    **MURPHY**, while housed in the Fresno County Jail, conspired to smuggle contraband, to include

7    methamphetamine and heroin, into the Fresno County Jail.  Specifically, the team became aware that

8    **SANCHEZ** and **D. MURPHY** coordinated the operation from custody over the recorded and monitored

9    phone system and video call system, while **ESCOBEDO, FELISCIANO, GARCIA, B. MURPHY,**

10    **RUVALCABA, and SANDOVAL** procured, packaged, transported, and attempted to distribute the

11    contraband to **SANCHEZ** and **D. MURPHY** within the Fresno County Jail.

12    248.    During this conspiracy, **SANCHEZ** coordinated the procurement of a pound of

13    methamphetamine from an unknown male (UM65).  **ESCOBEDO** brokered this procurement, while **L.**

14    **PLASENCIA** assisted in the transportation of it, and **FELISCIANO** packaged it to be sold after it was

15    obtained.

16    249.    I know based on my training and experience, including conversations with investigators

17    familiar with the Fresno County Jail, that incarcerated persons within the Fresno County Jail have been

18    bringing contraband into the facility through holes that ran from the housing units to the outer grounds

19    of the facility.  Investigators found that incarcerated persons would throw a "line" through these holes,

20    and that individuals outside of the facility would tie contraband onto the line as the incarcerated persons

21    pulled the contraband through the holes and into facility. This manner of bringing contraband into the

22    facility became commonly referred to as "fishing."

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///



*FIGURE 2: Photograph taken by FSO Sgt. J. Guzman on May 13, 2025 depicting holes in the Fresno County Jail.*

250.    On May 12, 2025, at 11:33 AM, **D. MURPHY** used the Fresno County Jail phone system to place a video call[55] to **B. MURPHY**.  **D. MURPHY** was identified by prior booking photographs of **D. MURPHY**, while **B. MURPHY** was identified by her California driver license photograph.  The video call began as **B. MURPHY** was observed in the video call manipulating an unknown object off camera.  **D. MURPHY** asked **B. MURPHY**, "which one is messed up?"  **B. MURPHY** then produced a handful of multi-colored straw shaped items that were interconnected and showed them to **D. MURPHY**.



*FIGURE 3: Screenshot of the video call between **D. MURPHY** (left) and **B. MURPHY** (right).*

---

[55] This video call system is an application based system which requires users, both in and out of custody, to create a profile within the application to accept video calls and messages.  This application advises users that these video calls are monitored and recorded.

251.    I believe this video call showed **B. MURPHY** was assembling a device which could be used to traffic contraband into the Fresno County Jail, at the direction of **D. MURPHY**.

252.    At approximately 1:01 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 401-8633 utilized by **FELISCIANO**.  The following is a transcript of the call, beginning at the 3:41 minute mark:

| NAME | TRANSCRIPTION |
|---|---|
| | [BEGINNING OF CONVERSATION] |
| FELISCIANO | On a different note – um – Regal? |
| SANCHEZ | Yes, my ninja. |
| FELISCIANO | He came this morning, to try to come in, pick up some candy bags and um… |
| SANCHEZ | But it was, yeah but the candy bags were not – did you get – what were [UI] that shit was all papas. Yeah, but I don't have that much candy bags to be giving I thought… |
| FELISCIANO | Yeah, but he had it – to pay for it. Because big cousin didn't want to give it to him. |
| SANCHEZ | Ok, what did he – what did he – what did he pay for? What did he take? |
| FELISCIANO | For uh – burrito. |
| SANCHEZ | Oh, ok – ok. |
| … | [The call continues as the two speak about the events of the night prior until the call ends at the 6:38 minute mark]. |
| | [END OF CONVERSATION] |

253.    I know from my training and experience that "Regal" is the street moniker of **RUVALCABA**, who **SANCHEZ** subsequently called "my ninja" during this call.  I know that members of the **ENTERPRISE** refer to narcotics utilizing terms and phrases that describe food.  In this call, I believe the phrase, "candy bags" actually means "narcotics."  I also know "big cousin" to be **GONZALES**.  I know the term, "burrito" to be commonly used by the **ENTERPRISE** and actually means, "an ounce of methamphetamine."

254.    I believe **FELISCIANO** communicated to **SANCHEZ** that **RUVALCABA** came to **FELISCIANO's** residence and purchased an ounce of methamphetamine.  At approximately 1:49 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 401-8633 (TT 8633) utilized by **FELISCIANO**.  **SANCHEZ** then asked **FELISCIANO** to set up a 3-way call with **RUVALCABA**[56] on (559) 210-2375[57] (TT21).  The following is a transcript of the call, beginning at the 1:40 minute

---

[56] This transaction was captured on the pen-register trap and trace device installed on (559) 401-8633 utilized by **FELISCIANO**.

[57] I entered (559) 210-2375 into "CashApp," a commonly used money sending mobile phone application, which indicated that (559) 210-2375 was associated with the account name "Rodrigo Torres" and the account handle "$regal15SJ". I know from my training and experience that it is common for San Joaquin Ruthless Perros (SRP) use "SJ" to represent "**S**an **J**oaquin." I also know that **RUVALCABA's** is an SRP Bulldog criminal street gang member who goes by the street moniker of "Regal." Based on the CashApp account name and handle, corroborated by the intercepted and monitored calls, and law enforcement databases, I believe the user of (559) 210-2375 is **RUVALCABA**

mark:

| NAME | TRANSCRIPTION |
|------|---------------|
| | [BEGINNING OF CONVERSATION] |
| SANCHEZ | My ninja. |
| RUVALCABA | Hey, yes. |
| SANCHEZ | My ninja, real quick right – I need you to do me a paro right.  Cuz, my little niece, she's over there in uh – right here in the no town right. |
| RUVALCABA | Uh huh [in affirmation] |
| SANCHEZ | And she doesn't know where the – where the theater is at like that.  You hear me? |
| RUVALCABA | Ok. |
| SANCHEZ | Can you – can you make a sister and – show her the theater and everything – and then um – make sure goes in the – um – she goes in the movie theater?  Cuz she's only uh – she's only uh – 14 years old.  Do you hear me? |
| RUVALCABA | Yeah. |
| SANCHEZ | But I just wanna make sure that her butt goes to the theater right. And, you know what I mean?  Cuz it's her and her friends. |
| RUVALCABA | Ok. |
| SANCHEZ | And then my tia, she's not – she's not around – my tia is – uh – she's active, she's got work.  So I just want to make sure that – you know what I mean?  My little – my little niece and her little friends, they go in the movie theater and they go in there safe you know what I mean? |
| RUVALCABA | Yeah, yeah. |
| SANCHEZ | That's all I need you to do. |
| RUVALCABA | Ok. |
| … | [The call continued as the two spoke about coordinating a ride for **RUVALCABA** before **RUVALCABA** left the call.  **SANCHEZ** and **FELISICIANO** continued their conversation until the call ends at the 14:57 minute mark]. |
| | [END OF CONVERSATION] |

255.    I know from my training and experience that incarcerated persons will use coded language, especially when communicating on recorded jail phone lines, in an attempt to thwart law enforcement's ability to arrest and prosecute them for trafficking illicit narcotics.  I know that **SANCHEZ** calls **RUVALCABA** "my ninja."  I also know that the term, "paro" is a Spanish slang term that translates to "a favor" in the English language[58].  I know that when **SANCHEZ** stated, "my little niece" "she's in the no town right," **SANCHEZ** used coded language to communicate that **B. MURPHY** (Niece[59]) resides in the City of Fresno (no town).  I also believe that the term, "theater" in this coded message referred to the Fresno County Jail.  I base this belief on my experience gained during a similar scheme in which **SANCHEZ** attempted to traffic narcotics into the Fresno County Jail on May 8, 2025.  During this prior attempt, **RUVALCABA** was identified by **SANCHEZ** as having the

---

[58] Spanish speaking members of the investigative team corroborated this translation.

[59] There is not a familial connection between **B. MURPHY** and **SANCHEZ**.  I believe "Niece" to be **B. MURPHY** based on my training, experience and context gained from prior efforts to smuggle narcotics into the Fresno County Jail perpetrated by **SANCHEZ**, **D. MURPHY** and their associates.

knowledge of where to stand outside of the Fresno County Jail to effectively traffic the contraband into the facility.

256.    I believe **SANCHEZ** communicated to **RUVALCABA** that **SANCHEZ** needed **RUVALCABA** to show **B. MURPHY** where the "fishing" holes were located in the Fresno County Jail, so that **B. MURPHY** could distribute contraband into the Fresno County Jail effectively.

257.    At approximately 4:06 PM, **D. MURPHY** used the Fresno County Jail phone system to call (559) 908-8713 (TT 8713) utilized by **B. MURPHY**.  The following is a transcript of the call, beginning at the 2:01 minute mark:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| **D. MURPHY** | Ok, so where you at? |
| **B. MURPHY** | Outside in Aladdin. |
| **D. MURPHY** | Did you guys uh – did Mariah give you the pens? |
| **B. MURPHY** | Yeah. |
| **D. MURPHY** | Did you put em on? |
| **B. MURPHY** | Um, yeah. |
| **D. MURPHY** | Do you have it with you? |
| **B. MURPHY** | No. |
| **D. MURPHY** | [exhales in annoyance] Ok, look sister… |
| **B. MURPHY** | What? |
| **D. MURPHY** | You hear me? |
| **B. MURPHY** | Yeah, I hear you. |
| **D. MURPHY** | We're going to have to – um – We're going to have to break the law. I'm going to need you to break the law for me – with me – ok? |
| **B. MURPHY** | I'mma have to do it? |
| **D. MURPHY** | Yep. |
| **B. MURPHY** | Oh my God. |
| **D. MURPHY** | It's going to be really simple sister, you hear me? |
| **B. MURPHY** | No… |
| **D. MURPHY** | Ok. |
| **B. MURPHY** | Alright – alright it's good, I'll do it. |
| **D. MURPHY** | Nope, you already said no. |
| **B. MURPHY** | It's ok, I'll just do it. |
| **D. MURPHY** | Nope.  I'll call you back, I'm going to find – um – I'm going to call you back right now. |
| **B. MURPHY** | Alright. |
| | [END OF CONVERSATION] |

258.    Based on my training and experience, I know "Aladdin" to be a bail bonds establishment located directly across the street from the Fresno County Jail.  I know that "pens" is short for "vape pens" that can contain controlled substances.  I believe **B. MURPHY** to be **D. MURPHY's** sister based on the fact that **D. MURPHY** called **B. MURPHY** share a common last name, as well as the fact that **D. MURPHY** called **B. MURPHY** "sister" in prior jail calls.

259.    I believe **D. MURPHY** called **B. MURPHY** to ask if **B. MURPHY** received the vape

pens from **M. MURPHY**, and if **B. MURPHY** had packaged them to be smuggled into the Fresno

County Jail. **B. MURPHY** related she obtained the vape pens and packaged them to be smuggled,

however she did not have the packaged contraband at the time of this call. I believe that when **D.**

**MURPHY** told **B. MURPHY** "I'm going to need you to break the law for me," **D. MURPHY**

communicated that he needed **B. MURPHY** to personally smuggle the contraband into the Fresno

County Jail on **D. MURPHY**'s behalf.

260.    At approximately 5:14 PM, the investigative team intercepted a call between

**RUVALCABA** on (559) 210-2375 (TT21) and **ESCOBEDO** on (831) 596-0869 (TT3). The following

is a transcript of the call:

| NAME | TRANSCRIPTION |
|---|---|
| | [BEGINNING OF CONVERSATION] |
| **ESCOBEDO** | I'm not going to say. [UI]. |
| **RUVALCABA** | Hey – Hey jenna… |
| **ESCOBEDO** | Yes. |
| **RUVALCABA** | Ok so – ok look, you hear me? [**SANCHEZ** heard in the background of **RUVALCABA's** line, likely on a separate phone's external speaker]. |
| **SANCHEZ** | Tell her – why the fuck is that shit not uh – um – fulled up! What was [UI]. |
| **RUVALCABA** | Hey you hear him? |
| **SANCHEZ** | Tell her… |
| **ESCOBEDO** | Yeah. |
| **SANCHEZ** | Come on man – Jen – ninjetta – of all the mother fucking people, why is that shit not filled up! |
| … | [**SANCHEZ** continued to berate **ESCOBEDO** for making **SANCHEZ** look dumb in front of other people. **ESCOBEDO** explained the situation to **SANCHEZ** beginning at the 00:39 second mark]. |
| **ESCOBEDO** | I filled the ones that I could fill. Me and Gracie finished doing the ones we could fill and then he told us to leave and then I did what I could do. And then the other ones that are empty – the ones – is because some of the – some of the black shirts got inside of the one – so I didn't put nothing in it. And the other ones have two or three of the black shirts. But we couldn't get them in and they were starting to melt. |
| … | [**SANCHEZ** goes on to express his frustration with **ESCOBEDO** as the call ended at the 1:21 minute mark]. |
| | [END OF CONVERSATION] |

261.    I know from my training and experience that "Jen" or "ninjetta" are ways **SANCHEZ**

identifies **ESCOBEDO**. I believe that when **SANCHEZ** asked, "why is that shit not filled up"

**SANCHEZ** was referring to the fact that the "straws" to be smuggled into the Fresno County Jail were

not filled with contraband to **SANCHEZ's** liking. I know "Gracie" to be Gracie **PULIDO**. I also know

"black shirts" are synonymous with "heroin."

262.    I believe **RUVALCABA** possessed two phones or devices during this call and was

speaking with **SANCHEZ** on a second phone or device which **RUVALCABA** used to simultaneously call **ESCOBEDO** on (831) 596-0869 (TT3).  **SANCHEZ** then expressed his frustration that **ESCOBEDO** and **PULIDO** did not fill the "straws" completely with narcotics to be smuggled into the Fresno County Jail.  **ESCOBEDO** went on to defend **PULIDO** and herself and stated that **ESCOBEDO** and **PULIDO** packaged what narcotics they had available to them at the time, which included heroin.

263.    At approximately 5:31 PM, **SANCHEZ** used the Fresno County Jail phone system to call **ESCOBEDO**, on (831) 596-0869 (TT3).  During the call, **SANCHEZ** asked **ESCOBEDO** if she remembered an individual that **SANCHEZ** and **ESCOBEDO** "dropped off at McDonald's." **SANCHEZ** continued and asked **ESCOBEDO** if the individual "had food." **ESCOBEDO** replied that she was not sure. **SANCHEZ** then asked **ESCOBEDO** about "Big Cousin."  **ESCOBEDO** related that **SANCHEZ** called **ESCOBEDO** the other day, and **ESCOBEDO** believed that the individual did "have food."

264.    Based on my training and experience, I am aware that narcotics traffickers often use vague and innocuous language to refer to narcotics in an effort to hide their illegal activity from law enforcement. In this call, I believe that **SANCHEZ** was using the word "food" to refer to narcotics and asked **ESCOBEDO** if "Big Cousin" was supplied with narcotics that **SANCHEZ** likely intended to purchase for further distribution. **SANCHEZ** directed **ESCOBEDO** to call this unidentified individual about the food.  **ESCOBEDO** stated, "I think he said six but I'll call him just to make sure" and put **SANCHEZ** on hold.  Based on this statement, I believe that **ESCOBEDO** meant to relay that the drug supplier previously quoted a price of "six" or $600 for a unknown quantity of a narcotic.

265.    Immediately following the direction from **SANCHEZ**, **ESCOBEDO**, using (831) 596-0869 (TT3), called (559) 753-3713 (TT3713) utilized by an unidentified male, hereinafter referenced as "UM65". **ESCOBEDO** asked UM65 if he "had anything available".

266.    Based on the conversation with **SANCHEZ** and the prior conversations between **ESCOBEDO** and UM65, I believe that **ESCOBEDO** asked UM65 if he had any narcotics available for distribution. UM65 asked **ESCOBEDO** what she needed, and **ESCOBEDO** said that she needed "eight." UM65 clarified "a half" and said that he, "got it but it's going to be six though."

267.    Based on my training and experience, I believe that **ESCOBEDO** meant that she, on

behalf of **SANCHEZ**, wished to purchase eight ounces of a narcotic, which UM65 clarified meant a half pound. I believe UM65 meant that he was supplied with the narcotic, but it would cost $600. Based on my training and experience, I am aware that $600 is consistent with the price of a half pound of methamphetamine in the Central Valley of California. Therefore, I believe **ESCOBEDO** asked UM65 for a half pound of methamphetamine and UM65 relayed that he could supply the drug for $600. **ESCOBEDO** then told UM65 that **ESCOBEDO** would "jump over really quick and tell him," which I believe meant that **ESCOBEDO** would reconnect with **SANCHEZ** who was on hold and relay the price of the methamphetamine.

268.    **ESCOBEDO** then placed UM65 on hold and rejoined the original call with **SANCHEZ**. **ESCOBEDO** relayed to **SANCHEZ** that it was "eight for six." Based on my training and experience and the context from the prior conversation between **ESCOBEDO** and UM65, I believe that **ESCOBEDO** meant to relay that UM65 would sell a half pound of methamphetamine for $600. **SANCHEZ** asked **ESCOBEDO**, "what if I wanted a fully?" Based on my training and experience, I believe **SANCHEZ** asked **ESCOBEDO** what the price would be if **SANCHEZ** purchased a full pound of methamphetamine. **ESCOBEDO** related that she would ask and put **SANCHEZ** on hold again.

269.    **ESCOBEDO** rejoined the call with UM65. **ESCOBEDO** told UM65, "he said how much would it be for a whole one." Based on my training and experience, I believe that a "whole one" referred to a whole pound of methamphetamine. UM65 replied that he did not have a "whole one" right now. UM65 said he had four the other day but now he only had "one." UM65 said he did not know if he could get "another one" right now. Based on the comment, I believe UM65 meant that he previously was supplied with four pounds of methamphetamine, but now only had one remaining, which UM65 was unable to sell to **SANCHEZ**. I believe UM65 meant to relay that he was unsure if he could acquire another pound of methamphetamine from whoever supplied UM65 which UM65 could then use to supply **SANCHEZ**. **ESCOBEDO** related that she would speak again with **SANCHEZ** and put UM65 back on hold.

270.    **ESCOBEDO** rejoined the call with **SANCHEZ**.  **ESCOBEDO** relayed that "he just has that right now" and that "he just has one." Based on the prior conversation, I believe **ESCOBEDO** meant to relay that UM65 only had a supply of one pound of methamphetamine and was only willing to

1   sell the half pound of methamphetamine previously discussed to **SANCHEZ**. **SANCHEZ** told

2   **ESCOBEDO**, "I want it, tell him I'll work my way over there and get it." Based on the comment (and

3   detailed further below in subsequent calls), I believe that **SANCHEZ** meant that he wanted to purchase

4   the whole pound of methamphetamine that UM65 had, and **SANCHEZ** would send a member of the

5   **ENTERPRISE** to UM65's location to complete the transaction.

6           271.    **ESCOBEDO** then placed **SANCHEZ** on hold and rejoined the call with UM65.

7   **ESCOBEDO** told UM65, "we'll take it." UM65 agreed and the call was ended. Shortly after, at

8   approximately 5:39 PM, UM65, using (559) 753-3713 (TT3713), called **ESCOBEDO**, using (831) 596-

9   0869 (TT3). UM65 asked **ESCOBEDO** how long it would take for them to get "here," which I believe

10  meant UM65's location to complete the drug transaction. **ESCOBEDO** relayed that "she" was coming

11  to pick her up and it should not take more than an hour. UM65 asked **ESCOBEDO** if "he" was still in

12  Fresno, and **ESCOBEDO** said, "yes." UM65 said, "damn so you can't even talk to him right now."

13  Based on the comment, I believe that UM65 asked about **SANCHEZ**, who was temporarily housed at

14  Fresno County Jail and did not have access to his contraband prison phone which **SANCHEZ** normally

15  used to communicate. UM65 continued and said, "it's a fresh one, if you guys want, I won't even open

16  it." Based on my training and experience, I believe that UM65 meant that he had not opened the pound

17  of methamphetamine that **ESCOBEDO** intended to purchase on behalf of **SANCHEZ**. This was clearer

18  when UM65 continued and said, "it's packaged the way they bring it across the border." Based on my

19  training and experience, I believe that UM65 meant that the methamphetamine was in the packaging in

20  which it was wrapped when the pound was smuggled into the United States. UM65 continued and said,

21  "if you want it, I'll do it for eleven right now." Based on my training and experience, I believe that

22  UM65 meant that he would sell the pound of methamphetamine to **ESCOBEDO** who represented

23  **SANCHEZ** for $1,100. **ESCOBEDO** asked UM65 to "give her a couple minutes" and she would get

24  back to UM65.

25          272.    Shortly after, at approximately 5:53 PM, **ESCOBEDO**, using (831) 596-0869 (TT3),

26  received a call from **SANCHEZ** on the Fresno County Jail phone system. During the call, **ESCOBEDO**

27  told **SANCHEZ** that "Big Cousin has that one right now…and he hasn't even opened it or nothing."

28  Based on the previous calls, I believe **ESCOBEDO** meant to relay that UM65 had an unopened pound

1    of methamphetamine that **SANCHEZ** could purchase. **SANCHEZ** told **ESCOBEDO** to tell UM65 that

2    **SANCHEZ** "wanted it" but told **ESCOBEDO** that **SANCHEZ** would have to give "the rest" to UM65

3    on CashApp. Based on the comment, I believe that **SANCHEZ** intended to purchase the pound of

4    methamphetamine from UM65 and would provide some of the $1,100 payment in cash and would send

5    the remaining balance through a Cashapp account. **ESCOBEDO** told **SANCHEZ** to send it to a third-

6    party female's CashApp.  **SANCHEZ** said he could do that and to tell UM65 "yes".

7        273.    **SANCHEZ** asked **ESCOBEDO** to tell his "primo" to send his "comadre four hundred,"

8    which would allow them to get a "full thing instead half of one." I believe that in this comment,

9    **SANCHEZ** was instructing **ESCOBEDO** on how to procure funds so the **ENTERPRISE** could

10   complete the transaction for the whole pound of methamphetamine. **SANCHEZ** and **ESCOBEDO**

11   continued to discuss facilitating funds and **SANCHEZ** told **ESCOBEDO** to put his "Primo" on the line.

12   Based on my knowledge of the investigation, I am aware that **SANCHEZ** referred to Benny

13   **GONZALES** as his "primo." Shortly after, a male voice I recognize as **GONZALES** from numerous

14   prior intercepts was merged into the call. **SANCHEZ** asked **GONZALES** about an account, and the call

15   was dropped.

16       274.    At approximately 6:04 PM, **ESCOBEDO**, using (831) 596-0869 (TT3), received another

17   call from **SANCHEZ** on the Fresno County Jail phone system.  During the call, **ESCOBEDO**,

18   **SANCHEZ**, and an additional male voice which I recognized as Benny **GONZALES** were connected.

19   I have reviewed hundreds of calls in which **GONZALES** was intercepted on (559) 961-6401(TT5)

20   during the course of this investigation.  Based on this past experience listening to **GONZALES'** voice, I

21   recognized **GONZALES'** voice as the male voice that joined this call.  **SANCHEZ** directed

22   **GONZALES** to "send 400 to my prima's chime."  I know from my training and experience that

23   "Chime" is a mobile banking application.  I also know that "prima" is a name by which **SANCHEZ**

24   identifies **FELISCIANO**.  **SANCHEZ** spoke again with **ESCOBEDO** later in the call. **SANCHEZ** and

25   **ESCOBEDO** discussed "Jay" who owed **SANCHEZ** "one seventy-five," which I believe meant $175.

26   **SANCHEZ** said that if "Jay" owed that much money, then "Jay" owed **SANCHEZ** some rides.  Based

27   on the comment, the investigative team believed that **SANCHEZ** planned to use "Jay's" vehicle to

28   complete the narcotics transaction. The investigative team believed that "Jay" likely referred to an

uncharged co-conspirator, who was known to operate a white Honda sedan. **SANCHEZ** told **ESCOBEDO**, "All I want is Susanna in the car, that's my main thing." **SANCHEZ** continued and said, "Regal is going to meet the home girl and we're going to do it like that." Based on the comment, I believe **SANCHEZ** was indicating that he wanted "Susanna" to be enroute to complete the drug transaction as soon as possible. I know from my training and experience that "Regal" is the street moniker of Rodrigo **RUVALCABA**.

275. At approximately 6:20 PM, **ESCOBEDO**, using (831) 596-0869 (TT3), received an incoming voice call from **SANCHEZ** on the Fresno County Jail phone system. **ESCOBEDO** told **SANCHEZ** that "everyone's here." **SANCHEZ** asked if "what's her name was here," and **ESCOBEDO** affirmed that she was. Based on the prior calls, I believe that the female **SANCHEZ** was clarifying was present was "Susanna." **SANCHEZ** said, "Let's rock and roll" and asked **ESCOBEDO** to call "Regal." Based on my knowledge of the investigation, I am aware that "Regal" referred to Rodrigo **RUVALCABA**. **ESCOBEDO** added a male to the call who I believe was **RUVALCABA**. **SANCHEZ** introduced "Susanna" to **RUVALCABA**.

276. At 6:30 PM, **D. MURPHY** used the Fresno County Jail phones to complete a video call to **B. MURPHY**. During this call, **D. MURPHY** asked **B. MURPHY**, "where's the whatchamacallit at?" **B. MURPHY** responded, "the stuff?" **D. MURPHY** then stated, "Yep" "did we put some pens on there?" To which **B. MURPHY** stated, "yeah" "still working on it." **B. MURPHY** then handed **RUVALCABA** the phone and **RUVALCABA** and **D. MURPHY** spoke while **RUVALCABA** manipulated an object out of the camera's view. **RUVALCABA** was identified from prior contacts with members of the investigative team, as well as **RUVALCABA's** California Department of Motor Vehicles photograph. **D. MURPHY** then stated to **RUVALCABA**, "the plumas?" to which **RUVALCABA** responded, "yeah." **D. MURPHY** then asked, "they're small enough right?" **RUVALCABA** responded in affirmation and showed **D. MURPHY** the object that **RUVALCABA** was manipulating out of the camera's view. This object was a rope shaped object and is pictured below:

///

///

///



*FIGURE 4: Screenshot of the video call between D. MURPHY (left) and RUVALCABA (right).*

*FIGURE 6: Screenshot of the video call between D. MURPHY (left) and RUVALCABA (right).*

277.    Based on my training and experience, I believe that the "whatchamacallit" **D. MURPHY** referenced is a rope shaped package of narcotics. I also believe, "the stuff" **B. MURPHY** referenced are narcotics and contraband. I know "pens" in the English language or "Plumas[60]" in the Spanish language are vape pens that can contain controlled substances.

278.    I believe this video call showed that **RUVALCABA**, an associate of **SANCHEZ**, and **B. MURPHY**, an associate of **D. MURPHY**, packaged narcotics and contraband to be trafficked into the Fresno County Jail at the direction of both **D. MURPHY** and **SANCHEZ**. I believe this video call demonstrated that **D. MURPHY** and **SANCHEZ** met personally within their housing unit[61] and decided

---

[60] Spanish speaking members of the investigative team corroborated this translation.

[61] Members of the investigative team searched jail records and found that both **SANCHEZ** and **D. MURPHY** were housed in MJ5B in the Fresno County Jail at this time.

to coordinate their efforts to bring narcotics into the Fresno County Jail.

279.    At approximately 7:00 PM, physical surveillance was established in the area of **GONZALES'** residence located at 36946 Los Angeles Street, Huron, CA. The white Honda associated with an uncharged male was located in the area parked near the intersection of Apple Avenue and Los Angeles Street in the City of Huron. The investigative team observed two females sitting within the Honda sedan. Shortly after, the Honda sedan departed and stopped at a shopping complex in the City of Huron. Members of the investigative team identified **ESCOBEDO** exit the vehicle along with **L. PLASENCIA**.

280.    At approximately 7:30 PM, surveillance units observed **L. PLASENCIA** walk back to the white Honda and enter the driver's seat. Shortly after, **ESCOBEDO** returned to the vehicle and entered the passenger side of the vehicle. Members of the investigative team followed the Honda sedan as it navigated onto State Route 41 northbound towards the city of Fresno.

281.    At 7:39 PM, **SANCHEZ** used the Fresno County Jail phones to call (831) 596-0869 (TT3) utilized by **ESCOBEDO**.  During this call, I believe **ESCOBEDO** was travelling in a vehicle as I could hear road noise in the background of the call.  **ESCOBEDO** relayed to **SANCHEZ** that she was in "Save Mart" taking money out.  **ESCOBEDO** and **SANCHEZ** confirmed that **ESCOBEDO** was with "comadre" and "chicana." **SANCHEZ** told **ESCOBEDO** that they needed to go to "Regal's" location and asked if they had "already picked up the food." Based on the prior conversations, I believe **SANCHEZ** was directing **ESCOBEDO** to meet up with **RUVALCABA** and asked if **ESCOBEDO** and those in her company had picked up the pound of methamphetamine from UM65. **ESCOBEDO** relayed that they did not yet but were on their way. **SANCHEZ** then stated, "my comadres going to take it back, make sure it is what it is you hear me?" Based on my training and experience, and in the context of the prior calls, **SANCHEZ** meant that **ESCOBEDO** and **L. PLASENCIA** should verify that the quantity of methamphetamine they received from UM65 was correct, and then his "comadre" would bring the narcotics back to Huron.  I know from my training and experience that "comadre" is a name by which **SANCHEZ** identifies **L. PLASENCIA**.  I also know that a "burrito" is an ounce of methamphetamine, and that "Susanna" is later identified as Susanna **GARCIA**.

282.    At approximately 8:08 PM, members of the investigative team observed the Honda sedan

arrive at a specific address in Fresno, California. At 8:13 PM, **ESCOBEDO**, using (831) 596-0869

(TT3), called UM65, on (559) 753-3713 (TT 3713). During the call, UM65 asked, "You here?", and

**ESCOBEDO** confirmed that she was. UM65 stated, "Alright, go to the garage, I'll be right there."

Based on the prior calls between UM65, **ESCOBEDO**, and **SANCHEZ**, I believe that **ESCOBEDO**

was at the location where **ESCOBEDO** and UM65 would complete the narcotics transaction for one

pound of methamphetamine. Members of the investigative team observed a subject exit the Honda sedan

and walk towards the garage following the call. At 8:20 PM, the Honda sedan departed the residence.

Due to darkness, it was unclear who returned to the vehicle or if the subject was carrying an object.

Based on the totality of the circumstances including the surveillance observations in conjunction with

the pertinent interceptions, I believe that **ESCOBEDO** entered the garage of 2314 Terrace Avenue, met

with UM65, and purchased a pound of methamphetamine.

283.    Between 8:31 PM and 8:34 PM, the Honda sedan was observed by the investigative team

arriving at the residence of **B. MURPHY** located at 632 Thorne Street in the City of Fresno.

284.    At approximately 8:41 PM, the Honda sedan and a Toyota sedan left the residence of **B.**

**MURPHY** in tandem.  The investigative team observed the Honda sedan separate from the Toyota

sedan, and the investigative team elected to stay with the Toyota sedan and observed it arrive at the

Fresno County Jail.  Concurrently, **SANCHEZ** used the Fresno County Jail phone system to call (831)

596-0869 (TT3) utilized by **ESCOBEDO** at 8:53 PM.  **ESCOBEDO** answered the phone and

**SANCHEZ** asked **ESCOBEDO** to "hand her the phone."  A female is heard on the phone and

**SANCHEZ** identified her as "Susanna."

285.    At approximately 8:55 PM, the investigative team observed three individuals exit the

Toyota sedan and approach the jail.  One of these individuals was a female who was holding a bag and

was on the phone.  Simultaneously, "Susanna"**,** using (831) 596-0869 (TT3), informed **SANCHEZ,** who

was utilizing the Fresno County Jail Phone system, that she was unable to locate the string lowered from

**SANCHEZ's** and **D. MURPHY's** housing unit.  At 9:08 PM, Fresno County Sheriff's Deputies

detained the female holding the bag and the phone.

286.    The female was verbally identified as Susanna **GARCIA**. **GARCIA** placed her open bag

on a brick half wall during this detention and complied with the Deputy's commands.  Deputies noticed

a glass pipe within **GARCIA's** open bag.  Deputies observed that the glass pipe had a burnt white

crystalline substance within it, consistent with methamphetamine.  A probable cause search of

**GARCIA's** bag was conducted and Deputies discovered a 19-foot apparatus that had vape pens, a black

substance, a green substance, and a white crystalline substance, all of which were wrapped in plastic and

secured to the apparatus with layers of tape.  These items are pictured below:



*Figure 7: Digital photograph taken by FSO Deputy E. Colegio.*



*Figure 8: Digital photograph taken by FSO Deputy E. Colegio.*



*Figure 9: Digital photograph taken by FSO Deputy E. Colegio.*

287.    During the previously described detention of **GARCIA**, the Toyota sedan attempted to leave the scene, but was eventually stopped by law enforcement.  **RUVALCABA** was driving the Toyota sedan and identified by his California identification card.  **SANDOVAL, B. MURPHY, ESCOBEDO,** and an uncharged individual were occupants in the Toyota sedan and were identified verbally as well as by their California Department of Motor Vehicles photographs.

288.    The contents of the rope shaped object were submitted to the Fresno County Sheriff's Office Forensic Laboratory and determined to be methamphetamine (46.178 grams), marijuana (2.088 grams), Tetrahydrocannabinol (THC) (54.682 grams) and heroin with fentanyl (1.151 grams).

289.    On the morning of May 13, 2025, **SANCHEZ** was transported from the Fresno County Jail back to the Salinas Valley State Prison.  At 10:47 AM, members of the investigative team intercepted and monitored an outgoing call from **SANCHEZ** on (279) 386-7769 (TT6) to **FELISCIANO** on (559) 401-8633 (TT 8633).  At the beginning of this call, **SANCHEZ** asked **FELISCIANO**, "did you make the 32?"  To which **FELISCIANO** replied, "yes."  I believe the "32" were 32 half ounce packages of methamphetamine that **FELISCIANO** made from the pound of methamphetamine procured from UM65.  The conversation turned to the thwarted effort to smuggle narcotics into the Fresno County Jail at the 8:46 minute mark.  The following is a transcript of the pertinent portions of that call:

| NAME | TRANSCRIPTION |
|---|---|
|  | [BEGINNING OF CONVERSATION] |
| SANCHEZ | I was so disappointed.  That's why I was chewing out Jen. |
| FELISCIANO | I was mad too. |
| SANCHEZ | Because I said you guys did not fucking do what I said – how I said it – and I couldn't even – remember I can't talk in the County.  I can't talk on that phone. |

| | |
|---|---|
| **FELISCIANO** | These were the words that you told me. For me to get everything to Jennifer that she needed, and for me to go to sleep. That's what you told me. But I still sat right there, and I still helped her. |
| … | [The call continues as the two speak about the events of the night prior until the call turned to the procurement of the pound of methamphetamine at the 15:44 minute mark.] |
| **FELISCIANO** | You should have seen the way they gave me the thing. |
| **SANCHEZ** | What thing? |
| **FELISCIANO** | I'm going to send you the picture, the – the- the cochina. |
| **SANCHEZ** | Ok, let me see. |
| … | **FELISCIANO** sent a multimedia message using (559) 402-8633 to **SANCHEZ** on (279) 386-7769 (pictured below). |



*Figure 10: Digital photograph taken by FSO Deputy E. Colegio.*

| | |
|---|---|
| **FELISCIANO** | And fucking – clean it and everything – like – It wasn't that hard like – it was easy just for me but – it was like – I was like – what the fuck, what am I gonna do with this shit. How do I do it. I put gloves on – I got napkins and I got a bag and I fucking get it. |
| … | [The call continues as the two speak about the current inventory of narcotics at the "thuggy," as well as law enforcement being called at the bar. The call ended at the 59:43 minute mark.] |

290.     I know from my training and experience that "Jen" or "Jennifer" is Jennifer

**ESCOBEDO**. I also know the "County" is the Fresno County jail. I know the term, "cochina" is used

by members of the **ENTERPRISE** to describe methamphetamine.

291.     I believe this call began as **FELISCIANO** and **SANCHEZ** blamed the failed smuggling

operation on **ESCOBEDO** and those in her company. **SANCHEZ** discussed his inability to speak

freely on the Fresno County Jail phone system, which I believe was due to the fact that these calls are

1   monitored and recorded.  **FELISCIANO** then described how she gave, "everything to Jennifer that she

2   needed."  I believe this indicated that **FELISCIANO** gave **ESCOBEDO** the narcotics that were seized

3   the night before, and then stated, "I still helped her," which I believe meant **FELISCIANO** helped

4   **ESCOBEDO** package the narcotics to be smuggled into the Fresno County Jail.

5         292.    The call then turned to the procurement of methamphetamine from UM65 as

6   **FELISCIANO** told **SANCHEZ** she would send **SANCHEZ** a photograph of the methamphetamine

7   they received.  **FELISCIANO** then sent an MMS to **SANCHEZ** that showed an unopened greasy

8   plastic bag containing a white crystalline substance I recognized as methamphetamine.

9         293.    Based on all of the above, I believe **SANCHEZ**, **L. PLASENCIA**, **D. MURPHY**,

10   **ESCOBEDO**, **PULIDO, RUVALCABA, GARCIA, FELISCIANO, SANDOVAL** and **B.**

11   **MURPHY**, conspired to distribute and possess with intent to distribute a controlled substance, in

12   violation of 21 U.S.C. §§ 846, 841(a)(1).

13         8.    **May 15, 2025 – SANCHEZ conspired with HERNANDEZ to distribute**
                 **methamphetamine to ESCOBEDO, and conspired with RIOS to distribute**

14                 **heroin to ESCOBEDO**

15         294.    During this conspiracy, **SANCHEZ** coordinated the procurement of heroin from Angel

16   Soto **RIOS**.

17         295.    On May 15, 2025, at 5:16 PM, **SANCHEZ**, using (279) 386-7769 (TT6), called **RIOS** on

18   (559) 514-1768 (TT 1768).  During this call, **SANCHEZ** asked **RIOS** if he had "Café" for sale.  **RIOS**

19   related he did and the two discussed the logistical details for **SANCHEZ's** associates to meet **RIOS** for

20   the procurement of "1."  **SANCHEZ** related he was already going to be in Fresno due to the fact that

21   **SANCHEZ** was attempting to purchase narcotics from "the homie from San Joaquin" "R-Dog."  The

22   call concluded as the two summarized their plans for the day.  The following is a transcript of the call,

23   beginning at the 2:25 minute mark:

| | [BEGINNING AT 2:25 MINUTE MARK] |
|---|---|
| **RIOS** | I'm going to contact my people right now and make it happen, ok? |
| **SANCHEZ** | Yes! |
| **RIOS** | For the "café?" |
| **SANCHEZ** | Yes, yes.  And it's good "café" right?  The fire, and the desire. |
| **RIOS** | It's always fire and desire dog! You already know. |
| **SANCHEZ** | Ok.  That's right, that's right.  Let me handle business right quick and then I'll holler at you.  Oh, alright? |

| RIOS | Alright. |
|---|---|
| **SANCHEZ** | I just wanted to give you the heads up, thank you. |
| **RIOS** | Alright B. |
| **SANCHEZ** | K cool.  K bye. |
| | [END of CALL] |

296.    Based on my training and experience, I know that drug traffickers often use vague or innocuous language to describe narcotics to attempt to thwart law enforcement's ability to arrest and prosecute them.  Therefore, I believe the term "café" is synonymous with heroin.  I also believe that when **SANCHEZ** asked for "1," **SANCHEZ** was asking for an ounce of heroin.  I know that the term, "fire" is used in popular culture to describe something that is of high quality.  I also know the phrase, "holler at you" to mean to contact someone.  I know the term, "B" is short for "Bulldog."  I know "R-Dog" from "San Joaquin" to be the street moniker of **R. LOPEZ** who is a member of the San Joaquin Ruthless Perros Bulldog criminal street gang.

297.    I believe this call indicated **SANCHEZ** intended to purchase narcotics from **R. LOPEZ,** as well as purchase heroin from **RIOS**, pending securing finances and a means of transportation to Fresno, CA.

298.    At 7:26 PM, **SANCHEZ**, using (279) 386-7769 (TT6), received a call from **R. LOPEZ**, using (559) 519-8338 (TT20). Among other things, **SANCHEZ** and **R. LOPEZ** discussed during the call how **SANCHEZ** wished to purchase more methamphetamine from **R. LOPEZ**. The following is a transcript of the pertinent portions of that call beginning at the 5:54 minute mark:

| NAME | TRANSCRIPTION |
|---|---|
| | [Beginning at the 5:54 minute mark] |
| **SANCHEZ** | You have a "P" oh – you have a "P" right now? |
| **R. LOPEZ** | That's all – that's what I was going to talk to you about right now and shit. Because I… |
| **SANCHEZ** | Yeah. |
| **R. LOPEZ** | This shit happens, this [UI] can happen and I had another [UI] this shit can happen right. |
| **SANCHEZ** | Yes. |
| **R. LOPEZ** | So – so – so – so I was like, the shit that – that end of the thing that I had left, that shit, well, my shit's gone, but I was thinking about getting more but then I'm like – not like – I'm barely trying not – proly not even thinking of getting more you know? |
| **SANCHEZ** | Mm-Hmm [in affirmation] |
| **R. LOPEZ** | But I – I got my person |
| **SANCHEZ** | Can you put me – can you do me a "paro?" |
| **R. LOPEZ** | Yeah, I got my homie.  Like – um – that fool is touched in with it right? |

| SANCHEZ | Mm-Hmm [in affirmation] |
|---|---|
| R. LOPEZ | The only thing is that fool – that fool fucking um – he said that, for the whole thing he'll do 11 but if you buy more than 1 he'll do it for 1 you know? |
| SANCHEZ | Ok so does he have 11 right now? I mean does he have 1 right now? |
| R. LOPEZ | Yeah he has one right now.  I just got off the phone with him right now too and I told him the whole get down cuz I told him look, I don't even think I want to get more. And he's like why not? And I just all just – just – just you know cuz it comes with a lot of shit you know? |
| ... | [The conversation continued as **SANCHEZ** reiterated his need for a "pound" and **R. LOPEZ** agreed on the price of $1,100. |
|  | [Ending at the 7:15 minute mark] |

299.    I know from my training and experience that drug traffickers often abbreviate or shorten the phrases and terms they use to describe money and contraband.  In this conversation, when the parties stated, they needed a "P" or "1" the parties actually meant a "pound", usually of narcotics. When they stated, "1100" or "for 1", it means for "$1,100" or "$1,000" respectively.  I know that the term, "shit" is synonymous with "methamphetamine."  I also know when **SANCHEZ** stated, "Paro", he meant a "favor."  I know the phrase, "touched in with it" means an individual has a lot of narcotics.

300.    Therefore, I believe this conversation demonstrated that **SANCHEZ** asked **R. LOPEZ** to procure a pound of narcotics on **SANCHEZ's** behalf.  **R. LOPEZ** replied that **R. LOPEZ** does not have any methamphetamine at the moment but could connect **SANCHEZ** with **R. LOPEZ's** source of supply due to the fact that **R. LOPEZ** is not interested in procuring methamphetamine at this time.  **R. LOPEZ** stated his source of supply is well stocked with methamphetamine, and per a recent conversation between **R. LOPEZ** and this source, this source of supply will sell a pound of methamphetamine for $1,100 per pound, or $2,000 for two pounds.

301.    This call continued as **R. LOPEZ** offered to connect **SANCHEZ** with his source of supply and the parties discussed **SANCHEZ**'s needs and his methodology, including his use of his "ninjetta" who I know to be **ESCOBEDO** based on my knowledge of this investigation as discussed throughout this affidavit.  **R. LOPEZ** then used (559) 519-8338 (TT20) to place an outgoing call to (559) 803-7096[62] (TT16) which I believe is utilized by **Gilberto HERNANDEZ**.  **R. LOPEZ** merged

---

[62] On May 22, 2025, interceptions indicated that **Ignacio SANCHEZ** intended to utilize **Romona FELISCIANO** to purchase a quantity of "pink, blue, and white" methamphetamine from the user of (559) 803-7096. **HERNANDEZ** directed **SANCHEZ** to send **FELISCIANO** to a gas station in Lemoore, CA to complete the transaction. Surveillance units monitored a vehicle occupied by **FELISCIANO** as it met with a vehicle described by the user of (559) 803-7096 as his

the call with **SANCHEZ** with **HERNANDEZ**, as is set out in detail below. The following is a transcript of the pertinent portions of the conversation after that point:

| | |
|---|---|
| | [At approximately 10:03, **HERNANDEZ** joined the call. After exchanging introductions and pleasantries, the conversation turned to **HERNANDEZ**'s narcotics supply.] |
| **SANCHEZ** | So trip out, dog, this- this is- this is the thing: I need someone consistent, right? I- I be doin' my thing. [stuttering] You can meet my- my- my, uh, girl, right? She's a girl. She's- she's my sidekick, dog. You know what I mean? [OV] |
| **HERNANDEZ** | [OV] Okay. |
| **SANCHEZ** | [stuttering] She does all my, um…  She fucked with Big Joe, too, you know what I mean? |
| **HERNANDEZ** | Okay. [OV] |
| **SANCHEZ** | [OV] A few times. Yeah, so… um, this is- this is the thing, though: uh, I'll go ahead and do the- do the eleven right now, but if we could work something like two for eighteen, I'll- I'll- I'll come through, uh, uh- I come through, dog… Every other- [OV] |
| **HERNANDEZ** | [OV] [UI] |
| **SANCHEZ** | -three- every other three days, every other four days I come through, dog. You know what I mean? |
| **HERNANDEZ** | Yeah, yeah, yeah, yeah. |
| . . . | [**SANCHEZ** then appeals to **HERNANDEZ**'s sense of common membership in the Bulldog gang and indicates that other individuals will consider **SANCHEZ** a "good dude."] |
| **SANCHEZ** | So can we do something like that after this one? Are you able to do stuff like that or not? |
| **HERNANDEZ** | Uh, I could work with you [UI] but… eighteen for two… I probably could do, like, nineteen, you know what I mean? |
| **SANCHEZ** | Yeah. Oka- [OV] |
| **HERNANDEZ** | [UI] |
| **SANCHEZ** | [UI] And I respect that, dog, I respect that. [**SANCHEZ** then spoke to himself in the background momentarily.] Alright. Alright, dog. I- I'll go ahead and, uh, uh, do that, uh, next time. I'll get one just to show you, dog: I don't play. I'll get one for eleven real quick. |
| . . . | [**SANCHEZ** then discussed the other matters he was attending to at the time.] |
| **SANCHEZ** | But, um, this is my thing, my dog: where would I have to meet you at? |

vehicle. Surveillance units positively identified the driver of the vehicle associated with (559) 803-7096 as **Gilberto HERNANDEZ**. Pertinent interceptions also indicated that **HERNDNEZ** had met with **FELISCIANO** and completed the transaction at the time of the surveillance observations. Following the transaction, surveillance continued to follow **FELISCIANO's** vehicle. A traffic stop was eventually conducted, and **FELISCIANO** was identified in the vehicle. Additionally, following one of the surveilled narcotics transactions which was arranged with the user of (559) 803-7096, the user was observed operating a vehicle back to a residence located at 3542 West Michigan Avenue, Fresno, CA. According to open-source records, this residence is associated with **HERNANDEZ**. During the same transaction, the user of (559) 803-7096 identified himself to **SANCHEZ** as "G", which I believe was a moniker for **Gilberto HERNANDEZ**. Therefore, I believe the user of (559) 803-7096 is likely **HERNANDEZ**.

| | | |
|---|---|---|
| 1 | **HERNANDEZ** | Uh, honestly, dog, either- if it's during the day [UI] I- I drive around, dog, so… I drive around for work, so… |
| 2 | **SANCHEZ** | Yes. |
| 3 | **HERNANDEZ** | [UI] taking me to work. I be goin' all the way to Lemoore and shit, you know what I mean? |
| 4 | **SANCHEZ** | Oh, oh, that's you. I'm right there at Huron and Coalinga. That's- that's- that's my little- uh, Lemoore's only- [OV] |
| 5 | **HERNANDEZ** | [UI] |
| 6 | **SANCHEZ** | Yeah, Lemoore's only, like, twenty miles from- from our area, you hear me? I know Lemoore real good, you know? |
| 7 8 9 | . . . | [**HERNANDEZ** then discussed the various narcotics he can produce, including pills and cocaine, and he and **SANCHEZ** compared the prices that **SANCHEZ** currently paid for those items. **SANCHEZ** also detailed the different narcotics **SANCHEZ** distributed.] |
| 10 11 | **HERNANDEZ** | The- the only- the only thing I can fuck with you on, dog, is- is the… is the- the- the glass. I mean, the- the little windows, the powder, and the little blue things. [UI] That's all I got at my disposal, you know what I mean? |
| 12 13 14 | . . . | [**SANCHEZ** then inquired about the price for and quality of **HERNANDEZ**'s cocaine, and the parties began discussing mutual acquaintances. **SANCHEZ** also spoke how he would previously arrange to distribute large quantities of narcotics and **HERNANDEZ** indicated that he was consistent.] |
| 15 16 | **SANCHEZ** | So, *spenca*, say your name again, dog. 'Cause I- I- I kinda- when I heard "Parkside" I- I didn't get your name right. I just heard the "park" and I was like, "Okay, that's the homie." Wh- what's [OV] |
| 17 | **HERNANDEZ** | [OV] "G." |
| | **SANCHEZ** | "G." "G," alright. |
| 18 | **HERNANDEZ** | [The parties then again spoke about mutual acquaintances.] |
| 19 20 | **SANCHEZ** | But anyhoo, dog, let's- let's get back to this dog. I'm gonna leave right now to Fresno. Where- where- where can I, um, meet you at or something, dog? |
| | **HERNANDEZ** | Um, ninety-nine and Clinton, dog. |
| 21 | **SANCHEZ** | Ninety-nine and Clinton? Okay. Ninety-nine and Clinton. A-a-um…dog, you don't mi- uh, *spenca*. Little R-Dog? |
| 22 | **R. LOPEZ** | Yeah? |
| 23 | **SANCHEZ** | Ey, ey, *spenca*, dog. Can you shoot me the homie's number and his address, dog, so I could have it? |
| 24 | **R. LOPEZ** | Um, I'll shoot you his number. I don't' know the address- [OV] |
| | **SANCHEZ** | [OV] Okay. Just- |
| 25 | **R. LOPEZ** | [OV] [UI] a long time ago. |
| | **SANCHEZ** | Sh- shoot me dog's number real quick, dog. |
| 26 27 28 | . . . | [**SANCHEZ** then discussed the other drug conspiracies that he was orchestrating and **HERNANDEZ** indicated that he had also engaged in one of the same conspiracies. **HERNANDEZ** also asked for **SANCHEZ**'s number and **SANCHEZ** gave him (279) 386-7769, as well as identifying himself as both "Giddy" and |

| | "Ninja." **SANCHEZ** also asked for the address where his associates would meet **HERNANDEZ** and **HERNANDEZ** indicated that they would meet on a corner, at a taco stand. The parties also spoke about future plans to meet with each other. **SANCHEZ** thanked **R. LOPEZ** and the parties eventually terminated the call after exchanging more pleasantries.] |
| --- | --- |
| | [END OF CONVERSATION] |

302.    Based on my training and experience, I know that drug traffickers very often attempt to use vague or innocuous language to attempt to confuse law enforcement and avoid prosecution for their illegal activity. Specifically, I know that they commonly refer both to their narcotics and to the price of their narcotics by number only. For example, here, when **SANCHEZ** said he would "do the eleven" but then wished to transition to "two for eighteen," I believe he was stating that he would purchase one pound of methamphetamine for $1,100 but in the future wished to purchase two pounds of methamphetamine for $1,800. I also know that it is very common for drug traffickers to use the word "window" or "glass" to refer to methamphetamine, "powder" to refer to cocaine, and "little blue things" to refer to pills, most likely M-30 pills. Based on my training and experience, I know that $1,100 for one pound and $1,900 for two pounds is consistent with the price of methamphetamine in California's Central Valley, that this is also not consistent with the price of cocaine, and that pills are generally not measured by pounds. I therefore believe that the parties are discussing the price of pounds of methamphetamine.

303.    Therefore, I believe that **SANCHEZ** began this portion of the conversation by indicating that he wanted to have a "consistent" narcotics distribution relationship with **HERNANDEZ**. Based on the context of the conversation, I believe that **SANCHEZ** then indicated that he would be using his "sidekick," a female, to physically obtain the methamphetamine since he was in custody, indicated that he was willing to purchase one pound for $1,100, and asked to purchase two pounds for $1,800 every three to four days. **SANCHEZ** then attempted to appeal to **HERNANDEZ**'s sense of comradery, but **HERNANDEZ** indicated that he was only willing to sell two pounds of methamphetamine for $1,900. **SANCHEZ** accepted the offer, and indicated that he would purchase one pound this time to show **HERNANDEZ** that he was serious. **SANCHEZ** then asked where to meet and **HERNANDEZ** indicated that he drives to Lemoore, CA frequently, at which point the parties discussed Lemoore, CA's vicinity to Huron, CA and Coalinga, CA, as well the various narcotics that **HERNANDEZ** could

1   produce. I believe **HERNANDEZ** then clarified that the only narcotics he had at his "disposal" were

2   methamphetamine, cocaine, and blue pills. When **SANCHEZ** asked again for **HERNANDEZ**'s name,

3   **HERNANDEZ** responded that he was known as "G," which based on my training and experience I

4   believe to be a moniker. After discussing other matters, **SANCHEZ** indicated that "he" was going to

5   leave for Fresno, CA and again asked where "he" (i.e. **ESCOBEDO**) could meet **HERNANDEZ**;

6   **HERNANDEZ** indicated that they could meet at "ninety-nine and Clinton." Based on my training and

7   experience, I know that State Route 99 runs through Fresno, CA and intersects with W. Clinton Avenue

8   within the city limits. **SANCHEZ** then addressed **R. LOPEZ** and asked for **R. LOPEZ** to send

9   **SANCHEZ HERNANDEZ**'s number and address. After **R. LOPEZ** indicated he would send

10  **HERNANDEZ**'s number, **SANCHEZ**, **HERNANDEZ**, and **R. LOPEZ** spoke about other matters and

11  eventually terminated the call, though it should be noted that **HERNANDEZ** indicated that the meeting

12  spot that evening would be on a corner, at a taco stand.

13      304.    At 7:51 PM, members of the investigative team intercepted an incoming call from

14  **FELISCIANO** on (559) 401-8633 (TT 8633) to **SANCHEZ** on (279) 386-7769 (TT6). During this

15  call, **SANCHEZ** told **FELISCIANO** he just spoke with a consistent source of supply. **SANCHEZ** then

16  spoke with **FELISCIANO** about gathering the necessary finances, as well as **ESCOBEDO** and

17  "Gordo" making the trip to Fresno to purchase the pound of methamphetamine. **SANCHEZ** told

18  **FELISCIANO,** "before you go, put all the money in the envelope real quick" and asked to speak to

19  "Gordo." "Gordo" is placed on the phone, as **SANCHEZ** asked, "Gordo, what do you like more – what

20  do you prefer – what do you like? Weed? Pens? "Gordo" then related he prefers pens and **SANCHEZ**

21  stated, "I got you on a pen." **SANCHEZ** then told **FELISCIANO**, "now we are going to rock and roll

22  and "Gordo" is going to be on his way."

23      305.    Based on my training and experience, I know "pens" to be vape pens that can contain

24  controlled substances. I believe **SANCHEZ** demonstrated in this call that **SANCHEZ** coordinated the

25  procurement of funds, as well as couriers to take the money to **HERNANDEZ** in exchange for a pound

26  of methamphetamine.

27      306.    At 8:26 PM, **SANCHEZ** used (279) 386-7769 (TT6) to send a text message to

28  **HERNANDEZ**, using (559) 803-7096 (TT16), which read, "My dog can you send me the address were

you want my peope's to meet up with you? Good looking out my ninja [dog paws emoji]." **SANCHEZ**

then sent another text approximately one minute later, which read, "Or the location?"

307.    At 8:32 PM, **HERNANDEZ**, using (559) 803-7096 (TT16), called **SANCHEZ**, on (279)

386-7769 (TT6). The following is a transcript of the pertinent portions of that conversation:

| NAME | TRANSCRIPTION |
|---|---|
| | [BEGINNING OF CONVERSATION] |
| HERNANDEZ | *Spensa,* I missed your call. |
| SANCHEZ | No- no, no- yeah, no, it's good. It's good. So- so, real quick, uh- 'cause my people left about twenty minutes already out of the hood, right? So I just need the location, my dog. Like- like, uh, the- the store or whatever. |
| HERNANDEZ | Yeah, yeah, yeah. |
| SANCHEZ | So they could put it on their little- on their phone and they could, uh, have it right there, you know? |
| HERNANDEZ | I'll send it to you right now, my dog. |
| SANCHEZ | Al- alright, my dog. Uh, uh, so they'll be over there – give or take – I wanna say [in] about forty-five minutes. Fifty minutes. |
| HERNANDEZ | [UI] good. |
| SANCHEZ | O- okay, my dog. |
| . . . | [The parties then spoke about multiple other issues for the remainder of the call.] |
| | [END OF CONVERSATION |

308.    Based on the context of the call, as well as the calls set out above, I believe **SANCHEZ**

was asking **HERNANDEZ** to send him the location where the narcotics deal would take place. I believe

**HERNANDEZ** indicated that he would send the location to **SANCHEZ**. When the call concluded

approximately nine minutes later – and after speaking about multiple other issues – **HERNANDEZ**,

using (559) 803-7096, sent a text message to **SANCHEZ**, using (279) 386-7769, which read, "3760 w

shields ave Fresno ca 93722". Based on my knowledge of the city of Fresno, CA, I know that Shields

Avenue is the next major street north of Clinton Ave that city, and therefore believe that the location

was close enough that **HERNANDEZ** had been estimating the location when he had spoken on the

phone about it. I also know that this address references a Mexican food restaurant located near the

intersection of W. Shields Avenue and N. Brawley Avenue, and is approximately one mile west of

where W. Shields Avenue intersects with State Route 99. I therefore believe that the text sent in the text

message was the location where the drug transaction was expected to occur.

309.    Based on **SANCHEZ**'s previous history of using **ESCOBEDO** to receive or distribute

illicit narcotics, the investigative team believed it was likely that **SANCHEZ** would use **ESCOBEDO**

1  to complete this transaction. The team then began monitoring precision location information transmitted

2  by (831) 596-0869 (TT3) pursuant to a court order and observed that (831) 596-0869 (TT3) left the City

3  of Huron. The investigative team located a Honda sedan known to be used by **SANCHEZ**'s associates

4  also leaving the City of Huron at this time and established physical surveillance on it.

5      310.    At approximately 9:35 PM, **SANCHEZ**, using (279) 386-7769 (TT6), called

6  **HERNANDEZ**, using (559) 803-7096 (TT16). During the call, **SANCHEZ** indicated that "they" (i.e.

7  his associates) were four minutes away and were in a white Honda Accord. **HERNANDEZ** indicated

8  that he was in a silver [Toyota] Camry and indicated that they should meet in front of a liquor store.

9  Five minutes after that, **SANCHEZ** again used (279) 386-7769 (TT6) to call **HERNANDEZ**, on (559)

10  803-7096 (TT16). During that call, **SANCHEZ** indicated that his associates were "right there in front of

11  the liquor store." **HERNANDEZ** indicated that he was about a block away.  Simultaneously, members

12  of the investigative team observed the Honda sedan regularly utilized by **SANCHEZ's** associates arrive

13  and park near the liquor store at 3760 w shields Avenue in Fresno, CA.  Members of the investigative

14  team then observed a silver Toyota Camry arrive at the same location.

15      311.    At approximately 9:37 PM, **SANCHEZ** used (279) 386-7769 (TT6) to call **RIOS** on

16  (559) 514-1768 (TT 1768) regarding the purchase of heroin.  The following is a transcription of the

17  pertinent portions of the call:

| NAME | TRANSCRIPTION |
|---|---|
|  | [BEGINNING OF CONVERSATION] |
| **RIOS** | Well, I'll be dammed. |
| **SANCHEZ** | I'm sor – I'm sorry dog.  They – Their asses – cuz I – remember – I was getting the "P" of the "white."  Ok, so – where is exactly – give me your address or the… |
| … | [**RIOS** and **SANCHEZ** joke back and forth, and eventually return to the procurement of heroin at the 51 second mark.] |
| **SANCHEZ** | Just send me the address.  They're already in the "no town." |
|  | [END OF CONVERSATION |

24      312.    Based on my training and experience, I know a "P" is used by drug traffickers to describe

25  a pound of narcotics. I also know "white" to describe methamphetamine.  I believe this call further

26  corroborated that **SANCHEZ** was in the process of procuring a pound of methamphetamine but was

27  also coordinating the procurement of heroin from **RIOS** and needed **RIOS'** address to complete that

28  transaction.

313.    At 9:39 PM, **RIOS** used (559) 514-1768 (TT 1768) to send **SANCHEZ** on (279) 386-7769 (TT6) the following text message:

"5838 W. pico Ave, Fresno 93722."

314.    Based on my training and experience, as well as the context from the prior call, I believe **RIOS** sent the address where **SANCHEZ's** associates could meet **RIOS** to purchase the heroin.

315.    At 9:41 PM, **HERNANDEZ**, using (559) 803-7096 (TT16), called **SANCHEZ**, on (279) 386-7769 (TT6). The following is a transcript of the pertinent portion of that conversation:

|  | [BEGINNING OF CONVERSATION] |
|---|---|
| **SANCHEZ** | Yeah, yeah, they just got scared because the- the- they said there was, uh, uh, a- a- activity right there. It's- you see their car right there? |
| **HERNANDEZ** | Is it, uh, is it a older one? |
| **SANCHEZ** | It's a w- uh… it's a white one. |
| **HERNANDEZ** | Is it- uh, is it, like, a long one, or sh- or new one or…? |
| **SANCHEZ** | Let me see, just say on the line, dog, okay? Alright, real quick. Hold up. Okay, lemme [UI] |
| . . . | [At this point, there is a pause, and then ambient noise may be heard, indicating another call has joined. Based on other calls I have reviewed involving **ESCOBEDO**, I recognized her voice in the following portion of the call.] |
| **ESCOBEDO** | [OV] Hello? |
| **SANCHEZ** | [OV] Jenny, I have- I have my boy on here. Where are- [OV] |
| **ESCOBEDO** | [OV] Okay. |
| **SANCHEZ** | [OV] -you guys exactly at? |
| **ESCOBEDO** | We're parked right here on the side of the liquor store. |
| **SANCHEZ** | You're parked on the side of the liquor store? Well- [OV] |
| **ESCOBEDO** | [OV] Yeah. |
| **SANCHEZ** | [OV] -what- what kind- is it a old, uh- uh- [OV] |
| **ESCOBEDO** | [OV] No, it's a newer one. |
| **SANCHEZ** | It's a newer one? Do you see it, my dog? They're parked on the side. |
| **HERNANDEZ** | Oh, yeah. |
| **ESCOBEDO** | I just barely pulled into the parking lot. |
| **SANCHEZ** | Yes. |
| **ESCOBEDO** | That's where. Yeah, we should- we should've- we should do this in front of, like, Dollar Tree, so [UI]. |
| **SANCHEZ** | Yeah. Yeah, but- [OV] |
| **ESCOBEDO** | [OV] Okay, lemme get off real quick. |
| **SANCHEZ** | [OV] [UI] it's good. |
| **HERNANDEZ** | [UI] in front of the grocery store. |
| **SANCHEZ** | [UI] [stuttering] |
| **ESCOBEDO** | Okay. |

| SANCHEZ | You could follow him t- front of the grocery store. [OV] |
|---|---|
| ESCOBEDO | [OV] Alright. Okay. |
| SANCHEZ | Yes. |
| . . . | [SANCHEZ then asked ESCOBEDO about another address that he gave her and the parties terminated the call.] |
| | [END OF CONVERSATION |

316.    Based on the context of the call, I believe that **SANCHEZ** was asking **HERNANDEZ** if **HERNANDEZ** saw **ESCOBEDO's** newer-model vehicle, and indicated that her vehicle was in front of a liquor store. I believe that **HERNANDEZ** eventually located **ESCOBEDO** and the parties then made plans to travel to an area in front of a grocery store.

317.    Members of the investigative team then observed the silver Toyota Camry and the Honda sedan travel to the front of a nearby grocery store in the same strip mall, at which point **ESCOBEDO** was observed exiting the Honda sedan and getting into the silver Toyota Camry. Several minutes later, **ESCOBEDO** was observed exiting the Toyota Camry while holding something to her abdomen with her hands. Immediately after **ESCOBEDO** exited the Toyota Camry, it began backing out of the parking stall, as **ESCOBEDO** re-entered the front passenger seat of the Honda sedan. The surveillance team then followed the silver Toyota Camry until it arrived at 3542 Michigan Avenue, Fresno, CA.

318.    At approximately 9:52 PM, **HERNANDEZ**, using (559) 803-8096 (TT16), called **SANCHEZ**, on (279) 386-7769 (TT6). The following is a transcript of the pertinent portions of that conversation:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| SANCHEZ | Yes, my dog. Everything good? |
| HERNANDEZ | Yes, sir, my dog. Touchdown. [OV] |
| SANCHEZ | Thank- thank- thank you, my dog. Appreciate you. |
| . . . | [The parties then spoke about future transactions they would complete together, as well as associates they had in common and which narcotics **HERNANDEZ** could distribute to **SANCHEZ**.] |
| | [END OF CONVERSATION |

319.    Based on my training and experience, I know that drug traffickers frequently use the phrase "touchdown" to indicate that an illegal transaction has been completed. I therefore believe that the above calls and surveillance observations indicate that the transaction for one pound of methamphetamine was successfully completed.

320.    At 10:18 PM, **RIOS** using (559) 514-1768 (TT 1768) called **SANCHEZ** on (279) 386-

7769 (TT6).  The following is a transcript of the pertinent portions of the call:

|  | [BEGINNING OF CONVERSATION] |
|---|---|
| SANCHEZ | Ninja. |
| RIOS | They're right here dog. [RIOS is counting out loud.] They gave me um – 155 dog.  So, what's owed is 2 – Um – 245. |
| SANCHEZ | Alright, alright.  Got you, got you. |
| RIOS | You got the CashApp right? |
| SANCHEZ | Yes, yes, I got you "B."  They already left? |
| RIOS | I'm in the car again right now dog. |
| SANCHEZ | Ok – ok.  They my people, they're my peoples. Ok? |
| RIOS | Nah – nah, I'm told them it's all good dog. It's all good. |
| SANCHEZ | Ok did – yeah um – alright, good. Good – good job I got you right now. It's gonna come from two different CashApps though. |
| RIOS | Ok dog. |
| … | [the conversation ended as the two exchange pleasantries and SANCHEZ reassures RIOS the money owed will be sent soon.] |
|  | [END OF CONVERSATION |

321.    Based on my training and experience, I believe RIOS was counting money given to him at the beginning of the call, which totaled $155.  RIOS then related that he was still owed $245.  I know that $400 for an ounce of heroin is consistent with the price of heroin in California's Central Valley.  Therefore, based on the first call between RIOS and SANCHEZ where SANCHEZ indicated he needed, "1" of "café" from RIOS, I believe SANCHEZ's associates purchased on ounce of heroin from RIOS for the price of $400.

322.    At 11:47 PM, SANCHEZ used (279) 386-7769 (TT6) to call FELISCIANO on (559) 401-8633 (TT 8633).  SANCHEZ asked FELISCIANO, "so what did she [ESCOBEDO] give you?" FELISCIANO responded, "she just gave me this bag."  SANCHEZ asked, "Ok, so what does it have in it then?"  FELISCIANO stated, "it has a whole thing."  SANCHEZ asked, "what about the black?" FELISCIANO responded, "oh it's right here."  The two speak about ESCOBEDO and her untrustworthiness, and how FELISCIANO paid her "2" for the procurements.  SANCHEZ asked, "does it look like a full one?"  FELISCIANO stated "no, in my point of view."  SANCHEZ then stated, "send me a picture."  At 11:49 PM, FELISCIANO used (559) 401-8633 (TT 8633) to send the following MMS to SANCHEZ on (279) 386-7769 (TT6):



*Figure 10: MMS sent from **FELISCIANO** on (559) 401-8633 to **SANCHEZ** on (279) 386-7769 at 11:49 PM.*

217.    **SANCHEZ** then instructed **FELISCIANO** to weigh the methamphetamine, which **FELISCIANO** obliged and related the methamphetamine was 8 grams short which **FELISCIANO** related was caused by the packaging.

218.    Based on my training and experience, I believe, "a whole thing" or "a full one" is coded language for a pound of methamphetamine.  I also know "black" is a term often used by drug traffickers to describe heroin. Therefore, I believe **ESCOBEDO** gave **FELISCIANO** a bag which contained the pound of methamphetamine and heroin which **ESCOBEDO** recently obtained on **SANCHEZ's** behalf. This belief was corroborated by the MMS that was sent/received during this conversation.

219.    Based on all of the above, I believe **SANCHEZ**, **R. LOPEZ, ESCOBEDO, RIOS** and **FELISCIANO**, conspired to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

9.    **May 22, 2025 – SANCHEZ facilitated the distribution of methamphetamine from HERNANDEZ to ESCOBEDO and FELISCIANO**

220.    Between May 21, 2025 and May 22, 2025, **SANCHEZ** conspired with **HERNANDEZ**, to distribute methamphetamine to **ESCOBEDO** and **FELISCIANO**.

221.    On May 21, 2025, at approximately 8:31 PM, **SANCHEZ**, using (279) 386-7769 (TT6), received a call from **Gilberto HERNANDEZ** using (559) 803-7096 (TT16). During the conversation,

1    SANCHEZ and **HERNANDEZ** spoke about **SANCHEZ**'s previous efforts to smuggle narcotics into

2    the Fresno County Jail, about how much money could be made selling narcotics in various detention

3    facilities, and about how **SANCHEZ** only had "black" – and no "white" – at the time of this call. Later

4    in the call, at approximately time marker 18:00, **HERNANDEZ** indicated that he had "some pink" and

5    "some blue" that he could sell to **SANCHEZ**. When **SANCHEZ** indicated that he was already familiar

6    with "the pink" being "food coloring," but expressed concern over "blue," indicating that "it turned

7    blue" when "they clean it out," **HERNANDEZ** indicated instead that "the blue" was "for the look and it

8    smells good, dog." **HERNANDEZ** then elaborated that "a lot of people – you know what I mean? – are

9    tired of just fuckin' with the white, and they see something that does the same thing. They're willing to

10   pay a couple bucks more, you know what I mean?" **SANCHEZ** then proposed that **HERNANDEZ** give

11   **SANCHEZ** "a Q.P. of- of- of- of the pink, a Q.P. of the blue, and then the half a P of the- of the- of the-

12   of the white." **HERNANDEZ** counter-proposed that he provide **SANCHEZ** with several "zips" of each

13   color, and the parties later agreed that if **SANCHEZ** like the "pink" and the "blue," he would buy

14   "Q.P."'s of each later on for "six bills" in total (i.e. three each), and that they would meet in "Lemoore"

15   "at the location" if this were to happen. **SANCHEZ** then asked where the parties would meet the

16   following day. **HERNANDEZ** initially described a location, but then indicated that he would send

17   **SANCHEZ** the address the following morning and further indicated that he drove "a big truck" and

18   could not "go into normal neighborhoods." It should also be noted that at approximately time marker

19   31:35, **SANCHEZ** indicated that **HERNANDEZ** was 25 years old; during that portion of the

20   conversation, **HERNANDEZ** also indicated that he has three children. The parties then spoke about

21   other matters and concluded the call.

22       222.    Based on my training and experience, I know that drug traffickers very often use vague

23   and innocuous words and phrases to speak about their narcotics in an attempt to confuse law

24   enforcement and avoid criminal liability for their activities. I also know that they use the word "zip" to

25   refer to an ounce of an illicit narcotic, the acronym "Q.P." to refer to one-quarter pound of an illicit

26   narcotic, the letter "P" to refer to a pound of an illicit narcotic, and the word "half" to refer to one-half of

27   whatever quantity the context of the conversation demands. I also know that $600 for one-half pound is

28   consistent with the price of methamphetamine in California's Central Valley at the time of this call and

that drug traffickers commonly use the word "bill" to refer to $100. Finally, I know that it is common for drug distributors to dilute their narcotics to attempt to artificially create a larger quantity of it and make more money; based on the context of this conversation, I believe **SANCHEZ** was using the phrase "to clean it out" in this fashion. Based on my knowledge of the investigation, I know that **ENTERPRISE** members commonly use the word "white" to refer to methamphetamine and the word "black" to refer to black tar heroin. I also know that **SANCHEZ**'s associates have purchased pink methamphetamine in the past and spoken with **SANCHEZ** about it; I therefore believe that he is already familiar with it.

223.    Therefore, I believe that in this conversation, **SANCHEZ** first indicated that he had control over a certain quantity of black tar heroin, but did not have any methamphetamine at the time of the call. Later, I believe that **HERNANDEZ** indicated that he would sell **SANCHEZ** pink and blue methamphetamine. I believe that **SANCHEZ** was already familiar with pink methamphetamine, knowing that it is pink merely because food coloring is added to it, but expressed concern that methamphetamine only turns blue when it is diluted, which would make it lower quality. I believe **HERNANDEZ** responded by indicating that blue methamphetamine is blue for the same reason as pink: drug users get bored with using "normal" white methamphetamine and want to try something new, and are willing to pay "a couple bucks more" to do so. When **SANCHEZ** proposed buying approximately one pound of methamphetamine, **HERNANDEZ** instead proposed that he distribute several ounces of methamphetamine at first, and then I believe the parties made plans for the future – if **SANCHEZ**'s customers like the pink and blue methamphetamine – for **SANCHEZ** to purchase one-half pounds of pink and blue methamphetamine for $600 in the future. I believe the parties then agreed to meet the following day, and that **HERNANDEZ** indicated he would send **SANCHEZ** the location.

224.    The following morning, on May 22, 2025, at approximately 7:23 AM, **SANCHEZ**, using (279) 386-7769 (TT6), called **ESCOBEDO**, using (831) 596-0869 (TT3). During the call, **SANCHEZ** indicated that he had two "train tickets" and was "trying to see what train ticket [he was going to] take," that he needed "a ride" "just to Lemoore," and that he would be bringing "some blue stuff and that pink stuff" to **ESCOBEDO**. It should be noted that at a certain point in the call, **SANCHEZ** switched to speaking about the "ticket" as if it were a bus ticket. **SANCHEZ** then asked **ESCOBEDO** to call "Jay,"

1  at which point **SANCHEZ** and **FELISCIANO** spoke for approximately one minute without

2  **ESCOBEDO**. When I reviewed call detail records for (831) 596-0869 (TT3), I observed that at

3  approximately 7:30 AM, (831) 596-0869 (TT3) called (559) 213-2144, used by an uncharged male

4  (UM200). Accordingly, after that one minute, **ESCOBEDO**'s voice came back on the line and said,

5  "He's on the line," at which point a voice I recognized as UM200's voice began speaking with

6  **SANCHEZ** about how **SANCHEZ** had "to be in Lemoore" and had "a bus ticket" that would "be there"

7  "at ten." **SANCHEZ** also indicated that "they're coming in a semi." After speaking about how much

8  money UM200 owed **SANCHEZ**, UM200 agreed to let **SANCHEZ** use his vehicle and arranged for

9  another uncharged male to drive it in exchange for some of his debt being wiped clean, as well as for

10  one-half ounce of methamphetamine.

11      225.    As is set out above, I know that drug traffickers commonly use vague and innocuous

12  phrasing to attempt to avoid criminal liability. Based on the context of the previous call, as well as the

13  fact that **SANCHEZ** switched back and forth between using the phrase "train ticket" and "bus ticket," I

14  believe that in this call **SANCHEZ** was speaking about his appointment with **HERNANDEZ** at

15  approximately 10:00 AM in Lemoore. I also believe that the "blue stuff" and "pink stuff" phrases

16  **SANCHEZ** used were references to the blue and pink methamphetamine discussed in the previous call.

17      226.    Therefore, I believe that in this call **SANCHEZ** was attempting to coordinate the

18  acquisition of the blue and pink methamphetamine with **FELISCIANO** and **ESCOBEDO**. I specifically

19  believe that **SANCHEZ** indicated that the transaction would take place in Lemoore, CA at

20  approximately 10:00 AM, and indicated that he would be bringing **ESCOBEDO** blue and pink

21  methamphetamine. I believe that **SANCHEZ** then arranged for transportation to Lemoore, CA with

22  UM200 and another driver.

23      227.    At approximately 7:39 AM, **SANCHEZ**, using (279) 386-7769 (TT6), sent several text

24  messages to (559) 803-7096 (TT16), used by **HERNANDEZ**, which when pieced together read, "Top

25  of the morning my dog, when you get the chance shoot the address, Good looking out, [dog paws

26  emoji]". After **SANCHEZ** and **HERNANDEZ** exchanged several more text messages in which

27  **SANCHEZ** indicated he would be able to be at the location "at 10," **HERNANDEZ** used (559) 803-

28  7096 (TT16) to send a multimedia message to **SANCHEZ**, using (279) 386-7769 (TT6), which

1  consisted of a picture of a hand holding a cellular phone with a map of 1130 Iona Ave, Lemoore, CA

2  displayed on it.

3      228.    At approximately 8:48 AM, **SANCHEZ**, using (279) 386-7769 (TT6), sent the same

4  picture to **FELISCIANO**, using (559) 401-8633 (TT 8633), as well as another text message

5  approximately two minutes later, which read, "5598037096". Based on my knowledge of the

6  investigation, I know that the string of numbers sent in the second text message is (559) 803-7096

7  (TT16). I therefore believe that with these two messages, **SANCHEZ** was informing **FELISCIANO** of

8  the location of the meeting and giving her **HERNANDEZ**'s phone number so that she could coordinate

9  the meeting with him when the time came.

10      229.    The investigative team then established surveillance at the Maverick truck stop at 1130

11  Iona Avenue, Lemoore, CA. At approximately 9:46 AM, a white Honda Accord sedan registered to

12  UM200 pulled into the parking lot at the Maverick truck stop. An uncharged male (UM327) and a

13  female positively identified as Jennifer **ESCOBEDO** based on a comparison with the picture maintained

14  on file with the California Department of Motor Vehicles exited the driver's seat and entered the store.

15  **FELISCIANO** was also positively identified as she exited the vehicle based on prior contacts, as well

16  as a comparison with the picture maintained on file by the California Department of Motor Vehicles.

17      230.    When I reviewed call detail records for (559) 401-8633 (TT 8633), used by

18  **FELISCIANO**, I observed that between approximately 9:47 AM and 9:53 AM, (559) 401-8633 (TT

19  8633) and (559) 803-7096 (TT16), used by **HERNANDEZ**, exchanged six calls. At approximately 9:54

20  AM, one minute after **FELISCIANO**'s last call with **HERNANDEZ**, the surveillance team observed a

21  white pickup truck pull into the parking lot; the vehicle had the words "Blackstone Wholesale Parts" and

22  a phone number written on its sides and back. **FELISCIANO** was then observed walking up to the truck

23  and receiving a bag from its driver, who was positively identified as Gilberto **HERNANDEZ** based on a

24  comparison with the picture maintained on file with the California Department of Motor Vehicles.

25  **FELISCIANO** then returned to and entered the white Honda sedan, and the white pickup truck pulled

26  away.

27      231.    After UM327 and **ESCOBEDO** re-entered the white Honda sedan with **FELISCIANO**,

28  the trio then travelled to another nearby gas station, parked, and exited the vehicle.

232.    At approximately 10:25 AM, **SANCHEZ**, using (279) 386-7769 (TT6), called (559) 803-7096 (TT16), used by **HERNANDEZ**. During the call, **SANCHEZ** asked if there was a "touchdown," to which **HERNANDEZ** responded, "Yeah, touchdown everything perfectly." Later in the call, **HERNANDEZ** indicated that "it was two pink, two blue, and the rest white," and also indicated that he was "in a company vehicle."

233.    Based on my training and experience, I know that contraband traffickers commonly use the phrase "touchdown" to indicate that a transaction of some kind has been completed successfully. Based on the context of the calls set out above, as well as subsequent events, I believe that **HERNANDEZ** was indicating to **SANCHEZ** that he had given him pink methamphetamine, blue methamphetamine, and white methamphetamine. Finally, I believe that the fact that **HERNANDEZ** also indicated that the methamphetamine had come from a "company vehicle" corroborates my belief that **FELISCIANO** received the methamphetamine from the white pickup truck with the words "Blackstone Wholesale Parts" and a phone number professionally displayed on it.

234.    As UM200, **FELISCIANO**, and **ESCOBEDO** were taking a break outside the second gas station, **SANCHEZ**, using (279) 386-7769 (TT6), called **ESCOBEDO**, using (831) 596-0869 (TT3). During the call, **SANCHEZ** asked if "everything's good," and **ESCOBEDO** responded that it was. **SANCHEZ** also asked where his "*prima*" "put the food at" and **ESCOBEDO** responded that it was "away." Later in the call, **SANCHEZ** asked if **ESCOBEDO** had seen "the pink, the blue and stuff," but **ESCOBEDO** indicated that "we haven't even looked at it or anything." **ESCOBEDO** then volunteered to take a pink "basketball" and a blue "basketball," and **SANCHEZ** agreed.

235.    Several minutes later, at approximately 10:42 AM, the surveillance team observed **FELISCIANO** get back into the white Honda, at which point the vehicle began to depart the Lemoore, CA area.

236.    After allowing the vehicle to depart the area, the investigative team initiated a traffic stop on the vehicle at approximately 10:59 AM. While the patrol vehicle was making the stop, **SANCHEZ**, using (279) 386-7769 (TT6), and **ESCOBEDO**, using (831) 596-0869 (TT3), had been in the middle of a conversation; **ESCOBEDO**'s side was on speakerphone such that **SANCHEZ** could speak with everyone in the vehicle. When UM200 indicated that "the Sheriff" was behind him, **SANCHEZ**

1  instructed the occupants of the vehicle to attempt to pull into a nearby housing area to act as if they lived

2  there. **SANCHEZ** also instructed "you" and "Jen" to "put that shit- 'cause you guys could half it and put

3  it in your guys' thing. That's if anything." When the parties inside the vehicle indicated that they were

4  actually being pulled over, **SANCHEZ** then said, "Okay, listen. Grab both of those things and put it

5  underneath your- your- you got your license, right? Put it underneath your stomach. Grab both- you

6  guys- put it underneath your guys' stomach. Or in your guys' pussy thing."

7       237.    Based on my training and experience, I know that it is very common for female drug

8  couriers to attempt to hide narcotics in their vaginal cavity to attempt to avoid detection by law

9  enforcement. I therefore believe that **SANCHEZ** was referring to **FELISCIANO** when he said "you"

10  and to **ESCOBEDO** when he said "Jen," and that he was instructing them to attempt to hide the

11  narcotics by splitting them in half and either inserting them into the females' vaginal cavities or hiding

12  them underneath a flap of human tissue in their stomach area.

13       238.    Despite **SANCHEZ**'s instructions for hiding the narcotics, investigative team members

14  located a bag filled with approximately one pound of blue, pink, and white shards consistent in

15  appearance with methamphetamine on **FELISCIANO**'s person, under her shirt. The following is an

16  image of that bag:



27       239.    I therefore believe that **SANCHEZ** coordinated the distribution of approximately one

28  pound of methamphetamine, that **FELISCIANO** and **ESCOBEDO** facilitated this distribution, that

1    FELISCIANO actually received the methamphetamine from **HERNANDEZ**, and that **HERNANDEZ**

2    coordinated the deal with **SANCHEZ** and distributed the methamphetamine to **FELISCIANO**.

3          10.    **May 22, 2025 – SANCHEZ and GONZALES facilitated the distribution of methamphetamine from HERNANDEZ to BONILLA and MARTINEZ**

4

5          240.    On May 22, 2025, the investigative team became aware that **SANCHEZ** conspired to

6    procure a half pound of methamphetamine from **HERNANDEZ** to **BONILLA** and **MARTINEZ**.

7          241.    On May 22, 2025, as described above, **SANCHEZ** conspired to procure one pound of

8    methamphetamine from **HERNANDEZ**. The investigative team observed the transaction, involving

9    **FELISCIANO** and **ESCOBEDO**, and ultimately arrested **FELISCIANO** and seized approximately

10   one pound of methamphetamine from her person. Later in the day on May 22, 2025, at about 1:29 PM,

11   the investigative team intercepted a call from **SANCHEZ**, using (279) 386-7769 (TT6) to

12   **HERNANDEZ** using (559) 803-7096 (TT16). During the initial portion of this call, **SANCHEZ**

13   advised **HERNANDEZ** that he wanted to "do an instant replay". **SANCHEZ** stated that he wants to do

14   it as soon as possible, he was willing to meet at the same spot, and he wanted "the colorful ones". The

15   two discussed times and locations for them to meet, and **SANCHEZ** advised that he was probably going

16   to send his child's mother. **SANCHEZ** also advised that he would have his associates there prior to 6:30

17   PM and referred to **HERNANDEZ** as "Bulldog" before ending the call.

18         242.    Based on my training and experience, I know that drug traffickers use innocuous and

19   vague-sounding terms to describe illicit narcotics. For example, I know that the terminology of "instant

20   replay" is used to describe that **SANCHEZ** wants to make a second narcotics purchase after having just

21   made a recent narcotics purchase earlier in the same day. **SANCHEZ** also stated he wanted "the colorful

22   ones," which I know from prior calls intercepted by the investigative team – set out in the section above

23   – to be a reference to pink and blue-colored methamphetamine. Therefore, I believe that in this call,

24   **SANCHEZ** asked **HERNANDEZ**, with whom he had just completed a procurement of one pound of

25   methamphetamine, some of which was pink and blue, to participate in a second methamphetamine sale.

26   I believe **HERNANDEZ** confirmed that he was willing to participate in the transaction, and the two

27   discussed a time and location to conduct the transaction.

28         243.    At approximately 1:33 PM, the investigative team intercepted a call coming from (559)

1   526-6067 being used by **ESCOBEDO**[63] to **SANCHEZ** using (279) 386-7769 (TT6). During this call,

2   **SANCHEZ** and **ESCOBEDO** discussed **FELISCIANO**'s arrest that occurred after the previous

3   narcotics purchase set out above. Later in the call, **SANCHEZ** asked **ESCOBEDO** if she still had

4   "food" and **ESCOBEDO** confirmed that she did. **SANCHEZ** then advised **ESCOBEDO** that he was

5   going to get some "colored food" later that day. The conversation then returned to discussing how

6   **FELISCIANO** attempted to hide the methamphetamine during the prior vehicle stop which resulted in

7   her arrest. This remained the topic of conversation until the call ended.

8       244.    Based on my training and experience, as well as my knowledge of the investigation, I

9   know that **SANCHEZ** and his associates frequently use the terminology of "food" and "colored food" to

10  refer to illegal narcotics. I also believe that the "colored food" terminology is much more specific and is

11  a reference to the pink and blue colored methamphetamine sold to **SANCHEZ** by **G. HERANDEZ**.

12      245.    Therefore, I believe that during this call, **SANCHEZ** requested to know whether or not

13  **ESCOBEDO** still had any narcotics in her possession, and that she confirmed that she did. Directly

14  afterwards, **SANCHEZ** advised **ESCOBEDO** that he was intending to purchase pink and blue-colored

15  methamphetamine the same day.

16      246.    At approximately 1:46 PM, the investigative team intercepted a call from **SANCHEZ**

17  using (279) 386-7769 (TT6) to (559) 573-0476, used by a female who **SANCHEZ** referred to as "Kris."

18  **SANCHEZ** advised Kris of the details of **FELISCIANO'S** arrest, and told "Kris" that she needed to be

19  in "the 'No town" by six. **SANCHEZ** placed "Kris" on hold, then returned shortly afterwards to tell her

20  to be in "the 'No town" by six-thirty. **SANCHEZ** advises he "did not tell his boy" because he did not

21  want him to get worried. **SANCHEZ** also advised "Kris" he will send her money on CashApp.

22      247.    Based on my training and experience, I know that drug traffickers will use innocuous and

23  vague-sounding terms to describe illicit narcotics. I also know that the phrase "'No town" is used

24  frequently in California's Central Valley area to refer to Fresno, CA. Based on the context of the

25  previous call, I believe that when **SANCHEZ** advised that he "did not tell his boy" because he did not

---

[63] At this point in the investigation, I have reviewed several hours of phone calls involving **ESCOBEDO** and can recognize her voice; I believe that the female using this phone number was **ESCOBEDO** based on that experience. Additionally, I believe the fact that they were speaking about **FELISCIANO**'s arrest also corroborates my belief.

1   want him to get worried, he was referring to the conversation he had with **HERNANDEZ** to set up a

2   new narcotics procurement without advising **HERNANDEZ** of **FELISCIANO's** arrest, to prevent

3   **HERNANDEZ** from being hesitant to sell to **SANCHEZ**. Additionally, I know the phone number (559)

4   573-0476 is registered to a Snapchat account for Louis **BONILLA** (**BONILLA**), is subscribed to an

5   Irene Bonilla, and in previous intercepted calls has been used by a male subject who is referred to as

6   "Louis". I also know **BONILLA** to be involved in a romantic relationship with Crystal **MARTINEZ**,

7   and Crystal **MARTINEZ** has a child in common with **SANCHEZ** from a previous romantic

8   relationship.

9       248.    Therefore, I believe that though the phone number (559) 573-0476 (TT 0476) is primarily

10  used by **BONILLA**, it was likely being used by **MARTINEZ** during this call. This belief is

11  corroborated by the earlier call at 1:29 PM when **SANCHEZ** stated to **HERNANDEZ** that he is

12  probably going to send his child's mother. I therefore believe that during this call **SANCHEZ** instructed

13  **MARTINEZ** to be in Fresno, CA by 6:30 PM.

14      249.    At approximately 1:49 PM, the investigative team intercepted a call from (559) 961-6401

15  (TT5), utilized by **GONZALES** to (279) 386-7769 (TT6), utilized by **SANCHEZ**. During this call,

16  **GONZALES** advised **SANCHEZ** that he had just got "five" right now, and **SANCHEZ** told

17  **GONZALES** to "send five to Kris." **GONZALES** agreed and said he will send it "right now." The

18  remainder of the call was spent discussing **FELISCIANO**'s arrest.

19      250.    I believe that **SANCHEZ** instructed **GONZALES** to send $500 to **MARTINEZ**

20  utilizing some type of money transfer application, which based on my knowledge of the investigation I

21  know both **SANCHEZ** and **GONZALES** to use frequently. Based on my training and experience, I also

22  know that $500 for one-half pound is consistent with the known current price for methamphetamine.

23      251.    At approximately 2:50 PM, the investigative team intercepted a series of text messages

24  between (279) 386-7769 (TT6), utilized by **SANCHEZ**, and (559) 573-0476 (TT 0476), utilized by

25  **MARTINEZ**. The following is a transcript of the text message conversation:

26

27

28

| | [BEGINNING OF CONVERSATION] |
|---|---|
| **SANCHEZ** | Kris |
| **MARTINEZ** | Yeah |
| **MARTINEZ** | I'll call you back in a bit k |
| **SANCHEZ** | We going to go right? |
| **SANCHEZ** | It's going to be in & out |
| **SANCHEZ** | Cuz I have to be in the no town, before 630 |
| **SANCHEZ** | ?? If not so I can try to look for a ride, |
| **MARTINEZ** | Am call you rn am just picking up the kids |
| **SANCHEZ** | Kk, |
| | [END OF CONVERSATION] |

252.    As stated above, I believe that **MARTINEZ** is the user of this phone, and therefore believe that the name "Kris" is a reference to Crystal **MARTINEZ**. As stated above, I also know that the phrase "'No town" is used to refer to Fresno, CA. I therefore believe that here **SANCHEZ** was confirming with **MARTINEZ** that she was going to be able to go to Fresno for him as they previously discussed, and **MARTINEZ** refusing to answer but advising she would call **SANCHEZ** soon.

253.    At approximately 3:18 PM, the investigative team intercepted a call from (279) 286-7769 (TT6), utilized by **SANCHEZ**, to (559) 573-0476 (TT 0476), utilized by **MARTINEZ**. During this call, **MARTINEZ** began complaining about "Anthony" being disrespectful. **SANCHEZ** redirected **MARTINEZ** by telling her to look at the big picture, and continued to persuade her to "pick up" for him. It should be noted that **MARTINEZ** stated "we are low too, we need some." **MARTINEZ** then told **SANCHEZ** she would call him from another phone.

254.    Based on my training and experience, as well as the context of the call, I believe the terminology of "pick up" used by **SANCHEZ** is a reference to picking up narcotics during a narcotics purchase. When **MARTINEZ** stated, "we are low too, we need some," I believe she was referring to herself and **BONILLA** needing to purchase their own methamphetamine. Based on my knowledge of the investigation, as well as my conversations with other members of the investigative team, I know that both **MARTINEZ** and **BONILLA** are known to use methamphetamine.

255.    Therefore, I believe in this short conversation, **SANCHEZ** attempted to convince **MARTINEZ** to assist in procuring narcotics from Fresno, CA on his behalf and **MARTINEZ** advised that she and **BONILLA** currently also needed methamphetamine.

256.    At approximately 3:25 PM, a call was intercepted from (559) 961-2103 (TT 2103) to

(279) 389-7769 (TT6), utilized by **SANCHEZ**. In the beginning of the call, the female user of (559) 961-2103 (TT 2103) identified herself as "Kris" and I have been informed by other members of the investigative team that the voice matched the previous user of (559) 573-0476 (TT 0476). I therefore believe that the user of (559) 961-2103 (TT 2103) was **MARTINEZ**. Later in the call, **MARTINEZ** told **SANCHEZ** that she only had $127 on Cash App and had not received the $500 yet. **SANCHEZ** told **MARTINEZ** to send a request to "Primo" for five hundred. **SANCHEZ** then spoke with "Anthony" and attempts to give him advice on being respectful to **MARTINEZ** and **BONILLA**. Afterwards **SANCHEZ** tells Anthony to put "Louis" on the phone; based on the totality of the circumstances, I believe that he was referring to Louis **BONILLA**, and I believe that **BONILLA** then joined the conversation. **BONILLA** then began speaking with **SANCHEZ**, and was apparently on speakerphone with **MARTINEZ**, who was also participating in the conversation. **SANCHEZ** told **BONILLA** that **BONILLA** should be getting the five hundred, and **SANCHEZ** was going to send another hundred for a total of six hundred. **MARTINEZ** asks what "burrito" she is getting in exchange for getting "the stuff," and **SANCHEZ** laughed and corrected her, saying she would receive a "half burrito." **SANCHEZ** also confirmed with **MARTINEZ** that they would get $600. Finally, **SANCHEZ** told **MARTINEZ** to call back in ten to fifteen minutes.

257. Based on my training and experience, I know that drug traffickers will use innocuous and vague-sounding terms to describe illicit narcotics. As with his prior coded language, I believe **SANCHEZ** utilized the term "burrito" to refer to one ounce of methamphetamine. I therefore believe **MARTINEZ** was requesting an ounce of methamphetamine to be provided to her for her participating in collecting methamphetamine on **SANCHEZ'** behalf, and **SANCHEZ** countered by advising her it would be half an ounce of methamphetamine. I also believe that **SANCHEZ** confirmed that **GONZALES**, whom he refers to as his "Primo," would send **MARTINEZ** a total of $600 through the CashApp phone application, $500 of which was for the methamphetamine purchase and $100 of which would be paid to **MARTINEZ**.

258. At approximately 3:34 PM, the investigative team intercepted a call placed from (559) 961-6401 9TT5), utilized by **GONZALES**, to (279) 389-7769 (TT6), utilized by **SANCHEZ**. During this call, **GONZALES** advised he has not yet sent the "five" to "Kris," at which point **SANCHEZ**

1  instructed **GONZALES** to send the $500 immediately. **SANCHEZ** also stated that he and Kris would

2  be going to "the 'No town to do what we gotta do".

3       259.    Based on my training and experience, I believe that this call indicated that **SANCHEZ**

4  was utilizing **GONZALES** to send $500 to **MARTINEZ** through the Cash App phone application. I

5  also believe, based on **SANCHEZ** and **GONZALES**' previous interactions involving illicit narcotics,

6  that the statement regarding going to "the 'No town to do what we gotta do" was **SANCHEZ** using

7  vague language to advise **GONZALES** that **SANCHEZ** was conducting a narcotics purchase and that

8  this was therefore the reason behind **SANCHEZ**'s request that **GONZALES** transfer funds. This is also

9  relevant based on the previous call where **SANCHEZ** advised **GONZALES** of **FELISCIANO's** arrest.

10      260.    At 3:36 PM, the investigative team intercepted multimedia message sent from (559) 961-

11  6401 (TT5), utilized by **GONZALES**, to (279) 389-7769 (TT6) utilized by **SANCHEZ**. The message

12  included the following image attachment:



23      261.    Based on my training and experience, I recognize the attached image to be a screenshot

24  from a cell phone utilizing the CashApp phone application. I also know that this specific screenshot

25  shows a transaction from **GONZALES** to **MARTINEZ** at 3:35 PM in the amount of $500 "for food."

26  As state above, I know that the food terminology is a commonly used code by members of the

27  **ENTERPRISE** when discussing illegal narcotics. I believe that **GONZALES** sent this image to

28  **SANCHEZ** as proof that he sent money via Cash App to **MARTINEZ**, as **SANCHEZ** had directed him

1  to do, and I believe also corroborates my belief that **GONZALES** knew that this money transaction was

2  for the purpose of paying for narcotics.

3       262.    At approximately 4:04 PM, the investigative team intercepted a call from (559) 895-3465

4  (TT 3645), which I again believe was utilized by **MARTINEZ** based on my conversations with other

5  members of the investigative team who recognized her voice and the context of the call, to (279) 386-

6  7769 (TT6), utilized by **SANCHEZ**. During this call, **MARTINEZ** confirmed having received "the

7  five" from **GONZALES** and "pulling it out." **MARTINEZ** also advised that she had left town already,

8  but she did not receive the extra $100. **SANCHEZ** told **MARTINEZ** to request $100 from his sister and

9  provided a phone number of "413-8584." **MARTINEZ** attempts to call the phone number but told

10  **SANCHEZ** that there was no answer. **SANCHEZ** told **MARTINEZ** to request $100 from "her" on

11  CashApp and provided the CashApp name "Carly XOXO – Carly Balboa". **SANCHEZ** also stated he

12  would call her to tell her to send the $100.

13       263.    Based on my training and experience, as well as the context of the conversation, I believe

14  that "the five" is a reference to the $500 received by **MARTINEZ**, and "pulling it out" is a reference to

15  the act of retrieving the money as cash through an automated teller machine.

16       264.    At approximately 4:13 PM, the investigative team intercepted a text message sent from

17  (279) 386-7769 (TT6), utilized by **SANCHEZ** to (559) 573-0476 (TT 0476), previously utilized by both

18  **MARTINEZ** and **BONILLA**. The text message indicated that "she sent it". I believe this message, in

19  the context of the previously described call, was **SANCHEZ** advising that Carly **BALBOA** had sent

20  $100 to **MARTINEZ** through Cash App.

21       265.    At approximately 4:23 PM, the investigative team intercepted a text message sent from

22  (279) 386-7769 (TT6), utilized by **SANCHEZ**, to (559) 895-3465 (TT 3465) utilized by **MARTINEZ**.

23  The text read, "drive normal". Based on the context of all the information in this section, I believe

24  **SANCHEZ** was warning **MARTINEZ** to drive in such a way that she would not have any encounters

25  with law enforcement while she is procuring narcotics for **SANCHEZ**.

26       266.    At approximately 4:52 PM, the investigative team intercepted a call placed by (559) 803-

27  7096 (TT16), utilized by **HERNANDEZ**, to (279) 389-7769 (TT6), utilized by **SANCHEZ**. During the

28  call, **HERNANDEZ** advised that he was running late because of a flat tire. **SANCHEZ** advised that his

1    people would be in Fresno in thirty to forty minutes, and asked for the address. **HERNANDEZ**

2    indicated he would send **SANCHEZ** the address.

3        267.    Based on my training and experience, as well as the context of all the events set out in

4    this section, when **SANCHEZ** and **HERNANDEZ** referred to "the address" in this call I believe they

5    were specifically referring to the address that would be used at the meeting location for their narcotics

6    transaction.

7        268.    At approximately 4:55 PM, the investigative team intercepted a call from (559) 895-3465

8    (TT 3465), utilized by **MARTINEZ**, to (279) 386-7769 (TT6), utilized by **SANCHEZ**. During this call,

9    **SANCHEZ** advised **MARTINEZ** that "his boy" was running late due to a flat tire, and that he was

10    getting the address.

11        269.    Based on the context of the call, when **SANCHEZ** advised "his boy" is running late, I

12    believe he was referring to **HERNANDEZ**.

13        270.    At approximately 4:57 PM, the investigative team intercepted a call from (559) 895-3465

14    (TT 3465), utilized by **MARTINEZ**, to (279) 386-7769 (TT6), utilized by **SANCHEZ**. During the call,

15    **MARTINEZ** advised **SANCHEZ** that she is almost to Fresno, CA, and that "Louis" was driving.

16    **SANCHEZ** mentioned that he could also get blue pills for **MARTINEZ**, but **MARTINEZ** declined

17    and said that was not something she wanted to get addicted to.

18        271.    Based on my training and experience, I believe that when **MARTINEZ** indicated that

19    "Louis" was driving, she was referring to **BONILLA**. I also believe that the mention of "blue pills" is a

20    reference to fentanyl, which is commonly processed into small round blue pills stamped with the

21    characters "M 30".

22        272.    At approximately 5:14 PM, the investigative team intercepted a multimedia message sent

23    from (559) 803-7096 (TT16), utilized by **HERNANDEZ**, to (279) 386-7769 (TT6), utilized by

24    **SANCHEZ**, which included a photograph attachment. The photograph was a cell phone showing

25    location information for a business named Boss Food & Liquor with an address of 3348 E Butler Ave. I

26    believe that this message was **HERNANDEZ** providing the location for **SANCHEZ** to have

27    **MARTINEZ** meet him at for the narcotics transaction.

28        273.    The next minute, at approximately 5:15 p.m. the investigative team intercepted another

multimedia message, this time sent from (279) 386-7769 (TT6), utilized by **SANCHEZ**, to (559) 895-3465 (TT 3465), utilized by **MARTINEZ**. The message included a photograph attachment, which was the same image described above. Based on the context of this second message, I believe **SANCHEZ** was providing the location that **HERNANDEZ** sent to **MARTINEZ** so that **MARTINEZ** could meet **HERNANDEZ** for the narcotics transaction.

274.    At approximately 5:16 PM, the investigative team intercepted a text message sent from (279) 386-7769 (TT6), utilized by **SANCHEZ**, to (559) 803-7096 (TT16), utilized by **HERNANDEZ**. The text message stated "Kk my dog , good looking out they 15mins a way.. appreciate u my P.Sider". Based on my training and experience, I know the terminology of "my dog" to be a term frequently used by Bulldog gang members to refer to other Bulldog gang members in a friendly manner. I also know the terminology of "P. Sider" to be a reference to **HERNANDEZ** being a member of the Parkside subset of the Bulldog criminal street gang.

275.    At about 5:27 PM, the investigative team observed a silver Toyota Camry associated with **HERNANDEZ** and conducted a vehicle stop on it at the intersection of Butler Ave and East Ave in Fresno County. During the vehicle stop, **HERNANDEZ** was identified as the driver and sole occupant of the vehicle based on previous contacts, as well as the driver's license he presented during the stop. A search of the passenger compartment of the vehicle revealed narcotics packaged for sales located in a hidden compartment within the center console. In total, three packages were located. Two contained about one-quarter pound each of suspected methamphetamine, one colored pink and one colored blue. The third bag contained what appeared to be several dozen round blue pills, consistent with M30 pills possibly containing fentanyl. The phone used by **HERNANDEZ** was not confirmed during this vehicle stop. The following is a cropped picture of the seized narcotics:

///
///
///
///
///
///



276.    While the vehicle stop was occurring, a series of text messages and phone calls occurred between **SANCHEZ**, **BONILLA** and **MARTINEZ**. At 5:33 p.m. **SANCHEZ** utilizing (279) 386-7769 (TT6), sent an outgoing text message to **HERNANDEZ**, utilizing (559) 803-7096 (TT16), which read, "My P my people's are right there". Based on the context surrounding this message, I believe **SANCHEZ** was notifying **HERNANDEZ** that **BONILLA** and **MARTINEZ** had arrived at the designated meeting location. **SANCHEZ** did not receive any response due to **HERNANDEZ**, as **HERNANDEZ** had been detained by the investigative team.

277.    Several minutes later, at approximately 5:41 PM, **SANCHEZ**, utilizing (279) 386-7769 (TT6), and **MARTINEZ** utilizing (559) 961-2103 (TT 2103), had a conversation consisting of a series of text messages. The following is a transcript of the conversation:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| **SANCHEZ** | Are you guys good? |
| **MARTINEZ** | We're here already |
| **MARTINEZ** | We're here already |
| **MARTINEZ** | We're here already |
| **SANCHEZ** | Ur at the pad, did my boi come out |
| **SANCHEZ** | ?? |
| **SANCHEZ** | Call me |
| | [END OF CONVERSATION] |

278.    Based on the context of the conversation, I believe that **SANCHEZ** was attempting to confirm with **MARTINEZ** that she had made contact with **HERNANDEZ** and conducted the narcotics transaction.

279.    While this text message exchange was occurring, the investigative team located a silver Toyota SUV bearing California license plate 9GVK255 parked in front of 3808 E Butler Ave which was known to be associated with **BONILLA**, and was registered as a leased vehicle to Louis **BONILLA** at his known residence of 853 Chianti Circle, Coalinga, CA. Undercover surveillance units confirmed that there were three occupants in the vehicle: a male subject seated in the driver's seat who was positively identified as **BONILLA** and a female subject in the rear passenger seat directly behind the driver who was positively identified as **MARTINEZ**. Both were identified based on a comparison with known pictures maintained on file by the California Department of Motor Vehicles. There was also an unidentified Hispanic male adult seated in the front passenger seat.

280.    At approximately 5:48 PM, **SANCHEZ**, utilizing (279) 386-7769 (TT6), placed a call to **MARTINEZ**, utilizing (559) 961-2103 (TT 2103). **BONILLA** answered the line rather than **MARTINEZ**, and **SANCHEZ** asked if they were at the address. **BONILLA** confirmed that they were at the address and the address was a store. **SANCHEZ** asked if they saw "the homie right there," and **MARTINEZ** can be heard in the background saying "no." **BONILLA** also asked, "What's he in? We don't even know what he looks like." **SANCHEZ** told **BONILLA** to hold on. While **BONILLA** was holding, **MARTINEZ** could be heard speaking to **BONILLA** in the background saying that right around the corner "they" have somebody pulled over and that a sheriff and a cop were searching. The parties then go back and forth about whether the individual that was pulled over was the one they were supposed to be meeting. After **MARTINEZ** and **BONILLA** indicated that the individual was arrested, **SANCHEZ** then attempted to arrange for a separate transaction with another subject for the remainder of the call.

281.    During this phone call, the investigative team was maintaining undercover surveillance of **BONILLA** and **MARTINEZ** and observed them driving past the vehicle stop involving **HERNANDEZ**. This occurred simultaneously with the conversation that was intercepted in the above-described call.

282.   Based on the context of this call, as well as the surveillance team's identification of **MARTINEZ** and **BONILLA** near the vehicle stop on **HERNANDEZ**, I believe that in this call **MARINTEZ** and **BONILLA** effectively informed **SANCHEZ** that **HERNANDEZ** had been detained by the police and that the vehicle was being searched. I believe that **SANCHEZ** realized that the narcotics transaction would not be completed, which is why he then was attempting to quickly locate an alternate source of narcotics.

283.   **SANCHEZ** then utilized (279) 386-7769 (TT6) to place several additional calls to multiple individuals attempting to obtain a new methamphetamine source. At 6:49 PM, **SANCHEZ** contacted **MARTINEZ**, utilizing (559) 961-2103 (TT 2103), and asked if they had left yet. **MARTINEZ** confirmed that they had already left Fresno. **MARTINEZ** also advised she would be putting the money back into Cash App.

284.   During this call, I believe **MARTINEZ** and **BONILLA** refused to wait in Fresno any further and departed the area. **MARTINEZ** stated she would be "putting the money back into Cash App", which I believe is a reference to the $500 she had obtained in cash after she received the CashApp transaction from **GONZALES** on **SANCHEZ'** behalf. I also believe **MARTINEZ** was advising **SANCHEZ** that she would return his money due to them not making a successful purchase.

285.   Based on all of the information set out above, I believe **SANCHEZ** organized the purchase of one-half pound of methamphetamine from **HERNANDEZ**, that **BONILLA** and **MARTINEZ** attempted to broker this purchase, and that **GONZALES** provided the monetary transaction to **MARTINEZ** to fund the purchase.

286.   Based on all of the above, I believe **SANCHEZ**, **HERNANDEZ, BONILLA, MARTINEZ** and **GONZALES**, conspired to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

### 11.   June 4, to June 9, 2025 – Ignacio SANCHEZ Arranged Two Methamphetamine Transactions with Luis Amaro AGUILAR Resulting in the Seizure of a Half Pound of Methamphetamine

287.   On June 4, 2025, **SANCHEZ**, while housed at the Fresno County Jail, coordinated the procurement of a half pound of methamphetamine from **AGUILAR**. On June 9, 2025, **SANCHEZ**, while housed at the Fresno County Jail, again coordinated the procurement of a second half pound of

methamphetamine from **AGUILAR**.

288.    On June 4, 2025, at approximately 12:25 PM, **SANCHEZ** used the Fresno County Jail phone system[64] to call (559) 401-8633 (TT 8633) utilized by **FELISCIANO**. **SANCHEZ** used his Fresno County Jail Identification Number to place this call. During this call, **SANCHEZ** asked **FELISCIANO** to send a text message and ask, "if they could come and fix the fence." **SANCHEZ** related that they would know what that meant. Simultaneously, at 12:40 PM, **FELISCIANO** used (559) 401-8633 (TT 8633) to send a text message to the uncharged user of (213) 334-1252 (TT18). The text message read, "Good afternoon. May you have a blessed day. My primo said he sends his and that everything is good. If you can send me the number or for you to call so we can have them bring us some groceries please and thank you."

289.    I know from my training and experience that drug traffickers use coded language, especially on monitored and recorded jail phones, to discuss criminal matters in an effort to thwart law enforcement's ability to arrest and prosecute them for these crimes. I also know that "my primo" is a name by which **FELISICIANO** identifies **SANCHEZ**. I know members of the ENTERPRISE use the term "groceries" to describe illicit narcotics.

290.    Therefore, I believe **SANCHEZ** used coded language to instruct **FELISCIANO** to send a text message to an uncharged individual regarding the procurement of illicit narcotics. **FELISCIANO** responded in kind and sent a message on behalf of **SANCHEZ** to an uncharged individual. **FELISCIANO** communicated in this text message that **SANCHEZ** needed more narcotics.

291.    At 12:41 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 401-8633 (TT 8633) utilized by **FELISCIANO**. During this call, **SANCHEZ** asked **FELISCIANO** "did Ninja Gorilla get back at you?" **FELISCIANO** responded, "I text him [UI] no." **SANCHEZ** responded, "No? Ok."

292.    Based on my training and experience, I believe **SANCHEZ** asked **FELICIANO** if the uncharged individual had returned **FELISCIANO's** text message. **FELISCIANO** responded that they had not responded despite **FELISCIANO** sending the text message.

---

[64] The parties on the call were advised the Fresno County Jail phone system is subject to monitoring and recording.

293.    **FELISCIANO**, while still on the jail call with **SANCHEZ**, **FELISCIANO** used (559) 401-8633 (TT 8633) to call the uncharged user of (213) 334-1252 (TT18).  **FELISCIANO** then merged this call with the original **SANCHEZ** jail call, allowing all three individuals to speak on a 3-way call. This uncharged individual spoke with **SANCHEZ** about **SANCHEZ's** current housing situation at the Fresno County Jail.  Later in this call, **SANCHEZ** asked the uncharged individual, "can you please get ahold of the guy to fix my fence?"  The uncharged individual is confused by this statement, so **SANCHEZ** clarified, "my boy-boy."  **SANCHEZ** continued, "he charges me 6 to hook up the whole fence and then I give him 50 bucks to eat food and stuff."  The uncharged individual responded, "so you want him to go and fix the fence today?"  **SANCHEZ** responded in affirmation and stated, "yes, and get a hold of my prima."

294.    Based on my training and experience, I believe **SANCHEZ** was again speaking in coded language about procuring narcotics from the uncharged user's source of supply.  I also know that drug traffickers shorten financial terms.  For example, when **SANCHEZ** stated, "he charges me 6" **SANCHEZ** actually communicated "he charges me $600."  I know the term, "bucks" to be a synonym for "dollars." I also know, "prima" to be a name by which **SANCHEZ** identifies **FELISCIANO**.

295.    I believe **SANCHEZ** communicated to the uncharged individual that **SANCHEZ** was prepared to purchase $600 worth of narcotics from the uncharged individual's source of supply, and that **SANCHEZ** would pay the supplier $50 for it to be delivered.  **SANCHEZ** further related that this transaction would be completed by **FELISCIANO** due to the fact that **SANCHEZ** is currently incarcerated.

296.    At 1:09 PM, the user of (213) 334-1252 (TT18) sent a text message to **FELISCIANO** on (559) 401-8633 (TT 8633).  This text message read, "I'm waiting on the homie to get back at me about the groceries I'll let you know asap when he does."

297.    Based on my training and experience, I know "homie" to be a fellow gang member.  As previously discussed, I know groceries to be narcotics.  I also know "asap" to mean "as soon as possible.

298.    I believe the uncharged user of (213) 334-1252 (TT18) communicated to **FELISCIANO**, and ultimately **SANCHEZ**, that the uncharged individual contacted their source of supply regarding the narcotics, and that they have not yet responded.  The uncharged individual advised they would notify

1  **FELISCIANO** when the source of supply responded.

2  299.  At 1:11 PM, the uncharged user (UCC3) of (213) 334-1252 (TT18) called **Luis Amaro**

3  **AGUILAR** on (559) 652-6826[65] (TT 6826).  The following is a transcript of the pertinent portions of

4  that call:

| | [BEGINNING OF CALL] |
|---|---|
| **AGUILAR** | Yo. |
| **UCC3** | What's good block? |
| **AGUILAR** | What's going on? |
| **UCC3** | Shit, [UI] just chilling. [stuttering] my celly wants to know right – if you could get another one? A half? |
| **AGUILAR** | Uh huh [in affirmation]. |
| **UCC3** | Alright.  And if you could roll all the way over there again and drop it off? |
| **AGUILAR** | Uh today? |
| **UCC3** | Uh – yeah – because… |
| **AGUILAR** | Uh – tell him – uh – to give me some time cuz I was barely going to head out right now to get a haircut – me and my son. |
| **UCC3** | Ok, just let me know – and then uh – he gots the 6 right? |
| **AGUILAR** | Yeah. |
| **UCC3** | Ok – uh – and he got that 50 too. |
| **AGUILAR** | Alright, yeah. |
| **UCC3** | Ok. Just let me know. |
| **AGUILAR** | Alright bud. |
| **UCC3** | Ok, alright, buh bye. |
| **AGUILAR** | Late. |
| | [END OF CALL] |

300.  Based on my training and experience, I know "celly" to be short for "cellmate."  I also

know drug traffickers use vague or innocuous language to describe narcotics in an attempt to thwart law

enforcement's ability to prosecute them.  I believe the phrase, "another one" and "a half" when used in

this context to mean "another half pound of narcotics."  I know the phrase, "to roll" when used in this

context to mean "to travel."  As previously described, drug traffickers often shorten terms associated

with finances.  For example, when the uncharged individual stated, "he gots the 6" they actually

communicated, "the price is $600."  I know that $600 for a half pound of narcotics is consistent with the

price of methamphetamine in the Central Valley of California.

---

[65] On June 9, 2025, members of the investigative team detained **AGUILAR** during a vehicle stop.  During this detention, the investigative team called (559) 652-6826 and watched as **AGUILAR's** cell phone received a call.  Therefore, I believe **AGUILAR** is the user of (559) 652-6826.

301.    Therefore, I believe the uncharged individual communicated to **AGUILAR** that **SANCHEZ** needed to purchase another half pound of methamphetamine for $600.  Therefore, I believe **AGUILAR** responded that **AGUILAR** had the narcotics requested, and confirmed he would accept $600 in addition to the $50 as a delivery fee.

302.    At 1:12 PM, the uncharged individual (UCC3) used (213) 334-1252 to call **FELISCIANO** on (559) 401-8633 (TT 8633).  The following is a transcript of that call:

| | [BEGINNING OF CALL] |
|---|---|
| UCC3 | Because right now he's going to get his son a haircut. And all that stuff. |
| FELISCIANO | Ok. |
| UCC3 | But he's – but he's gonna to let me know when he gets on the road – and when it's good. |
| FELISCIANO | Ok.  Just let me know for I could [UI] I could go get the money and have it in hand. |
| UCC3 | Yeah – yeah cuz he wants it in cash. It – it – its' the 6 plus the 50. |
| FELISCIANO | That's ok. |
| UCC3 | Ok, cool. |
| FELISCIANO | Ok, thank. |
| UCC3 | Ok, I'll let you know. Alright later. |
| FELISCIANO | Bye. |
| | [END OF CALL] |

303.    Based on my training and experience, as well as the context from the prior call, I believe the uncharged individual communicated to **FELISCIANO** that their narcotics source confirmed the price of $600 for the half pound of methamphetamine, as well as the $50 delivery fee, and would be leaving soon to deliver the methamphetamine.

304.    At 3:08 PM, **AGUILAR** used (559) 652-6826 (TT 6826) to send a text message to the uncharged user of (213) 334-1252 (TT18).  This text message read, "omw."  I know this to mean "on my way."  At 3:33 PM, the uncharged user of (213) 334-1252 (TT18) called **FELISCIANO** on (559) 401-8633 (TT 8633) and related "they're on their way right now."  I believe the uncharged individual relayed the impending arrival of **AGUILAR** to **FELISCIANO**.  At 3:58 PM, the uncharged user of (213) 334-1252 (TT18) called **FELISCIANO** on (559) 401-8633 (TT 8633) and the two decided the methamphetamine transaction would take place at the same location as previous transactions.

305.    At 4:09 PM, **FELISCIANO** used (559) 401-8633 (TT 8633) to send a text message to the uncharged user of (213) 334-1252 (TT18).  This text message read, "here" indicating **FELISCIANO** had arrived.  Moments later, the uncharged user of (213) 334-1252 (TT18) responded with a text that

read, "He should be pulling up right now" indicating **AGUILAR** was arriving as well.  At 4:10 PM,
**FELISCIANO** used (559) 401-8633 (TT 8633) to send a text message to the uncharged user of (213)
334-1252 (TT18).  This text message read, "It's a raiders touch down."  Simultaneously, **AGUILAR**
used (559) 652-6826 (TT 6826) to send a text message to the uncharged user of (213) 334-1252 (TT18).
The text message read, "Touch down."

306.    Based on my training and experience, I know the term "Touchdown" is used by members
of the ENTERPRISE to communicate that there has been a successful narcotics transaction.  Therefore,
based on these text messages, I believe that **FELISCIANO** met with **AGUILAR** and purchased a half
pound of methamphetamine.

307.    At 5:24 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 401-
8633 (TT 8633) utilized by **FELISCIANO**.  During this call, **FELISICIANO** stated, "touchdown."
**SANCHEZ** responded, "Touchdown, big mighty Raider touchdown!"

308.    Based on my training and experience, and the context of the prior call, I believe
**FELISCIANO** communicated to **SANCHEZ** that she successfully purchased a half pound of
methamphetamine.

309.    Between June 5, and June 8, 2025, the uncharged individual, **AGUILAR** and
**FELISCIANO** on behalf of **SANCHEZ**, exchanged messages and calls that indicated **SANCHEZ**
would like to purchase additional narcotics.

310.    On June 7, 2025, at 6:07 PM, **SANCHEZ** used the Fresno County Jail phone system to
call (559) 401-8633 (TT 8633) utilized by **FELISCIANO**.  During this call, **SANCHEZ** stated, "If you
can, text Ninja Gorilla, and let him know that – I don't know how the day is going to go – we should be
good huh Prima?"  **FELISCIANO** responded in affirmation.  **SANCHEZ** continued, "I need to let him
know that tomor…" **FELISCIANO** interjected, "Monday" as **SANCHEZ** continued, "Yeah for
Monday" "it would be for the afternoon."

311.    Based on my training and experience, and the context of the prior communications on
June 4, 2025, I know "Ninja Gorilla" to be the uncharged user of (213) 334 1252 (TT18).  I know
"prima" to be a name by which **SANCHEZ** identifies **FELISCIANO**.

312.    Therefore, I believe **SANCHEZ** communicated to **FELISICIANO** that **SANCHEZ**

would like **FELISCIANO** to again contact the uncharged individual to broker another purchase of narcotics on Monday (June 9, 2025).

313.    **FELISCIANO** responded in kind and used (559) 401-8633 (TT 8633) to send a text message to the uncharged user of (213) 334-1252 (TT18) at 7:10 PM.  This text message read, "[UI characters]ed me to tell you if you can hit up old boy and let him know that he needs more groceries. If he works on the weekend or not.  If they can come tomorrow or Monday cause we are ready."  At 7:10 PM, the uncharged user of (213) 334-1252 (TT18) responded with a text message to **FELISCIANO** on (559) 401-8633 (TT 8633) and stated, "He said he could make it over there Monday."

314.    Based on my training and experience, I know the term, "groceries" is used by members of the ENTERPRISE to describe narcotics. Therefore, I believe **FELISCIANO**, at **SANCHEZ's** direction, contacted the uncharged individual to procure additional narcotics on the afternoon of June 9, 2025.

315.    On June 9, 2025, at 8:33 AM, the uncharged user of (213) 334-1252 (TT18) sent a text message to **AGUILAR** on (559) 652-6826 (TT 6826).  This text message read, "I'm going to be on giddys phone [phone emoji].

316.    Based on my training and experience, I know "giddy" to be the street moniker of **Ignacio SANCHEZ**, who is typically the user of (279) 386-7769 (TT6).  Therefore, I believe the uncharged individual communicated to **AGUILAR** that **AGUILAR** could communicate with the uncharged individual on (279) 386-7769 (TT6).

317.    At 8:58 AM, the uncharged user of (279) 386-7769 (TT6) sent a text message to (559) 401-8633 (TT 8633) utilized by **FELISCIANO**.  This text message read, "Do you think you'll make it back in time for the homie..he said he's getting on the road at 1.. and will be there at 2 with the groceries."

318.    Based on my training and experience, I know members of the ENTERPRISE use food terms to describe narcotics. I know the term, "groceries" when used in this context to mean "narcotics." I also know "homie" to be a fellow gang member, and in this text message, I believe "homie" to be **AGUILAR**.

319.    I believe the uncharged individual communicated to **FELISCIANO** that **AGUILAR**

would be arriving at 2:00 PM with narcotics.

320.    At 1:08 PM, **AGUILAR** used (559) 652-6826 (TT 6826) to send a text message to the uncharged user of (279) 386-7769 (TT6).  This text message read, "Okay, on my way."  Based on my training and experience, as well as the context from the prior calls, I believe **AGUILAR** communicated that he was departing to meet with **FELISCIANO** to conduct a transaction for narcotics.

321.    Members of the investigative team established physical surveillance at the residence of **AGUILAR** located at 2417 S. Argyle Avenue in the City of Fresno, CA.  The investigative team observed **AGUILAR**[66] leave the residence and departed in a Dodge Durango.

322.    At 1:30 PM, the uncharged person (UCC3) using (279) 386-7769 (TT6) called **FELISCIANO** on (559) 401-8633 (TT 8633).  The following is a transcript of the pertinent portions of that call:

| NAME | TRANSCRIPTION |
|---|---|
| | [BEGINNING OF CALL] |
| **FELISCIANO** | CiCi. |
| **UCC3** | CiCi.  Yeah, fucking – um – Yeah – so they should be there about 2:17, he's on his way – um |
| **FELISCIANO** | Ok. |
| **UCC3** | You got the 6 and the 50 right? |
| **FELISCIANO** | Yeah. |
| **UCC3** | Ok, cool. |
| **…** | [The conversation turns to non-pertinent talk about another individual.] |
| | [END OF CALL] |

323.    Based on my training and experience, I know that drug traffickers shorten terms and phrases associated with finances.  For example, when the uncharged individual stated, "You got the 6 and the 50 right?" The uncharged individual actually stated, "you got the $600 and $50 right?"  I also know that $600 is the current price for a half pound of methamphetamine in the Central Valley of California.

324.    Based on the context from the prior calls, I believe that **AGUILAR** was responding to traffic narcotics. Based on this call, **FELISCIANO**, on behalf of **SANCHEZ**, is again purchasing a half pound of methamphetamine for $600, and paying **AGUILAR** $50 as a delivery fee, as they did on June

---

[66] **AGUILAR** was the sole occupant of the vehicle, and later identified by his California driver license during a vehicle stop.

4, 2025.

325.    At 1:34 PM, members of the investigative team detained **AGUILAR** during a vehicle stop.  **AGUILAR** was identified by his California driver license.  A search of **AGUILAR's** vehicle was conducted and a plastic bag containing a white crystalline substance was located under the driver's seat. Based on their training and experience, members of the investigative team recognized the substance as methamphetamine.



FIGURE 6: WHITE CRYSTALLINE SUBSTANCE LOCATED UNDER THE DRIVER'S SEAT OF AGUILAR'S VEHICLE ON JUNE 9, 2025.

326.    **AGUILAR** was arrested and later booked at the Fresno County Jail without further incident.

327.    At 2:18 PM, **FELISCIANO** used (559) 401-8633 (TT 8633) to send a text message to the uncharged user of (279) 386-7769 (TT6).  The text message read, "I'm here already waiting."

328.    At 2:20 PM, the uncharged user of (279) 386-7769 (TT6) sent a text message to

**FELISCIANO** on (559) 401-8633 (TT 8633) that read, "I haven't heard nothing from him."

329.    I believe these text messages show that **FELISCIANO** had arrived at the meeting location, and the supplier, **AGUILAR**, had not arrived due to the fact that he was detained by members of the investigative team.

        12.    **June 10, 2025 – SANCHEZ facilitated the distribution of methamphetamine from an uncharged male to PULIDO**

330.    Between June 9 and June 10, 2025, the investigative team became aware that **SANCHEZ**, while housed in the Fresno County Jail and Salinas Valley State Prison, conspired to procure a pound of methamphetamine from an unidentified male (UM828).  This procurement was brokered by **PULIDO** and was acquired by **PULIDO** and an uncharged co-conspirator**.**

331.    On June 9, 2025, at approximately 10:47 AM, **SANCHEZ** used the Fresno County Jail phone system[67] to call (559) 413-9807 (TT 9807) utilized by **PULIDO**[68].  **SANCHEZ** used his Fresno County Jail Identification Number to place this call.  The Fresno County Jail system began the call by identifying the caller via a pre-recorded message.  This pre-recorded message indicated the incarcerated person who placed the call was "Giddy." I know "Giddy" to be the street moniker of **SANCHEZ**.

332.    During the initial portion of this call, **PULIDO** and **SANCHEZ** speak about **SANCHEZ's** court proceedings. At the 9:57 minute mark, the conversation turned to the procurement of narcotics.  The following is a transcript of the pertinent portions of that conversation:

| | [BEGINNING AT THE 12:27 MINUTE MARK] |
|---|---|
| **SANCHEZ** | Where do you go grocery shopping at? |
| **PULIDO** | Uh – when I was at your mom's, we use to always go to Wal-Mart.  But I go to that Foods – I like to bargain shop – fucking – [UI] Foods Co. – I'll go to Foods Co., or like – if they have like sales at Costless or whatever I'll like – I'll go over there. |
| **SANCHEZ** | Yeah. No – and then the other food too? The other food.  The other food. |
| **PULIDO** | Oh that food! Oh – um – I have a homeboy right here.  Fucking uh – His name's "Nutty." |
| **SANCHEZ** | Yeah. |
| … | [The call continued as **PULIDO** advised she gets "food" from other sources and named multiple uncharged individuals. The call quickly turned to matters unrelated to the procurement of narcotics. The call ended at the 16:10 minute mark.] |

---

[67] The parties on the call were advised the Fresno County Jail phone system is subject to monitoring and recording.

[68] On June 10, 2025, members of the investigative team detained **PULIDO** during a vehicle stop.  **PULIDO** advised (559) 413-9807 was **PULIDO's** cell phone number.  **PULIDO's** cell phone was located during the detention and found to be associated to phone number (559) 413-9807.

| | [END OF CALL] |
|---|---|

333.    Based on my training and experience, I know that members of the ENTERPRISE refer to narcotics using terms and phrases associated to food.  I have also heard **SANCHEZ** refer to the procurement of narcotics as "grocery shopping" during prior intercepted calls.

334.    Therefore, I believe **SANCHEZ** asked **PULIDO** where **PULIDO** purchases narcotics from.  **PULIDO** initially did not understand **SANCHEZ's** hidden meaning and answered with establishments that **PULIDO** has purchased groceries from.  **SANCHEZ** then clarified, "Yeah. No – and then the other food too? The other food.  The other food."  To which **PULIDO** answered with sources to which she acquires narcotics.

335.    At 5:22 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 413-9807 (TT 9807) utilized by **PULIDO**.  **SANCHEZ** used his Fresno County Jail Identification Number to place this call.  The following is a transcript of the pertinent portions of that conversation:

| | [BEGINNING AT THE 1:40 MINUTE MARK] |
|---|---|
| **SANCHEZ** | Remember what we were talking about earlier? |
| **PULIDO** | Uh – no. |
| **SANCHEZ** | About – remember what I asked you? Where you used to go grocery shopping and stuff like that? |
| **PULIDO** | Oh, yeah, yeah, yeah. |
| **SANCHEZ** | Ok – um – is [stuttering] there like Costco – like – do they have – uh – big – yeah. Uh – [stuttering][UI] My Dad wants to barbeque and everything – and you need to go over there and barbeque with them.  Just take a pound of meat. You know what I mean? |
| **PULIDO** | Yeah. |
| **SANCHEZ** | Yeah. |
| **PULIDO** | Oh, like to get a pound of meat? |
| **SANCHEZ** | Yeah. |
| **PULIDO** | See if they want me to take a pound of meat? |
| **SANCHEZ** | Yes. For you.  And then I got a burrito for you.  And you don't owe that 60 bucks no more or nothing. |
| **PULIDO** | Alright. I don't know if they're going to have.  We'll see. Let me tap in real quick. |
| ... | [The call ended as the two rehashed the statements made.]  The call ended at the 3:28 minute mark.] |
| | [END OF CALL] |

336.    Based on my training and experience, I know members of the ENTERPRISE use food terms to describe narcotics.  I also know from the context of the earlier call, that **SANCHEZ** asked **PULIDO** who she purchases narcotics from.  I know the term "burrito" to be used by **SANCHEZ** to

1  describe an ounce of methamphetamine.  I also know the phrase, "tap in" to be used in popular culture

2  which means, "to contact."

3       337.     Therefore, I believe **SANCHEZ** called **PULIDO** to ask **PULIDO** to contact her source

4  of supply to purchase a pound of narcotics on **SANCHEZ's** behalf.  **SANCHEZ** related that in return,

5  **SANCHEZ** would forgive **PULIDO's** debt of $60 and provide **PULIDO** with an ounce of

6  methamphetamine.

7       338.     At 5:43 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 413-

8  9807 (TT 9807) utilized by **PULIDO**. During this call, **PULIDO** stated, "Yeah I called and then [UI] he

9  will make a call, and he's waiting on him."  I believe **PULIDO** communicated to **SANCHEZ** that

10  **PULIDO** had contacted her source of supply as requested by **SANCHEZ**, and that the source was

11  working on locating a pound of narcotics.  **SANCHEZ** then stated, "So most likely you're going to go

12  over there to the barbeque?"  **PULIDO** related, "yeah, yeah for sure."  I believe **SANCHEZ** again was

13  using "the barbeque" as coded language to communicate the procurement of narcotics on **SANCHEZ's**

14  behalf, to which **PULIDO** advised she was able to complete.

15       339.     At 6:58 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 401-

16  8633[69] (TT 8633), used by **FELISCIANO**.  During this call, **SANCHEZ** and **FELISCIANO** discussed

17  funds available to **SANCHEZ** to purchase narcotics.  **SANCHEZ**, satisfied with the finances then

18  stated, "Text Gracie. Say my primo said thumbs up."

19       340.     Based on my training and experience, I believe "Gracie" to be Grace **PULIDO**.  I also

20  know, "primo" to be a name by which **FELISCIANO** identifies **SANCHEZ**.  I know "thumbs up" to be

21  another way of saying, "we are good to go."

22       341.     Therefore, I believe **SANCHEZ** and **FELISCIANO** discussed funding the pending

23  purchase of narcotics.  **SANCHEZ** then requested **FELISCIANO** send a text message to **PULIDO**, to

24  communicate that **PULIDO** was to plan on purchasing the pound of narcotics.  Concurrently,

25  **FELISCIANO** used (559) 401-8633 (TT 8633) to send a text message to (559) 413-9807 (TT 9807)

26

27  ───────────

28  [69] On March 11, 2025, members of the investigative team established physical surveillance on **FELISCIANO**. Members of the investigative team called (559) 401-8633 and spoke with **FELISCIANO** while surveilling her.  Therefore, I believe FELISCIANO is the user of (559) 401-8633.

1  utilized by **PULIDO**.  This transaction was captured on a pen-register installed on (559) 401-8633 (TT

2  8633) via a court order.

3       342.    At 8:01 PM, **SANCHEZ** used the Fresno County Jail phone system to call (559) 413-

4  9807 (TT 9807) utilized by **PULIDO**.  **PULIDO** communicated to **SANCHEZ** that, "early in the

5  morning, he said yeah for the 11."  **SANCHEZ** then responded in affirmation and stated, "I got you for

6  a burrito" and "thank you Grace."

7       343.    I know based on my training and experience that drug traffickers often shorten words

8  describing money.  For example, in this call when **PULIDO** stated, "for the 11" she communicated "for

9  $1,100."  I also know that "burrito" is synonymous with an ounce of methamphetamine.  I know based

10 on my training and experience, that a pound of methamphetamine is typically sold in the Central Valley

11 of California for $1,100.

12      344.    I believe **PULIDO** communicated to **SANCHEZ** that **PULIDO's** source of supply

13 would sell **SANCHEZ** a pound of methamphetamine for $1,100 tomorrow morning.  **SANCHEZ** then

14 reiterated that **PULIDO** would receive an ounce of methamphetamine for this procurement.

15      345.    On June 10, 2025, at 9:35 AM, **SANCHEZ** used (213) 334-1252[70] (TT18) to call

16 **PULIDO** on (559) 413-9807 (TT 9807).  During this call, **PULIDO** stated, "I'm driving over there to

17 go do that."  I believe **PULIDO** communicated to **SANCHEZ** that **PULIDO** was on her way to procure

18 the narcotics as planned.  **PULIDO** then stated, "Carly wanted you to call her," "because I guess

19 yesterday you told her whatever she had in hand, and I ended up needing the whole – the 11 so fucking

20 uh – I think she just wanted to clear that with you."  Later in the call, **SANCHEZ** stated, "text me an tell

21 me touchdown" to which **PULIDO** responded in affirmation.

22      346.    I know based on my training and experience that "Carly" is Carly **BALBOA**, the sister of

23 **SANCHEZ**.  I also know **BALBOA** to distribute and store narcotics and finances on **SANCHEZ's**

24 behalf.  I know "on hand" to mean "in one's possession."  I know that drug traffickers often shorten

25 words describing money.  For example, in this call when **PULIDO** stated, "the 11" she communicated

---

[70] (213) 334-1252 was identified as being a contraband cell phone used by both **SANCHEZ** and other incarcerated persons within the Salinas Valley State Prison during the course of this investigation.  I also recognized **SANCHEZ's** voice to be the same on this call as compared to the previously mentioned Fresno County Jail phone calls.

"the $1,100." I also know, "touchdown" to be a term ENTERPRISE members use when they have successfully obtained narcotics for distribution.

347. Therefore, I believe **PULIDO** communicated to **SANCHEZ** that **BALBOA** gave **PULIDO** all the money **BALBOA** had, which was $1,100, to purchase the pound of methamphetamine at the direction of **SANCHEZ**. I checked the historical location data on the GPS tracking device affixed to **PULIDO's** vehicle pursuant to a court order and found that on June 9, 2025, at 9:27 PM, **PULIDO**'s vehicle traveled to **BALBOA's** residence located at 664 Northstar Drive in the City of Hanford. I believe this GPS data corroborated that **PULIDO** did in fact obtain the finances for this procurement from **BALBOA** at the direction of **SANCHEZ**. **SANCHEZ** then directed **PULIDO** to text **SANCHEZ** when the methamphetamine had been procured.

348. At 12:56 PM, **PULIDO** used (559) 413-9807 (TT 9807) to send a textmessage to **SANCHEZ** on (213) 334-1252 (TT18) which read, "Should be here any minute." At approximately 1:00 PM, members of the investigative team established physical surveillance on **PULIDO's** vehicle and found it to be unoccupied at 1020 Evergreen Avenue in the City of Lemoore, CA. At 1:33 PM, the investigative team observed a white Volkswagen sedan arrive at 1020 Evergreen Avenue. An uncharged individual exited the residence and retrieved a manilla envelope with a bulge from the occupant(s) of the Volkswagen sedan. The uncharged individual returned to the residence of 1020 Evergreen Avenue, as the Volkswagen sedan departed. Simultaneously, **PULIDO** used (559) 413-9807 (TT 9807) to send a textmessage to **SANCHEZ** on (213) 334-1252 (TT18) which read, "It's here are we hooking up my friend for the paro or what." I know "Paro" to be a Spanish slang term for "favor." I also know "hooking up" to mean to provide someone with something.

349. I believe these text messages show that **PULIDO** had arrived at the source of supply's location, and that the narcotics had also arrived. I believe **PULIDO** asked **SANCHEZ** if he intended on providing **PULIDO's** friend with a gift in exchange for the favor he provided.

350. At 1:40 PM, **PULIDO** received an incoming call on (559) 413-9807 (TT 9807) from **SANCHEZ** on (213) 334-1252 (TT18). **SANCHEZ** related, "we can give him a couple basketballs and give you six of em."

351. Based on my training and experience, I know "basketballs" are a term used by members

of the ENTERPRISE that mean methamphetamine packaged in 3.5 grams packages. I believe this call showed that **PULIDO** would give her friend a couple 3.5 gram packages of methamphetamine, and that **PULIDO** would get six of the same packages.

352.    At 1:56 PM, members of the investigative team observed **PULIDO** exit the residence of 1020 Evergreen Lane and entered the driver side of her vehicle. **PULIDO** departed the residence and was detained along with an uncharged passenger during a vehicle stop. **PULIDO** was identified by her California driver license while her vehicle and person were searched. Fresno County Sheriff's Deputies located a clear bag containing a white crystalline substance under **PULIDO's** left breast and recognized the substance to be methamphetamine based on their training and experience.



FIGURE 7: PHOTOGRAPH OF WHITE CRYSTALLINE SUBSTANCE REMOVED FROM PULIDO'S PERSON.

353.    Based on all of the above, I believe **SANCHEZ**, **FELISCIANO, BALBOA** and **PULIDO**, conspired to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

B.    **Count 2 - PINON Possesses and Distributes Methamphetamine**

354.    During April 15, 2025, a series of intercepted communications on (559) 931-4104 (TT1), used by Ray **PINON**[71], and (559) 301-6131 (TT 6131), used by an uncharged co-conspirator (UM49).

355.    On April 15, 2025, at approximately 11:22 AM, the following phone call was made by **PINON** using (559) 931-4104 (TT1), to UM49, using (559) 301-6131 (TT 6131). After speaking about whether UM49 was going to sell **PINON** a rifle, UM49 asked **PINON** if when he gets off UM49 could get some "black t-shirts." **PINON** told UM49, "Yes." UM49 told **PINON** that he was not sure how many he would purchase, but he might get the "piece." **PINON** told UM49 that sounded good, and the conversation ended.

356.    Based on my training, experience, and knowledge of this investigation, I believed the uncharged co-conspirator was referring to black tar heroin when he referenced purchasing black t-shirts. Based on my training and experience, I am aware that UM49 was possibly referring to a "Mexican piece," which based on my training and experience I know to be a term used in drug communities to describe an ounce of heroin that weighs approximately 25 grams instead of 28 grams.

357.    On April 15, 2025, beginning at approximately 6:45 PM, **PINON**, using (559) 931-4104 (TT1), and UM49, using (559) 301-6131 (TT 6131), spoke about whether **PINON** could get the "white shirts" down to "six." **PINON** said no and offered to make a call, but UM49 said it was okay and that he did not need it at that time. UM49 further said "I still got like . . . ." and the rest was unintelligible. UM49 confirmed with **PINON** that if he obtained six "black shirts" it would only be "two fifty," but if he got 12 it would be 600, and it would cost more money. **PINON** asked, "How much did I tell you the half was?" UM49 replied, "Six hundred." **PINON** asked if it would be easier to get that. UM49 stated, "two sixes," which is two quarters is "five hundred," and further stated that "[i]t's a hundred dollars cheaper." **PINON** admitted those are the prices "they" gave him and that is what he goes off of. When UM49 asked, "How much for a zip of the cris?" **PINON** said it would cost $120. UM49 then said he

---

[71] The investigative team learned via intelligence gathered from a Confidential Human Source (CHS-1) that **PINON's** used the cell phone number (559) 931-4104. This was corroborated as multiple individual's call **PINON** "risk" during intercepted calls on (559) 931-4104. "Risk" is one of the street monikers PINON is known by. Members of the investigative team have also intercepted **PINON** on (559) 931-4104 while simultaneously watching **PINON** talk on the phone via a pole camera installed near **PINON's** residence. Therefore, I believe **PINON** is the user of (559) 301-6131.

1  would take one of those, but he is going to count the money and call back.

2      358.    Based on my training and experience, I know that drug traffickers commonly use the

3  term "crys" to refer to crystal methamphetamine. Therefore, I believe that UM49 asked **PINON** how

4  much money it would cost him to purchase an ounce of crystal methamphetamine. Based on my training

5  and experience I know a "zip" is a street drug terminology to describe an ounce. **PINON** told UM49 it

6  would cost him $120, which is consistent with my knowledge of the price for an ounce of

7  methamphetamine as of the writing of this warrant.

8      359.    On April 15, 2025, at approximately 7:14 PM, **PINON**, using (559) 931-4104 (TT1),

9  received a call from UM49, using (559) 301-6131 (TT 6131). During that call, UM49 told **PINON** he

10  did not need "ice cream" and would probably need it tomorrow, but if anything, he needed some "cris"

11  and some "black," which as stated above I believe to mean crystal methamphetamine and black tar

12  heroin. After speaking again about selling **PINON** a rifle, UM49 then stated he wanted to come over

13  and get some "black shirts" and some "ice cream." **PINON** told UM49 they were acting weird on the ice

14  cream. **PINON** told UM49 he thought his drug source wanted more money for the "ice cream," which

15  he originally told UM49 would be $120. **PINON** told UM49 he would call him in about 40 minutes.

16      360.    Based on the context of the previous calls, as well as my training and experience, I

17  believe that UM49 was indicating during this call that he wanted to purchase black tar heroin and/or

18  methamphetamine.

19      361.    On April 15, 2025, at approximately 7:41 PM, **PINON**, using (559) 931-4104 (TT1),

20  called UM49, using (559) 301-6131 (TT 6131). During the call, **PINON** told UM49, "It's good to go".

21  UM49 asked **PINON**, "the white and black"? **PINON** confirmed that UM49 wanted ice cream. **PINON**

22  told UM49 he could obtain six black t-shirts for "two something" and that it would cost $120 for the ice

23  cream. **PINON** told UM49 he would talk to UM49 when UM49 arrived at **PINON**'s house.

24      362.    The investigative team then established surveillance on **PINON**'s residence at 17271

25  Tornado Avenue, Huron, CA.

26      363.    At approximately 8:29 PM, the surveillance team observed a white truck approaching

27  **PINON**'s residence. An individual was subsequently observed exiting the truck and entering **PINON**'s

28  residence. The driver then came back out, briefly re-entered the truck, and then re-entered the residence.

364.    At approximately 8:54 PM, the driver again entered the truck, appeared to turn it on, and then left the vehicle again.

365.    At approximately 9:06 PM, the driver again entered the driver's seat and drove away from the residence. The investigative team maintained mobile surveillance on the vehicle as it began to depart the area and conducted a traffic stop on the vehicle at approximately 9:27 PM.

366.    During a search of the vehicle, UM49 was contacted and identified. The team recovered two clear plastic bags containing approximately 30 grams of a white crystalline substance consistent with the appearance of methamphetamine on UM49's person.

367.    Additionally, during the stop, a team member observed the phone in UM49's possession while another team member called (559) 301-6131 (TT 6131). While the second team member was calling that number, the first team member observed UM49's phone begin to ring. I therefore believe that UM49 is the user of (559) 301-6131 (TT 6131).

368.    Based on the calls set out above, as well as my knowledge of the investigation, I believe **PINON** distributed methamphetamine to UM49 on April 15, 2025.

C.    **Count 3 - VELAZQUEZ and PINON Distribute and Possess with Intent to Distribute Methamphetamine**

369.    On April 26, 2025, **PINON** coordinated with **VELAZQUEZ** and CHS-1 for **VELAZQUEZ** to distribute narcotics to **PINON**, at which point **PINON** distributed those narcotics to CHS-1.

370.    On April 26, 2025, the investigative team became aware that **PINON** conspired to distribute a pound of methamphetamine from **VELASQUEZ** (supplier) to CHS-1.  CHS-1 purchased this methamphetamine at the direction of the investigative team.

371.    At 11:40 AM, **PINON** used (559) 931-4104 (TT 4104) to call CHS-1 on a phone number they had previously provided to the investigative team. The following is a transcript of the call, beginning at the 2:25 minute mark:

| NAME | TRANSCRIPTION |
|------|---------------|
| | [BEGINNING of CONVERSATION] |
| PINON | Well, tell her that I – that I – that you have some – that they're at a thousand. |
| CHS-1 | Alright. |
| PINON | Right now.  But I need it right now.  No – hey Tuesday, Monday, Wednesday.  If she |

| | | |
|---|---|---|
| | | wan't em right now, if not forget it. |
| | CHS-1 | Ok. |
| | **PINON** | I don't want to go through all that bullshit again.  Like – oh, we got the money. |
| | CHS-1 | [UI] Don't give people time to adjust basically. |
| | **PINON** | Ya – just fucking yes or no, and we got it – and the half for 500 and a full for a thousand – and um – the O.Z.s we could do em at 1 – 140 – 150. So… |
| | CHS-1 | Ok. |
| | **PINON** | Ok. |
| | CHS-1 | I'll call you right back |
| | | [END of CALL] |

372.    In prior controlled purchases of narcotics between CHS-1 and **PINON**, the investigative team instructed CHS-1 to inform **PINON** that CHS-1 was brokering purchases of narcotics on behalf of a female rival gang member.  Based on my training and experience, I know drug traffickers use vague or innocuous language to communicate about narcotics in an attempt to thwart law enforcement's ability to arrest and prosecute them.  I believe when **PINON** stated, "that you have some" and "they're at a thousand," **PINON** actually stated that **PINON** had pounds of methamphetamine for sale at a thousand dollars a pound. I also believe that when **PINON** stated, "half for 500 and a full one for a thousand" "the O.Z.s we could do em at 1 – 140 – 150," **PINON** actually communicated that **PINON** would sell a half pound of methamphetamine for $500, a full pound of methamphetamine for $1,000, and ounces of methamphetamine for between $140 and $150.

373.    Therefore, I believe **PINON** called CHS-1 to communicate that **PINON** had pounds of methamphetamine for sale, and would sell them to CHS-1 connection for the aforementioned prices.

374.    At 11:43 AM, CHS-1 contacted members of the investigative team and related that **PINON** had procured methamphetamine and had attempted to sell it to CHS-1. The investigative team instructed CHS-1 to finalize the purchase with **PINON** and that the investigative team would provide $1,000 to CHS-1 to purchase a pound of methamphetamine from **PINON**. CHS-1 agreed and related CHS-1 would attempt to use **PINON's** vehicle to act as a courier between **PINON** and the investigative team.

375.    At 3:08 PM, CHS-1 called **PINON** on (559) 931-4104.  The call turns to the methamphetamine procurement 15 seconds into the call.  The following is a transcript of the pertinent portions of that call:

| | | |
|---|---|---|
| | | [BEGINNING of CONVERSATION] |

| | |
|---|---|
| CHS-1 | Well, they're ready. |
| **PINON** | They're ready? |
| CHS-1 | Yeah. |
| **PINON** | To sell – I mean to buy one? |
| CHS-1 | Yeah. |
| **PINON** | Ok.  [CHS-1], If I let you use my car, how fucking fast are you going to get over there and back? |
| CHS-1 | [UI] there and back. |
| **PINON** | I need it there and back, and give me the money so I can get more. |
| … | [The conversation ended as CHS-1 reasured **PINON** CHS-1 would be quick with the transaction.] |
| | [END of CALL] |

376.    Based on my training and experience, I believe that when **PINON** stated, "to buy one" **PINON** was communicating "to buy a pound of methamphetamine."  Therefore, I believe CHS-1 communicated to **PINON** that **CHS**-1's buyer was ready to purchase a pound of methamphetamine, and that **PINON** would allow CHS-1 to utilize **PINON's** vehicle to broker the transaction.

377.    At 3:40 PM, **PINON** used (559) 931-4104 to call **Hemir VELASQUEZ**[72] on (213) 795-3500 (TT14).  The call occurred almost entirely in Spanish and was translated by a Spanish-speaking member of the investigative team. The following is a transcript of the pertinent portions of that call:

| NAME | TRANSCRIPTION (SPANISH) | TRANSCRIPTION (ENGLISH) |
|---|---|---|
| | [BEGINNING OF CALL] | [BEGINNING OF CALL] |
| **VELASQUEZ** | [English] | 'Sup? |
| **PINON** | [English] | Hey. |
| **VELASQUEZ** | [English] | What? |
| **PINON** | *Si quieres traeme una y media si quieres. O si no traeme una y si no traeme una Y que vaije mi compa pa llevar se lo. Y ahorita en unos cuarenta cinco minutos. Unos veinte pa ya y veinte para tras. Por que yo le dije que yo no mas fuera de* [UI]. | If you want, bring me one and a half, if you want. Or if not, bring me one, and if not, bring me one, and my friend comes to take it to him. And in about forty-five minutes about twenty there and twenty back.  Because I told him to I was just going to be [UI]. |
| **VELASQUEZ** | *este Bueno… aqui tengo una ya. Ya me trajieron uno. Le dije que me trajieron uno por que iban a  tocar. Compar a subir ayi para ya pa pa por Visalia…* | Well, here I have one now. They already brought me one. I told him they brought me one because they were going to touch. Going to buy to raise for over there in Visalia. |
| **PINON** | [English] | Oh, oh, okay. |
| **VELASQUEZ** | *Fueron vender a Visalia y aqui me dejaron una.* | They went to Visalia and they left me one here. |

---

[72] On May 20, 2025, members of the investigative team established physical surveillance on **VELASQUEZ** and called (213) 795-3500.  Simultaneously, the investigative team observed **VELASQUEZ** answer his cell phone. Therefore, I believe **VELASQUEZ** is the user of (213) 795-3500.

| | | |
|---|---|---|
| **PINON** | *OK Que Ve... Ok si vendo esa. Que voy a tener aqui pa vender yo.* | Okay, what… Okay, if I sell that one. What am I going to have here to sell? |
| **VELASQUEZ** | *Si si te estoy diciendo te estoy diciendo Que vende esa que vende esa Y mandamos Traer otra, dos si quieres, otras tres, cuatro, cinco. Como a tu ahorita le ocupas piezas enteras, ya como a tu si quieres has tu pasito en media te dejo media por que en el city ocupo sacar piezas enteras a la neta. Ok ocupas juntar hortita la "unintelligible" ocupo vajar por, ocapan vajar manana por por mas pues y* | Yes, yes, I am telling you- I am telling you to sell that one- to sell that one. And we will send to bring another one, two if you want, another three, four, five. Like for you right now- you need pieces whole, and how you want- if you want, do your little steps in half, I'll leave you half, because in the city I need to take out whole pieces for reals. Okay, you need to gather right now [UI] I need to take down, they need to take down tomorrow for more then and… |
| **PINON** | *Pos te te dijo, que por que no mandaste con pa trajer unos dos horita* | Well, I told you, why did you not send for more, or to bring two right now? |
| **VELASQUEZ** | *Por que que asi um como asi.* | Because like that, um, like that. |
| **PINON** | *Por que ira voy a vender uno horita and then mi compa mi otro compa que esta alla en pinche Hawaii, Va querer una media. And then Uno dos, tres aqui, que van a querer unas otras aqui [UI]* | Because right now I'm going to sell one and then my homie, my other homie, that is in fuckin' Hawaii, is going to want half. And then two, three here, that are going to want some here [UI] |
| **VELASQUEZ** | *ok Horita vende ese Y horita, Horita que trigan* | Okay, right now, sell that one and right now, right now they will bring. |
| **PINON** | *So So lo lo no se.* | So- So- I- I- I don't know. |
| **VELASQUEZ** | *Hay te veo pa ya* | I'll see you over there. |
| **PINON** | [English] | Okay. |
| | [END OF CONVERSATION] | [END OF CONVERSATION] |

378.    Based on the context of the previous calls set out above, as well as subsequent events set out in further detail below, I believe that when **PINON** spoke with **VELASQUEZ** about "one and a half," he was speaking about a pound and a half of methamphetamine. Additionally, I therefore also believe that when the parties spoke about single numbers (e.g. "three, four, five") they were actually speaking about pounds of methamphetamine.

379.    Therefore, I believe that **PINON** began the conversation by asking if **VELASQUEZ** could bring him a pound and a half of methamphetamine, and if not, **VELASQUEZ** could just bring "one." When **VELASQUEZ** indicated that he only had "one," **PINON** then asked what he would have left to sell if he immediately sold the "one" that **VELASQUEZ** brought, and **VELASQUEZ** indicated that he would bring more pounds of methamphetamine for **PINON** to sell later. **PINON** later confirmed

1   that he had multiple other individuals that were going to want to buy pounds of methamphetamine from

2   him. The parties then ended the call with **VELASQUEZ** indicating that he would "see [**PINON**] over

3   there."  Based on prior calls, as well as subsequent events, I believe **PINON** intended to obtain this

4   pound of methamphetamine from **VELASQUEZ** to sell to CHS-1.

5        380.    CHS-1 then travelled[73] to **PINON's** residence at 17271 Tornado Avenue, Huron, CA,

6   met with **PINON** in the driveway, and then entered the residence with **PINON**. The investigative team

7   was able to view CHS-1's arrival at the residence on the pole camera installed in the vicinity. At

8   approximately 3:46 PM, a Hispanic male subject, not known to CHS-1, arrived at **PINON's** residence

9   and entered the garage. CHS-1 later informed the investigative team that CHS-1 and **PINON** met this

10  Hispanic male in the garage, where the Hispanic male gave **PINON** a clear plastic bag; **PINON**

11  immediately handed the bag to CHS-1. CHS-1 then entered **PINON's** white Honda Accord and departed

12  the area with the bag; the unidentified male left the area approximately two minutes later, at 3:50 PM.

13  Based on the prior calls, I believe the Hispanic male that supplied **PINON** with the clear plastic bag was

14  in fact **VELASQUEZ**.

15       381.    Members of the surveillance team followed CHS-1 to a pre-planned meeting location.

16  CHS-1 and **PINON's** white Honda were searched; no contraband was located other than the clear plastic

17  bag previously handed to CHS-1 by **PINON**. The investigative team located approximately one pound

18  of a clear white crystalline substance consistent with the appearance of methamphetamine inside of the

19  bag. CHS-1 was then given $1,000 in buy funds, returned to **PINON's** residence, and gave the money to

20  **PINON**.

21       382.    Based on all of the above, I believe **PINON** and **VELASQUEZ**, conspired to distribute

22  and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

23  **D.    Count 4 – GUILLEN Conspires to Traffic in Firearms and Count 5 – VIERA**

24  **Possesses a Firearm as a Felon**

25       383.    On May 9, 2025, the investigative team became aware that **GUILLEN** conspired to

26

27  _____

    [73] Because CHS-1 did not have a working vehicle, the investigative team was not able to meet with CHS-1 prior to

28  CHS-1's meeting with **PINON** due to **PINON's** extensive network of individuals who inform him of strange or out-of-the-
    ordinary activity in Huron, CA.

broker the purchase of a firearm between an uncharged individual (UCC4) and **VIERA JR**.

384.    At 12:38 PM, **GUILLEN** used (559) 508-6409 (TT9) to call an uncharged individual (UCC4) using (559) 934-9745 (TT 9745). The following is a transcript of the pertinent portions of the call:

| | [BEGINNING of CONVERSATION] |
|---|---|
| **GUILLEN** | Hey. |
| UCC4 | Hello? |
| **GUILLEN** | Hey you hear me? |
| UCC4 | Yeah |
| **GUILLEN** | Hey – they just sent me a picture of a 43X like yours. |
| UCC4 | A what? |
| **GUILLEN** | They sent me a 43X right now [UI] |
| UCC4 | How much? |
| **GUILLEN** | For 9. |
| UCC4 | Where at? |
| **GUILLEN** | In Fresno.  They just told me to come grab it if you want it. |
| UCC4 | Tell them I'm going right now. |
| **GUILLEN** | Alright.  Let me get the address real quick. |
| UCC4 | Alright then.  Call me. |
| **GUILLEN** | Alright look at the picture then. |
| UCC4 | Alright then. |
| **GUILLEN** | Alright. |
| | [END of CALL] |

385.    Based on my training and experience, I know a "43X" is a Glock pistol.  I believe when **GUILLEN** stated, "for 9" he communicated the price was $900.  Therefore, I believe **GUILLEN** communicated to the uncharged individual, that **GUILLEN** was contacted by an unknown individual regarding the sale of a Glock 43X pistol. **GUILLEN** acted as a broker during this call and relayed the seller was asking $900 for the pistol.  The uncharged individual expressed interest in the firearm, and **GUILLEN** related he would obtain the address for the transaction.

386.    At 1:20 PM, **GUILLEN** used (559) 508-6409 (TT9) to call an unknown male (UM333) on (559) 420-3927[74] (TT 3927).  The following is a transcript of that call:

| | [BEGINNING of CONVERSATION] |
|---|---|
| **UM333** | What happened? |
| **GUILLEN** | Hey, you hear me? |

---

[74] Although the investigative team suspects **VIERA JR.** is the user of (559) 420-3927, there are not enough articulable facts to confirm this suspicion.  Therefore, the user of (559) 420-3927 is herein referenced as UM333.

| UM333 | Yeah. |
|---|---|
| **GUILLEN** | Fuck dog, do you think the homie would take um – you think the homie would fucking take um – CashApp? |
| UM333 | I – I think he – I could ask him why? |
| **GUILLEN** | Cuz Dog, the fucking homie is fucking – Dog he left Fresno dog – but his girls out there and he could CashApp his girl and she'll pick it up. |
| UM333 | Alright for sure.  Let me see right now. |
| ... | [The call ended as **GUILLEN** expressed his frustration with "the homie" for doing the transaction in this manner.] |
| | [END of CALL] |

387.    Based on my training and experience, I know the term "homie" to mean a fellow gang member. I also know "CashApp" to be a money sending/receiving application.  I know "his girl" to mean girlfriend or wife.  Therefore, based on the fact that **GUILLEN** called UM333 shortly after speaking with the uncharged individual, I believe UM333 is acting on behalf of the seller for this firearm transaction.  I therefore believe **GUILLEN** called UM333 to ask if the seller of the firearm would accept a CashApp payment for a firearm.  **GUILLEN** indicated that "the fucking homie," who I believe to be the uncharged individual, had just left Fresno, but could send his paramour to pick up the firearm should the seller agree to accept CashApp as a form of payment.

388.    At 1:24 PM, **GUILLEN** used (559) 508-6409 (TT9) to call the uncharged individual on (559) 934-9745 (TT 9745).  During this call, **GUILLEN** and the uncharged individual discuss other firearms available for purchase within the ENTERPRISE, as well as the "G43X" that the uncharged individual is inclined to purchase. **GUILLEN** told the uncharged individual, that "he said that you guys could CashApp the money" and "how far is your girl from that address right now?" **GUILLEN** then clarified, "835 W. Ashlan Avenue."  the uncharged individual related it was unlikely his girlfriend could make it before the seller had to leave the residence at 1:40 PM, due to the fact that the uncharged individual had to deposit the cash he had on hand in order to transfer any money on CashApp. **GUILLEN** related he would just "tell him [seller] it's not going to be CashApp – it's going to be cash" and that the transaction would take place in a few hours.  Both **GUILLEN** and the uncharged individual agreed and the call ended shortly thereafter.  During this call, I believe that **GUILLEN** was utilizing a second phone to communicate with the seller of the firearm.  This observation is based on the fact that **GUILLEN** was heard during this call reading text messages aloud and sending text messages to the seller while a 2nd phone could be heard periodically making notification sounds that indicated incoming

1   messages were being received.  This belief was corroborated when the investigative team observed (559)

2   508-6409 (TT9) had a lack of transactional data during this call.  This search of transactional data was

3   conducted via a Pen Register Trap and Trace device which was installed on (559) 508-6409 (TT9)

4   pursuant to a court order.

5        389.  Based on my training and experience and the context from the prior calls, I believe

6   **GUILLEN** originally planned to have the uncharged individual send his girlfriend to pick up the firearm

7   from 835 W. Ashlan Avenue in the City of Fresno, while the uncharged individual sent the money via

8   CashApp.  This plan was not completed, and therefore had to be modified to accommodate the purchase

9   of the firearm.

10       390.  At 2:46 PM, **GUILLEN** used (559) 508-6409 (TT9) to call an unknown male (UM333)

11   on (559) 420-3927 (TT 3927).  The following is a transcript of that call:

| | [BEGINNING OF CONVERSATION] |
|---|---|
| UM333 | Hello? |
| **GUILLEN** | Hey, send me the address. |
| UM333 | I'm at my house. |
| **GUILLEN** | Huh? |
| UM333 | My house. |
| **GUILLEN** | Well send me the address. |
| UM333 | Alright. |
| **GUILLEN** | Alright |
| | [END of CALL] |

18       391.  Based on the context of this call, as well as subsequent events, I believe **GUILLEN**

19   contacted UM333 after speaking with the uncharged individual to obtain UM333's location so that

20   **GUILLEN** could in turn relay that information to the uncharged individual to complete the firearm

21   transaction. Though no data was intercepted by the investigative team on TT9, based on my training and

22   experience, I know it is very common for firearms traffickers to communicate with each other using

23   means other than their cellular phones, and therefore believe that this is what happened here.At 4:17

24   PM, the uncharged individual used (559) 934-9745 (TT 9745) to call **GUILLEN** on (559) 508-6409

25   (TT9).  During this short call, the uncharged individual advised he was 20 minutes away.  **GUILLEN**

26   asked the uncharged individual to inform **GUILLEN** when the uncharged individual was 10 minutes

27   away.

28       392.  I believe the uncharged individual called **GUILLEN** to inform **GUILLEN** of the

1  uncharged individuals estimated time of arrival, due the fact that **GUILLEN** would relay this

2  information to the seller of the firearm.  This is significant due to the fact that this call showed that

3  **GUILLEN** brokered this firearm transaction.

4      393.    Immediately following this call, **GUILLEN** used (559) 508-6409 (TT9) to call an

5  unknown male (UM333) on (559) 420-3927 (TT 3927).  During this call **GUILLEN** told UM333 that,

6  "he's 20 minutes away."  Based on the context of the prior call, I believe **GUILLEN** relayed the

7  uncharged individual's current location to facilitate the firearm transaction.

8      394.    At 4:38 PM, **GUILLEN** used (559) 508-6409 (TT9) to call the uncharged individual on

9  (559) 934-9745 (TT 9745).  During this call, the uncharged individual related he was arriving at the

10 seller's location.  **GUILLEN** related he would notify the seller, who **GUILLEN** identified as "the

11 homie from 5th Street," to come outside.

12     395.    I know based on my training and experience that "homie" is a term for a fellow gang

13 member, while "5th street" is the Vario Fifth Street Bulldog criminal street gang within the City of

14 Fresno. Additionally, I know that the word "homie" is generally used when referring to members of

15 one's own gang, and I therefore believe it unlikely that **GUILLEN** would use this word with someone

16 who is not also a Bulldog gang member, as he is at the very least referring to UM333 as a Bulldog gang

17 member. However, the fact that **GUILLEN** said "the homie from 5th Street" is more significant, as it

18 implies that **GUILLEN** knows that the uncharged individual is aware that the phrase "5th Street" in a

19 Bulldog gang clique context refers to the 5th Street Bulldog criminal street gang clique. In other words, I

20 believe **GUILLEN** is effectively identifying UM333 as a member of the 5th Street Bulldog criminal

21 street gang clique and expecting the uncharged individual to understand this fact, which would be

22 unlikely if the uncharged individual were not also a Bulldog gang member. Therefore, I believe that this

23 conversation indicates not only that **GUILLEN** and UM333 are Bulldog gang members, but that the

24 uncharged individual is also a Bulldog gang member and that **GUILLEN** is aware of this fact.

25 Therefore, I believe this call showed that the uncharged individual had arrived at the seller's location,

26 and that **GUILLEN** would contact this fellow gang member to coordinate the sale of the firearm.

27     396.    In May of 2020, **GUILLEN** was arrested for a violation of California Penal Code section

28 30305(b)(1) – A misdemeanor count of possessing ammunition as a member of a criminal street gang,

1  and California Penal Code section 25850(c)(3) – A felony count of possessing a firearm as a member of

2  a criminal street gang. **GUILLEN**, because of this arrest, is aware that it is a Felony in the State of

3  California to possess a firearm as a member of a criminal street gang.

4      397.    Therefore, I believe **GUILLEN** not only knew that this firearm transaction was illegal

5  due to it circumventing the requirements set out in California Penal Code section 27545, but it was also

6  a Felony based solely on the fact that **GUILLEN** was coordinating the purchase of a firearm from

7  Bulldog criminal street gang members, who are prohibited from possessing a firearm per California

8  Penal Code section 25850(c)(3), as **GUILLEN** was arrested for this violation in the year 2020.

9      398.    At 4:43 PM, **GUILLEN** used (559) 508-6409 (TT9) to call the uncharged individual on

10  (559) 934-9745 (TT 9745). During this call, the uncharged individual asked if the seller was wearing a

11  white T-shirt. **GUILLEN** related he wasn't sure, but the seller was named, "the homie Herm" and that

12  those in his company were "the homies from 5th."

13      399.    Based on my training and experience, I know "Herm" from "5th street" to be Herman

14  **VIERA JR**.

15      400.    Members of the investigative team established physical surveillance at 4362 E. Ball

16  Avenue, the address of record for Herman **VIERA JR**. and watched as the uncharged individual arrived

17  in a black Toyota sedan at 4:43 PM. Simultaneously, members of the investigative team observed

18  **VIERA JR**[75] exit the residence wearing a white tank top and carried an object to the uncharged

19  individual who remained in his vehicle. The uncharged individual then left **VIERA JR.'s** residence.

20      401.    At 4:46 PM, UM333 used (559) 420-3927 (TT 3927) to call **GUILLEN** on (559) 508-

21  6409 (TT9). The following is a transcript of the pertinent portions of that call:

| | [BEGINNING of CONVERSATION] |
|---|---|
| **GUILLEN** | Yeah. |
| UM333 | He got it. |
| **GUILLEN** | Alright then, thank you. |
| UM333 | Yup. |
| **GUILLEN** | [UI] appreciate it – um – I'll let you know what comes up over here from our side alright. |
| UM333 | Yup it's good, tap in. |
| **GUILLEN** | Alright then, send my love, thank you. |

[75] **VIERA JR.** was positively identified by his prior booking photograph.

| UM333 | I send mine too. |
| | [END of CALL] |

402.    Based on my training and experience, and the context gathered from the prior call, I believe UM333 confirmed that the sale of the firearm between **VIERA JR**. and the uncharged individual had been completed.

403.    At 4:53 PM, members of the investigative team observed the uncharged individual arrive at the "Dollar General" parking lot located at 1520 N. First Street, Fresno, CA.  The uncharged individual met with an unknown individual who appeared to give the uncharged individual a box containing a chain necklace.

404.    At 5:20 PM, members of the investigative team located the uncharged individual and detained him during a vehicle stop and determined the uncharged individual was the sole occupant of the vehicle.  The uncharged individual was identified by his California driver license.  A probable cause search of the passenger compartment of the uncharged individual's vehicle revealed a Glock Model 43X firearm was stored under the driver's seat of the vehicle.  The firearm was serialized and found to be recently stolen in March of 2025[76].  The uncharged individual was arrested and advised of his rights pursuant to the Miranda decision.  The uncharged individual waived his right to silence and counsel and provided a statement.  The uncharged individual related he obtained the firearm from his aunt who he identified.  The uncharged individual advised he could not remember his aunt's birthday, her phone number or her address nor would that information be on his cellphone. The uncharged individual further advised his aunt got the Glock pistol from the uncharged individual's grandfather, upon him passing away in 2023.  The uncharged individual was asked multiple follow-up questions regarding the source of the firearm, to which he eventually stated, "[he] just wanted to get this over with."  The uncharged individual was subsequently booked into the Fresno County Jail.

405.    On June 12, 2025, Special Agent Kristin Loeffler utilized the specialized training she received from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in the origin and manufacture of firearms to examine a picture of the firearm and confirmed with me that the firearm had been manufactured outside the state of California.

---

[76] Fresno Police Department Case #2503130758.

406.    Based on all of the above, I believe **GUILLEN** brokered the purchase of a firearm between the uncharged individual and **VIERA JR**, knowing that it would be a felony for the uncharged individual to use, carry, or possess that firearm under the laws of the State of California, in violation of 18 U.S.C. § 933(a)(1), and that **VIERA JR**, a convicted felon, knowingly possessed and distributed a firearm in violation of 18 U.S.C. § 922(g)(1).

**E.    Count 6 – LICEA, AYALA, VASQUEZ, and FORNES Conspire to Deal in Firearms without a License and Count 7 - VASQUEZ and FORNES Conspire to Traffic in Firearms**

407.    On May 11, 2025, at approximately 6:59 PM, the investigative team intercepted a call between **VASQUEZ** on (559) 895-2027[77] (TT10) and **Brian FORNES** (**FORNES**) on (559) 742-9396[78] (TT23).

408.    During the call, **VASQUEZ** spoke to **FORNES** about picking up a "chop" in the "C" by the "airport." I know from conducting and working on multiple gang investigations that "chop" is a commonly used slang term by gang members to describe fully automatic firearms, specifically fully automatic rifles. I also know from working this wire investigation that "C" is a shortened version for the town of Coalinga in California. From the call it appears **VASQUEZ** is requesting **FORNES** to go with him to acquire an automatic firearm by the airport in Coalinga. The call then drops.

409.    Several seconds later **VASQUEZ** on (559) 895-2027 (TT10) calls **FORNES** on (559) 742-9396 (TT23) and **VASQUEZ** confirms he would like **FORNES** to pick him up so he can pick up a "chop" by the "airport" where "the helicopters land" out in the "C." **FORNES** agrees to assist **VASQUEZ** and tells him that his won't be ready to go until around 7:30.

410.    On May 11, 2025, a surveillance team was set in Huron, CA to follow **VASQUEZ** and **FORNES** to observe them obtaining a firearm. At 7:40 PM the surveillance team positively identified **VASQUEZ** and **FORNES** at a Chevron gas station located at 36700 Lassen Ave, Huron, CA. The two

---

[77] On March 13, 2025, members of the investigative team established physical surveillance on **VASQUEZ** while calling (559) 895-2027 (TT10).  Simultaneously, the investigative team observed **VASQUEZ** answer his cell phone. Therefore, I believe **VASQUEZ** is the user of (559) 895-2027 (TT10).

[78] On May 11, 2025, members of the investigative team detained **FORNES** at the termination of a vehicle pursuit. **FORNES** provided (559) 742-9396 as the phone number to his cell phone.  Therefore, I believe **FORNES** is the user of (559) 742-9396.

1  were observed in a 2019 Hyundai Elantra, Ohio license plate number KCF5947. The surveillance team

2  observed **FORNES** get into the driver's seat and **VASQUEZ** into the front passenger seat. The Hyundai

3  then drove out of the Chevron parking lot and traveled South on Lassen Ave. Surveillance followed the

4  Hyundai out of Huron and towards Coalinga.

5      411.    On May 11, 2025, at approximately 7:43 PM, the investigative team intercepted a call

6  between **VASQUEZ** on (559) 895-2027 (TT10) and **Jose LICEA (J. LICEA)** on 559-410-2221[79] (TT

7  2221). **J. LICEA** told **VASQUEZ** "that fool" was waiting and told **VASQUEZ** to "bang that shit."

8  Approximately 10 minutes after this call at 7:53 PM **VASQUEZ** on (559) 895-2027 (TT10) placed a

9  call to **J. LICEA** on TT26. **VASQUEZ** confirmed with **J. LICEA** that his was supposed to "grab it and

10  hand this one off?" **J. LICEA** agreed and told **VASQUEZ** to hand off "the box." **J. LICEA** asks if

11  **VASQUEZ** saw the contact and that the contact should be under the bridge. **VASQUEZ** confirmed that

12  he saw a car pulled over under the bridge. **J. LICEA** told **VASQUEZ** to go to that car and tell them that

13  **VASQUEZ** was with him. The surveillance team at this time observed the Hyundai travel to an offroad

14  area underneath Interstate 5 (I5) near South El Dorado Avenue and a dirt extension of Phelps Ave. A

15  few minutes later, **VASQUEZ** on (559) 895-2027 (TT10) received a call from **J. LICEA** on 559-410-

16  2221 (TT 2221). **J. LICEA** told **VASQUEZ** "don't hand it until you pop it" and "don't hand it until you

17  see that it works." **VASQUEZ** confirmed with **J. LICEA** that he wanted him to "load it and shoot it?"

18  **J. LICEA** responded positively and told **VASQUEZ** to ask for "Servando." At approximately 8:09 PM

19  **VASQUEZ** on (559) 895-2027 (TT10) called **J. LICEA** on 559-410-2221 (TT 2221). **VASQUEZ** said

20  that the "fool" put one round in the "AR" right in front of him and shot towards the office. **VASQUEZ**

21  told **J. LICEA** that the AR "smacks." **VASQUEZ** then told **J. LICEA** that he was on his way back into

22  town and they agreed to meet up once **VASQUEZ** was back in town. The surveillance team was able to

23  observe the vehicle that met with **VASQUEZ**, it had a California license plate 8ZBG048 and was

24  registered to Servando **AYALA**, date of birth December 21, 1994, address 389 Jefferson St, Coalinga,

---

26  [79] 559-410-2221 (TT 2221) is subscribed to "Jose Licea." Members of the investigative team have intercepted calls
in which the user of 559-410-2221 is called, "T-Bird." Based on my knowledge of the investigation, I know that "T-Bird" is
27  the moniker used by **Jose LICEA**. On May 4, 2025, **J. LICEA** was detained in a vehicle stop by the investigative team. I
searched the historical precision location data associated with 559-410-2221 (TT 2221) and found 559-410-2221 (TT 2221)'s
28  location data covered the location at which **J. LICEA** had been physically detained at the time. Therefore, I believe J.
**LICEA** is the user of 559-410-2221 (TT 2221).

1    CA.

2    412.    Based on the above conversation, **J. LICEA** appears to have orchestrated a firearms trade

3    or purchase between the seller "Servando," and the buyers **VASQUEZ** and **FORNES**. This is apparent

4    due to the fact that **J. LICEA** seems to be giving step-by-step instructions to **VASQUEZ** on who

5    **VASQUEZ** is meeting, where the meeting is to take place, how to exchange the firearms, and how to

6    test the firearms.  When **J. LICEA** tells **VASQUEZ** to "bang that shit" and "don't hand it until you see

7    that it works," I believe **J. LICEA** is telling **VASQUEZ** to ensure that the firearm worked and was fully

8    functional before he completed the trade. This was confirmed with **VASQUEZ** asks **J. LICEA** if he

9    wants him to "load it and shoot it?" From the conversations above it appeared **VASQUEZ** did have the

10   firearm tested when he told **J. LICEA** "that the "fool" put one round in the "AR" right in front of him

11   and shot towards the office. I know that AR is a common acronym for a an Armalite Rifle or Assault

12   Rifle, in both instances it refers to a rifle. The person who was selling the firearm to **VASQUEZ** appears

13   for have loaded the rifle and fired it in the direction of an office. The surveillance team in the area who

14   were following **VASQUEZ** at the time reported hearing gunshots coming from the direction where

15   **VASQUEZ** and "Servando" were parked. It should be noted that the surveillance personnel were not

16   close enough to determine who was firing the weapon.

17   413.    The investigative team searched the Pen Register Trap and Trace records installed on

18   559-410-2221 (TT 2221) and found that on May 11, 2025, between 3:26 PM and 7:37 PM, **J. LICEA**

19   received 11 calls on 559-410-2221 (TT 2221) from the phone number (559) 403-3241[80] (TT 3241).  T-

20   Mobile was subpoenaed for (559) 403-3241 (TT 3241) and returned subscriber information for

21   Servando **AYALA** with residential address of 389 Jefferson St, Coalinga, CA. With the call timing for

22   **J. LICEA** on 559-410-2221 (TT 2221) to (559) 403-3241 (TT 3241) matching with **J. LICEA** on 559-

23   410-2221 (TT 2221) calling **VASQUEZ** on (559) 895-2027 (TT10), I believe that Servando **AYALA**

24   was the "Servando" involved in the illegal firearms transfer described above.

25   414.    After the firearms transfer was completed, **VASQUEZ** with **FORNES** in the Hyundai

26

27   _____

     [80] I entered (559) 403-3241 into CashApp, a commonly used money sending mobile phone application, which
     indicated that (559) 961-6401 was associated with the account name "servando ayala" and the account handle

28   "$9nty4kidd559." Furthermore, **AYALA** is listed as the subscriber of (559) 403-3241.  Therefore, I believe **AYALA** is the
     user of (559) 403-3241.

started to drive towards Huron. They called **J. LICEA** and asked where he was located. I believe they were bringing the firearm they had just acquired from **AYALA** to **J. LICEA**, which is why **J. LICEA** was coordinating the transfer of the firearm. As they arrived in Huron a traffic stop was conducted by the Fresno County Sheriff's Office. The Hyundai, being driven by **FORNES**, failed to yield and a vehicle pursuit was initiated. During the pursuit **VASQUEZ** on (559) 895-2027 (TT10) called **J. LICEA** on 559-410-2221 (TT 2221) at 8:21 PM and **VASQUEZ** said he "lost the chop." **VASQUEZ** appeared to be short of breath and sounded like he could be running. **VASQUEZ** then told **J. LICEA** "they caught me." At approximately 8:34 PM the Fresno County Sheriff's Office notified the surveillance personnel that two subjects were apprehended from the pursuit of the Hyundai, the two subjects were **VASQUEZ** and **FORNES**. During a subsequent search of the area a rifle was located. The rifle appeared to have been thrown by one of the occupants of the Hyundai.

415.    A Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent utilized their specialized training in the origin and manufacture of firearms to examine a picture of the firearm and confirmed with me that the firearm had been manufactured outside the state of California.

416.    When I reviewed **VASQUEZ**'s criminal history, I observed that he has several previous felony arrests in 2019 and 2021, both for carrying a loaded firearm. When I reviewed **FORNES**' criminal history, I observed that he was arrested in 2019 for carrying a loaded firearm as a gang member. When I reviewed **AYALA's** criminal history, I observed that 2012, **AYALA** had a Felony conviction for selling controlled substances.  I therefore believe that both **VASQUEZ** and **FORNES** were aware that if they possessed the rifle described above, they could be arrested for felony offenses under the laws of the state of California.

417.    Members of the investigative team found that on October 4, 2023, Coalinga Police Department (COPD) was dispatched to an assault with a firearm.  COPD Officers contacted the victim and found that Servando **AYALA** pointed a firearm at the victim.  On October 12, 2023, COPD Officers arrested **AYALA**, and searched his residence pursuant to a search warrant.  COPD Officers located and seized multiple illegal firearms and ammunition during this search.  COPD Case #23-2043 was filed by the Fresno County District Attorney's Office for multiple charges.  Ultimately, the charges were reduced and **AYALA** was convicted of a misdemeanor charge of Penal Code 30605(a) – possession of an assault

weapon.

418.    Based on the fact that **AYALA** is a Felon and has recently had all of his illegal firearms and firearm's accessories removed from his residence by law enforcement, I believe **AYALA** is not simply selling firearms personally owned by him. I believe **AYALA** procured additional firearms after this seizure by Coalinga Police Department and was intentionally circumventing the requirements set out in California Penal Code section 27545[81] during the aforementioned sale of firearms to **FORNES** and **VASQUEZ**.  Furthermore, these beliefs are further corroborated by the fact that **AYALA** was observed advertising the capabilities of these firearms in violation of California Penal Code sections 25850[82] and 246.3[83].

419.    Therefore, I believe that **VASQUEZ** and **FORNES** conspired and attempted to obtain a firearm, the possession of which was a felony under the laws of the state of California, a violation of 18 U.S.C. § 933 (a)(1) and (a)(3). I also believe that **J. LICEA** knowingly conspired with **AYALA** to illegally purchase a firearm, and that **AYALA** did in fact engage in the business of dealing in firearms with **VASQUEZ** and **FORNES**, in violation of 18 U.S.C. § 371 and 922(a)(1)(A).

F.    **Count 8 – QUESADA Illegally Possessed and Distributed a Firearm.**

420.    On May 31, 2025, Jesus **QUESADA**, a convicted felon, illegally possessed and distributed a firearm to O.A.A., an uncharged individual.

421.    On May 31, 2025, between approximately 5:54 PM and 6:29 PM, Jesus **QUESADA**,[84] using (559) 796-3656 (TT27) and an uncharged individual (O.A.A.),[85] using (559) 309-2506 (TT 2506), exchanged the following text messages:

---

[81] Failure to use a licensed firearms dealer for a private party transfer.

[82] Carrying a loaded firearm in public.

[83] Discharging a firearm in public in a grossly negligent manner.

[84] On May 25, 2025, at approximately 3:14 PM, members of the investigative team conducting surveillance observed a male entering a vehicle and positively identified the male as **Jesus QUESADA** based on comparison to a known California Department of Motor Vehicles photograph of **Jesus QUESADA**.  Members of the investigative team followed **QUESADA** and observed that the approximate location of (559) 796-3656 (TT27) was the same as **QUESADA**.  Additionally, (559) 796-3656 (TT27) is subscribed to Jesus Quesada.  I therefore believe that the user of (559) 796-3656 (TT27) is **QUESADA.**

[85] As is set out below, during a traffic stop later that day on a vehicle driven by O.A.A., a phone in O.A.A.' possession began to ring when a member of the investigative team called (559) 309-2506 (TT 2506). I therefore believe that O.A.A. is the user of (559) 309-2506 (TT 2506).

| | O.A.A. | Can we use your piece |
|---|---|---|
| | O.A.A. | ? |
| | O.A.A. | If not it's cool lmk cuz ima be in Lemoore rq |
| | **QUESADA** | Of course you can |
| | **QUESADA** | I'll be home in 5 minutes |
| | O.A.A. | Ok |
| | O.A.A. | Ok |
| | O.A.A. | Close can u come out with it I got to still get my bros lol |
| | **QUESADA** | Ok |

422. Based on my training and experience, I know that the word "piece" is commonly used in criminal street gang culture to refer to a firearm. I also know that the acronym "R.Q." is used in popular culture to refer to the phrase "right quick."

423. Therefore, I believe that in this text message exchange, O.A.A. was asking **QUESADA** if O.A.A. could use **QUESADA**'s firearm, and I believe QUESADA agreed to allow him to do so. I believe that O.A.A. then asked **QUESADA** to come outside when O.A.A. was close to **QUESADA**'s residence.

424. After the initial text messages sent and received in this thread, the investigative team had established surveillance on 640 Kimball Lane, Hanford, CA, a property **QUESADA** owns and which is registered to him with the California Department of Motor Vehicles. At approximately 6:31 PM, a red Chevy SUV was seen pulling up the address. The surveillance team observed **QUESADA** walk up to the vehicle from the residence and then return to the residence.

425. The surveillance team then followed the red SUV and coordinated a traffic stop on the vehicle several minutes later. A Glock 19, serial number BGZD037, chambered in 9 millimeter, was located in the vehicle and O.A.A. was arrested and booked into the Kings County Jail. The following is a picture of the firearm:

///

///

///

///

///

///



426.    During the stop, a team member called (559) 309-2506 (TT 2506), and watched as the phone which had been in O.A.A.' possession began to ring. I therefore believe that O.A.A. is the user of (559) 309-2506 (TT 2506).

427.    A Special Agent with ATF utilized their specialized training in the origin and manufacture of firearms to examine a picture of the firearm and confirmed with me that the firearm had

been manufactured outside the state of California.

428.    Later that evening, at approximately 8:19 PM, an unidentified male (UM597), using (559) 796-5389 (TT 5389) called **QUESADA**, using (559) 796-3656 (TT27). **QUESADA** began the conversation by asking, "Are you guys okay?"  UM597 asked if **QUESADA** had given "Adrian"[86] something, to which **QUESADA** responded, "He asked me for something." UM597 responded, "Well, he got fuckin' pulled over and now he's booked." When UM597 and **QUESADA** continued to discuss the situation, **QUESADA** eventually said that "that shit was extra. You know what I'm talkin' about?" UM597 indicated that he did. The parties then discussed how they believed O.A.A. had lied to them about the circumstances surrounding the matter, after which **QUESADA** said, "Well, that's what he told me. He said, 'I'm in Lemoore, *tio*. Um, can I hold something?' And I said, 'Yes.' Fuck. I don't give a fuck about the toy, but-" The parties then briefly spoke over each other, after which **QUESADA** said, "The thing is- it's, um, extra. And that's not good." UM597 then asked if **QUESADA** thought that O.A.A. would be questioned, and **QUESADA** responded that he did not know but had "wiped it" before he gave "it" to O.A.A.. UM597 then clarified that he wanted to know if O.A.A. had "got one" or was "hiding it" and **QUESADA** responded, "No, no, no. He asked me. Because- remember, you text[ed] me? [UM 597: "Yeah."] And- and then I thought you guys were all goin' together. And [UI] I even said too, 'Are you sure? Because you don't got no tags or none o' that shit." At that point, UM597 indicated that he just wanted to let **QUESADA** know and **QUESADA** responded, "Ok, I'm gonna- yeah, I gotta put something- some stuff away." The parties then spoke about how O.A.A. was in "Kings."

429.    Based on my training and experience, I know that gang members and firearms traffickers commonly speak in vague or innocuous phrases when speaking about firearms in order to attempt to confuse law enforcement and avoid criminal liability for their illegal activity. Here, based on the context of the information set out above, I believe the parties used the words, "something," "shit," and "stuff" to refer to one or more firearms. I also know that it is very common for the same communities to use the word "toy" to refer to a handgun, specifically. Furthermore, I know that the word "extra" is commonly used in street gang circles to refer to a firearm that will yield more evidence if it is examined closely; for

---

[86] It should be noted that name as said by UM597 sounded closer to a name such as "Ayden." However, given the totality of the circumstances, I believe it is clear that he was speaking about O.A.A., as O.A.A.'s middle name is "Adrian."

1    example, if the firearm has been used in a homicide and its casings entered into a national database

2    meant to identify the firearm if it is ever used again, an examination of the firearm from one criminal

3    incident would yield "extra" evidence of other criminal activity. I also know that gang members

4    commonly attempt to remove any of their fingerprints from firearms by wiping them after a firearm has

5    been used in criminal activity. Finally, I know that contraband traffickers take special care to make sure

6    that their vehicle registration is current, as this removes a way for law enforcement to conduct traffic

7    stops on their vehicles and therefore impede their criminal activity. Based on my knowledge of the

8    investigation, I know that O.A.A.' middle name is "Adrian" and that he indicated during the traffic stop

9    that this was the name he uses on a daily basis.

10        430.     Therefore, based on the context of the events set out above, I believe that UM597 had

11    been informed of O.A.A.' arrest and was calling **QUESADA** to ask if **QUESADA** had given O.A.A. –

12    "Adrian" – a firearm. I believe that **QUESADA** acknowledged that he did. When UM597 indicated that

13    O.A.A. had been arrested and then booked into jail, **QUESADA** indicated that he was worried because

14    the firearm had been used in criminal activity and would therefore yield "extra" evidence. I believe that

15    **QUESADA** also indicated that he had wiped the fingerprints off of the firearm before giving it to

16    O.A.A., and that he also had other firearms which he needed to hide, given the fact that this firearm had

17    been brought to the attention of law enforcement. Finally, I believe that **QUESADA** indicated that he

18    had questioned O.A.A. to make sure that his vehicle's "tags," (i.e. registration tags) were current so that

19    ARIAS could not be pulled over.

20        431.     When I reviewed **QUESADA**'s criminal history, I observed that he has been convicted of

21    several felonies, including a 1994 conviction for California Penal Code § 12021(a) – felon in possession

22    of a firearm, 1999 convictions for California Penal Code § 246 – Shooting into an inhabited dwelling

23    and California Penal Code § 245(a)(2) – assault with a firearm upon a person, and a 2001 conviction for

24    California Penal Code § 459 – burglary.

25        432.     Therefore, I believe that on May 31, 2025, **QUESADA**, a convicted felon, illegally

26    possessed and distributed a firearm which had travelled in interstate commerce to Osbaldo O.A.A., a

27    violation of 18 U.SC. § 922(g)(1).

28

1

## III.    CONCLUSION

2      433.    Based on the totality of facts set forth in this affidavit, I believe there is probable cause to

3  believe that the defendants committed the violations as described above.

4      434.    I respectfully request the issuance of arrest warrants for individuals listed above.

5          I declare under penalty of perjury that the facts contained herein are true and correct to the best

6  of my knowledge and belief.

7

8  Ryan Steger, Special Agent
   Federal Bureau of Investigation

9

10 Attested to by the applicant in accordance with
   the requirements of Fed.R.Crim.P. 41.1, by internet/

11 telephone this 23rd day of June, 2025.

12

13

14 The Honorable Stanley A. Boone
   United States Magistrate Judge

15

16
   Approved as to form and substance:

17
   /s/ Antonio J. Pataca

18 Antonio J. Pataca
   Assistant United States Attorney

19

20

21

22

23

24

25

26

27

28

**PENALTY SLIP**

<u>**COUNT 1:**</u>                         **IGNACIO SANCHEZ,**
                                      **AKA "GIDDY";**
**BENNY GONZALES,**
        **AKA "HUERO";**
**RAMONA FELISCIANO;**
**JENNIFER ESCOBEDO;**
**ARMANDO ALFARO,**
        **AKA "WHISPER";**
**LUIS AMARO AGUILAR;**
**CARLY BALBOA;**
**TIMOTHY CHENOT,**
        **AKA "LIL WHISPER";**
**BARBARA DIAZ;**
**SUSANNA GARCIA;**
**AXEL GUEVARA,**
        **AKA "ACTION";**
**CARLOS GUILLEN,**
        **AKA "C-DOG";**
**GILBERTO HERNANDEZ;**
**ANTHONY JEFF;**
        **AKA "ENVY";**
**VICTORIA LIMA;**
**ANGEL SOLORIO LOPEZ,**
        **AKA "RONZO";**
**RICARDO LOPEZ,**
        **AKA "R-DOG";**
**DAMIEN MURPHY;**
**BRIDGETT MURPHY;**
**RICARDO NUNEZ;**
**LAURA PLASENCIA,**
        **AKA "LP";**
**GRACIE PULIDO;**
**DANIEL LOUBET ROMERO,**
        **AKA "TOPO";**
**DEBBIE SANCHEZ;**
**NAUL SANDOVAL;**
**ANGEL SOTO RIOS;**
**RODRIGO RUVALCABA,**
        **AKA "REGAL";**
**VICTOR TAMAYO;**
**LOUIS BONILLA; and**
**CRYSTAL MARTINEZ**

**VIOLATION:**         **Conspiracy to Distribute and Possess with
                        Intent to Distribute Methamphetamine in violation of 21
                        U.S.C. §§ 846, 841(a)(1)**

**PENALTY:**           Mandatory minimum of 10 years in prison and up to life; or
                        Fine of up to $10,000,000; or both fine and imprisonment
                        Supervised release of at least 5 years and up to life
                        $100 Special Assessment (mandatory on each count)


**COUNT 2:**           **RAY PINON, AKA "LIL RAY"**


**VIOLATION:**         **Distribution and Possession with Intent to Distribute
                        Methamphetamine in violation of 21 U.S.C. § 841(a)(1)**


**PENALTY:**           Mandatory minimum of 10 years in prison and up to life; or
                        Fine of up to $10,000,000; or both fine and imprisonment
                        Supervised release of at least 5 years and up to life
                        $100 Special Assessment (mandatory on each count)


**COUNT 3:**           **RAY PINON, AKA "LIL RAY"
                        HEMIR ALONSO FEVELA VELAZQUEZ;**

**VIOLATION:**         **Distribution and Possession with Intent to Distribute
                        Methamphetamine in violation of 21 U.S.C. § 841(a)(1)**

**PENALTY:**           Mandatory minimum of 10 years in prison and up to life; or
                        Fine of up to $10,000,000; or both fine and imprisonment
                        Supervised release of at least 5 years and up to life
                        $100 Special Assessment (mandatory on each count)


**COUNT 4:**           **CARLOS GUILLEN,
                            AKA "C-DOG";**

**VIOLATION:**         **Conspiracy to Traffic in Firearms in violation of 18 U.S.C. §
                        933(a)(1), (2), and (3)**

**PENALTIES:**         Maximum of 15 years in prison,
                        A fine of up to $250,000 fine, or both,
                        A term of Supervised Release of up to three years
                        $100 Special Assessment (mandatory on each count)

| | |
|---|---|
| **COUNT 5:** | **HERMAN VIERA JR.** |

**VIOLATION:** **Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1)**

**PENALTIES:** Maximum of 15 years in prison,
A fine of up to $250,000 fine, or both,
A term of Supervised Release of up to three years
$100 Special Assessment (mandatory on each count)

**COUNT 6:** **SERVANDO AYALA;**
**JOSE LICEA;**
    **AKA "T-BIRD";**
**ALEXANDER VASQUEZ,**
    **AKA "A-DOG";**
**BRIAN FORNES**

**VIOLATION:** **Conspiracy to Deal Firearms Without a License in violation of 18 U.S.C. §§ 371 and 922(a)(1)**

**PENALTIES:** Maximum of 5 years in prison,
A fine of up to $250,000 fine, or both,
A term of Supervised Release of up to three years
$100 Special Assessment (mandatory on each count)

**COUNT 7:** **ALEXANDER VASQUEZ,**
    **AKA "A-DOG";**
**BRIAN FORNES**

**VIOLATION:** **Conspiracy to Traffic in Firearms in violation of 18 U.S.C. § 933(a)(1), (2), and (3)**

**PENALTIES:** Maximum of 15 years in prison,
A fine of up to $250,000 fine, or both,
A term of Supervised Release of up to three years
$100 Special Assessment (mandatory on each count)

**COUNT 8:** **JESUS QUESADA, AKA "ROJO".**

**VIOLATION:** **Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1)**

**PENALTIES:** Maximum of 15 years in prison,
A fine of up to $250,000 fine, or both,
A term of Supervised Release of up to three years
$100 Special Assessment (mandatory on each count)